1
2
3
4
5
6

**UNITED STATES DISTRICT OF ARIZONA**

7
8

William Westley Duncan,
Petitioner

9

-vs-

Charles L. Ryan, *et al.*,
Respondents.

10
11

CV-11-8067-PCT-JAT (JFM)

**Order on Motion for Evidentiary Hearing
and Request for Counsel
and
Report & Recommendation
on Petition for Writ of Habeas Corpus**

12

## I.  MATTER UNDER CONSIDERATION

13
14
15
16

Petitioner, presently incarcerated in the Arizona State Prison Complex at Buckeye, Arizona, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on April 29, 2011 (Doc. 1).  On September 13, 2011, Respondents filed their Answer (Doc. 14).  Petitioner filed a Reply on December 16, 2011 (Doc. 25).

17
18
19

Supplements of omitted exhibits have been filed at Documents 35 and 41, and Respondents supplemented the record with recent state court proceedings on February 8, 2013 (Docs. 45, 46), and December 17, 2014 (Doc. 67).

20
21
22
23

Following a stay to permit exhaustion of state remedies (*see* Order 3/8/13, Doc. 48), Petitioner filed a Supplemental Petition on February 4, 2015 (Docs. 78, 79), to which Respondents filed a Supplemental Response (Doc. 80) on March 6, 2015.  On April 1, 2015, Petitioner filed his Supplemental Reply (Doc. 84).

24
25
26
27
28

On April 2, 2015, Petition filed a Motion for Evidentiary Hearing (Doc. 82) and Motion to Appoint Counsel (Doc. 83).  On May 12, 2015, Respondents responded (Doc. 86) to the Motion for Evidentiary Hearing, and Petitioner replied (Doc. 88) on June 4, 2015.  Because the resolution of these motions is intertwined with the recommended resolution of the Petition, as supplemented, their disposition is included herein.

The Petitioner's Petition, Supplemental Petition, Motion for Evidentiary Hearing and Request for Counsel are now ripe for consideration.  Accordingly, the undersigned makes the following orders and proposed findings of fact, report, and recommendation pursuant to Rule 8(b), Rules Governing Section 2254 Cases, Rule 72(b), Federal Rules of Civil Procedure, 28 U.S.C. § 636(b) and Rule 72.2(a)(2), Local Rules of Civil Procedure.

## II.  RELEVANT FACTUAL & PROCEDURAL BACKGROUND

### A.  FACTUAL BACKGROUND

In disposing of Petitioner's first direct appeal, the Arizona Court of Appeals described the factual background as follows:

> Robert Franz ("Robert") identified defendant as the man who had knocked on the door of his trailer at 11:45 p.m. on July 10, 1998, entered carrying a shotgun, and shot his wife, Elisha ("Elisha"). Robert watched the shooting through a partially open bedroom door, and then ran to a neighbor's house to call 9-1-1. Robert testified he immediately suspected that a drug dealer he knew only as Muggsy, later identified as Michael Isaacs ("Isaacs"), was behind Elisha's murder because she had informed on him. As a result, police had been able to arrest Isaacs, directly in front of Robert and Elisha's trailer, with drugs in his possession. Isaacs thought Elisha had turned him in and had threatened her when he was released from jail.
>
> Bernardo Hernandez testified that he had met defendant while both of them worked at the Cinema Nine movie theater in Laughlin, Nevada. On July 10, 1998, after leaving work at about 9:00 p.m., Hernandez, defendant, and another co-worker went to a party at a home in Bullhead City where Isaacs was staying. Hernandez introduced defendant to Isaacs, and the three men agreed that defendant would drive them to another location where Isaacs could obtain methamphetamine.
>
> During the drive, defendant and Isaacs assured each other that they were both "cool" and could be trusted regarding the drug deal they were about to do. Defendant also told Isaacs that he had killed people during Desert Storm and that doing so had not bothered him. Isaacs then asked defendant if he would kill a "narc" who had informed on him to the police. In exchange, Isaac's offered to provide defendant with all the methamphetamine he wanted, any time he wanted it. Defendant agreed.
>
> Hernandez testified that the three of them returned to the

house where Isaacs was staying so that he could get a pump-type shotgun. They then drove to the trailer where Elisha and Robert lived. Defendant parked his car in the street in front of the trailer and knocked on the door; when a woman answered, defendant raised the shotgun to her head, pushed her inside, and demanded "Where's your man at?" About thirty seconds later Hernandez heard three shots and then saw defendant run back to the car. Hernandez testified that once defendant was inside the car, Isaacs asked defendant, "Did you get him?" Defendant replied by saying something to the effect that "he did the job."

After the murder, the three men drove to the home of one of Isaacs' friends and unsuccessfully tried to get him to hide the shotgun for them. Subsequently, Isaacs threw the weapon into the water under a bridge on the Arizona-Nevada border.

When Hernandez heard police were checking into his employment records in connection with the murder, he had defendant drive him to Mexico. After spending approximately two months in Mexico, Hernandez returned to the United States and told police what had happened allegedly because his conscience was bothering him. A diver subsequently recovered the shotgun near the bridge where Hernandez told police to search.

(Exhibit GG, Mem. Dec. 2/28/02 at 2-4.)[1]

## B. PROCEEDINGS AT TRIAL

### 1. Pre Trial Proceedings

On November 5, 1998, the Mohave County Grand Jury indicted Petitioner and Isaacs on one count of First Degree Murder. (Exhibit A-1, ROA Item 2, Indictment.)[2]

### a. MIL re Petitioner's Priors

The prosecution evidenced an intent to impeach Petitioner with the following prior felony convictions:

---

[1]   Exhibits to the Answer, Doc. 14, are referenced herein as "Exhibit ___" and include the Supplement filed 8/17/12 (Doc. 35), containing the omitted Exhibit LLL.
[2]   Exhibits A-1 through A-5 comprise what Respondents describe as "Photo-stated Instruments."  They consist of the trial court's record on appeal ("ROA"), and are referenced herein by the handwritten numbers on their faces, many of which are partially obscured, and which do not appear to correlate to the trial court's docket numbers. (*See* Exhibit A-1, Doc. 266, Index of Record on Appeal.)   The undersigned strongly discourages the use of such group labeling of exhibits, which greatly complicates referencing the record.

- Burglary (two counts), and Evading Arrest, felony convictions in CR 97-0137, Anderson County, Tennessee, convictions entered on August 22, 1997.
- Burglary, and Theft (two counts), felony convictions in CR 93-000089, Anderson County, Tennessee, convictions entered on February 11, 1994.
- Aggravated Burglary, and Arson, felony convictions in CR 93-000123C, Anderson County, Tennessee, convictions entered on February 11, 1994.
- Aggravated Assault, felony conviction in CR 93-000129, Anderson County, Tennessee conviction entered on February 11, 1994.

(Exhibit A-1, ROA Item 57, Motion in Limine at 2.) Petitioner moved to suppress evidence of his prior felony convictions, or for a limitation on the number used, and the exclusion of the nature of the convictions.   Petitioner argued that the use of the convictions would be unfairly prejudicial, that the failure to limit the number of convictions would deprive him of his federal right to a fair trial, and that the failure to sanitize the nature of the convictions would deprive him of a right to a fair trial. (*Id.* at 2-4.)

The prosecution responded that the priors were sufficiently different in kind from the charged offenses that no prejudice would result, and distinguished Petitioner's authorities as dealing with use of priors in the prosecution's case-in-chief, rather than as impeachment.  (Exhibit A-1, ROA Item 61.)  Petitioner replied that the unfair prejudice was not limited by the stage at which the priors were introduced.  (Exhibit A-1, ROA Item 64.)

The court held that the state could impeach Petitioner with all of his prior felony convictions "which can be identified by name and date of conviction," but noted the potential for a motion for reconsideration.  (Exhibit A-1, ROA Item 79, M.E. 11/30/99, at 2; Exhibit B, R.T. 11/30/99 at 38.)

Petitioner also moved to suppress evidence of his arrests.  (Exhibit A-1, ROA Item 80.)  The motion was granted.  (Exhibit C, R.T.  2/22/00 at 20-21.)

Petitioner then moved for reconsideration on the evidence of prior convictions,

4

seeking specifically to preclude admission of the nature of the convictions for Arson, Aggravated Assault, and Evading Arrest. (Exhibit A-1, ROA Item 81.) The request was denied, but again the court invited a motion for reconsideration. (*See* Exhibit DD, Opening Brief at 43-44 (describing the order as "confusing").)

### b.   Motion to Suppress Identification

Petitioner moved to require the prosecution to provide a photographic lineup used to identify Petitioner. (Exhibit A-1, ROA Item 86.) He also moved to suppress the out-of-court identifications as unduly suggestive, and any in-court identifications as tainted by the out-of-court identifications. (Exhibit A-1, ROA Item 90.)

The request for disclosure of the "ninth" lineup was granted. (Exhibit A-1, ROA Item 102, M.E. 2/22/00.) Eventually, the court denied the motion, finding that the state had shown the procedures were not unduly suggestive. (Exhibit A-1, ROA Item 107, M.E. 3/20/00.)

### c.   Other Motions

Petitioner moved for funds for an expert witness, asking to retain a "qualified criminalist." (Exhibit A-1, Doc. 66.) The motion was granted. (Exhibit A-1, ROA Item 79, M.E. 11/30/99.) Petitioner moved to preclude evidence of co-Defendants guilty plea. (*Id.* at Item 67.) The prosecution responded. (*Id.* at Item 71.) The motion was granted, "except for impeachment in the event the Co-Defendant testifies." (Exhibit A-1, ROA Item 79, M.E. 11/30/99 at 2.) Petitioner moved to have the jury participate in the sentencing phase, citing various federal cases. (*Id.* at Item 68.) The motion was denied. (Exhibit A-1, ROA Item 79, M.E. 11/30/99 at 2.) Petitioner made various *pro se* requests for appointment of an investigator and to review counsel's bills. Those requests were denied. (Exhibit A-1, ROA Item 79, M.E. 11/30/99 at 1.) A voluntariness hearing was held on Petitioner's statements to an officer, and the statements were found to be voluntary. (Exhibit A-1, ROA Item 79, M.E. 11/30/99 at 1-2.) Petitioner moved for

various disclosures, which were granted.  (Exhibit A-1, ROA Item 79, M.E. 11/30/99 at 3.)  Petitioner moved for a specific juror selection procedure.  (Exhibit A-1, ROA Item 91.)  The prosecution opposed various juror questions.  (*Id.* at Item 97.)  Petitioner moved to preclude gruesome or inflammatory photos of the victim.  (Exhibit A-1, ROA Item 94.)  The parties eventually reached a stipulation on the  photos to be admitted, which was adopted by the Court.   (Exhibit A-1, ROA Item 106, M.E. 3/16/00.)  Petitioner moved to suppress information concerning his being a suspect in a burglary investigation.  (Exhibit A-1, ROA Item 96.)  Counsel filed a Motion and Affidavit, advising that he had received a communication from co-defendant offering to testify in Petitioner's favor.  Counsel sought to have co-defendant transported for trial.  (Exhibit A-2, ROA Item 121 & 122.)  The motion was granted.  (Exhibit A-2, Item 123, Order 4/11/00           .)

Petitioner sought out of state subpoenas for witness Arnold Burdett.  (Exhibit A-2, ROA Item 124.)  Mr. Burdett eventually testified.  (Exhibit A-2, ROA Item 181, M.E. 5/2/00 at 2.) Petitioner successfully moved to exclude evidence in the prosecution's case in chief about Petitioner's drug use.  (Exhibit A-2, ROA Item 181, M.E. 5/2/00 at 1.)

**2.  Trial Proceedings**

    **a.   Jury Selection**

Jury selection began on April 20, 2000, with a jury being selected and sworn on April 25, 2000.  (Exhibit A-2, Docs. 152, 153, and 154.)  (*See also* Exhibit F, R.T. 4/20/00; Exhibit G, R.T. 4/24/00; Exhibit H, R.T. 4/24/00 Supplement; Exhibit I R.T. 4/25/00.)

    **b.   Prosecution's Case**

After opening statements (Exhibit K, R.T. 4/26/00), the prosecution presented testimony of: (1) the uncharged participant, **Bernardo (aka Bernie) Hernandez** (Exhibit L, R.T. 4/26/00 at 5-63); (2) the victim's husband, **Robert Franz** (*id.* at 66-

106); (3) first respondent, **Officer Thomas Ferris** (*id.* at 106-139); (4) interviewer of Mr. Franz, **Officer Walt Hemingway** (*id.* at 122-139); (5) scuba specialist and retriever of the shotgun, **Sergeant Don Kramer** (*id.* at 142-150); (6) **Larry Witzig**, who refused to hide the shotgun (Exhibit M, R.T. 4/27/00 at 6 - 24); (7) **Adrienne Stambaugh**, mother of Larry Witzig (*id.* at 24-31); (8) investigating police technician **Virgil Walters** (*id.* at 33-107); (9) medical examiner, **Dr. Donald Nelson** (*Id.* at 108-127); (10) investigating **Detective Steven Underwood** (*id.* at 128-155; Exhibit N, R.T. 4/27/00 at 4-20); (11) lead **Detective Edward Betts** (*id.* at 20-64; Exhibit O, R.T. 5/1/00 at 4-65); (12) DPS **criminalist William Morris** (*id.* at 67-75); (13) **Officer Craig Karinen**, controlling officer of the victim as informant (*id.* at 76-108); (14) **Travis Scroggins**, host of the party where Isaacs and Petitioner met (*id.* at 108-117); and (15) Florida FBI **Agent Christopher Kerr** (Exhibit P, R.T. 5/2/00 at 10-36).[3]

In the midst of the prosecution's case, Petitioner moved for reconsideration of the Court's ruling precluding the defense from cross-examining Hernandez regarding his sales of methamphetamine during the summer of 1998, arguing *inter alia* that the denial violated Petitioner's right of confrontation under the Sixth Amendment to the U.S. Constitution.  (Exhibit A-2, ROA Item 168.)  The motion was denied.  (Exhibit A-2, ROA Item 169, M.E. 5/1/00 at 2.)

The prosecution filed a motion in limine to preclude testimony that Petitioner had been scheduled to work overtime on the day after the murder, arguing that "unless they were the ones that actually scheduled the overtime, it would be hearsay."  (Exhibit A-2, ROA Item 170.)  The motion was denied.  (Exhibit A-2, ROA Item 181, M.E. 5/2/00 at 1-2.)

Petitioner moved for a directed verdict.  The motion was denied.  (Exhibit A-2, ROA Item 181, M.E. 5/2/00 at 2.)

---

[3] Summaries of testimony at trial, sentencing and the evidentiary hearings on postconviction relief are being filed simultaneously with this Report & Recommendation.  The summaries are not intended to be exhaustive, nor to supplant review of the actual transcripts, but to provide an overview of the testimony presented in the state courts.

**c.   Defense's Case**

The parties stipulated that the first newspaper article about the case appeared on Sunday, 12, 1998.  (Exhibit A-2, ROA Item 181, M.E. 5/2/00 at 2.)

In addition, the defense intended to call co-Defendant **Michael (aka Mugsy) Isaacs**, who invoked his Fifth Amendment rights, and thus was not called. (Exhibit A-2, Doc. 155, M.E. 4/26/00 at 3; Exhibit L, R.T. 4/26/00 at 152-154.)

Petitioner presented testimony of: (1) responding **Officer Ryan Poor** who interviewed Franz (Exhibit P, R.T. 5/2/00 at 52 -63); (2) alibi witness, apartment maintenance supervisor **Jerry Daundivier** (*id.* at 64-84); (3) alibi witness, apartment maintenance supervisor **Arnold Burdett** (*id.* at 86-100); (4) alibi witness, apartment maintenance co-worker **Kelly Erickson** (*id.* at 102-123); (5) corroborating alibi witness, apartment maintenance co-worker **Jesus Viera** (Exhibit Q, R.T. 5/3/00 at 5-17); (6) apartment records keeper **Kerri Martin** (*id.* at 17-27); and (7) crime scene analyst **Michael Sweedo** (*id.* at 29-125).

The defense had also identified as witnesses but did not call: Ron Driver, Emory Jobe, Michael Isaacs, Adriana Scroggins, Gracie Cox, and Thomas Vandenberg. (Exhibit A-2, ROA Item 190, Defendant's Witness List.)  Subpoenas had been issued and served on Gracie Cox and Adriana Scroggins.  (Exhibit A-2, ROA Item 172 & 179, Subpoenas and Proofs of Service.)

Finally, although the defense had listed Rusty Britton as a witness, she was not called.  Consequently, the prosecution filed a motion to allow Agent Kerr to testify regarding her statements, but the motion was denied.  (Exhibit Q, R.T. 5/3/00 at 65-76.)

**d.   Conclusion of Trial**

The prosecution presented no rebuttal evidence, and counsel made their closing arguments on May 4, 2000.  (Exhibit R, R.T. 5/4/00.)  The Court then instructed the jury (Exhibit S, R.T. 5/4/00 at 1-17).  The jury retired to deliberate at about 11:00 a.m. (*id.* at 17), made several inquiries of the court (*i.e.* Isaacs convictions, asked for copies of the

8

911 transcript, and the temperature of the jury room) (*id.* at 17-29).  At about 4:00 p.m., the jury returned with a verdict of guilty of first degree murder.  (*Id.* at 29, *et seq.*)  The jury was polled and affirmed the verdict. (*Id.*; and Exhibit A-2, ROA Item 192, M.E. 5/4/00 at 2.)

### e.   Motion for New Trial

Petitioner filed a Motion for New Trial, arguing that the jury's verdict was contrary to the weight of the evidence, and the court had erred in denying a lost evidence instruction under *State v. Willits*, 96 Ariz. 184, 393 P.2d 274 (1964) (regarding the lost measurements of the scene), and that he was entitled to such an instruction under the 14th Amendment to the U.S. Constitution.  (Exhibit A-2, ROA Item 194.)

The motion was argued on July 14, 2000, with defense counsel adding an argument that interviews of the jurors indicated that their verdict was uniquely founded upon their perception of Bernardo Hernandez as a truthful and upright citizen, indicating the harm from the court's exclusion of evidence of his drug selling.   The prosecution argued that the evidence of his selling was solely his own voluntary admission, indicating a propensity for truthfulness.

The court rejected the arguments on Hernandez, finding his drug selling was not directly probative of truthfulness. (Exhibit T, R.T. 7/14/00 at 6.)  While the court opined "I wouldn't have bet my own money on the likelihood of a conviction in this case," due to its dependence upon Hernandez's credibility, it concluded that there was sufficient evidence for the jury to reasonably convict.  (*Id.* at 7.) The court rejected the argument on *Willits,* finding that the absence of the lost evidence did not prejudice Petitioner.  (*Id.* at 8.)  The motion was denied.  (*Id.*)

### f.   Sentencing

Trial counsel sought to and did retain a criminalist to testify at sentencing on blood alcohol effects and a neuropsychologist to testify on the effects of brain damage,

9

and moved for production of jail records.  (Exhibit T, R.T. 7/14/00 at 9-21.)

The defense presented testimony of: (1) Petitioner's girlfriend, **Rusty Britton** (Exhibit U, R.T. 7/25/00 at 3-37); (2) intoxication criminologist **Chester Flaxmayer** (Exhibit V, R.T. 8/28/00 at 3-58); (3) Petitioner's mother, **Joann Sykes** (Exhibit AA, R.T. 12/18/00 at 12-41); (4) Petitioner's investigator **Robert Pelzer** (*id.* at 41-55); (5) evaluating neuropsychologist **Dr. Daniel Blackwood** (*id.* at 55-82); (6) Tennessee parole officer **Carol Cavin**; (*id.* at 84-92); (7) Petitioner's aunt, **Anna Pooler** (*id.* at 97-108); (8) Petitioner's aunt **Alma Long** (*id.* at 109-119); (9) Petitioner's uncle **Edward Duncan** (*id.* at 119-125); (10) Petitioner's sister, **Holly Towey** (*id.* at 129-141); (11) Petitioner's aunt **Chestene Vandenberg** (*id.* at 142-148); (12) Petitioner's father, **Harold Duncan** (*id.* at 149-154); and (13) Petitioner's brother **Austin Duncan** (*id.* at 155-188).

The victim's husband, **Robert Franz** made a statement (Exhibit AA, R.T. 12/18/00 at 155-188), and **Petitioner** made a statement (*id.* at 179-190).

In the midst of the various sentencing proceedings, Petitioner sent a letter to the trial judge asking to represent himself with the assistance of a legal advisor, complaining that trial counsel was refusing to simply argue his innocence at sentencing.  (Exhibit Z, R.T. 12/14/00 at 2.)  Ultimately, Petitioner concluded to proceed with counsel.  (*Id.* at 5.)

On January 24, 2001, the trial court entered its Special Verdict.  The court found a single aggravating factor of: commission while on release.  The court found mitigating factors, including intoxication and impairment from history of substance abuse, family support, and relative sentence of co-defendant in light of his status as the instigator of the crime.  The court found, for purposes of choosing between the death penalty and life in prison, the mitigating circumstances outweighed the aggravating circumstances.  The court found additional aggravating circumstances under Ariz. Rev. Stat. §  13-702(C), and found the circumstances called for denial of the possibility for parole.  (Exhibit A-2, ROA Item 251, Special Verdict.)  A sentence of life without possibility of parole was entered.  (Exhibit A-2, ROA Item 252.) (*See also* Exhibit BB, R.T. 1/24/01.)

10

## C.  PROCEEDINGS ON FIRST DIRECT APPEAL

Petitioner filed a direct appeal, and through counsel argued the following issues:

1.  The court deprived him of his Sixth Amendment right to confrontation by improperly precluding impeachment of the state's primary witness, Hernandez.

2.  The court failed to give a *Willits* lost evidence instruction.

3.  The prosecutor violated his rights to due process by using lost evidence.

4.  The court failed to suppress the identifications.

5.  The court allowed the state to impeach Petitioner with his prior convictions.

6.  There was insufficient evidence.

7.  The court refused to allow impeachment on the state's lack of investigation of exculpatory evidence.

8.  The court considered improper aggravating and mitigating circumstances in imposing a natural life sentence.

(Exhibit DD, Opening Brief.)  (*See also* Exhibit EE Answering Brief; and Exhibit FF, Reply Brief.)

The Arizona Court of Appeals rejected the confrontation clause claim, concluding that the trial court did not abuse its discretion, because of the limits on use of prior bad acts, the other evidence of Hernandez's involvement in drugs, and the unfair prejudice of the evidence.  (Exhibit GG, Mem. Dec. at 7-9.)  The court rejected the *Willits* instruction claim, concluding that Petitioner had not shown prejudice from the lost measurements of the scene.  (*Id.* at 9-12.)  The court rejected the prosecutorial misconduct claim, finding no reliance by the prosecution on "lost evidence."  (*Id.* at 13-14.)  It rejected the claim on impeachment with prior convictions, finding that Petitioner waived the claim by not testifying at trial.  (*Id.* at 14.)  It rejected the pretrial identification claim, finding that the number, configuration, and timing of the photographic lineups made them not unduly suggestive.  (*Id.* at 14-17.) The court rejected the sufficiency of the evidence claim, finding that the testimony of Hernandez and the victim's husband were sufficient to

11

convict.  (*Id.* at 18.)  The Court rejected the claim on impeachment of the investigation, finding no error because the trial court left Petitioner the option of further impeachment after presenting evidence from the purported alibi witnesses.  (*Id.* at 19-20.)  Finally, the Court rejected the attack on the sentence, finding the trial court properly considered and rejected circumstances presented as aggravating or mitigating.  (*Id.* at 20-24.) Petitioner's conviction and sentence were affirmed. (*Id.* at 24.)

Petitioner sought review by the Arizona Supreme Court, solely on the issues of the right of confrontation, and the refusal to give a *Willits* instruction.  (Exhibit HH, PFR at 2.)  The Arizona Supreme Court summarily denied review.  (Exhibit II, Order 9/26/02.)

## D.  PROCEEDINGS ON POST-CONVICTION RELIEF

Following denial of his direct appeal, Petitioner filed a Notice of Post-Conviction Relief on November 21, 2002 (Exhibit A-3, ROA Item 274, Notice.)   Counsel was appointed to represent Petitioner.  (*Id.* at Item 278, M.E. 12/12/02.)    (This PCR proceeding is generally referred to herein as Petitioner's "first" PCR proceeding).

## 1.  Funding of Investigator

Counsel sought funding for or appointment of an investigator (*id.* at Item 283, Motion), which request was denied on the basis that counsel had not proffered sufficient information to support the request, nor shown authority for the request (*id.* at Item 284, M.E. 3/3/03).

Counsel then moved to stay the proceedings to allow time to file a special action to challenge the court's decision (*id.* at Item 291), which was granted.  The Court of Appeals declined jurisdiction over the Special Action, and the deadline for a petition was reset. (*Id.* at Item 294, Mot. To Reinstate; *id.* at Item 300, Order 4/30/03; *id.* at Item 295, M.E. 5/5/03.)

## 2.  Petition

Eventually, on June 2, 2003, Petitioner filed his PCR Petition (Exhibit A-3 at Item 297), asserting ineffective assistance of counsel on the following bases:

1.   Trial counsel failed to interview exculpatory identified witnesses;

2.  Trial counsel was ineffective during jury selection;

3.  Trial counsel was ineffective in cross-examining Hernandez on inconsistencies, reputation for truthfulness, alcoholism and drug abuse, and drug and alcohol impairment;

4.  Trial counsel was ineffective in cross-examining Robert Franz on inconsistencies, and prior bad acts with the decedent;

5.  Trial counsel failed to call various exculpatory witnesses;

6.  Trial counsel failed to argue evidence pointing to Isaacs as the shooter;

7.  Trial counsel failed to advocate for a sentence less than natural life, and failed to object to reliance on improper aggravating circumstances; and

8.  Appellate counsel failed to challenge reliance on improper aggravating circumstances.

(*See also* Exhibit A-3 at Item 298, Appendix (Exhibits A thru J); and Exhibit A-4, Appendix cont. (Exhibits K thru Q).)

The trial court found Petitioner's claims not precluded and set an evidentiary hearing.  (Exhibit A-4 at Item 304, M.E. 7/30/03.)  The hearing was eventually held on November 10, 2003.  (*Id.* at Item 318, M.E. 11/10/03.)

## 3.  Evidentiary Hearing

At the evidentiary hearing, Petitioner presented testimony of: (1) Franz neighbor, **Douglas Johnson** (Exhibit JJ, R.T. 11/10/03 at 10-28); (2) Isaacs' girlfriend, ex-sister-in-law of Travis Scroggins and party host, **Griselda (Gracie) Cox** (*id.* at 29-67); (3) ex-wife of Travis Scroggins and party host, **Adriana (Scroggins) Chavira** (*id.* at 68-83); (4) friend of the victim, **Lisa Sittel-Dailey** (*id.* at 84-107); (5) Petitioner's trial

13

investigator, **Robert Pelzer** (*id.* at 108-117); (6) Petitioner's trial investigator **Richard Eyestone** (*id.* at 118-131); (7) Petitioner's trial counsel **Vincent Iannone** (*id.* at 132-190); and (8) Petitioner's trial counsel **Conrad Baran** (*id.* at 191-250).

**4. Ruling**

The PCR court took the matter under advisement, and on November 20, 2003, issued its ruling denying the Petition on the ineffective assistance claims, finding that:

1. Trial counsel was not defective in jury selection when considering both the written questionnaires and oral *voir dire*.

2. Trial counsel was not defective in failing to interview exculpatory identified witnesses or failing to call various exculpatory witnesses. The court found the affidavits of the witnesses insufficient for consideration and not subject to a presumption of credibility, and that none of the witnesses who testified were credible. The court further found strategic reasons to not call various witnesses.

3. Trial counsel's performance was not defective in cross-examining Hernandez or Franz, and Petitioner failed to show any prejudice.

4. Trial counsel's performance was not defective in failing to argue evidence pointing to Franz as the shooter.

5. Trial counsel's performance was not defective in failing to argue evidence pointing to Isaacs or as the shooter.

(Exhibit A-5, ROA Item 319, M.E. 11/20/03.) The PCR court deferred consideration of the sentencing issues until argument. (*Id.*) Petitioner filed a Motion for Reconsideration, arguing that the court improperly failed to consider the affidavits, and had considered the various instances of deficient performance in isolation (Exhibit A-5, ROA Item 321), which was denied on the basis that the Court had considered the affidavits but found them not credible, and had considered the alleged deficient performance in context (*id.* at Item 325, M.E. 2/10/04.)

Petitioner filed a Supplemental Memorandum arguing that the trial court had erred at sentencing by considering aggravating and mitigating factors outside Ariz. Rev. Stat. § 13-703, and that Petitioner had been acquitted of the death penalty and thus faced a maximum new sentence of natural life.  (Exhibit A-5, ROA Item 324, Supp. Mem.)

**5.  Re-Sentencing**

The PCR court granted the PCR Petition with respect to the claim that trial counsel was ineffective at sentencing for failing to oppose reliance on factors outside § 13-703, and that Petitioner was therefore entitled to be re-sentenced based solely on the permissible factors.  The Court then re-sentenced Petition to natural life, applying a reduced preponderance of the evidence standard to the aggravating circumstances based upon the death penalty no longer being a consideration, and finding the same statutory aggravating factors and the same mitigating factors.  (Exhibit A-5, ROA Item 325, M.E. 2/10/04.)

**6.  Petition for Review**

Petitioner then filed a Petition for Review, arguing that the PCR court erred: (1) in denying Petitioner's request for funding for an investigator; and (2) in rejecting his ineffective assistance of counsel claims concerning jury selection, concerning the investigation and presentation of the defense, etc..  (Exhibit LL.)

**E.  PROCEEDINGS ON SECOND DIRECT APPEAL**

Petitioner also filed a second direct appeal, challenging the new sentence. Petitioner filed through counsel an Opening Brief arguing the sentence should be reduced to life with parole because:

1.   the court used aggravating circumstances not enumerated in Ariz. Rev. Stat. § 13-703(F);

2.   there was no evidence that Petitioner could not be rehabilitated; and

15

3.  the mitigating circumstances outweighed the legitimate mitigating ones.
(Exhibit MM, Opening Brief.)   Petitioner supplemented the brief with a claim that Petitioner was entitled to a jury determination of the aggravating factors under *Blakely v. Washington*, 524 U.S. 296 (2004).

Petitioner successfully moved to consolidate his Petition for Review from his PCR proceeding with the second direct appeal.  (Exhibit NN, Mot. Consol.; Exhibit OO, Order 6/4/04.)

The Arizona Court of Appeals rejected the challenges to sentencing, finding no *Blakely* error because the verdict alone authorized a natural life sentence, but concluded that the PCR court had erred in denying the request for an investigator, vacated that order and remanded to the PCR court with instructions to grant the motion for an investigator and further PCR proceedings.  (Exhibit SS, Mem. Dec. 10/18/05; Exhibit TT, Mandate.)

**F.  PROCEEDINGS ON REMAND**

**1.  Supplemental PCR Petition**

After a series of changes in counsel (Exhibits UU, VV, YY, ZZ, AAA, and BBB), and provision for an investigator, on October 18, 2007, counsel filed a "Supplemental Petition for Post-Conviction Relief" asserting actual innocence based upon two newly discovered witnesses to a confession by Isaacs to being the shooter  (Exhibit CCC). (This is generally referred to herein as Petitioner's "second" PCR proceeding.)

**2.  Evidentiary Hearing**

An initial evidentiary hearing was held on March 14, 2008.  Petitioner presented testimony of PCR investigator **John Pizzi**. (Exhibit GGG, R.T. 3/14/08.)   The inmate witnesses, Isaacs, Allen and Roinuse had not been transported and so the matter was continued.

Co-defendant Michael Isaacs was scheduled to testify, but wrote the PCR judge and advised him that although he had originally agreed to speak with PCR counsel, he

had since changed his mind and did not wish to be involved in Petitioner's proceeding. (Exhibit HHH, Letter 5/18/08.)  On the basis of that letter, the court refused to order Isaacs transported to testify.  (Exhibit III, M.E. 5/23/08.)  Eventually the Court ruled that Isaacs was unavailable to testify for purposes of the hearsay rule.  (Exhibit LLL, R.T. 5/30/08 at 15, 168.)

The continued evidentiary hearing was held on May 30, 2008, and Petitioner presented testimony of inmate **Clayton R Roinuse** (Exhibit LLL, R.T. 5/30/2008 at 19-62),[4] inmate **Jason Allen** (*id.* at 63-81), and **Petitioner William Duncan** (*id.* at 83- 155) was received, and the out of court statements of co-defendant Isaacs (as presented by Roinuse and Allen) were admitted.  (Exhibit JJJ, M.E. 5/30/08; Exhibit KKK, M.E. 5/30/08.)

### 3.  Ruling

After taking the matter under advisement, the PCR court and rejected the actual innocence claim on the basis that even if the witnesses were believed, the truth of the statements attributed to Isaacs were not credible given the prison yard benefits to Isaacs from being known as a killer of an informant. Petitioners' testimony was found to be not credible.  (Exhibit MMM, M.E. 6/12/08.)

The PCR court did not further address the merits of the ineffective assistance claims. (*Id.*) The briefs on the ensuing Petition for Review indicates continued reliance upon the original ruling in the first PCR proceeding on the merits of those claims.  (*See e.g.* Exhibit NNN, Pet. Rev. at 1(again seeking review of the "additional PCR rulings by the trial court dated November 21, 2003") and 16 (arguing trial court denied relief); Exhibit QQQ, Pet. Rev. at 1 (seeking review of "additional PCR rulings in the trial court dated November 21, 2003.)   (*See* Exhibit A-5, ROA Item 319, M.E. 11/20/03, filed 11/21/03 (denying relief on first PCR petition).)

---

[4] Exhibit LLL is filed at Doc. 35.

**4.  Petition for Review**

Petitioner then filed a Petition for Review by the Arizona Court of Appeals, arguing that the actual innocence claim should have been accepted, and trial counsel should have been found ineffective as to jury selection and the investigation and presentation of the defense.  (Exhibit NNN, PFR.)  The state responded on the merits.  (Exhibit OOO, Resp. PFR.) On December 8, 2009, the Arizona Court of Appeals summarily denied review.  (Exhibit PPP, Order 12/8/09.)

Petitioner then sought review by the Arizona Supreme Court, raising the same arguments.  (Exhibit QQQ, PFR.)  That petition was denied on May 21, 2010.  (*See* Exhibit RRR, Motion to Stay at 1.)  **No copies of the order have been provided**.  A stay was granted to permit Petitioner to file a Petition for Writ of Certiorari.  (Exhibit RRR, Order 8/26/10.)

Petitioner did not do so.


**G.  RECENT POST-CONVICTION PROCEEDINGS**

On July 17, 2012, during the pendency of this habeas proceeding, Petitioner commenced his third PCR proceeding by filing with the Mohave County Superior Court a Notice of Post-Conviction Relief, asserting claims for ineffective assistance of counsel.  (Resp. to Amend. Mot. to Stay, Doc. 38 at Attachment D.)   That Notice was dated July 9, 2012.   (*Id.* at 3.)   (This is generally referred to herein as Petitioner's "third" or "recent" PCR proceeding.)

On September 4, 2012, Petitioner filed his PCR Petition, asserting the following grounds for relief:

1.  Actual innocence

2.  Ineffective assistance of trial counsel based on:

   A. Failure to adequately impeach Hernandez

   B. Failure to call Isaacs to testify

   C. Failure to call Rusty Briton to testify

18

D. Failure to call Stephen Greenwood to testify

E. Failure to Call Forensic Expert

F. Failure to impeach victim Robert Franz on life insurance and divorce plans

G. Failure to call Amelia Boston to testify

H. Failure to pursue *Brady* materials

I. Failure to call Brie Rivera to testify

J. Failure to pursue a competency screening

K. Failure to call other witnesses to testify

L. Failure to seek an accomplice liability jury instruction

3. Prosecutorial misconduct

4. *Blakely* violation at sentencing based on judge-found aggravating factor (Supplement to Record, Doc. 45 at Exhibit 1.)   The state responded, addressing the merits of the actual innocence and ineffective assistance claims, and asserting that all but the actual innocence claim was procedurally barred.  (*Id.* at Exhibit 2.)

On January 18, 2013, the PCR court summarily dismissed the Petition, concluding that the actual innocence claim was without merit.  (*Id.* at Exhibit 4, Order 1/18/13 at 2.) The PCR court found that the ineffective assistance of counsel claims "were either finally adjudicated on the merits or were waived in any previous collateral proceedings." (*Id.* at 3.)   The claim of prosecutorial misconduct was deemed "waived" by failure to raise an objection, and ti was not newly discovered evidence.  (*Id.*)  The *Blakely* claim was found to be without merit based upon a record showing the allegedly unsupported aggravating factor was not relied upon.   (*Id.* at 3-4.)   The PCR court rejected the contention that *Martinez v. Ryan*, 132 S.Ct. 1309 (2012) constituted a significant change in the law, because it was inapplicable. (*Id.* at 4.)

On February 21, 2013, Petitioner filed a Petition for Review with the Arizona Court of Appeals.   (Second Supplement, Doc. 67 at Exhibit A.)   In addition to challenging the procedures in the PCR court, Petitioner reasserted his substantive claims

in general terms, *i.e.* although he asserted he had "raised 12 specific instances of IAC in the recent PCR," he did not describe the facts underlying those claims. (*Id.* at 4, and generally.)

On July 2, 2014, the Arizona Court of Appeals issued a Memorandum Decision (*id.* at Exhibit E), finding that the PCR court "correctly concluded the claims raised either were precluded pursuant to Rule 32.2 or were not colorable as exceptions to that rule." (*Id.* at 3.) Consequently, the PCR court's ruling was adopted, and relief was denied. (*Id.*)

Petitioner then sought review by the Arizona Supreme Court (*id.* at Exhibit F), which was summarily denied in an Order filed October 20, 2014 (*id.* at Exhibit H).

## H. PRESENT FEDERAL HABEAS PROCEEDINGS

### 1. Petition

Petitioner commenced the current case by filing his Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on April 28, 2011 (Doc. 1). Petitioner's Petition asserts the following 12 grounds for relief:

> (1)   His Sixth Amendment right to confrontation was violated when the trial court improperly precluded his impeachment of the State's primary witness and when the Arizona Court of Appeals erroneously found no Sixth Amendment violation.
> (2)   Petitioner's due process rights were violated when the trial court "failed to give a *Willits* lost evidence instruction["] to the jury and when the Arizona Court of Appeals erroneously failed to reverse his conviction on this basis.
> (3)   Petitioner's rights to due process and a fair trial were violated when the prosecutor used lost evidence against Petitioner at trial[ ] and when the Arizona Court of Appeals erroneously failed to find a violation of Petitioner's rights to due process and a fair trial based on this basis.
> (4)   Petitioner's due process rights were violated when the trial court "failed to suppress unduly suggestive/tainted identification procedures/identifications" and when the Arizona Court of Appeals erroneously failed to find that the trial court erred in failing to suppress the identifications.
> (5)   Petitioner's rights to due process and a fair trial were violated

because the trial court "erred by allowing the [S]tate to admit [his] prior felony convictions as impeachment if [he] testified at trial" and when the Arizona Court of Appeals erroneously found that Petitioner had waived this issue by not testifying at trial.

(6)     Petitioner's Fifth, Sixth, and Fourteenth Amendment rights were violated because the verdict was based on insufficient evidence and because the Arizona Court of Appeals erroneously failed to reverse on this basis.

(7)     Petitioner's Fifth, Sixth, and Fourteenth Amendment rights were violated when the trial court "abused its discretion by improperly preventing [Petitioner] from impeaching the homicide detective with the [S]tate's lack of investigation into potentially exculpatory evidence" and when the Arizona Court of Appeals failed to find that the trial court abused its discretion.

(8)     Petitioner's Fifth, Sixth, and Fourteenth Amendment rights were violated because the trial court "abused its discretion when it denied [Petitioner's] Motion for Appointment of Investigator or Funding for an Investigator" and because the Arizona Court of Appeals erroneously declined to accept special action jurisdiction and forced Petitioner to "conduct post-conviction preparations without an investigator."

(9)     His Sixth and Fourteenth Amendment rights were violated because he received ineffective assistance of counsel.

(10)    His Fifth, Sixth, and Fourteenth Amendment rights were violated because the trial court "relied on improper aggravating circumstances and abused its discretion when it sentenced [Petitioner] to natural life." Petitioner also contends that he is entitled to a new sentencing hearing before a jury.

(11)    Petitioner's Fifth, Sixth, and Fourteenth Amendment rights were violated because the trial court "abused its discretion by denying [Petitioner's] Supplemental Petition for Post-Conviction Relief after an evidentiary hearing that asserted [Petitioner's] actual innocence."

(12)    Petitioner's constitutional rights were violated because the trial court "abused its discretion by denying [Petitioner's] Supplemental [Petition for Post-Conviction Relief] after [a] hearing that asserted [Petitioner's] trial counsel provided ineffective assistance of counsel."

(Order 5/5/11, Doc. 6 at 2-3.)

**2.  Response**

On September 13, 2011, Respondents filed their original Answer (Docs. 14, 15, 16, 17, 18, 19, and 20).  Respondents argue:

1.  Ground One (Confrontation) is without merit.  (Doc. 14 at 80-81.)

2.  Ground Two (Lost Evidence Instruction) was not fairly presented, is procedurally defaulted and is without merit. (*Id.* at 81-101.)

3.  Ground Three (Prosecutor Misconduct) is without merit.  (*Id.* at 101-109.)

4.  Ground Four (Identifications) is without merit. (*Id.* at 109-132.)

5.  Ground Five (Impeachment of Petitioner) was procedurally barred under an independent and adequate state wavier ground.  (*Id.* at 132-138.)

6.  Ground Six (Insufficient Evidence) is without merit.  (*Id.* at 138-142.)

7.  Ground Seven (State's Investigation) is partially procedurally defaulted and is without merit.  (*Id.* at 142-147.)

8.  Ground Eight (Investigator) is partially procedurally defaulted and is without merit.  (*Id.* at 147-161.)

9.  Ground Nine (Ineffective Assistance) is addressed in 9 subparts: [5]

    a.  Ground 9A (Investigation) is without merit.  (*Id.* at 161-176.)

    b.  Ground 9B (Jury Selection) is without merit.  (*Id.* at 176-187.)

    c.  Ground 9C (Impeachment of Hernandez) is without merit.  (*Id.* at 187-205.)

    d.  Ground 9D (Incrimination of Franz) is without merit.  (*Id.* at 205-213.)

    e.  Ground 9E (Exculpatory Witnesses) is partially procedurally defaulted and is without merit.  (*Id.* at 213-215.)

    f.  Ground 9F (Closing Arguments) is procedurally defaulted and without merit.  (*Id.* a 215-221.)

    g.  Ground 9G (Sentencing) is procedurally defaulted, and is without merit.  (*Id.* at 221-224.)

    h.  Ground 9H (Appellate Counsel) is procedurally defaulted, and is without merit.  (*Id.* at 224-228.)

---

[5] Petitioner denominates the subparts as number 1 through 8 and adds his cumulative errors argument at the end.  The undersigned adopts Respondents' more consistent labeling.

i. Ground 9I (Cumulative Errors) is procedurally defaulted and is without merit.  (*Id.* at 229-234.)

10. Ground Ten (Sentence) is partially non-cognizable and the balance is without merit.  (*Id.* at 234-249.)

11. Ground Eleven (Actual Innocence) is without merit.  (*Id.* at 249-156.

12. Ground Twelve (Ineffective Assistance) is either duplicative or procedurally defaulted.  (*Id.* at 256-257.)

**3.  Reply**

Petitioner filed his original Reply (Doc. 25) on December 16, 2011.  Petitioner argues that he is entitled to an evidentiary hearing.  (*Id.* at 2-7.)  He also addresses the substance of the Answer.  (*Id.* at 7-29.)

**4.  Stay of Proceedings**

On August 8, 2012, Petitioner filed an Amended Motion to Stay (Doc. 32), seeking to stay consideration of the Petition to permit him to exhaust state remedies on additional claims to be added by amendment or on the basis of the motion.  On March 8, 2013, the Court adopted the Report & Recommendation (Doc. 47) of the undersigned magistrate judge, and granted a stay.  (Order 3/8/13, Doc. 48.)  That stay remained pending until November 13, 2014, following the denial of Petitioner's Petition for Review by the Arizona Supreme Court. (Order 11/13/14, Doc. 64.)

Respondents have supplemented the record to include these recent proceedings. (Docs. 45/46, 67.)

**5.  Supplemental Petition**

On January 23, 2015, the Court granted (Doc. 76) Petitioner leave to file a supplement to his petition to assert the new claims proffered in his Amended Motion to Stay.   On February 4, 2015, Petitioner filed his Supplemental Petition (Docs. 78, 79).

Petitioner's Supplemental Petition asserts the following additional grounds for relief:

1.  Actual Innocence

2. Ineffective Assistance of trial counsel based upon: (A) failure to impeach Hernandez (and use the impeaching evidence at sentencing) and (F) Franz, failure to call (B) Isaacs, (C) Briton, (D) Greenwood, (E) a forensic expert, (G) Boston, and (I) Rivera, failure to pursue (H) *Brady* material, (K) other witnesses, and (L) an aiding and abetting instruction.

3.  Cumulative error.

**6.  Supplemental Response**

On March 6, 2015, Respondents filed their Response (Doc. 80) to the Supplemental Petition.  Respondents argue:

1.  Supplemental Ground 1 (actual innocence) is without merit;

2.  Supplemental Grounds 2 (ineffective assistance) and 3 (cumulative error) are untimely;

3.  Supplement Ground 2 (ineffective assistance) was barred on independent and adequate state grounds, and the claims are without merit and thus PCR counsel was not ineffective for failing to raise them;

4.  Supplemental Ground 3 (cumulative error) is procedurally defaulted.

**7.  Supplemental Reply**

On April 1, 2015, Petitioner filed his Supplemental Reply (Doc. 84) in support of his Supplemental Petition.  Petitioner argues:

1.  Respondents have misstated the procedural history and mischaracterized his claims;

2. His actual innocence claim has merit;

3.  His supplemental claims are not barred by the statute of

1    limitations; and

2         4.  His claims are not procedurally barred or procedurally defaulted.

3

4    **8.  Motion for Evidentiary Hearing and Request for Counsel**

5         At the time of filing his Supplemental Petition, Petitioner filed his Motion for

6    Evidentiary Hearing (Doc. 82) and Motion to Appoint Counsel (Doc. 83).  Petitioner

7    seeks an evidentiary hearing on the merits of his claims, his assertions of actual

8    innocence, and the ineffectiveness of PCR counsel in failing to raise the claims of

9    ineffective assistance of trial counsel.  Petitioner seeks appointment of counsel, citing as

10   cause his untrained, *pro se* status, limited legal resources, and the likelihood of his

11   success on the merits of his claims.

12        The Court directed a response to the Motion for Evidentiary Hearing (Order

13   4/27/15, Doc. 85).  Respondents filed their Response (Doc. 86) on May 12, 2015, and

14   Petitioner filed his Reply (Doc. 88) on June 4, 2015.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.  APPLICATION OF LAW TO FACTS

## A.  MOTION FOR EVIDENTIARY HEARING

### 1.  Arguments

**Petitioner's Arguments** – Petitioner has consistently sought an evidentiary hearing in this matter.   His pending arguments arise from his Petition, Reply, Supplemental Petition, Supplemental Reply, Motion for Evidentiary Hearing, and Reply in Support of Motion for Evidentiary Hearing.

In his original **Reply** in support of his original Petition, Petitioner argues that he is entitled to an evidentiary hearing because he asserted colorable claims and the state courts have not reliably found relevant facts after a full and fair hearing.  (Doc. 25 at 3.) Petitioner argues that he was not permitted the opportunity to develop his ineffective assistance and actual innocence claims in Ground 9, 20, 11 and 12, and this Court cannot make credibility determinations without conducting a hearing.  (*Id.* at 4.)  In particular, Petitioner complains that the state courts ruled on his PCR petitions "without forcing the state to call the co-defendant Michael C. Isaacs, who is the self-admitted actual killer in this case, to testify."  (*Id.*)  He argues "this Court must consider the confession testimony of Isaacs and reopen the proceedings to allow the petitioner to present the testimony of the witnesses the state court prevented him from presenting during his IAC Rule 32 evidentiary hearings."  (*Id.* at 6-7.)  Petitioner does not identify any specific witnesses, however, other than Isaacs.  (*See also id.* at 26 (intent to call Isaacs).)

In Ground 1 (actual innocence) of his **Supplemental Petition**, Petitioner requests an evidentiary hearing and argues that his most recent PCR petition was denied without any evidentiary hearing. Petitioner does not proffer, however, any indication of the evidence to be adduced.  (Supp. Petition, Doc. 78 at 5-6.5.)   In connection with Supplemental Ground 2, Petitioner requests an evidentiary hearing so he can call his trial, appellate and PCR counsel to testify.  Petitioner does not suggest, however, what testimony he expects them to offer. (*Id.* at 5-7.3 – 7.4.)  Petitioner further argues that he would call appellate counsel Jill Evans, PCR counsel David Goldberg, co-defendant

Michael Isaacs, inmate Sean Gaines and inmate Jason Ellis to "'prove' my IAC claims and my actual innocence." (Supp. Petition, Doc. 78 at 5-7.17.)   Petitioner argues that the Court cannot determine whether a reasonable strategic decision was made without a hearing. (*Id.*)  Petitioner argues that PCR counsel David Goldberg is expected to testify "consistent with his statements to the Arizona Justice Project volunteers that he "missed" all of these new IAC issues and will offer no valid reason (factual, strategic, or otherwise) for not identifying and raising these new claims." (*Id.* at 5-11-B.)

In his **Supplemental Reply**, Petitioner argues that this Court should permit unspecified discovery and hold an evidentiary hearing to address his claims of "cause" under *Martinez v. Ryan*. (Doc. 84 at 4, 11, 14, 17.)  Petitioner again complains that Isaacs has never testified, and thus his demeanor could not have been observed and his credibility adequately assessed by the state courts. (*Id.* at 8.)

In his 22 page **Motion for an Evidentiary Hearing** (Doc. 82), Petitioner again argues that the state fact finding processes were inadequate, he has established colorable claims, he has diligently sought evidentiary hearings in the state courts, and therefore he is entitled to an evidentiary hearing. (*Id.* at 1-2, 10-12, 13-15.)  He restates his various arguments regarding his actual innocence (*id.* at 3-9), and cause under *Martinez v. Ryan* (*id.* at 9-10). He argues 28 U.S.C. § 2254(d) is inapplicable to the claims in his Supplemental Petition because they were not adjudicated on the merits, but on procedural grounds. (*Id.* at 11, 15-16, 18, 20-21.)  He argues that 28 U.S.C. § 2254(e) does not prevent him from having an evidentiary hearing, and the presumption of correctness does not render a hearing superfluous. (*Id.* at 16-18, 20-21.)  He reiterates his expectation that PCR counsel Goldberg would testify about missing Petitioner's new claims of ineffective assistance. (*Id.* at 13.)   He argues a hearing is necessary to evaluate the state court's determination of Isaacs's credibility and motives to lie in his confession. (*Id.* at 18-20.)

**Respondents' Arguments** – In their 46 page Response (Doc. 86) to the Motion for Evidentiary Hearing, Respondents incorporate by reference their Response (Doc. 28)

to Petitioner's first Motion for an Evidentiary Hearing (Doc. 26), and pages 55 through 63 of their Supplemental Response (Doc. 80).

Respondents argue that 28 U.S.C. § 2254(d)(1) and (e)(2) preclude an evidentiary hearing and/or any new evidence with regard to Petitioner's original Grounds 9 (Ineffective Assistance) and 11 (Substantive Actual Innocence).  Respondents argue that Petitioner cannot complain about the absence of testimony from Isaacs because Petitioner had the opportunity to, and attempted to, present testimony from Isaacs, but did not exercise due diligence in doing so.

Respondents argue an evidentiary hearing is unnecessary because a confession by Isaacs would not establish Petitioner's actual innocence, Petitioner's new IAC claims may be resolved by referencing the existing record, testimony from the newest inmate witnesses (Ellis and Gaines) would not prove Petitioner's actual innocence.

Respondents argue that the failure to identify additional information beyond potential testimony by PCR counsel Goldberg indicates no evidentiary hearing is warranted.  Respondents further argue that Petitioner fails to show what Goldberg's testimony would be, and has offered differing reports of what he told Arizona Justice Project volunteers.

Respondents argue that AEDPA provides the standard for whether an evidentiary hearing is permissible, that Petitioner's new claims of ineffective assistance of counsel are time barred or procedurally defaulted, and Petitioner failed to develop the record for his IAC counsel claims in his first PCR proceeding.

Respondents argue that the quality of a state court's fact finding processes is not relevant to deciding whether an evidentiary hearing is available on a claim decided by the state courts on the merits.

**Petitioner's Reply** – In his Reply (Doc. 88) on the Motion for Evidentiary Hearing, Petitioner argues that he requested an evidentiary hearing in his original Petition (Doc. 1), his Reply (Doc. 25), his original Motion for Evidentiary Hearing (Doc. 26), and his second Motion for Evidentiary Hearing (Doc. 73), and such requests were

28

not limited to specific grounds for relief.  (Doc. 88 at 8-9.)  Petitioner requests that all of his requests be considered collectively.

Petitioner repeats his legal arguments that the Court should exercise its discretion to hold an evidentiary hearing, and argues that he sought evidentiary hearings in state court by filing his PCR notices and PCR petitions, which were dismissed on procedural grounds. (*Id.* at 10-11.)   He argues he has proffered clear and convincing evidence of his actual innocence, and the state courts resolved the issue without testimony from Isaacs, and based on incorrect determinations regarding prison culture.  (*Id.* at 11-12.)

Petitioner again argues that testimony from PCR counsel Goldberg is necessary to resolve his new IAC claims.  (*Id.* at 12-13.)

## 2.  Request to Conduct Discovery

To the extent that the Court might discern a request to conduct discovery in Petitioner's filings, the undersigned finds the request unsupported.

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course."  *Bracy v. Gramley*, 520 U.S. 899, 904 (1997).  "Rather, discovery is available only in the discretion of the court and for good cause shown."  *Rich v. Calderon*, 187 F.3d 1064, 1068 (9th Cir. 1999).  *See also Campbell v. Blodgett*, 982 F.2d 1356, 1358 (9th Cir. 1993); and Rules Governing Section 2254 Cases, Rule 6. The court should allow discovery when it is "essential" to the full development of a petitioner's claim. *Pham v. Terhune,* 400 F.3d 740, 743 (9th Cir.2005). Discovery is essential when it "may well" uncover "favorable, material information" that would tend to support the claim. *Id.*

Here, the Court cannot find that any discovery is essential because Petitioner fails to offer any suggestion what kinds of discovery he would undertake, what he would hope to discover, and how it would be favorable or material to his claims.

Moreover, Petitioner has had substantial opportunities and resources to investigate and pursue potential claims, including representation on appeal, representation in PCR

1  proceedings aided by a court funded investigator, and assistance in these proceedings by

2  learned relatives and the Arizona Justice Project.  This suggests that Petitioner's generic

3  request for discovery is simply a fishing expedition.

4          Accordingly, any such request for discovery will be denied.

5

6  **3.  Applicable Law**

7          Petitioner relies upon *Earp v. Ornoski*, 431 F.3d 1158 (9th Cir. 2005), for the

8  proposition that, having made out colorable claims he is entitled to an evidentiary

9  hearing, particularly where the state court failed to conduct an evidentiary hearing.  That

10  is generally true.

11              Accordingly, where the petitioner establishes a colorable claim for
              relief and has never been afforded a state or federal hearing on this
12              claim, we must remand to the district court for an evidentiary
              hearing. In other words, a hearing is required if: "(1) [the defendant]
13              has alleged facts that, if proven, would entitle him to habeas relief,
              and (2) he did not receive a full and fair opportunity to develop
14              those facts [.]"

15  *Id.* at 1167. "In showing a colorable claim, a petitioner is 'required to allege specific

16  facts which, if true, would entitle him to relief.'" *Id.* at 1167, n.4.

17          But *Earp* is addressed to the cross section between the rules applicable to the

18  necessity of a habeas court holding an evidentiary hearing, and the limits on its authority

19  to do so.  As discussed hereinafter, decisions since *Earp* demonstrate that the *Earp*

20  decision painted with broad strokes which glossed over the exact lines of both necessity

21  and authority.

22

23          **a.   Necessity of an Evidentiary Hearing**

24          Indeed, the general rule concerning habeas evidentiary hearings was set out long

25  ago, before AEDPA, in *Townsend v. Sain*, 372 U.S. 293 (1963).[6] Except as modified by

26  ───────────────
[6] *Townsend* was overruled by *Keeney v. Tamayo–Reyes*, 504 U.S. 1 (1992) to the extent
27  that *Townsend* applied a "deliberate bypass" standard for excusing failure to develop a
material fact in state court, adopting in its place the standard of "cause and prejudice."
28  That portion of *Keeney* has since been superseded by the adoption of 28 U.S.C. §
2254(e)(2). *See Williams v. Taylor,* 529 U.S. 420, 434 (2000).

AEDPA, "[t]hat basic rule has not changed."  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

> We hold that a federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances: If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Townsend*, 372 U.S. at 313.  Moreover, *Townsend* leaves intact the district court's discretion to conduct an evidentiary hearing in other circumstances.

It is important to note that *Townsend* does not require a habeas evidentiary hearing every time the state court failed to conduct an evidentiary hearing, but rather only when "the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing."  A full hearing does not always require an evidentiary hearing.  The two terms are not synonymous. "The judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decision making in all circumstances." *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976).

*Earp* uses language which suggests that (ignoring for the moment the limits on *authority* for a hearing) an evidentiary hearing is a necessity every time a petitioner alleges a colorable claim.  Two years later, however, in *Schriro v. Landrigan*, 550 U.S. 465 (2007), the Supreme Court made clear that the requirement is not so automatic. "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."  *Id.* at 474.  Indeed, the *Landrigan* court noted that the Ninth Circuit (and other circuits) has long applied such a rule.  *Id.* (quoting *Totten v. Merkle*, 137 F.3d 1172, 1176 (1998)).  *See also Hibbler v. Benedetti*, 693 F.3d 1140, 1148 (9th Cir. 2012) ("We begin with the rule that no such hearing is required '[i]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief.' ").

Synthesizing these cases, the following can be said:   Before an evidentiary hearing may be held, a petitioner must assert a colorable claim.  In the *Townsend* situations, an evidentiary hearing would normally then be required, and otherwise it is discretionary.  But in any situation, no hearing is required if the existing record refutes the claim.

Finally, a bald request for an evidentiary hearing need not be granted.   "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."  *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).  Where a petitioner does not proffer any evidence to be adduced at an evidentiary hearing which would prove the allegations of the petition, the habeas court need not grant a hearing.  *Chandler v. McDonough*, 471 F.3d 1360, 1363 (11th Cir. 2006)  ("The failure to proffer any additional evidence defeats [petitioner's] argument that he was entitled to an additional evidentiary hearing in federal court.");  *Williams v. Bagley,* 380 F.3d 932, 977 (6th Cir.2004) ("district court did not abuse its discretion in denying Williams's request, given his failure to specify ... what could be discovered through an evidentiary hearing"); *Lincecum v. Collins,* 958 F.2d 1271, 1279–80 (5th Cir.1992) (denying evidentiary hearing "[a]bsent any concrete indication of the substance of the mitigating evidence" the hearing supposedly would provide).

Moreover, mere conclusory statements in a habeas petition are insufficient to require a habeas evidentiary hearing. *United States v. Hearst*, 638 F.2d 1190, 1194 (9th Cir.1980), *cert. denied*, 451 U.S. 938 (1981).

### b.   Authority for an Evidentiary Hearing: Limits from the AEDPA

Even if an evidentiary hearing would ordinarily be required or at least discretionary, the AEDPA imposes several limitations on the authority of the habeas court to conduct such a hearing.  "Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those

32

standards in deciding whether an evidentiary hearing is appropriate." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).

"Although state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so. Provisions like §§ 2254(d)(1) and (e)(2) ensure that '[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.'" *Cullen v. Pinholster*, 131 S. Ct. 1388, 1401 (2011) (quoting *Michael Williams v. Taylor,* 529 U.S. 420, 437 (2000)).   In his limited concurrence in *Pinholster*, Justice Alito predicted:  "Under AEDPA evidentiary hearings in federal court should be rare." *Pinholster*, 131 S. Ct. at 1411 (2011) (Alito, J., concurring in part).

### (1).  Deference to State Court Decisions: 28 U.S.C. § 2254(d)

First, the habeas court must take into account the limitations on habeas relief under 28 U.S.C. § 2254(d)(2).  That provision precludes habeas relief on a "claim that was adjudicated on the merits in State court proceedings" unless either: (1) the decision was significantly legally flawed; or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

**Legal Challenges** - With regard to the former, the petitioner must show that the state court decision was an unreasonable application of or contrary to state law.   28 U.S.C. § 2254(d)(1).   Under this prong, the habeas court's review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).  "It would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court." *Id.* at 1399.  Thus no evidentiary hearing (or other new evidence) may be considered for a claim governed by § 2254(d)(1).

**Factual Challenges** - The latter limitation concerns assertions of error directly

attacking a state court's fact-finding, "Challenges under § 2254(d)(2) fall into two main categories. First, a petitioner may challenge the substance of the state court's findings and attempt to show that those findings were not supported by substantial evidence in the state court record. Second, a petitioner may challenge the fact-finding process itself on the ground that it was deficient in some material way." *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012).

With regard to the latter, one way of showing a deficient fact-finding process is to demonstrate that no evidentiary hearing was held.  But that is not always sufficient.  "But we have never held that a state court must conduct an evidentiary hearing to resolve every disputed factual question; such a per se rule would be counter not only to the deference owed to state courts under AEDPA, but to Supreme Court precedent." *Hibbler*, 693 F.3d 1140, 1147 (9th Cir. 2012) (citing *Landrigan,* 550 U.S. at 476.)  "A state court's decision not to hold an evidentiary hearing does not render its fact-finding process unreasonable so long as the state court could have reasonably concluded that the evidence already adduced was sufficient to resolve the factual question." *Id.*  "A state court need not hold an evidentiary hearing when it would not afford relief even assuming the defendant's allegations were true." *Gulbrandson v. Ryan*, 738 F.3d 976, 991 (9th Cir. 2013).

In *Hibbler*, the Ninth Circuit identified one type of determination that might require an evidentiary hearing to be reasonable: resolving a "'credibility contest'" between witnesses where there was corroboration of the petitioner's position in the record. 693 F.3d at 1147 (citing *Earp,* 431 F.3d at 1169–70 & n. 8).

Although cast in terms of a "credibility contest," a more appropriate term might be a "demeanor contest." *See* Hon. James P. Timony, *Demeanor Credibility*, 49 Cath. U.L. Rev. 903, 907 (2000) (identifying demeanor as only one means to assess credibility).   There are a variety of ways to assess credibility, *e.g.* "the witness's opportunity and capacity to observe and relate to the event, and his …bias, character, and any prior inconsistent statements…contradiction of, or support for, a witness's version of

1  events by other evidence, and the plausibility of the witness's version", *id.*, that don't

2  depend upon the fact finder observing the witness.

3        Thus, under § 2254(d)(2), the failure of the state court to conduct an evidentiary

4  hearing might render its factual determinations unreasonable, and thus a basis for habeas

5  relief.   In such an instance, an evidentiary hearing may not only be necessary, but

6  authorized.

7

8                **(2).  Presumption of Correctness: 28 U.S.C. § 2254(e)(1)**

9        Second, the habeas court must take into account the presumption of correctness

10  under 28 U.S.C. § 2254(e)(1).   Under that provision, "a determination of a factual issue

11  made by a State court shall be presumed to be correct…[and the] applicant shall have the

12  burden of rebutting the presumption of correctness by clear and convincing evidence."

13        Thus, for example, even where a petitioner's allegations depend on a credibility

14  determination that would ordinarily require a hearing to resolve, the habeas court may

15  forego such hearing if the facts supporting the claim (even with the credibility

16  determination made in petitioner's favor) would not amount to clear and convincing

17  evidence.  *See Clark v. Johnson,* 202 F.3d 760, 767 (5th Cir. 2000) (cited approvingly in

18  *Landrigan,* 550 U.S. at 474-75).

19        Two things bear keeping in mind.  First, this limitation only applies to factual

20  determinations actually made by the State courts.  Second, where deference under 28

21  U.S.C. § 2254(d) applies, even clear and convincing evidence may not be relied upon to

22  rebut the state court finding.  *Taylor v. Maddox,* 366 F.3d 992, 1000 (9th Cir. 2004).  *But*

23  *see* Means, *Postconviction Remedies § 28:3* (The deference standard – The relationship

24  between § 2254(d)(2) and (e)(1)) (noting dispute between circuits, and Supreme Court's

25  declination to resolve the dispute to date).

26

27                **(3).  Failure to Develop: 28 U.S.C. § 2254(e)(2)**

28        Finally, the habeas court must take into account the absolute prohibition on

1  evidentiary hearings in 28 U.S.C. § 2254(e)(2).  Under this section, "the court shall not
2  hold an evidentiary hearing" if the petitioner "has failed to develop the factual basis of a
3  claim in State court proceedings."  28 U.S.C. § 2254(e)(2).

4        It is important to note, however, that § 2254(e)(2) is limited to evidentiary
5  hearings on "a claim" and does not apply to other relevant evidentiary matters, *e.g.*
6  establishing cause and prejudice to excuse a procedural default, etc.  *Dickens v. Ryan*,
7  740 F.3d 1302, 1321 (9th Cir. 2014).

8        **Bar Applies to Any New Evidence** – "Those same restrictions [under 28 U.S.C.
9  § 2254(e)(2)] apply *a fortiori* when a prisoner seeks relief based on new evidence
10  *without* an evidentiary hearing."  *Holland v. Jackson*, 542 U.S. 649, 653  (2004). Thus,
11  "the conditions of § 2254(e)(2) generally apply to Petitioners seeking relief based on
12  new evidence, even when they do not seek an evidentiary hearing."  *Cooper-Smith v.*
13  *Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005) (citing *Holland*).   Thus, where the
14  habeas court cannot conduct an evidentiary hearing, it also may not consider other forms
15  of new evidence, e.g. affidavits, records, etc.) which were not before the state courts.

16        **Failure to Develop** – "Under the opening clause of § 2254(e)(2), a failure to
17  develop the factual basis of a claim is not established unless there is lack of diligence, or
18  some greater fault, attributable to the prisoner or the prisoner's counsel."  *Williams v.*
19  *Taylor*, 529 U.S. 420, 432  (2000). "Federal courts sitting in habeas are not an alternative
20  forum for trying facts and issues which a prisoner made insufficient effort to pursue in
21  state proceedings."  *Id.* at 437.

22        "Diligence will require in the usual case that the prisoner, at a minimum, seek an
23  evidentiary hearing in state court in the manner prescribed by state law."  *Id.  See also*
24  *Bragg v. Galaza*, 242 F.3d 1082, 1090 (9th Cir. 2001) (finding a failure to develop where
25  no evidentiary hearing was requested).   "Diligence…depends upon whether the prisoner
26  made a reasonable attempt, in light of the information available at the time, to investigate
27  and pursue claims in state court; it does not depend…upon whether those efforts could
28  have been successful."  *Williams*, 529 U.S. at  435.

Nonetheless, diligence must be evaluated in light of the applicable state procedures.  For example, failure to request an evidentiary hearing may be excused where a state petition is summarily dismissed before the time for requesting such a hearing. *Horton v. Mayle*, 508 F.3d 570, 582 n. 6 (9th Cir. 2005).  On the other hand, where a petitioner fails to assert facts or available evidence in support of his state evidentiary hearing request sufficient to justify the grant of a hearing, he will not be found to have been diligent.  *Dowthitt v. Johnson*, 230 F.3d 733 (5th Cir. 2000) (finding no diligence where relevant and available affidavits of family members were not presented with state request).   Thus, where a state evidentiary hearing was not held, a petitioner who failed to avail himself of an opportunity to present available evidence by way of affidavit, etc. may be found to have "failed" to develop a factual record.  *Baja v. Ducharme*, 187 F.3d 1075 (9th Cir. 1999).  *See also Lopez v. Ryan,* 630 F.3d 1198, 1206 (9th Cir. 2011) (lack of diligence when key evidence not submitted with Arizona PCR petition as required by Ariz. R. Crim. P. 32.5).

A petitioner's attorney's "fault" is generally attributed to the petitioner for purposes of § 2254(e)(2)'s diligence requirement.  *Dickens v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014).

**Exceptions Related to Innocence** – Despite a failure to develop the facts in state court, Section 2254(e)(2) permits an evidentiary hearing on claims under new law or newly discovered facts, but only if "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  28 U.S.C. § 2254(e)(2)(B).  Not every claim of innocence will trigger this exception.  Rather, the claim of innocence must be founded upon the facts underlying the claim.  And, there must be some constitutional error shown.

Moreover, one of two explanations for the failure to develop the state record must be shown: new law, or new facts.

New Law Exception – Section 2254(e)(2)(A)(1) permits the innocence exception

37

to apply where the claim relies on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable."

New Facts Exception - Section 2254(e)(2)(A)(2) permits the innocence exception to apply where the claim relies on "a factual predicate that could not have been previously discovered through the exercise of due diligence." This exception permits an evidentiary hearing on claims establishing innocence despite a lack of diligence, "if efforts to discover the facts would have been in vain." *Williams v. Taylor*, 529 U.S. 420, 435 (2000).

**4. Application to Proffered Evidence**

Petitioner proffers only four types of evidence to be adduced at an evidentiary hearing: (1) Isaacs' confession to demonstrate Petitioner's actual innocence; (2) testimony from inmates Ellis and Gaines to support that claim; (3) evidence regarding prison life to refute the conclusion that Isaacs had motivation to lie about his committing the murder; and (4) PCR counsel Goldberg's expected admission that he "missed" Petitioner's new, supplemental claims of ineffective assistance of trial counsel.

Thus, even though Petitioner seeks an evidentiary hearing on all of his claims, the only claims for which he has supported that request with a proffer of evidence, are original Ground 11 (actual innocence), Supplemental Ground 1 (actual innocence), and Supplemental Ground 2 (ineffective assistance of trial counsel) (and indirectly, therefore Supplemental Ground 3 (cumulative error). In addition, the evidence proffered regarding Petitioner's actual innocence would be relevant to his assertions of procedural actual innocence to excuse his any statutorily barred, or procedurally defaulted claims.

**a. Testimony of Isaacs**

Petitioner proffers testimony of Isaacs. Petitioner seems to presume that Isaacs will testify to being the murderer. Petitioner proffers nothing, however, to suggest that Isaacs will so testify. The record suggests he will not, including his refusal to testify at

1  trial, and the failure to Petitioner to present Isaacs as a witness to the state courts.

2  Nonetheless, the undersigned presumes for purposes of this Report & Recommendation

3  that Isaacs would testify that he was the murderer.

4

5  **(1).  Deference to State Court Decisions: 28 U.S.C. § 2254(d)**

6  The state courts have twice before considered Petitioner's assertions of actual

7  innocence, in his second and third PCR proceedings.   As discussed hereinafter,

8  Respondents do not contend that Petitioner has failed to properly exhaust and has now

9  procedurally defaulted his state remedies on his claims of actual innocence.  (*See infra*

10  Section III(D)(2) (Application of Exhaustion).   Accordingly, the undersigned will

11  hereinafter proceed to the merits of those claims.  (*See infra* Section III(S) (Substantive

12  Actual Innocence).)

13  However, the deference under 28 U.S.C. § 2254(d) only applies if the state court

14  actually decided Petitioner's federal claim of actual innocence on the merits.

15  Petitioner's federal claim of actual innocence was not decided on the merits.  In

16  his PCR petition, Petitioner asserted that he was "entitled to relief under Rule 32.1(h)"

17  based upon his offered "clear and convincing evidence" of his actual innocence.

18  (Exhibit CCC, Supp. PCR Petition at 10.)  Petitioner did not assert that his continued

19  detention was a violation of federal law.  At best, Petitioner cited several federal cases to

20  illustrate a clear and convincing case of actual innocence.  (*Id.* at 10-11 (discussing

21  *Sawyer* v. *Whitley,* 505 U.S. 333, 341 (1992) and *Carriger* v. *Stewart,* 132 F.3d 463 (9th

22  Cir. 1997)).)  Petitioner regurgitated the same arguments in his Petition for Review to the

23  Arizona Court of Appeals, (Exhibit NNN, Pet. Rev. at 14-15), and his Petition for

24  Review to the Arizona Court of Appeals (Exhibit QQQ, Pet. Rev. at 9.)  The PCR court

25  addressed the claim only under Arizona Rule 32.1(h), (Exhibit MMM, Order 6/12/08),

26  and the appellate courts summarily denied review (Exhibit PPP, Order 12/8/09; Exhibit

27  MMM, Mot. Stay).

28  Petitioner's citations to *Sawyer* and *Carriger* were not adequate to cast his claims

39

of actual innocence as a federal one.  *Sawyer* did not deal with a substantive claim of actual innocence, but a procedural one asserted for purposes of obtaining leave to file a second or successive habeas petition or to obtain review of a procedurally defaulted claim.  *Sawyer*, 505 U.S. at 335.  In contrast, Petitioner's Ground 11 (and Supplemental Ground 1) asserts free-standing claims of substantive actual innocence.  *Carriger*, on the other hand, did address a claim of substantive actual innocence.  However, Petitioner cited *Carriger* to the PCR court and Arizona Court of Appeals solely for the proposition that confessions to other inmates could establish actual innocence.  (Exhibit CCC, PCR Pet. at 10-11; Exhibit NNN, Pet. Rev. at 14-15.)  He cited *Carriger* to the Arizona Supreme Court solely for the proposition that his claims of actual innocence "under Rule 32.1(h) should be addressed based on all of the exculpatory evidence.  (Exhibit QQQ, Pet. Rev. at 9.)

The PCR court addressed this claim solely under Rule 32.1(h).  (Exhibit MMM, Order 6/12/8 at 2.)  That was the last reasoned decision.

With regard to Supplemental Ground 1, Petitioner again asserted his claim of actual innocence in his most recent PCR proceeding solely under Arizona Rule of Criminal Procedure 32.1(h).  (*See* Supp. Records, Docs. 45/46, Appendix 1, PCR Pet. at 2-3.)  (*Cf. id.* at Appendix 2, PCR Response at 15.)  The PCR court addressed it solely on that state law basis.  (*Id.* at Appendix 4, Order 1/18/13 at 2.)  Petitioner argued the issue to the Arizona Court of Appeals solely as an abuse of discretion.  (2nd Supp. Records, Doc. 67, Appendix A, PCR Pet. Rev. at 2-4.)

Thus, it cannot be said that the Arizona courts had before it federal claims of actual innocence.[7]

---

[7] Arguably, therefore, Petitioner has failed to exhaust his state remedies with regard to his claims of substantive actual innocence, and has now procedurally defaulted on them. However, Respondents have not argued that the claims are procedurally defaulted.  (*See* Answer, Doc. 14 at 249-256; Supplemental Answer, Doc. 80 at 17-22.)  "Procedural default, like the statute of limitations, is an affirmative defense. We therefore …hold that the defense of procedural default should be raised in the first responsive pleading in order to avoid waiver." *Morrison v. Mahoney*, 399 F.3d 1042, 1046 (9th Cir. 2005).  *See Franklin v. Johnson,* 290 F.3d 1223, 1231 (9th Cir. 2002) (28 U.S.C. § 2254(b)(3)'s

Accordingly, the limitations of 28 U.S.C. § 2254(d) do not apply to Petitioner's actual innocence claims, including the requirement that the decision be "an unreasonable determination of the facts."  Accordingly, this habeas court need not account for those restrictions in evaluating whether Petitioner can be granted an evidentiary hearing on his actual innocence claims.

### (2).  Failure to Develop: 28 U.S.C. § 2254(e)(2)

On the other hand, the state courts need not have addressed Petitioner's federal claim of actual innocence on the merits for the limitations of 28 U.S.C. § 2254(e)(2) to apply.

On the day the PCR evidentiary hearing was originally scheduled, PCR counsel Goldberg represented to the PCR court that he believed Isaacs was willing to testify in Petitioner's behalf, and obtained a continuance to present his testimony (as well as the other inmates who had been scheduled to testify, but had not been transported).  (Exhibit GGG, R.T. 3/14/08 at 5-6, 9.)  Eventually, the PCR court issued a subpoena and an order to transport Isaacs for a hearing, but Isaacs eventually wrote the Court and indicated he would refuse to talk about Petitioner.  (Exhibit HHH, Letter from Isaacs.)  Consequently, the court declined to have Isaacs transported.  (Exhibit III, Order 5/23/08.)   At the continued hearing, the PCR court observed:

> There was previously an order for the  transporting of codefendant Isaacs to this hearing to  give testimony, and he recently sent me correspondence saying he refused to talk -- to speak with anybody about anything that Duncan is doing, which I unilaterally  interpreted to mean he was refusing to testify.
> And so I, for security reasons,  primarily, and cost reasons, since the county and the State and much of the nation are in financial straits, I  ordered that he not be brought back here, at least for  today.
> And so because of that ruling, I realize there is now going to be legal argument about whether he is legally unavailable for purposes of the hearsay exception rules and whether his statements to others in or around the prison will be admissible under the hearsay exceptions.

requirement for an explicit waiver of exhaustion "has no bearing on procedural default defenses").

41

(Exhibit LLL, R.T. 5/30/08 at 5.) PCR counsel Goldberg then argued that Isaacs was "unavailable" for purposes of exceptions to the hearsay rule, based upon Isaacs' previous refusals to testify, and implications that he was asking to be transported solely to facilitate visitation with family. (*Id.* at 6-8.) Goldberg concluded: "So it's clear from his letter and his previous conduct that he's refusing to testify and he's unavailable." (*Id.* at 8.) The state then argued that the proper interpretation of Isaacs' letter to the court was simply that he refused to talk to Goldberg, not that he refused to testify. (*Id.* at 8-11.) The PCR court concluded by agreeing to conditionally accept the hearsay testimony from the other witnesses, subject to evidence that Isaacs really would have testified:

> THE COURT: … I'm going to allow the State to try to pursue, whether by written interrogatory or whatever method you want in the words that you would choose, Isaacs to say -- to clearly say I will if you make me, or I won't even if you try to make me testify. And then I'm going to give -- I'm going to accept the testimony, subject to other rules of evidence, of course, today, under that theory provisionally, and then give you a chance to pursue that before I end up ruling on the petition. And then if it turns out that I -- you convince me to change my decision, I just won't consider the evidence that I heard under the -- this ruling today.

(*Id.* at 15.)   (*See also* Exhibit JJJ, M.E. 5/30/08 at 1.)   Ultimately, however, the prosecution conceded the issue:

> THE COURT: All right. I had provisionally ruled that the proposed witness Michael Isaacs was unavailable for today. And subject only to the State trying to pursue evidence to the contrary.
>         And your final answer on that is that you're not going to pursue Michael Isaacs?
>         MR. CARLISLE [for the State]: Your Honor, I would just want to have this hearing done and over with, so if you want to rule that he's unavailable, that's fine. I think I already stated on the record that I thought we should have called him up here and had him say that.
>         I do want to correct one thing. And I was going back through the trial, and I think I did err.[8] Because I know that I never prepared a cross-examination of Michael Isaacs, so I knew that he was never going to testify at the trial.

(Exhibit LLL, R.T. 5/30/08 at 168.)

At a minimum, Petitioner neglected to press the PCR court to enforce its

---

[8] The State had earlier argued that Isaacs had not been called by the defense to testify at trial because the prosecution threatened to impeach him with the jailhouse letter he had written to Petitioner.

subpoena to Isaacs.   Arguably, however, Petitioner made the tactical decision to take advantage of the prosecution's willingness to concede Isaacs unavailability without resolving his willingness to testify.   By doing so, Petitioner obtained admission of the Isaacs hearsay without running the risk of actually calling Isaacs to testify with the potential that he would deny committing the murder.   (That tactical decision is understandable given Isaacs' expressed unwillingness to "talk" about the case ahead of time, leaving PCR counsel unable to ascertain what his testimony would be.)

Under these circumstances, the undersigned concludes that Petitioner failed to develop the factual basis of his claim of actual innocence, at least insofar as it relates to Isaacs' testimony.

Having reached that conclusion, this Court must determine whether, notwithstanding that failure, Petitioner may nonetheless present Isaacs' testimony. Section 2254(e)(2) would permit the testimony only if "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."   28 U.S.C. § 2254(e)(2)(B).   For the reasons discussed hereinafter with respect to Petitioner's procedural and substantive claims of actual innocence, the undersigned cannot find such clear and convincing evidence.  (*See infra* Sections III(R) and (S).)

Moreover, Petitioner's claim of actual innocence does not rely on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable."   28 U.S.C. § 2254(e)(2)(A)(1).

Nor has Petitioner proffered anything to suggest that his claim of actual innocence relies on "a factual predicate that could not have been previously discovered through the exercise of due diligence."   28 U.S.C. § 2254(e)(2)(A)(2).   Petitioner's contention since the early stages of trial has been that he is innocent and Isaacs committed the murder.   At the time of his PCR proceeding, Petitioner had not only the purported knowledge of, but access to the ability to discover Isaacs' testimony by insisting on enforcement of the

subpoena.  *Cf. Ford v. Gonzalez*, 683 F.3d 1230, 1235 (9th Cir. 2012) (defining factual predicate under habeas statute of limitations).   (*See infra* Section III(C)(2)(b)(2) (discussing distinction between evidence and factual predicates).)

Even if the testimony of inmates Gaines and Ellis (Isaacs' latest confidants) were deemed to be the factual predicate of his claim of actual innocence, Petitioner has failed to develop Isaacs' testimony as the factual basis for his claim because Petitioner did nothing in his latest PCR proceeding to present Isaacs' testimony.  Petitioner made no suggestion to the PCR court that Isaacs' testimony, if subpoenaed, would support his claim of actual innocence.  (Supp. Record, Doc. 45/46, Appendix 1, PCR Pet. at 2-3.)  At best, Petitioner simply requested an evidentiary hearing.  (*Id.* at 21.)

Therefore, Petitioner is precluded under 28 U.S.C. § 2254(e)(2) from an evidentiary hearing to present testimony of Isaacs in support of his claim of substantive actual innocence.

On the other hand, that does not preclude Petitioner from seeking an evidentiary hearing for purposes of supporting his assertion of procedural actual innocence.  *See Detrich v. Ryan*, 740 F.3d 1237, 1247 (9th Cir. 2013) (§ 2254(e)(2) does not apply to hearings on cause and prejudice to excuse procedural default).


### (3).  Presumption of Correctness: 28 U.S.C. § 2254(e)(1)

In disposing of Petitioner's Supplemental PCR Petition, the PCR court made a series of factual findings which are entitled to a presumption of correctness in this proceeding.  These include the finding that inmates Roinuse and Allen were credible in their testimony that:

> Isaacs reaps benefits within the prison inmate culture, especially those in white supremacy gangs, by claiming to have killed an informant. Not only does Isaacs gain some measure of respect and authority over others by these statements, but he reduces the risk of being victimized himself by other inmates. As I mentioned at the close of the last hearing, Isaacs appears to be a person who needs all the protection he can muster.

(Exhibit CCC, Order 6/12/08 at 2.)   It also  includes  the  finding  that  Petitioner's

testimony about the events of the night of the murder was not credible.  "Aside from his numerous felony convictions, the self-reported substance abuse that night would have rendered him unable to clearly perceive, remember or recite the activities off that time period with the detail he provides." (*Id.*)

In addition, in disposing of Petitioner's most recent PCR petition, the PCR court found:  "the fact that Isaacs is demanding payment of $25,000.00 in exchange for this testimony makes him even less credible, were that even possible." (Supp. Records, Doc. 45/46 at Appendix 4, Order 1/18/13.)

Those credibility determinations are entitled to a presumption of correctness.


### (4).  Mandatory Hearing: *Townsend*

Petitioner argues that a hearing is required because the PCR court in his latest PCR proceeding failed to conduct an evidentiary hearing on his claim of actual innocence.  In essence, Petitioner argues that the sixth *Townsend* condition applies, "it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing." *Townsend*, 372 U.S. at 313.

But Petitioner fails to show what additional evidence an evidentiary hearing would have placed before the PCR court.  At best, Petitioner suggests the Court should have permitted Petitioner to call his witnesses to permit the Court to examine their demeanor.  But the only witnesses Petitioner proffered on his actual innocence claim were inmates Gaines and Ellis.  However, the PCR court did not question the credibility of these inmates.  To the contrary, the PCR court "[a]ssum[ed] *arguendo* that Ellis and Gaines are believable." (Supp. Records, Doc. 45/46 at Appendix 4, Order 1/18/13 at 2.) Petitioner argues that the PCR court should have examined Isaacs' demeanor.  But Petitioner had not suggested to that court that Isaacs would testify to his own guilt.

Thus, the only new evidence that Petitioner proffered to the PCR court, that court assumed to be credible.  In such circumstances, an evidentiary hearing had nothing to add, and the hearing via the briefs was adequate to afford a "full and fair fact hearing."

Any complaint that the PCR court did not conduct an adequate hearing on Petitioner's claims of actual innocence in his Supplemental PCR petition must be rejected because the only then potential testimony Petitioner has pointed to which was not before the court was that of Isaacs.   But as discussed hereinabove, Petitioner effectively waived having Isaacs testify.

Accordingly, the undersigned concludes that Petitioner is not entitled to a mandatory hearing under *Townsend*.


### (5).  Discretionary Hearing

To the extent that this Court could conclude that it retains discretion to hold an evidentiary hearing, the undersigned finds that such a hearing would not be of benefit to the resolution of the issues herein for the following reasons.

First, as discussed hereinafter in resolving Petitioner's claims of procedural actual innocence, even if it is assumed that Isaacs would testify to his own guilt, and to do so with a credible demeanor, the other evidence of Petitioner's guilt, particularly when coupled with the presumptively correct findings by the state courts, would preclude a finding that Petitioner has made the requisite high showings of his actual innocence.

Accordingly, no evidentiary hearing need b granted to hear Isaacs' confession first hand.


### b.   Testimony of Ellis and Gaines

Petitioner seeks an evidentiary hearing to present testimony from inmates Ellis and Gaines about Isaacs' confessions to the murder, in order to support his claim of actual innocence.


### (1).  Deference to State Court Decisions: 28 U.S.C. § 2254(d)

As discussed hereinabove with regard to the Isaacs testimony, the undersigned concludes that the Arizona courts did not decide Petitioner's federal claim of actual

innocence on the merits.  Accordingly, the limitations of 28 U.S.C. § 2254(d) do not apply, including the requirement that the decision be "an unreasonable determination of the facts."  Accordingly, this habeas court need not account for those restrictions in evaluating whether Petitioner can be granted an evidentiary hearing on his actual innocence claims.

### (2).  Failure to Develop: 28 U.S.C. § 2254(e)(2)

As discussed hereinabove, the undersigned has concluded that Petitioner failed to develop the factual basis of his claim of actual innocence, at least insofar as it relates to Isaacs' testimony. Assuming that this results in a finding that Petitioner failed to develop the factual basis of the entire claim of actual innocence, Petitioner is precluded under 28 U.S.C. § 2254(e)(2) from an evidentiary hearing to present any testimony in support of his claim of substantive actual innocence.

On the other hand, that does not preclude Petitioner from seeking an evidentiary hearing to present this evidence for purposes of supporting his assertion of procedural actual innocence.  *See Detrich*, 740 F.3d at 1247.

### (3).  Presumption of Correctness: 28 U.S.C. § 2254(e)(1)

The factual findings of the state court regarding Petitioner's assertions of actual innocence, as discussed hereinabove with regard to Isaacs' testimony, would equally apply to any testimony from inmates Ellis and Gaines.

### (4).  Mandatory Hearing: *Townsend*

A discussed hereinabove with respect to the Isaacs testimony, the PCR court "[a]ssum[ed] *arguendo* that Ellis and Gaines are believable."  (Supp. Records, Doc. 45/46 at Appendix 4, Order 1/18/13 at 2.)  Petitioner does not suggest what else would have been added by conducting an evidentiary hearing to hear Gaines and Ellis testify.

Accordingly,  the  undersigned  concludes  that  Petitioner  is  not  entitled  to  a

47

mandatory hearing under *Townsend*.

### (5).  Discretionary Hearing

To the extent that this Court would conclude that it retains discretion to hold an evidentiary hearing to elicit testimony from Ellis and Gaines, the undersigned finds that such a hearing would not be of benefit to the resolution of the issues herein for the following reasons.

First, the PCR court assumed the credibility of Ellis and Gaines.  Moreover, as discussed hereinafter in resolving Petitioner's claims of procedural actual innocence, the undersigned presumes that these inmates are credible.  Accordingly, Petitioner proffers nothing to be added by having them testify at an evidentiary hearing.  Moreover, the other evidence of Petitioner's guilt, particularly when coupled with the presumptively correct findings by the state courts, would preclude a finding that Petitioner has made the requisite high showings of his actual innocence.

### c.   Testimony Regarding Prison Life

The next category of evidence Petitioner proffers for an evidentiary hearing concerns the relevant motivations of a prisoner like Isaacs to lie about having killed a snitch.  Petitioner points to no witness available to testify on such matters, and accordingly, the undersigned concludes that Petitioner would intend to offer his own testimony on such issues.

### (1).  Deference to State Court Decisions: 28 U.S.C. § 2254(d)

As discussed hereinabove with regard to the Isaacs, Ellis and Gaines testimony, the undersigned concludes that the Arizona courts did not decide Petitioner's federal claim of actual innocence on the merits.  Accordingly, the limitations of 28 U.S.C. § 2254(d) do not apply, including the requirement that the decision be "an unreasonable determination of the facts."  Accordingly, this habeas court need not account for those

48

restrictions in evaluating whether Petitioner can be granted an evidentiary hearing on his actual innocence claims.

### (2).  Failure to Develop: 28 U.S.C. § 2254(e)(2)

As discussed hereinabove, the undersigned has concluded that Petitioner failed to develop the factual basis of his claim of actual innocence, at least insofar as it relates to Isaacs' testimony. The same is true with respect to evidence concerning the motivations of prisoners to lie about killing a snitch.  Petitioner proffered no evidence, beyond cross-examination of his own witnesses, to establish such motivations.

Assuming that this results in a finding that Petitioner failed to develop the factual basis of the entire claim of actual innocence, Petitioner is precluded under 28 U.S.C. § 2254(e)(2) from an evidentiary hearing to present any testimony in support of his claim of substantive actual innocence.  Under these circumstances, the undersigned concludes that Petitioner failed to develop the factual basis of his claim of actual innocence, at least insofar as it relates to prison life testimony.

Moreover, as discussed hereinabove with respect to the Isaacs testimony, the undersigned cannot find clear and convincing evidence of Petitioner's actual innocence to meet the requirements of 28 U.S.C. § 2254(e)(2)(B).   Further, for the reasons discussed hereinabove, the undersigned concludes that Petitioner's claim of actual innocence does not rely on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable," 28 U.S.C. § 2254(e)(2)(A)(1), nor on "a factual predicate that could not have been previously discovered through the exercise of due diligence."   28 U.S.C. § 2254(e)(2)(A)(2). Moreover, particularly with regard to any prison life testimony, Petitioner offers nothing to suggest that he was unaware that such testimony would be relevant.  Counsel in his Supplemental PCR proceeding could reasonably be expected to anticipate such an attack on Isaacs' confessions.

Therefore, Petitioner is precluded under 28 U.S.C. § 2254(e)(2) from an

1   evidentiary hearing to present testimony on prison life in support of his claim of
2   substantive actual innocence.

3         On the other hand, that does not preclude Petitioner from seeking an evidentiary
4   hearing to present this evidence for purposes of supporting his assertion of procedural
5   actual innocence. *See Detrich*, 740 F.3d at 1247.

6
7               **(3).  Presumption of Correctness: 28 U.S.C. § 2254(e)(1)**

8         The factual findings of the state court regarding Petitioner's assertions of actual
9   innocence, as discussed hereinabove with regard to Isaacs' testimony, would equally
10  apply to any testimony regarding prison life.  Moreover, the state court concluded that
11  inmates Allen and Roinuse were credible in testifying about such matters.  Petitioner
12  proffers nothing to suggest that any new testimony, whether from Petitioner or some
13  undisclosed source, would be more credible than Allen and Roinuse, such that it would
14  constitute clear and convincing evidence sufficient to overcome the existing finding on
15  this issue.

16
17              **(4).  Mandatory Hearing: *Townsend***

18        Petitioner never proffered any specific testimony to the state courts in his recent
19  PCR proceeding to counter the testimony of Allen and Roinuse on prison life.  Thus,
20  Petitioner cannot contend that the fact finding process based on the briefs was
21  inadequate.  Accordingly, the undersigned concludes that Petitioner is not entitled to a
22  mandatory hearing on this matter under *Townsend*.

23
24              **(5).  Discretionary Hearing**

25        To the extent that this Court would conclude that it retains discretion to hold an
26  evidentiary hearing to elicit testimony regarding prison life, the undersigned finds that
27  such a hearing would not be of benefit to the resolution of the issues herein for the
28  following reasons.

First, Petitioner proffers nothing to suggest that he will have evidence sufficient to meet his clear and convincing burden of proof regarding Isaacs' motivations to lie. Second, the other evidence of Petitioner's guilt, particularly when coupled with the presumptively correct findings by the state courts, would preclude a finding that Petitioner has made the requisite high showings of his actual innocence.

Based upon the foregoing, Petitioner is not entitled, and the Court finds unnecessary, an evidentiary hearing to present testimony on the conditions of prison life.

### d.   Testimony of PCR Counsel Goldberg

The last category of evidence Petitioner proffers for an evidentiary hearing concerns testimony from PCR counsel Goldberg consistent with his statements to the volunteers of the Arizona Justice Project that he "missed" all of the new IAC issues submitted in Supplemental Ground 2, and to show he will offer no valid reason (tactical, strategic, or otherwise) for not identifying and raising these new claims."   (Supp. Petition, Doc. 78 at 5-11-B.)

Petitioner seeks to provide this testimony to show the ineffective assistance of PCR counsel under *Martinez v. Ryan*, for the purpose of establishing cause to excuse Petitioner's procedural default on those claims.

### (1).  Deference to State Court Decisions: 28 U.S.C. § 2254(d)

The undersigned has concluded that Petitioner failed to fairly present his claims of ineffective assistance of counsel in Supplemental Ground 2 to the Arizona Court of Appeals, and thus they are procedurally defaulted. Moreover, although the claims were fairly presented to the PCR court, that court disposed of them on procedural grounds. (*See infra* Section III(D)(2)(j).)   Accordingly, there was no decision on the merits on this claim, and therefore no deference applicable under 28 U.S.C. § 2254(d).

More importantly, however, Goldberg's testimony is not offered to establish a ground for relief in this proceeding, but to show cause for Petitioner's failure to properly

exhaust his state remedies on the claims in Supplemental Ground 2.  Thus, § 2254(d) has not application to this evidence.

### (2).  Failure to Develop: 28 U.S.C. § 2254(e)(2)

Similarly, because the testimony from Goldberg is not relevant to any claim for relief in this proceeding,  § 2254(e)(2) does not apply.  *Dickens*, 740 F.3d at 1321.

### (3).  Presumption of Correctness: 28 U.S.C. § 2254(e)(1)

Respondents proffer no state court factual findings on the issue of PCR counsel's ineffectiveness.   Accordingly, there is no "clear and convincing" hurdle which new evidence would be required to clear.

### (4).  Mandatory/Discretionary Hearing: *Townsend*

Petitioner never presented a claim of ineffective assistance of  PCR counsel to the state courts.  Accordingly, there were no fact finding procedures in the state courts, and ordinarily, therefore, an evidentiary hearing would ordinarily be required.

However, the undersigned finds little reason to believe that Petitioner's request for an evidentiary hearing on this issue is anything more than a fishing expedition.[9] Petitioner contends that his prognostication of Goldberg's testimony is founded upon an interview between Goldberg and volunteers from the Arizona Justice Project.  Petitioner fails, however, to proffer any evidence to support that contention.   He proffers no transcript or summary of the interview, and does not proffer an affidavit from Goldberg or anyone else to support his allegation.  In sum, Petitioner proffers his own statement of

---

[9] The undersigned notes that Respondents argue Petitioner's assertions about Goldberg's admissions are suspect because Petitioner's Amended Motion to Stay (Doc. 32), filed August 6, 2012, only argued that Goldberg admitted missing the claim in Supplemental Ground 2A (impeachment of Hernandez).  (*See* Amend. Mot Stay, Doc. 32 at 4.)  That is true, but Petitioner did not assert that this was the only claim Goldberg had admitted to missing.  Moreover, in a portion of his September 11, 2012 PCR Petition addressing his reasons for not raising his claims previously, Petitioner contended that Goldberg had admitted missing "the points herein."  (Supp. Record, Docs. 45/46, Appendix 1, PCR Petition, Memorandum at 20.)

double hearsay (what the volunteers told Petitioner that Goldberg told the volunteers). For this reason alone, the undersigned would not grant an evidentiary hearing.

Further, however, the undersigned concludes that an evidentiary hearing would in any event be unnecessary in light of the limited value of the evidence proffered.

At most, Petitioner asserts that Goldberg would testify that he "missed" the new claims of ineffectiveness asserted in Supplemental Ground 2 without legitimate explanation. The record plainly reflects that Goldberg failed to raise the claims. The record is also devoid of any explanation from Goldberg for his doing so. Thus, to the extent that Goldberg's admission to "missing" the claims simply acknowledges those facts, his testimony would be cumulative evidence of an undisputed fact.

To the extent that Goldberg should be expected to testify that he not only did not raise the claims, but was unaware of them, that fact adds nothing to this Court's analysis. This is so for three reasons.

First, the simple fact that Goldberg was unaware of the claims is insufficient to show deficient performance. "The mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." *Murray v. Carrier*, 477 U.S. 478, 486 (1986). Rather, Petitioner must demonstrate that Goldberg's failure to raise the claim was ineffective assistance under the standards in *Strickland v. Washington*, 466 U.S. 668 (1984). *Id.* at 487; *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (applying *Martinez*, 132 S.Ct. at 1318). And, Petitioner simply asserts that Goldberg would offer no valid reason for not pursuing the claims. Petitioner does not suggest nor proffer anything to show that Goldberg would testify that his real reason was one demonstrative of deficient performance. The court need not determine the actual reason for an attorney's actions, as long as the act falls within the range of reasonable representation. *Morris v. California*, 966 F.2d 448, 456-457 (9th Cir. 1991), cert. denied, 113 S. Ct. 96 (1992).

Second, even if Goldberg's statement were viewed as an assertion that he had performed deficiently, that self-evaluation is largely meaningless. "To establish

ineffectiveness, a 'defendant must show that counsel's representation fell below an *objective* standard of reasonableness.'" *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000) (quoting *Strickland*, 466 U.S. at 688).  The question is not whether Goldberg thinks his performance was deficient, but whether the Court can find that his performance was objectively unreasonable.  "Because the standard is an objective one, that trial counsel (at a post-conviction evidentiary hearing) admits that his performance was deficient matters little." *Chandler v. United States*, 218 F.3d 1305, 1316, n. 16 (11th Cir. 2000). A reviewing court is "not obligated to 'accept a self-proclaimed assertion by trial counsel' of inadequate performance." *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007).  Thus, bald admissions of deficient performance by counsel Goldberg in this proceeding are not significant.

Third, as discussed hereinafter in evaluating the claims in Supplemental Ground 2 under *Martinez v. Ryan*, the undersigned concludes that each of the claims, even if of "some merit," are ultimately not meritorious.  (*See infra* Section III(D)(6)(a)(4) (Application of *Martinez*).)  Thus, no prejudice could be found to result from PCR counsel's failure to raise the claims, even if he were deficient in doing so.  *See Landrigan*, 550 U.S.  at 474 ( no evidentiary hearing required "if the record …precludes habeas relief, a district court is not required to hold an evidentiary hearing").

## 5.  Conclusion

Based upon the foregoing, the undersigned concludes that Petitioner is not entitled to any evidentiary hearing, or to conduct discovery.  Accordingly, Petitioner's requests for such a hearing and discovery will be denied.

## B.  REQUEST FOR COUNSEL

On April 1, 2015, Petitioner filed his Motion for the Appointment of Counsel (Doc. 83).  Petitioner argues that counsel should be appointed pursuant to 18 U.S.C. § 3006A(2)(B) because: (1) his grounds for relief are "extensive, multi-dimensional, and complex"; (2) the seriousness of the conviction and sentence, particularly in light of his claims of actual innocence, and the need for counsel for an evidentiary hearing and discovery, and to establish cause to avoid his procedural defaults; (3) his lack of access to case law; (4) the likelihood of his success and the complexity of the legal issues, which he details; (5) Petitioner's lack of the legal training and expertise necessary to clearly articulate his claims on those complex issues; and (6) his lack of success in obtaining *pro bono* representation.

Respondents have not responded to the motion.

**No Right to Counsel** - The sixth amendment right to counsel does not apply in habeas corpus actions.  *Knaubert v. Goldsmith*, 791 F.2d 722 (9th Cir.), *cert. denied*, 479 U.S. 867 (1986).

**Limited Authority to Appoint Counsel** - 18 U.S.C. § 3006A(a)(2) authorizes the appointment of counsel for an indigent habeas petitioner whenever "the court determines that the interests of justice so require." The Rules Governing Section 2254 Cases in the United States District Courts provides that an attorney shall be appointed for an indigent petitioner "[i]f an evidentiary hearing is warranted," Rule 8(c), or "[i]f necessary for effective discovery," Rule 6(a).  Otherwise, the decision to appoint counsel is within the discretion of the court.  *Terrovona v. Kincheloe*, 912 F.2d 1176, 1177 (9th Cir. 1990); *Knaubert v. Goldsmith*, 791 F.2d 722, 728 (9th Cir.), *cert. denied*, 479 U.S. 867 (1986).

**Discretionary Appointment** - The purpose of 18 U.S.C. §3006A(a)(2) is to provide for appointed counsel whenever required by the Constitution, *Knaubert*, and since the Sixth Amendment right to counsel does not apply in habeas corpus actions, *id.*, the upward parameter of the court's discretion is measured by  whether the failure to appoint counsel would amount to a denial of due process.  *Chaney v. Lewis*, 801 F.2d

1191, 1196 (9th Cir. 1986), *cert. denied*, 107 S.Ct. 1911 (1987); *Knaubert; Kreiling v. Field*, 431 F.2d 638, 640 (9th Cir. 1970); *Eskridge v. Rhay*, 345 F.2d 778, 782 (9th Cir. 1965), *cert. denied*, 382 U.S. 996 (1966).

"In deciding whether to appoint counsel in a habeas proceeding, the district court must evaluate the likelihood of success on the merits as well as the ability of the petitioner to articulate his claims pro se in light of the complexity of the legal issues involved." *Weygandt v. Look,* 718 F.2d 952, 954 (9th Cir. 1983).  Factors which have been held relevant in determining the appropriate exercise of discretion include:  whether the claim is non-frivolous; whether the nature of the litigation makes the appointment of counsel beneficial to the litigant and to the court; the *pro se* litigant's ability to investigate facts and present claims; and the complexity of the factual and legal issues involved in the case. *Battle v. Armontrout*, 902 F.2d 701, 702 (8th Cir. 1990).

**Application to Petitioner** - Petitioner's Motion fails to make the showing necessary for appointment of counsel at this time.  The Court has concluded herein that Petitioner is not entitled to an evidentiary hearing or discovery.

Moreover, given the conclusions reached herein on the merits of Petitioner's claims, the Court cannot find a likelihood of success on the merits.

Petitioner asserts no specific circumstances, beyond those routinely faced by *pro se* prisoners, which would require appointment of counsel to ensure Petitioner is afforded due process in these proceedings.  Requiring an untrained prisoner, without access to a law library, to prosecute his habeas petition *pro se* is not, without more, a violation of due process in the Ninth Circuit. *See Chaney v. Lewis*, 801 F.2d 1191, 1196 (9th Cir. 1986) ("Indigent state prisoners applying for habeas corpus relief are not entitled to appointed counsel unless the circumstances of a particular case indicate that appointed counsel is necessary to prevent due process violations."); and *Hess v. Schriro*, 2007 WL 2892963 (D.Ariz. 2007) (due process did not require appointment of counsel for Arizona, *pro se,* habeas petitioner without access to case law cited in response to habeas petition).

1    In addition, Petitioner has not been wholly without resources.  Rather he has had

2    substantial assistance in these proceedings by learned relatives and the Arizona Justice

3    Project, and has amassed a significant legal library which includes:  *Georgetown Law*

4    *Journal*, *Federal Courts Habeas Corpus*, *Winning Habeas Corpus Conviction Relief*,

5    *Prisoners Self-Help Litigation Manual*, *Smith's Guide to Habeas Corpus*, *Arizona*

6    *Criminal Law and Rules 2010-2011 Edition*, *Criminal Law Volume III, Constitutional*

7    *Law Parts 1 & 11, Legal Research/Writing*, *Paralegal Career for Dummies, Paralegal*

8    *Practice and Procedure*, and five volumes of paralegal studies.  (*See* Response to Mot.

9    Stay, Doc. 38 at Appendix A, Perry Affidavit and attachments.)

10   Petitioner's claims are not, individually, unusually complex.  Respondents'

11   defenses are routine and the complexities encountered in addressing them arise from

12   counter contentions ably asserted by Petitioner.  To be sure, this case has become

13   generally complex.  But that has largely come from the sheer volume of claims asserted

14   by Petitioner, and the presentation of many of them in a supplemental petition after the

15   completion of full briefing and a stay.

16   Moreover, and despite the limited legal resources available to him, Petitioner has

17   shown himself capable of marshaling evidence and arguments in support of his Petition

18   and Supplemental Petition, bolstered with appropriate authorities.  Only a small handful

19   of Petitioner's arguments suggest a lack of legal training or experience, and even those

20   may well simply reflect a strategic decision to "throw in the kitchen sink."

21   Further, the Court appreciates the distinction between a general level of

22   articulateness, and the background necessary to effectively litigate, particularly in the

23   context of the procedural quagmire that habeas has become.  But Petitioner has

24   demonstrated ability far beyond a general level of articulateness, and has shown himself

25   an extraordinarily able prison litigator, whose ultimate lack of any success will likely

26   result from the lack of merit in the claims, not any lack of legal ability.

27   Under these circumstances, the Court cannot find that denying Petitioner counsel

28   will result in a denial of due process, or that he is otherwise entitled to the appointment

1   of counsel.

2          Accordingly, the Motion to Appoint Counsel will be denied.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## C.  STATUTE OF LIMITATIONS

Respondents argue that the new claims asserted by Petitioner in Supplemental Grounds 2 (ineffective assistance) and 3 (cumulative error) in his Supplemental Petition are barred by the habeas statute of limitations.  (Supplemental Answer, Doc. 80 at 23, *et seq.*)  In reply, Petitioner asserts that he has argued the statute of limitations "to the best of his ability."  (Supp. Reply, Doc. 84 at 10.)  In his Supplemental Petition, Petitioner argues that he has been proceeding *pro se*, his PCR counsel was ineffective, he is actually innocent, he has shown cause to excuse any procedural defaults, he is entitled to equitable tolling because he did not discovery his claims despite diligence, and the claims relate back to his previous state appeals.  (Supp. Pet. Doc. 78 at 5-11-A to 5-11-D.)

## 1.  One Year Limitations Period

As part of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Congress provided a 1-year statute of limitations for all applications for writs of habeas corpus filed pursuant to 28 U.S.C. § 2254, challenging convictions and sentences rendered by state courts.  28 U.S.C. § 2244(d).  Petitions filed beyond the one year limitations period are barred and must be dismissed.  *Id.*

## 2.  Commencement of Limitations Period

### a.   Finality of Conviction

The one-year statute of limitations on habeas petitions generally begins to run on "the date on which the judgment became final by conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).[10]

Here, Petitioner's original direct appeal remained pending through September 26,

---

[10] Later commencement times can result from a state created impediment, newly discovered factual predicates, and newly recognized constitutional rights.  *See* 28 U.S.C. § 2244(d)(1)(B)-(D).  Except as discussed herein, Petitioner proffers no argument that any of these apply.

1   2002, when the Arizona Supreme Court denied his Petition for Review.  (Exhibit II
2   Order 9/26/02.)[11]

3        However, Petitioner's first PCR proceeding resulted in a determination that
4   Petitioner had been improperly sentenced and a re-sentencing on February 10, 2004 to
5   the same term of natural life.  (Exhibit A-5, ROA Item 325, M.E. 2/10/04.)

6        In *Burton v. Stewart*, 549 U.S 147 (2007), the Court concluded that for purposes
7   of the habeas statute of limitations, "[f]inal judgment in a criminal case means sentence.
8   The sentence is the judgment." *Id.* at 799 (quoting *Berman v. United States*, 302 U.S.
9   211, 212 (1937)).  *See also Ferreira v. Secretary, Dept. of Corrections*, 494 F.3d 1286
10  (11th Cir. 2007) (holding re-sentencing judgment is relevant one, even if challenge is
11  directed only to earlier conviction).

12       Following his re-sentencing, Petitioner filed a second direct appeal, challenging
13  the new sentence.  (Exhibit MM, Opening Brief.)  Petitioner successfully moved to
14  consolidate his Petition for Review from his PCR proceeding with the second direct
15  appeal.  (Exhibit NN, Mot. Consol.; Exhibit OO, Order 6/4/04.)

16       On October 18, 2005, the Arizona Court of Appeals rejected the challenges to
17  sentencing, but concluded that the PCR court had erred in denying the request for an
18  investigator, vacated that order and remanded to the PCR court with instructions to grant
19  the motion for an investigator and further PCR proceedings.  (Exhibit SS, Mem. Dec.
20  10/18/05.)  Petitioner did not seek further review.  (*See* Petition, Doc. 1 at 4, *et seq.*
21  (characterizing the appeal from resentencing as part of Petitioner's Second PCR Petition)
22  and 5 (indicating no appeal to Arizona Supreme Court in "Second petition").)  (*See also*
23  Exhibit TT, Mandate 12/8/05 (showing no further appeal).)

24       Following the Arizona Court of Appeals' Memorandum Decision in his second
25  direct appeal, and in the absence of a motion for reconsideration, Petitioner had 30 days

26

27  _____
    [11] The action by the Arizona Supreme Court was taken on September 24, 2002, but the
    Order was not issued until September 26, 2002.  (Exhibit II, Order 9/26/02.)  Because it
28  does not affect the outcome, the undersigned presumes that the effective date of the order
    was the later date.

to seek further review by the Arizona Supreme Court. *See* Ariz. R. Crim. P. 31.19(a). Arizona applies Arizona Rule of Criminal Procedure 1.3 to extend "the time to file an appeal by five days when the order appealed from has been mailed to the interested party and commences to run on the date the clerk mails the order." *State v. Zuniga*, 163 Ariz. 105, 106, 786 P.2d 956, 957 (1990). Thus, Petitioner would have had thirty five days, or through Tuesday, November 22, 2005, to file his petition for review.

Because it does not affect the outcome, the undersigned presumes (in Petitioner's favor) for purposes of this Report and Recommendation that Petitioner's conviction did not become final until issuance of the mandate of the Arizona Court of Appeals on December 8, 2005. *Compare Wixom v. Washington*, 264 F.3d 894 (9th Cir. 2001) (conclusion of direct review on Washington conviction not delayed for issuance of mandate); *Hemmerle v. Schriro*, 495 F.3d 1069 (9th Cir. 2007) (Arizona PCR proceeding no longer pending for tolling purposes after denial of review by Arizona Supreme Court); and *Washington v. Ryan*, 2015 WL 274151 (D. Ariz. Jan. 22, 2015) (statutory tolling continued through issuance of Arizona mandate).

Accordingly, because Petitioner did not file a petition for review, Petitioner's conviction became final no later than December 8, 2005.

### b.   Factual Predicate

Petitioner argues that he only recently identified these claims with the assistance of the Arizona Justice Project. (Supplemental Petition, Doc. 79 at 5-11-D.)

### (1).  Applicable Standards

Although the conclusion of direct review normally marks the beginning of the statutory one year, section 2244(d)(1)(D) does provide an alternative of "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." Thus, where despite the exercise of due diligence a petitioner was unable to discover the factual predicate of his claim, the statute does not

commence running on that claim until the earlier of such discovery or the elimination of the disability which prevented discovery.

The commencement is not delayed until actual discovery, but only until the date on which it "could have been discovered through the exercise of due diligence."  28 U.S.C. § 2244(d)(1)(D).    "Although section 2244(d)(1)(D)'s due diligence requirement is an objective standard, a court also considers the petitioner's particular circumstances." *Ford v. Gonzalez*, 683 F.3d 1230, 1235 (9th Cir. 2012).  Thus the court should consider such things as a petitioner's physical confinement and the limits of his imprisonment. "Just as the petitioner's particular circumstances may include impediments to discovering the factual predicate of a claim, they may also include any unique resources at the petitioner's disposal to discover his or her claim." *Id.* at 1246.  For example, the court may consider such things as familial assistance and other legal assistance.

Similarly, information available to a habeas petitioners' attorneys is relevant to the determination whether knowledge is chargeable to a petitioner.  "Under ordinary circumstances-and there is no room for the application of a different principle here-a lawyer's knowledge is attributed to her client."  *Wood v. Spencer*, 487 F.3d 1, 4-5 (1st Cir. 2007), cert. denied, 128 S. Ct. 260 (2007). *See also Ford v. Galaza*, 683 F.3d 1230, 1236 (9th Cir. 2012) (citing *Wood*, 487 F.3d at 4-5, but not relying on attribution of attorney's knowledge to petitioner).  On the other hand, where the factual predicate concerns such things as counsel's conflict of interest or failure to file a notice of appeal, which counsel could be presumed to conceal from his client, the knowledge of counsel may not be attributable to the petitioner.  *See e.g. Anjulo-Lopez v. United States*, 541 F.3d 814, 817 (8th Cir. 2008) (counsel's failure to file notice of appeal).  Moreover, the nature of the representation is relevant to determining what chargeable to counsel is chargeable to the petitioner.  For example, in *Starns v. Andrews*, 524 F.3d 612 (5th Cir. 2008), the Fifth Circuit concluded that knowledge of the petitioner's civil suit counsel was not chargeable to his criminal defense lawyer, and thus not chargeable to the petitioner.

To the extent that a petitioner refers to recently discovered evidence, such evidence may not be the "factual predicate" of his claims, but rather only the evidence of those facts. *See Flanagan v. Johnson*, 154 F.3d 196, 198-99 (5th Cir.1998) (receipt of trial counsel's affidavit irrelevant where knowledge of facts supporting claim ineffectiveness previously known to defendant). Other times, the "factual predicate" (such as false testimony by the victim) would have been known to the petitioner at trial. In such cases, an attempt by Petitioner to rely on section 2244(d)(1)(D) would conflate knowledge of the "factual predicate" of a claim with the development of sufficient evidentiary support to prove the claim.

Courts have attempted to distinguish between supporting evidence and a factual predicate by referring to the latter as the "vital facts." *See e.g. Ford v. Gonzalez*, 683 F.3d 1230, 1235 (9th Cir. 2012). The Ninth Circuit has not elucidated what is meant by "vital facts," but other circuits have.

> The facts vital to a habeas claim are those without which the claim would necessarily be dismissed under Rule 4 of the Rules Governing § 2254 Cases in the United States District Courts (requiring a district judge to dismiss a petition "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief") or Rule 12(b)(6) of the Federal Rules of Civil Procedure (allowing for dismissal of a civil complaint where the plaintiff has "fail[ed] to state a claim upon which relief can be granted").

*Rivas v. Fischer*, 687 F.3d 514, 535 (2d Cir. 2012) (applying § 2244(d)(1)(D)).

Cases explicating or even applying Rule 4 are few and far between, and most date to an era far more freewheeling in its view of the rigors of pleading. The Rule simply provides: "If it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court, the judge must dismiss the petition."

In contrast, more recent case law related to Federal Rule of Civil Procedure 12(b)(6) imposes some significant requirements for a case to survive summary dismissal. In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Court addressed a motion to dismiss a civil rights complaint for failure to state a claim by looking to Federal Rule of Civil Procedure

63

8.  The Court noted that while Rule 8 does not demand detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Rather, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Thus, although a plaintiff's specific factual allegations may be consistent with a constitutional claim, a court must assess whether there are other "more likely explanations" for a defendant's conduct. *Id.* at 681.

Moreover, it is only the facts which must be chargeable to the petitioner, not their legal significance.  *Hasan v. Galaza*, 254 F.3d 1150, 1154 n. 3 (9th Cir. 2001). *See also* Means, *Federal Habeas Manual* § 9A:34 (citing Hasan and *Flanagan v. Johnson*, 154 F.3d 196, 199 (5th Cir. 1998)).  The rationale is well put by the Seventh Circuit:

> Like most members of street gangs, Owens is young, has a limited education, and knows little about the law. If these considerations delay the period of limitations until the prisoner has spent a few years in the institution's law library, however, then § 2244(d)(1) might as well not exist; few prisoners are lawyers.

*Owens v. Boyd*, 235 F.3d 356, 359 (7th Cir. 2000), *as amended* (Jan. 22, 2001).

In the context of a claim of ineffective assistance of counsel, the petitioner must be chargeable with knowledge of both deficient performance of counsel, and the resulting prejudice.  *Hasan*, 254 F.3d at 1154.

### (2).  General Application to Petitioner

In their Surreply (Doc. 40) to Petitioner's Motion to Stay, Respondents argue the

following facts regarding Petitioner's opportunities to discover the factual predicate of his various claims:

> (1) Petitioner and his relatives contacted [the Arizona Justice Project] about representing him in federal habeas proceedings some unspecified time before Judge Hall [Petitioner's mother's cousin, an administrative law judge for the Department of Labor] delivered seven boxes of his legal file to AJP staff members on October 26, 10; (2) AJP, not Judge Hall, retained custody of all seven boxes of legal materials until January 25, 2011, when AJP honored Petitioner's request to have two specific boxes returned to him so that he could append documentary exhibits to his § 2254 petition; (3) AJP continues to maintain custody of the remaining five boxes of Petitioner's legal file, almost 2 full years after Judge Hall delivered them on October 26, 2010; (4) despite retaining possession of most of Petitioner's file, researching co-defendant Isaacs' court files, and interviewing Goldberg and Iannone, AJP has still not elevated the classification of Petitioner's case to "Level 1," the consequence of which is that none of its volunteer attorneys have entered an appearance in this matter; (5) AJP personnel did not visit Petitioner at the prison for the first time until June 2, 2011—218 days after Judge Hall gave them seven boxes of Petitioner's legal file, 37 days after Petitioner filed his pro per pending habeas petition (April 26, 2011)…; (6) AJP staff members visited Petitioner a second time on April 16, 2012—583 days after Judge Hall delivered Petitioner's case file to AJP personnel (October 26, 2010)…and 122 days after Petitioner filed his reply to Respondents' answer (December 16, 2011); and (7) during this second visit, AJP attorneys not only informed Petitioner about their "recent" interviews of Goldberg and Iannone, but also gave him a copy of the transcript memorializing the presentence hearing held in co-defendant Isaacs' case—an indication that AJP did not discover the factual predicates to three new claims (specifically, New IAC #1, New IAC #8, and the Brady claim) until several weeks or months before AJP members submitted their April 6, 2012 request for the prison's permission to visit Petitioner 10 days later, on April 16, 2012.

(Surreply, Doc. 40 at 11-12.)

In contrast, Petitioner argued in his Reply (Doc. 39) in support of his Motion to Stay that while the boxes of legal material may have been delivered to the prison on August 13, 2010, that Petitioner signed to acknowledge the prison's receipt, but under ADOC's policies, he could possess only 2 boxes of legal material in his cell, and already had the maximum number of boxes in his cell.  (Doc. 39 at 3.)  He argues his first and only access to the boxes was on September 1, 2010.  (*Id.* at 4.)  The boxes were taken by Judge Hall on October 26, 2010.  (*Id.*)  Petitioner confirms meeting with personnel from

the Arizona Justice Project on June 2, 2011 and April 16, 2012. (*Id.* at 6.)

With the exception of his Supplemental Ground 1 (based upon Petitioner's assertions of actual innocence arising from subsequent prison disclosures), Petitioner proffers nothing to show that the factual predicates of his new claims were not contained within the record in the possession of his PCR counsel or otherwise available to PCR counsel.  To be sure, Petitioner argues that PCR counsel was ineffective in failing to discover the factual basis of his claims.  Those assertions are addressed hereinafter in connection with Petitioner's assertions of his entitlement to equitable tolling.[12]  For purposes of applying 28 U.S.C. § 2244(d)(1)(D), however, the knowledge available to Petitioner's PCR counsel is generally attributable to Petitioner. *Wood*, 487 F.3d at  4-5. Petitioner proffers no reason why PCR counsel could not have, through the exercise of reasonable diligence, have discovered the factual predicate of these claims.  Nor does Petitioner assert that his delinquent claims of ineffective assistance , or the facts underlying them, are of a type that Petitioner should not be charged with knowledge of facts that PCR counsel should be charged with knowing.

Further, Petitioner had personal access to his entire file in August 2010. Petitioner complains that he was restricted in the amount of material he was allowed to maintain in his prison cell.  However, Petitioner proffers nothing to show that in the ensuing months he could not have exchanged boxes between his cell and storage, and thereby have completed his review.

Instead, Petitioner chose to deliver those materials two months later, in October, 2010, first to Judge Hall and then to the Arizona Justice Project.  Petitioner argues that he was dependent upon their assistance because of his untrained, incarcerated status. However, the only claim brought in the Supplemental Petition which derived from a unique legal (as opposed to factual) analysis, is Supplemental Ground 2L regarding the aiding and abetting instruction.  Moreover, it is not the legal significance of facts which must have been available to Petitioner, but the facts themselves.  *Hasan*, 254 F.3d at

---

[12] *See infra* Section III(C)(5), Equitable Tolling.

1154 n. 3.

Finally, Petitioner was armed with the assistance of Judge Hall and the Arizona Justice Project at least from October, 2010. Indeed, Judge Hall relates conferring in writing with Petitioner and reviewing court documents prior to and throughout 2009. (*See* Supplement, Doc. 45, Appendix 1, at Exhibit H, Hall Affidavit at ¶ 6.)  It is true that Petitioner did not meet with the AJP for some eight months, in June, 2011, and not again for another ten months, in April, 2012.  Petitioner attempts to explain the delay by pointing to the nature of the AJP as a volunteer organization with multiple clients. That might explain the AJP's delay, it does not explain Petitioner's patience.  Even assuming Petitioner believed he was dependent upon them for assistance in identifying his claims, at some point Petitioner was the master of his own ship and could have demanded his file back to complete his own review.  Instead, Petitioner allowed almost two years to pass by, and did not pursue his claims in state court until July, 2012, when he commenced his most recent PCR proceeding.

### (3).  Application to New Claims

The only new facts relied upon by Petitioner in any of his Supplemental Claims are the purported confessions of Isaacs to inmates Ellis and Gaines which form the basis of Petitioner's actual innocence claim in **Supplemental Ground 1**.  Petitioner submits a declaration by Ellis dated August 1, 2012 (and with an address of "A.S.P.C. Lewis/Rast), in which Ellis describes a conversation between he and Isaacs in 2011 in ASPC's S.M.U. I,[13] when Isaacs admitted his guilt and Petitioner's innocence and told Ellis to communicate an offer to Petitioner to confess for $25,000.  Ellis describes returning to

---

[13] According to his addresses of record with this Court, Petition was housed at SMU I from the filing of his Petition (Doc. 1), through his Notice of Change of Address (with the same address), filed September 20, 2011 (Doc. 21), until his Notice of Change of Address (to ASPC Lewis/Buckley Unit) dated January 6, 2012 (Doc. 27).  On July 16, 2012, Petitioner filed a Notice of Change of Address dated July 1, 2012 (to ASPC Lewis/Rast) (Doc. 29), where he remained until February 2, 2015, when he signed his Notice of Change of Address reflecting his relocation to Buckley (Doc. 77).

his cell and relaying the offer to Petitioner, who then requested Ellis to talk to Petitioner's attorneys. (Supplement, Doc. 45, Attachment 1, PCR Petition, Appendix A, Ellis Declaration.)   Similarly, in a Declaration dated August 1, 2012, inmate Gaines reports a conversation with Isaacs in 2011 in S.M.U. I when Isaacs confessed to the murder. Gaines reports that he did not report the conversation to Petitioner until July of 2012, two weeks before writing the declaration.

Respondents construe Petitioner's assertion as being that this information become available to Petitioner only two weeks before his Amended Motion to Stay, or in July, 2012.  (Resp. Amend. Mot. Stay, Doc. 38 at 97.)  Respondents make no argument that this information was previously available to Petitioner.

However, at its most basic level, the factual predicate of Petitioner's Supplemental Ground 1 is that Petitioner is actually innocent.  This "fact" has been known to Petitioner from the very beginning of his prosecution.  It is only the evidence of the fact, *e.g.* the statements of Ellis and Gaines, that has recently become available to Petitioner.[14]  But that "fact" is not sufficient to state a claim of actual innocence.

In *Herrera v. Collins*, 506 U.S. 390 (1993), the Court considered what would qualify as a viable habeas ground for relief based upon actual innocence, and observed that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  *Id.* at 400.  Similarly, in *Jones v. Taylor*, 769 F.3d 1232 (9th Cir. 2014), the Ninth Circuit declined to decide whether an actual innocence claim was cognizable, but relied instead upon the petitioner's failure to make the requisite showing, which it described as a showing that

---

[14] Arguably, if knowledge of innocence were all that was required, in all but the rarest case (for example, a petitioner without knowledge of his own guilt because of amnesia), a habeas petitioner could almost never qualify under § 2244(d)(1)(D) to assert a belated claim of actual innocence.  On the other hand, in *McQuiggin v. Perkins*, 133 S.Ct. 1924 (2013), the Court considered the applicability of § 2244(d)(1)(D) to actual innocence claims and determined that such claims were more properly dealt with by the adoption of an actual innocence exception to the statute of limitations, without application of the standard under § 2244(d)(1)(D).

"that 'in light of the new evidence, no juror, acting reasonably, would have voted to find [Jones] guilty beyond a reasonable doubt.'" *Id.* at 1251 (quoting *Schlup v. Delo,* 513 U.S. 298, 329 (1995)).  Thus, a claim of actual innocence requires, as a vital fact, new reliable evidence of innocence, not merely a bald assertion of innocence.

Therefore, Petitioner's allegations of Isaacs' confessions to Ellis and Gaines were "vital facts" to his claim of actual innocence.    It is true that Petitioner argues in his Supplemental Reply that this claim is founded on "All of the evidence contained in all of my previous pleadings and on the evidence in its entirety."  (Doc. 84 at 7 (emphasis in original).)  That is true to the extent that any claim of actual innocence is by nature founded upon all the evidence.  But the genesis of Petitioner's claim was not all the evidence, but the specific addition of the Ellis and Gaines' statements.  Thus, those specific facts are the "vital facts."

The record is uncontradicted (albeit maligned as unbelievably convenient) that Petitioner did not discover those facts until two weeks before his Amended Motion to Stay, dated August 6, 2012 (Doc. 32).

Nor is there anything to suggest that Petitioner, through the exercise of greater diligence, could have discovered the confessions sooner.

Accordingly, the undersigned concludes that the factual predicate for Supplemental Ground 1 was not available to Petitioner until July 23, 2012.

In **Supplemental Ground 2A**, Petitioner argues that trial counsel was ineffective for failing to impeach Hernandez with testimony from an investigator at the Isaacs pre-sentence hearing.  (Supplemental Petition, Doc. 78 at 5-7.1.)  (*See* Supplement, Attachment 1, PCR Petition at Appendix C, R.T. 2/4/00 at 58-59.) Petitioner proffers nothing to suggest that this information was not available to trial counsel, nor Judge Hall or the AJP.  Indeed, Petitioner argues that trial counsel has admitted to having transcripts of the impeaching testimony, and PCR counsel had admitted to overlooking the issue. (Supplemental Petition, Doc. 78  at 5-7.2 to 5-7.3.)

Nor does Petitioner explain why he himself could not previously have discovered

the testimony.  The Isaacs case was not some unrelated proceeding, that Petitioner could not have anticipated having produced relevant testimony.  It was his alleged accomplice's trial on the same murder.  A reasonably diligent petitioner could have anticipated the availability of relevant testimony in that proceeding, and would have looked for usable material.  While Petitioner points to his incarceration to explain away his failings, Petitioner also makes no suggestion that he ever attempted to obtain the transcripts from the Isaacs case.

Nor was the issue of pecuniary gain and its relationship to Hernandez novel to the case.  In the trial court's Special Verdict, the court found:  "The state alleges that the defendant committed the offense in the expectation of pecuniary gain under F5. The only evidence of this motive was the testimony of Mr. Hernandez."  (Exhibit A, ROA at Item 251, Spec. Verd. at 3.)  Nor was the argument novel that there was no pecuniary gain, as reflected by Petitioner's arguments in his original Petition that "Hernandez asserted that…on Isaacs' dare, [I] shot and killed Mrs. Franz."  (Petition, Doc. 1 at 9:7-B.)

In **Supplemental Ground 2B** Petitioner argues that trial counsel was ineffective for failing to call his alleged accomplice, *Isaacs*.  (Supplemental Petition, Doc. 78 at 5-7.5.)   The essence of the claim is Isaacs' purported guilt, and various evidence showing he committed the murder.  The only thing new about this claim is the availability of Isaacs' prison confessions to Gaines and Ellis to show prejudice.[15]  But Petitioner has long had similar evidence to support this claim of ineffective assistance.  Thus Gaines and Ellis's statements are only additional evidence in support of the claim, not the "vital facts" of the claim.

**Supplemental Ground 2C** relates to trial counsel's failure to call Petitioner's own girlfriend, *Rusty Britton*.  (Supplemental Petition, Doc. 78 at 5-7.6.)  Petitioner points to no part of this claim not previously known to him.

---

[15] Trial counsel could not, of course, have been aware of these post-trial confessions and statements.  Accordingly, they are irrelevant to determining whether counsel performed deficiently in failing to call Isaacs.  They are relevant only to the extent that they tend to show what Isaacs' testimony would have been had he been called to testify.

**Supplemental Ground 2D** relates to trial counsel's failure to call *Stephen Greenwood*, the man who Franz had identified to police as his wife's killer.  (*Id.* at 5-7.7.)  However, testimony about Greenwood was part of the trial testimony.  (Exhibit L, R.T. 4/26/00 at 95 *et seq.*)   Thus, Petitioner was aware of the availability of testimony from Greenwood.  Petitioner fails to identify any new facts underlying this claim.

**Supplemental Ground 2E** relates to failure to call a tire and footprint *forensic expert* to testify that the tire marks and footprints were not attributable to Petitioner, and to explain Mr. Franz's movements.  (Supplemental Petition, Doc. 78 at 5-7.8.)   The forensic specialist from the police department, Virgil Walters, proffered testimony about footprints and tire tracks.  (*See* Exhibit M, R.T. 4/27/00 Vol. I at 36-50.)   Thus, the availability of such testimony, and its relevance to the case were explicit within the trial proceedings.  Petitioner fails to identify any new facts underlying this claim.

**Supplemental Ground 2F** relates to counsel's failure to impeach Franz with evidence of the pending divorce from and life insurance on the victim.  Petitioner makes no explanation what facts underlying this claim were not previously available to him.  Petitioner asserted a similar claim of ineffective assistance in Ground 9D of the original Petition, arguing that trial counsel failed to impeach Franz "with his…prior bad acts involving the decedent." (Petition, Doc. 1 at 9:5-A.)   Petitioner argued that witnesses should have been called to testify about the troubled relationship between Franz and the victim, that Franz "threatened to physically harm the victim," that Franz and the victim "had a volatile and violent relationship," that a witness "personally witnessed Robert's physical abuse of the children and Elisha" and his "fight with Elisha on the day prior" and he "had obtained and collected upon a life insurance policy."  (*Id.* at 9:5-E to 9:5-F.)[16]

**Supplemental Ground 2G** relates to trial counsel's failure to call *Amelia Boston*, a friend of Hernandez regarding threats made by police to Hernandez about the death

---

[16] Indeed, because the facts underlying Supplemental Ground 2F and original Ground 9D are so similar, the undersigned concludes hereinafter that the supplemental ground relates back to the filing of the original Petition.

penalty.   (Supplemental Petition, Doc. 78 at 5-7.8.)   Petitioner relates that he has a cassette tape of the interview between Boston and detectives.   (*Id.*)   Petitioner proffers nothing to suggest that this interview was not previously available to counsel or directly to Petitioner as part of the materials provided by counsel.   Petitioner makes no suggestion that this interview had been suppressed by the prosecution.   Petitioner's only allegation of failure of the prosecution to disclose evidence relates to letters from Isaacs to Petitioner mailed through Griselda Cox.   (Supplemental Petition, Doc. 78 at 5-7.9.)

**Supplemental Ground 2H** relates to trial counsel's ineffectiveness for failing to assert prosecutorial misconduct as a  result of the prosecutions' withholding of evidence intended to be used to impeach Griselda Cox, resulting in counsel not calling Cox to testify.   (Supplemental Petition, Doc. 78 at 5-7.9.)   The purportedly withheld evidence was letters (plural) between Petitioner and Isaacs sent through Cox.   Petitioner argues only one such letter was disclosed by the prosecution.   However, in the evidentiary hearing on November 10, 2003, during testimony by trial counsel Iannone, the issue of whether there were multiple "messages" relayed through Cox was addressed.

> A. …We found out like a couple of hearings before we were planning to put [Cox] in the box, that while she and - - I'm sorry, while Bill and Mugsy [Isaacs] were both guests  at the county jail, that she had been passing messages  back and forth between them. [Co-counsel Baran's] concern was that the jury would perceive a connection between Bill and Mugsy and would -- and would -- would see this as, you know -- as something tying the two of them together.  [Baran] was concerned about that.  And at the end of the day, I believe that was the reason that he determined that -- that Ms. Cox and her younger sister, whose name I no longer recall --
> * * *
> Q.  But you said messages. Was there just -- was there something that came to light that was just one letter that had been passed? Is that right?
> A. There was -- yeah, there was one letter. And I believe it was Bill who had written it.
> * * *
> Q.  [Showing Exhibit 103] Is that the message you're speaking of?
> A. Yes, it is.
> Q. Is there more than that, or is that it?
> A. I don't recall there being any more than this.
> Q.  So that would be the only -- and that's -- and that's apparently, because we don't know, because we don't have them here to cross-examine, Mr. Isaacs writing a letter to Bill Duncan, his

codefendant, right?

A. That is -- that is my understanding of what this is.

* * *

Q. What I'm trying to get at is this letter is the only evidence that -- upon which the defense people based its decision to not call Gracie Cox as a witness in this case; is that right?

A. Yes.

Q. And all this letter shows is that one codefendant sent a letter to another codefendant  saying -- saying whatever it says in there. We don't have to get into the details at this point.

A. Well, as I recall, Conrad and I did get into the details of what it said.

(Exhibit JJ, R.T. 11/10/3 at 164-166.)   Apart from this testimony, the only recently discovered facts supporting his claim in Supplemental Ground 2H is the purported interview of trial counsel Iannone by the Arizona Justice Project where he purportedly reiterated the facts concerning the letter (singular). (Supp. Petition, Doc. 78 at 5-7.9) However, that adds nothing necessary to Petitioner bringing the claim asserting letters (plural).

Accordingly, the undersigned concludes that Petitioner's claim is founded solely upon this testimony, which has long been known to Petitioner.

**Supplemental Ground 2I** relates to trial counsel's failure to call *Brie Rivera*,[17] the older sister of Hernandez, regarding provision of information about the case to Hernandez while he was hiding in Mexico.  (Supplemental Petition, Doc. 78 at 5-7.9.) Petitioner alleges that this information was provided in "collusion" with the police.  (*Id.*)

Hernandez testified at trial that he returned from Mexico and turned himself in because of information given to him by his sister about the murder.  (Exhibit L: R.T. 4/26/00 at 60, 62.)  Detective Betts testified the he had worked with Rivera to go get Hernandez.  (Exhibit N, R.T. 4/27/00 Vol. II at 46.)  Thus, Petitioner was on notice that the sister and police were working together to return Hernandez to the United States. Petitioner proffers no explanation what any additional facts necessary to this claim he, or counsel, would have been unable to discover with diligence.  For example, Petitioner makes no suggestion that Rivera was unavailable to be interviewed.

---

[17] Hernandez's sister is alternatively referenced by the names "Brie," "Briz," "Breeze," and "Rivera," and "Riviera."

In **Supplemental Ground 2J**, Petitioner argues that trial counsel was ineffective for failing to request a psychological evaluation of Petitioner, based on Petitioner's prior head injuries, multiple concussions, headaches, etc. (Supplemental Petition, Doc. 79 at 5-7:10.)   Petitioner proffers no facts not long available to Petitioner on which this claim depends.   For example, Petitioner does not suggest he was unaware of his medical history.   To the extent that Petitioner might simply assert that he was unaware of the legal significance of those facts, e.g. that he had a right to obtain an evaluation or that the facts might have provided a defense at trial, and thus counsel was ineffective for failing to pursue such matters, then Petitioner was not delayed from a lack of facts, but a lack of knowledge of their legal significance. That does not justify a delayed commencement under 28 U.S.C. § 2244(d)(1)(D).  *Hasan*, 254 F.3d at 1154 n. 3.

In **Supplemental Ground 2K**, Petitioner argues that trial counsel was ineffective for failing to "canvas[ ] the neighborhood where the [crime] occurred and locate and interview potential witnesses."  (Supplemental Petition, Doc. 78 at 5-7.10.)  Counsel's failure to interview neighborhood witnesses has long been known to and a topic of dispute by Petitioner.  In his original Ground 9A, Petitioner argued that trial counsel was ineffective for "failing to interview several identified witnesses."  (Petition, Doc. 1 at 9:5-A.)  Petitioner then goes on to point to Douglas Johnson (*id.* at 9:5-C), Buck Ridley (*id.* at 9:5-D), and Robert Hill (*id.*) as neighborhood witnesses available to testify.  He further argued that the investigators admitted having no instructions to canvas the neighborhood, and co-counsel Iannone admitting not considering canvassing the neighborhood.  (*Id.* at 9:5-D.)  Petitioner proffers nothing to suggest that the facts underlying this new claim were not as well known, or at least as available to him, as those underlying original Ground 9A.

In **Supplemental Ground 2L**, Petitioner argues that trial counsel was ineffective for failing to request an aiding and abetting jury instruction.  (Supplemental Petition, Doc. 78 at 5-7.11.)  Petitioner argues that the evidence showed that his only involvement in the murder was helping to dispose of the weapon after the fact, and therefore counsel

should have pushed for instructions on a lesser included offense of aiding and abetting. (*Id.*)

Petitioner points to no facts underlying this claim which were not long known to him.  At most, Petitioner implies that he did not understand the legal significance of the facts, in the form of the availability of the propose jury instruction.  That is the legal significance of his factual predicate, not the predicate itself.  .  *Hasan*, 254 F.3d at 1154 n. 3.

In **<u>Supplemental Ground 3</u>** Petitioner argues that the cumulative errors in his pre-trial, trial, sentencing, appeal, and post-conviction relief proceedings denied him due process of law. (Supplemental Petition, Doc. 78 at 5-8.1.)  As discussed hereinabove, the factual predicates of Petitioner's individual claims were available to Petitioner at least through the time of his original PCR proceedings. The only exception is Petitioner's claim of actual innocence.

However, a claim of actual innocence is not founded upon any error in the proceeding.  In *Herrera*, the Supreme Court carefully distinguished between normal habeas claims founded upon errors and the free standing claim of actual innocence.

> Petitioner in this case is simply not entitled to habeas relief based on the reasoning of [the procedural actual innocence] line of cases. For he does not seek excusal of a procedural error so that he may bring an independent constitutional claim challenging his conviction or sentence, but rather argues that he is entitled to habeas relief because newly discovered evidence shows that his conviction is factually incorrect.

*Herrera*, 506 U.S. at 404.

Thus, all of the factual predicates underlying Supplemental Ground 3 have been available to Petitioner since at least his first PCR proceeding.


### (4).  Summary re Factual Predicate

Based upon the foregoing, the undersigned concludes that Petitioner is chargeable with the factual predicate of his claim of actual innocence in Supplemental Ground 1 as of July 23, 2012.

Petitioner is chargeable with knowledge of the factual predicates of the remainder of his Supplemental Grounds during his trial or at the latest in his first and second PCR proceedings.  Because these claims are based upon assertions of ineffective assistance of trial counsel, the undersigned presumes for purposes of this Report and Recommendation that knowledge attributable to trial counsel should not be attributable to Petitioner, but that knowledge attributable to PCR counsel should be. Petitioner's counsel in that proceeding had sufficient opportunity to discover the factual predicates of these claims at least as of the conclusion of his original PCR proceedings following remand.   That occurred on June 12, 2008.  (*See* Exhibit MMM, M.E. 6/12/08.)

### c.   Conclusions re Commencement

Using the finality of Petitioner's conviction as the commencement date, Petitioner's one year limitations period began running on December 9, 2005, and without any tolling expired on Friday, December 8, 2006.

With regard to Petitioner's Supplemental Ground 1, the undersigned concludes that 28 U.S.C. § 2244(d)(1)(D) applies, and that Petitioner is chargeable with discovery of the factual predicate of that claim as of July 23, 2012, with his one year running thereafter, and without any tolling, expiring on Tuesday, July 23, 2013.

With regard to the remainder of Petitioner's supplemental grounds, the undersigned presumes, in Petitioner's favor, that Petitioner is not chargeable with the discovery of the factual predicate of these claims until June 12, 2008, upon conclusion of those proceedings in the PCR court.  Thereafter his one year began running, and without any tolling expired on June 12, 2009.

### 3.  Effective Filing Dates of Claims

Petitioner's original Petition (Doc. 1) was filed April 29, 2011. Petitioner's Supplemental Petition (Doc. 78) was filed on February 4, 2015.  Arguably, Petitioner did not effectively file his Supplemental Petition until February 11, 2015 when he signed the

76

cover page to (and filed) his signature page.  (Doc. 79)

### a.   Prison Mailbox Rule

"In determining when a pro se state or federal petition is filed, the 'mailbox' rule applies. A petition is considered to be filed on the date a prisoner hands the petition to prison officials for mailing." *Porter v. Ollison*, 620 F.3d 952, 958 (9th Cir. 2010).

Petitioner's original Petition asserts that the Petition "was placed in the prison mailing system on April 26, 2011." (Petition, Doc. 1 at 11.)  Similarly, the signature page for the Supplemental Petition (Doc. 78) asserts that petition was "placed in the prison mailing system on February 4th, 2015.  (Doc. 79 at 3 ("5-11").)  Respondents proffer nothing to counter those assertions, but instead treat the Petition as filed on April 26, 2011 (Answer, Doc. 14 at 4) and the Supplemental Petition as filed February 4, 2015 (Supplemental Answer, Doc. 80 at 15).

Accordingly, the undersigned finds that the Petition and Supplemental Petition were delivered to prison officials for mailing on the dates indicated, and that they should be deemed "filed" as of that date.  Thus, the undersigned concludes that the Petition was "filed" as of April 26, 2011 and that the Supplemental Petition was "filed" as of February 4, 2015.

### b.   Relation Back

Petitioner argues that, with the exception of his new claim based on newly discovered evidence of actual innocence (SG1), all of his new claims relate back to his previous petition.  (Supplemental Petition, Doc. 78 at 5-11-A.)

Here, the purportedly untimely claims were raised in a Supplemental Petition. Applications for habeas corpus "may be amended or supplemented as provided in the rules of procedure applicable to civil actions."   28 U.S.C. § 2242.  Similarly, Rule 11 of the Rules Governing Section 2254 Cases provides that "[t]he Federal Rules of Civil Procedure, to the extent that they are not inconsistent with these rules, may be applied,

1    when appropriate, to the petitions filed under these rules."

2        Rule 15(c), Federal Rules of Civil Procedure provides that an "amendment of a

3    pleading relates back to the date of the original pleading when . . . (2) the claim or

4    defense asserted in the amended pleading arose out of the conduct, transaction, or

5    occurrence set forth or attempted to be set forth in the original pleading."  "So long as

6    the original and amended petitions state claims that are tied to a common core of

7    operative facts, relation back will be in order."  *Mayle v. Felix*, 545 U.S. 644, 664

8    (2005).   An amended habeas petition "does not relate back (and thereby escape

9    AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts

10   that differ in both time and type from those the original pleading set forth." *Id.* at 650.

11   Conversely, relation back is ordinarily allowed "'when the new claim is based on the

12   same facts as the original pleading and only changes the legal theory.'"  *Id.* at 664, n.3

13   (quoting  3 J. Moore, *et al.*, *Moore's Federal Practice* § 15.19[2], p. 15–82 (3d

14   ed.2004)).

15       In evaluating purportedly related claims of ineffective assistance of counsel, it is

16   the underlying conduct by counsel which must have common facts.  It is not sufficient

17   that the claims all assert ineffective assistance.   *Schneider v. McDaniel*, 674 F.3d 1144

18   (9th Cir. 2012).  Nor is it sufficient that the claims assert similar types of misconduct.

19   Thus in *Schneider* claims of failure to investigate witnesses and damage were distinct

20   from a claim alleging failure to investigate a co-defendant's defense strategy.  *Id.* at

21   1152.   Similarly, claims of failure to pursue a voluntary intoxication defense were

22   distinct from claims of failure to develop an insanity or competency defense.  *Id.*

23       It is true that here, Petitioner's new claims have been raised in a "supplemental"

24   rather than an amended, new, petition.  Rule 15(c) by its terms relates to amendments.

25   Rule 15(d) governs a "supplemental pleading" which is deemed to refer to pleadings

26   asserting claims based on "any transaction, occurrence, or event that happened after the

27   date of the pleading to be supplemented."  But here, the Court's grant of leave to

28   supplement (as opposed to amending) was not based upon a determination that the new

claims were based on recent events.   Rather, the Court permitted a supplemental

pleading in lieu of an entirely new amended petition because the existing petition had

long been fully briefed, involved voluminous records, and the undersigned had, in fact,

been prepared to file a Report & Recommendation on the original Petition at the time

Petitioner sought to stay the case with an eye to adding his new claims.   Thus, the

"supplement" was in the nature of an amendment to assert new claims based on pre-

existing events, but merely accomplished for expediency's sake by way of a separate

pleading.      Thus, the undersigned concludes that Rule 15(c) continues to apply to the

Supplemental Petition.

Nonetheless, Petitioner's new claims do not arise out of a common core of

operative facts underlying his original claims.

Petitioner's **Supplemental Ground 1** raises a claim of actual innocence founded

upon declarations from inmates Ellis and Gaines received by Plaintiff on August 1, 2012,

avowing that Isaacs confessed to the murder.   (Supplemental Petition, Doc. 1 at 5-6.1 *et*

*seq.*)   Ellis's interaction with Isaacs was in 2011.   (*Id.*)   Similarly, Gaines's interaction

with Isaacs was in 2001.   (*Id.* at 5-6.2.)   In contrast, Ground 11 of the original Petition

also asserted a claim of actual innocence, but it was based upon evidence presented at his

November 10, 2003 evidentiary hearing on his PCR petition, and based upon admission

of guilt by Isaacs "on at least five separate, independent occasions beginning in 1998 and

culminating in 2008."   (Petition, Doc. 1 at 9:7-A.)   It is true that the facts underlying

Supplemental Ground 1 are of the same type as those underlying original Ground 11.

They are, however, from a far different time:   2011 vs. 1998 to 2008.   Accordingly,

Supplemental Ground 1 does not relate back in time to the original Petition.

Leaving for the moment the multi-part Supplemental Ground 2, **Supplemental**

**Ground 3** asserts a claim of cumulative error in Petitioner's "pre-trial, trial, sentencing,

appeals, and post-conviction relief proceedings" resulting in a denial of due process.

(Supplemental Petition, Doc. 78 at 5-8.1.)   If Supplemental Ground 2 were limited to the

errors specified in the original Petition, then arguably the new ground would simply be a

1    new legal theory for relief based on those grounds.  However, Petitioner makes no such

2    limitation on the purported errors, but asks the Court to "view all of the facts, law, and

3    arguments I have outlined in these proceedings and the facts I will develop in the

4    requested evidentiary hearing to determine all of the grounds herein and in my Petition

5    (DOC 1)."  (*Id.*)  Thus, while Supplemental Ground 3 is based in part on facts alleged in

6    the original Petition, Petitioner extends the underlying facts beyond that pleading to

7    those alleged in his Supplemental Pleading and others to be developed in an evidentiary

8    hearing.   Accordingly, Supplemental Ground 3 does not relate back in time to the

9    original Petition.

10       Now, with regard to Supplemental Ground 2, Petitioner sets out 12 separate

11   claims of ineffective assistance of counsel.  Respondents argued in the Response to the

12   Motion to Stay that none of them relate back to the original Petition. (Response, Doc. 38

13   at 84, *et seq.*)

14       The undersigned concludes that only one of them, Supplemental Ground 2F,

15   relates back to the original Petition.

16       In **Supplemental Ground 2A**, Petitioner argues that trial counsel was ineffective

17   for failing to impeach Hernandez and use the impeachment at sentencing.  (Supplemental

18   Petition, Doc. 78 at 5-7.1, *et seq.*)  Petitioner reincorporates the existing claim, but adds

19   "Petitioner is now alledging [sic] a newly discovered instance of IAC/impeachment of

20   Hernandez" based on testimony by an investigator at Isaacs pre-sentencing hearing that

21   Hernandez told him there had been no promise of money or drugs."  (Supplemental

22   Petition, Doc. 78 at 5-7.1. – 5-7.2.)

23       Petitioner asserted a similar claim of ineffective assistance in Ground 9C of the

24   original Petition.  In the original Petition, Petitioner argued that trial counsel failed to

25   impeach Hernandez "with his numerous prior inconsistent versions of the events,

26   reputation for untruthfulness, and alcoholism and drug abuse, and by drug and alcohol

27   impairment on the night of the alleged offense." (Petition, Doc. 1 at 9:5-A.)  While

28   Petitioner outlined in his original Ground 9 a variety of witnesses who would have

contradicted Hernandez, or testified to a reputation for untruthfulness, the ground identified no specific prior inconsistent statements by Hernandez. (*Id.* at 9:5-A to –I.) Petitioner did argue that the trial court had found prior inconsistent statements, referencing the PCR court's order on the original PCR petition, attached as Exhibit A to Petitioner's Petition for Review.  (*Id.* at 9:5-G.)  In that Order, the PCR court observed:

> The inconsistent statements about how the gun was handled after the murder should have been exposed. Whether the murderer asked the victim where her husband was, or where her "man" was or where her "old man" was would not be a critical area of impeachment, as those are all commonly used terms for the same person; since Franz' credibility is under attack by the defense, conflict between what he said and what Hernandez said would not necessarily make Hernandez a liar.

(Exhibit LL, PCR PFR 3/9/4 at Exhibit A, Order 11/21/03 at 5.) No reference was made to inconsistent statements by Hernandez regarding the pecuniary gain.  Nor was any reference made to inconsistent statements made by Hernandez to the investigator who testified at the Isaacs pre-sentencing hearing.   Indeed, in his prior PCR Petition, Petitioner had argued that "For this murder Duncan received no money or apparent benefit. Duncan's own motive was equally non-existent." (Exhibit A, ROA Item 297, PCR Pet. at 4.)   The only incidents of inconsistent statements by Hernandez argued by Petitioner in that PCR Petition were: (1) Hernandez's statements to police about his alcohol and drug usage, whether he and Petitioner had worked together that night; and his inability to hear conversations between Petitioner and Isaacs in the car prior to the murder (*id.* at 13-14); (2) Hernandez's statements in pretrial interviews about Petitioner's demands to the victim, and where the shotgun was kept in the vehicle (*id.* at 14); and (3) Hernandez's testimony at Isaacs' bail hearing about whether Isaacs had carried the gun on initially entering Witzig's house (*id.*).  No reference was made to money or drugs, or to testimony at Isaacs' presentence hearing.

　　　　To the extent that Petitioner simply relies upon previously asserted instances of prior inconsistent statements, this ground is merely repetitive of existing Ground 9C.  To the extent that Petitioner relies upon the prior inconsistencies arising about the pecuniary

gain or from Isaacs' sentencing hearing, the facts used to demonstrate the ineffectiveness of counsel are different in both type and time.

Petitioner further asserts that the ineffectiveness extended into his sentencing hearing by failing to introduce that evidence to dispel arguments on the sentencing factor of pecuniary gain.  (*Id.* at 5-7.5.)  Petitioner never asserted any such ineffectiveness by trial counsel at sentencing.

Accordingly, Supplemental Ground 2A does not relate back in time to the original Petition.

In **Supplemental Grounds 2B, 2C, 2D, 2E, 2G and 2I**, Petitioner argues that trial counsel was ineffective for failing to call a specific list of witnesses. Supplemental Ground 2B relates to failure to call *Isaacs*.  (Supplemental Petition, Doc. 78 at 5-7.5.) Supplemental Ground 2C relates to failure to call *Rusty Briton*.  (*Id.* at 5-7.6.) Supplemental Ground 2D relates to failure to call *Stephen Greenwood*.  (*Id.* at 5-7.7.) Supplemental Ground 2E relates to failure to call a *forensic expert*.  (*Id.* at 5-7.8.) Supplemental Ground 2G relates to failure to call *Amelia Boston*.  (*Id.*)  Supplemental Ground 2I relates to failure to call *Brie Rivera*.  (*Id.* at 5-7.9.)

In original Ground 9E, Petitioner argued that trial counsel was ineffective for failing to call a different, specific list of witnesses:  "the following witnesses…(1) Griselda Cox; (2) Kristina Cox; (3) Jennifer Seeley; (4) Lena Sinclair; (5) Douglas Johnson; (6) Robert Hill; (7) Buck Ridley; (8) Gloria Gilbert; (9) Tina Malcomson; and (10) Lisa Daily."  (Petition, Doc. 1 at 9:5-A.)  None of the witnesses in Supplemental Grounds 2B, 2C, 2D, 2E, 2G, or 2I were identified.  Thus, the core operative fact (the witness who should have been called) is not the same between the new claims and the original claim.  *Cf. Everett v. Barnett*, 162 F.3d 498, 502 (7th Cir. 1998) (failing to argue in state court that counsel was ineffective for not calling a certain witness resulted in procedural default, even though petitioner had previously argued that other witnesses should have been called).

Accordingly, Supplemental Grounds 2B, 2C, 2D, 2E, 2G, and 2I do not relate

back in time to the original Petition.

In **Supplemental Ground 2F**, Petitioner argues that trial counsel was ineffective for failing to impeach Franz with evidence of the pending divorce from and life insurance on the victim.  Petitioner argues that these provide a motive for Franz to have arranged for the victim to be murdered by Isaacs.  (Supplemental Petition, Doc. 78 at 5-7.8.)

Petitioner asserted a similar claim of ineffective assistance in Ground 9D of the original Petition.  In the original Petition, Petitioner argued that trial counsel failed to impeach Franz "with his…prior bad acts involving the decedent." (Petition, Doc. 1 at 9:5-A.) But Petitioner made no reference to impeachment with the divorce and life insurance.

However, Petitioner argued that other witnesses should have been called to testify about the troubled relationship between Franz and the victim, that Franz "threatened to physically harm the victim," that Franz and the victim "had a volatile and violent relationship," that a witness "personally witnessed Robert's physical abuse of the children and Elisha" and his "fight with Elisha on the day prior" and he "had obtained and collected upon a life insurance policy."  (*Id.* at 9:5-E to 9:5-F.)

Thus, the impeachment of Franz with the life insurance was raised as part of the original Ground 9D, and is repetitive in that regard.

While there was no reference in original Ground 9D to a pending divorce filed by Mr. Franz, there was a reference to information that the victim "was filing for divorce." (*Id.* at 9:5-F.)  The addition of an allegation that Mr. Franz had also filed for divorce does not change the common core of operative fact, *i.e.* that Franz and the victim were divorcing and Franz had life insurance on the victim, giving him a motive to arrange her death.

Respondents argue that Supplemental Ground 2F is limited to arguing "trial counsel should have cross-examined" Franz about the divorce and life insurance, while the related matters argued in original Ground 9D involved failure to call impeaching

witnesses.  (Resp. to Mot. Stay, Doc. 38 at 96.)  To the contrary, Supplemental Ground 2F is not limited to cross-examination of Franz, but broadly relates to counsel "failing to impeach Mr. Franz."  (Supp. Pet. Doc. 78 at 5-7.8.)  Similarly, original Ground 9D referred to both the failure to effectively cross-examine Franz, and the failure to impeach him with the other evidence.  (Petition, Doc. 1 at 9:5-A.)

Accordingly, Supplemental Ground 2F ***does*** relate back in time to the original Petition.

In **Supplemental Ground 2H**, Petitioner argues that trial counsel was ineffective for failing to assert prosecutorial misconduct as a  result of the prosecutions' withholding of evidence intended to be used to impeach Griselda Cox, resulting in counsel not calling Cox to testify.  (Supplemental Petition, Doc. 78 at 5-7.9.)

Petitioner did not raise any similar claim or facts as part of his claims of ineffective assistance of counsel.  (*See* Petition, Doc. 1 at 9::5-A *et seq.*.)  At best, Petitioner observed that counsel had decided not to call witnesses because "the state produced a letter written by Isaacs to me."  (*Id.* at 9:5-E.)  (*See also id.* at 9:7-C (arguing actual innocence).)  He also asserted that counsel could have raised "hearsay and confrontation clause objections."  (*Id.* at 9:5-E.) However, Petitioner made no suggestion that the letter had been improperly withheld, or that counsel performed deficiently by failing to object on that basis.

Accordingly, Supplemental Ground 2H does not relate back in time to the original Petition.

In **Supplemental Ground 2J**, Petitioner argues that trial counsel was ineffective for failing to request a psychological evaluation of Petitioner, based on Petitioner's prior head injuries, multiple concussions, headaches, etc. (Supplemental Petition, Doc. 79 at 5-7:10.)   Petitioner made no similar allegations in his original Petition.

Accordingly, Supplemental Ground 2J does not relate back in time to the original Petition.

In **Supplemental Ground 2K**, Petitioner argues that trial counsel was ineffective

1   for failing to "canvas[ ] the neighborhood where the [crime] occurred and locate and

2   interview potential witnesses."  (Supplemental Petition, Doc. 78 at 5-7.10.)

3          In his original Ground 9A, Petitioner argued that trial counsel was ineffective for

4   "failing to interview several identified witnesses."  (Petition, Doc. 1 at 9:5-A.)  Petitioner

5   then goes on to point to Douglas Johnson (*id.* at 9:5-C), Buck Ridley (*id.* at 9:5-D), and

6   Robert Hill (*id.*) as neighborhood witnesses available to testify.  He further argued that

7   the investigators admitted having no instructions to canvas the neighborhood, and co-

8   counsel Iannone admitting not considering canvassing the neighborhood.  (*Id.* at 9:5-D.)

9          To the extent that Petitioner's Supplemental Ground 2K is founded upon failure to

10  call Johnson, Ridley, and Hill, it is merely repetitive of original Ground 9A.  To the

11  extent that Petitioner contends there were other available witnesses, Supplemental

12  Ground 2K arises out of some of the same facts asserted in original Ground 9A, but the

13  critical facts, namely the identify to the additional witnesses (or its absence), their

14  expected testimony, and the prejudice from the lack of such testimony, would be

15  different from that of his prior claims regarding Johnson, Ridley, and Hill.

16         Accordingly, Supplemental Ground 2K does not relate back in time to the original

17  Petition.

18         In **Supplemental Ground 2L**, Petitioner argues that trial counsel was ineffective

19  for failing to request an aiding and abetting jury instruction.  (Supplemental Petition,

20  Doc. 78 at 5-7.11.)  Petitioner raised no similar assertions of ineffective assistance in his

21  original Petition, and made no reference to any request for an aiding and abetting jury

22  instruction.  Indeed, the only jury instruction referenced by Petitioner in his original

23  Petition was the "*Willits*" lost evidence instruction in original Ground 2 and 3 (Petition,

24  Doc. 1 at 7 *et seq.*), and the "*Dessereault*" instruction on the suggestiveness of the lineup

25  identifications in original Ground 4 (*id.* at 9-A).  These address separate phases of the

26  trial, i.e. evaluation of evidence versus the permissible verdicts.

27         Accordingly, Supplemental Ground 2L does not relate back in time to the original

28  Petition.

**Summary re Relation Back** – Based upon the foregoing, the undersigned concludes that only Supplemental Ground 2F relates back in time to the original petition, and thus must be considered timely filed on that basis

### c.   Pendency of Motion to Amend/Supplement

Although not truly a question of the filing date, the question arises whether Petitioner is entitled to tolling of the statute of limitations during the time in which he was seeking to add his new claims ultimately included in his Supplemental Petition.

> Amended complaints may not be filed until the court has ordered leave to do so. A number of courts have addressed the situation where the petition for leave to amend the complaint has been filed prior to expiration of the statute of limitations, while the entry of the court order and the filing of the amended complaint have occurred after the limitations period has expired. In such cases, the amended complaint is deemed filed within the limitations period.

*Mayes v. AT & T Info. Sys., Inc.*, 867 F.2d 1172, 1173 (8th Cir. 1989).

"Where a motion to amend is full and comprehensive as to the facts, the motion itself may stand in place of an actual amendment, in which event the timely filing of such a motion may defeat a statute of limitations defense."   54 C.J.S. Limitations of Actions § 329.

> However, it is well established, for the purpose of calculating the statute of limitations, that an amended pleading is effectively filed when the motion to amend is filed. The rationale underlying this rule is twofold. First…parties have "no control over when a court renders its decision regarding the proposed amended complaint." In addition, when a motion to amend is accompanied by the proposed amended pleading, the motion to amend notifies the defendant of the impending claim.

*In re Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1282 (E.D. Wash. 2007) (quoting *Moore v. Indiana,* 999 F.2d 1125, 1131 (7th Cir.1993).)  *Cf. Rothman v. Gregor*, 220 F.3d 81, 96 (2d Cir. 2000) ("When a plaintiff seeks to add a new defendant in an existing action, the date of the filing of the motion to amend constitutes the date the action was commenced for statute of limitations purposes.").  Similarly, the service of the lodged, proposed amendment ordinarily stops the running of the statute of limitations.  54 C.J.S.

Limitations of Actions § 329.

Here, Petitioner filed his Motion to Supplement Habeas Petition (Doc. 74) on December 29, 2014.  The motion is dated the same date.  That motion laid out his supplemental claims in detail.  The motion was granted on January 23, 2015, and Petitioner was given 14 days to file his supplemental Petition. (Order 1/23/15, Doc. 76.) Petitioner filed his Supplemental Petition eleven days later, on February 4, 2015 (Doc. 78), and his executed signature page a week later, on February 11, 2015 (Doc. 79).

Moreover, Petitioner's Amended Motion for a Stay and Abeyance, filed August 8, 2012 (Doc. 32) spelled out his new claims and included a request as alternative relief for the Court to "grant additional time for Petitioner to Supplement these new claims to his Petition." (*Id.* at 13.)  Thus, Respondents have been on notice of the new claims since the filing of that motion.

It is true that Petitioner had filed his original Motion for a Stay and Abeyance on July 19, 2012 (Doc. 30).  In setting a deadline for an amendment to that motion, the Court observed:

> The Court notes, however, that Petitioner's motion is devoid of any particulars about the purported claims, which are required to allow the Court and Respondents to evaluate such things as the likelihood of success of the claims on the merits, the potential that the claims are procedurally defaulted or barred, or the diligence of Petitioner in pursuing these claims heretofore.

(Order 7/23/12, Doc. 31 at 1.)

Accordingly, the undersigned concludes that Petitioner's Supplemental Petition was effectively filed, for purposes of the statute of limitations, as of the filing of his Amended Motion to Stay, on December August 8, 2012.

### d.   Conclusion re Filing

Based upon the foregoing, the undersigned concludes that:

(1)  Petitioner's original Petition (Doc. 1) was filed as of April 26, 2011;

(2)  Petitioner's Supplemental Ground 2F relates back in time to the original Petition, deemed filed as April 26, 2011;

(3)   The other grounds in the Supplemental Petition do not relate back to the original Petition and are deemed filed as of August 8, 2012, when Petitioner filed his Amended Motion for a Stay and Abeyance (Doc. 32).

As determined in subsection (2) above, without any tolling Petitioner's one year habeas limitations period on the claims in his original Petition expired on Friday December 6, 2006.  Thus, without any tolling, those claims would be almost five years delinquent.

The limitations period on Supplemental Ground 1 expired on Tuesday, July 23, 2013, and thus without any tolling, that claim, deemed filed as of August 8, 2012, was timely.

The limitations period on the remainder of Petitioner's supplemental grounds expired on June 12, 2009.  Thus, Supplemental Ground 2F, even though deemed filed as of April 26, 2011, without any tolling was untimely by some 22 months.  The other supplemental grounds, deemed filed as of August 8, 2012, were without any tolling over three years delinquent.


**4.  Statutory Tolling**

    **a.   Governing Principles**

The AEDPA provides for tolling of the limitations period when a "properly filed application for State post-conviction or other collateral relief with respect to the pertinent judgment or claim is pending."  28 U.S.C. § 2244(d)(2).  This provision only applies to state proceedings, not to federal proceedings.  *Duncan v. Walker*, 533 U.S. 167 (2001).

**Properly Filed** - Statutory  tolling of the habeas limitations period only results from state applications that are "properly filed," and an untimely application is never "properly filed" within the meaning of § 2244(d)(2).  *Pace v. DiGuglielmo*, 544 U.S. 408 (2005).  On the other hand, the fact that the application may contain procedurally barred claims does not mean it is not "properly filed."  "[T]he question whether an application has been 'properly filed' is quite separate from the question whether the claims

contained in the application are meritorious and free of procedural bar." *Artuz v. Bennett*, 531 U.S. 4, 9 (2000).

Even if the state court provides alternative grounds for disposing of the state application, a ruling that the application was untimely precludes it from being "properly filed" and tolling the limitations period. *Carey v. Saffold*, 536 U.S. 214, 225-26 (2002). If the state court summarily disposes of a state application without identifying if it was on timeliness grounds, or otherwise fails to give a clear indication whether it has deemed the application timely or untimely, the federal habeas court "must itself examine the delay in each case and determine what the state courts would have held in respect to timeliness." *Evans v. Chavis*, 546 U.S. 189, 198 (2006).

**<u>Mailbox Rule</u>** - For purposes of calculating tolling under § 2244(d), the federal prisoner "mailbox rule" applies.  Under this rule, a prisoner's state filings are deemed "filed" (and tolling thus commenced) when they are delivered to prison officials for mailing.   In *Anthony v. Cambra*, 236 F.3d 568 (9th Cir. 2000), the Ninth Circuit noted:

> [I]n *Saffold v. Newland*, 224 F.3d 1087 (9th Cir.2000), we squarely held that the mailbox rule applies with equal force to the filing of state as well as federal petitions, because "[a]t both times, the conditions that led to the adoption of the mailbox rule are present; the prisoner is powerless and unable to control the time of delivery of documents to the court." *Id.* at 1091.

*Id*. at 575.

Although a state may direct that the prison mailbox rule does not apply to filings in its court, *see Orpiada v. McDaniel,* 750 F.3d 1086, 1090 (9th Cir. 2014), Arizona has applied the rule to a variety of its state proceedings.  *See e.g.  Mayer v. State,* 184 Ariz. 242, 245, 908 P.2d 56, 59 (App.1995) (notice of direct appeal); *State v. Rosario*, 195 Ariz. 264, 266, 987 P.2d 226, 228 (App.1999) (PCR notice); *State v. Goracke*, 210 Ariz. 20, 23, 106 P.3d 1035, 1038 (App. 2005) (petition for review to Arizona Supreme Court).

Accordingly, the "mailbox rule" applies to determining whether an Arizona prisoner's state filings were timely.

**b.   Application to Original Petition**

Pursuant to the presumptions made hereinabove, Petitioner's limitations period, using the finality of his conviction as the relevant trigger date, commenced running on December 9, 2005, and without any tolling expired on Friday, December 8, 2006.

**First PCR Proceeding** - Petitioner's first PCR proceeding was commenced on November 21, 2002, when Petitioner filed a Notice of Post-Conviction Relief (Exhibit A-3, ROA Item 274, Notice).  This was before his limitations period began running.

That PCR proceeding remained pending through October 18, 2005, when the Arizona Court of Appeals remanded with directions to allow an investigator.  (Exhibit SS, Mem. Dec. 10/18/05.)

**Second PCR Proceeding** – Petitioner eventually filed his Supplemental PCR Petition (Exhibit CCC).  Although the undersigned has denominated these post-remand proceedings as a "second" proceeding, because they were handled on remand, they were a continuation of the original PCR proceeding, which remained pending.  Accordingly, Petitioner's tolling continued from the date of the remand order (October 18, 2015), through the filing of the Supplemental PCR Petition.

Thereafter, it remained pending through the additional proceedings on remand before the PCR court, until May 21, 2010 when the Arizona Supreme Court denied review on Petitioner's second Petition for Review.  (*See* Exhibit RRR, Motion to Stay at 1.)

Further, a stay of the mandate was ultimately granted by the Arizona Court of Appeals to permit Petitioner to file a petition for writ of certiorari.  (Exhibit RRR, Order 8/26/10.)  Because Petitioner did not file a petition for writ of certiorari, that stay should have expired on September 30, 2010.  (*Id.*)  The parties have not provided a copy of the order and mandate.  The docket of the trial court reflects the filing of an order of the Arizona Court of Appeals on October 4, 2010.  *See* http://apps.supremecourt.az.gov/ public access, search for case S-8015-CR-98001153, last accessed 6/24/15.  Because it does not affect the outcome, the undersigned presumes for purposes of this Report &

Recommendation, that the mandate did not issue until October 4, 2010.

It is true that a petition for writ of certiorari would not have itself resulted in tolling of the statute of limitations. *Duncan v. Walker*, 533 U.S. 167 (2001) (2244(d)(2) only applies to "state" applications, thus federal petitions do not toll the running of the statute). However, because it is unclear, the undersigned assumes for purposes of this report and recommendation, that the stay of issuance of a mandate leaves an Arizona state proceeding pending. *Compare Celaya v. Stewart*, 691 F.Supp.2d 1046, 1054–55 (D.Ariz.2010), *aff'd* 497 Fed. Appx. 744, 2012 WL 5505736 (9th Cir. 2012), *cert. denied* 133 S.Ct. 1824 (2013) (tolling continued until issuance of mandate) and *Hemmerle v. Schriro*, 495 F.3d 1069 (2007) (delay for return of record by Arizona Supreme Court to Arizona Court of Appeals when petition for review denied did not extend tolling).

Thus, under the presumptions adopted herein, Petitioner's habeas limitations period on the claims in his original Petition was tolled from its commencement through October 4, 2010.

It commenced running again on October 5, 2010, and expired one year later on October 4, 2011.

Thus, Petitioner's original Petition, deemed filed as of April 26, 2011, was timely.

### c.   Application to Supplemental Ground 1

Petitioner's Supplemental Ground 1 was deemed filed as of August 8, 2012. The limitations period on Supplemental Ground 1 expired on Tuesday, July 23, 2013, and thus without any tolling, that claim was timely.

### d.   Application to Supplemental Ground 2F

Under the presumptions adopted herein (in Petitioner's favor) the limitations period on the remainder of Petitioner's supplemental grounds began running on June 13, 2008, and without any tolling expired on June 12, 2009. Thus, Supplemental Ground 2F, even though deemed filed as of April 26, 2011, without any tolling was untimely by

some 22 months.

However, as discussed hereinabove (and subject to the presumptions made in Petitioner's favor), Petitioner is entitled to tolling from his original PCR proceedings until October 4, 2010.   His one year on his supplemental grounds (other than Supplemental Ground 1) would have begun running thereafter, and expired on October 4, 2011. Thus his Supplemental Ground 2F, deemed filed as of April 26, 2011, was timely.

### e.   Application to Other Supplemental Grounds

Petitioner's other supplemental grounds, however, cannot be deemed filed until August 8, 2012.  Thus, without additional tolling, such that the limitations period expired on October 4, 2011, they were over ten months delinquent.

**Third PCR Proceeding** - Petitioner's next PCR proceeding was not commenced until July 17, 2012, during the pendency of this habeas proceeding, when Petitioner filed his third Notice of Post-Conviction Relief.  (Resp. to Amend. Mot. to Stay, Doc. 38 at Attachment D.)  At that time, his one year had been expired for over nine months.  Once the statute has run, a subsequent post-conviction or collateral relief filing does not reset the running of the one year statute. *Jiminez v. Rice*, 276 F.3d 478, 482 (9th Cir. 2001); *Ferguson v. Palmateer*, 321 F.3d 820, 823 (9th Cir. 2003).

Consequently, with the exception of Supplemental Grounds 1 and 2F, Petitioner's claims in his Supplemental Petition are barred by the habeas statute of limitations.

### f.   Summary Regarding Statutory Tolling

With the applicable statutory tolling, and under the presumptions in Petitioner's favor adopted herein, Petitioner's claims in his original Petition (Doc. 1) and Grounds 1 and 2F of this Supplemental Petition (Doc. 79) are timely.  The remainder of the claims in his Supplemental Petition were untimely.

**5.  Equitable Tolling**

"Equitable tolling of the one-year limitations period in 28 U.S.C. § 2244 is available in our circuit, but only when 'extraordinary circumstances beyond a prisoner's control make it impossible to file a petition on time' and 'the extraordinary circumstances were the cause of his untimeliness.'"  *Laws v. Lamarque*, 351 F.3d 919, 922 (9th Cir. 2003).

> To receive equitable tolling, [t]he petitioner must establish two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way. The petitioner must additionally show that the extraordinary circumstances were the cause of his untimeliness, and that the extraordinary circumstances ma[de] it impossible to file a petition on time.

*Ramirez v. Yates,* 571 F.3d 993, 997 (9th Cir. 2009) (internal citations and quotations omitted).  "Indeed, 'the threshold necessary to trigger equitable tolling [under AEDPA] is very high, lest the exceptions swallow the rule.' "  *Miranda v. Castro,* 292 F.3d 1063, 1066 (9th Cir. 2002)  (quoting *United States v. Marcello*, 212 F.3d 1005, 1010 (7th Cir.).  Petitioner bears the burden of proof on the existence of cause for equitable tolling.  *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005); *Rasberry v. Garcia*, 448 F.3d 1150, 1153 (9th Cir. 2006) ("Our precedent permits equitable tolling of the one-year statute of limitations on habeas petitions, but the petitioner bears the burden of showing that equitable tolling is appropriate.").

In his Supplemental Petition, Petitioner argues that he is entitled to equitable tolling because he was diligent and extraordinary circumstances stood in his way.  (Supp. Petition, Doc. 78 at 5-11-C.)    However, Petitioner identifies no such extraordinary circumstances beyond his assertions of ineffective assistance of trial, appellate and PCR counsel.  (*Id.*)  (At most, Petitioner argues his delay in discovering his claims.)

The undersigned has identified no explicit argument for equitable tolling in Petitioner's Supplemental Reply (Doc. 84) or his Reply (Doc. 39) on his Amended Motion to Stay.  Petitioner does complain of his *pro se* untrained status, and the limitations from his incarceration.  And, he complains of the ineffective assistance of his

PCR counsel in failing to assert his claims of ineffective assistance by trial counsel, but does as cause to excuse his procedural defaults. None of these establish grounds for equitable tolling.

**Pro se Status and Limited Legal Resources** – "It is clear that *pro se* status, on its own, is not enough to warrant equitable tolling." *Roy v. Lampert,* 465 F.3d 964, 970 (9th Cir. 2006). A prisoner's "proceeding *pro se* is not a 'rare and exceptional' circumstance because it is typical of those bringing a § 2254 claim." *Felder v. Johnson*, 204 F.3d 168, 171 (5th Cir. 2000). *See also Rasberry v. Garcia,* 448 F.3d 1150, 1154 (9th Cir. 2006) ("a *pro se* petitioner's lack of legal sophistication is not, by itself, an extraordinary circumstance warranting equitable tolling"). And, "ignorance of the law, even for an incarcerated pro se petitioner, generally does not excuse prompt filing." *Fisher v. Johnson*, 174 F.3d 710, 714 (5th Cir.1999).

Petitioner complains about his dependence upon the Arizona Justice Project to discern claims within his file, and to investigate outside the prison. The former is simply a recasting of an assertion of ignorance of the law. The latter fails for three reasons:

First, a limitation on an ability to investigate is not an extraordinary circumstance, but common to nearly every habeas petitioner. (Arguably, such factors are the reason why habeas petitioners are permitted the extraordinary period of one year to pursue relief in what has been an on-going criminal proceeding.)

Second, Petitioner fails to show that he was without assistance outside the prison during the relevant time. Here, Petitioner's limitations period on his time-barred claims was expiring during the period October 5, 2010 through October 4, 2011. As discussed hereinabove in connection with Petitioner's discovery of the factual predicate of his claims,[18] for all but the first few weeks of that time frame, Petitioner had the assistance of not only Judge Hall, but the Arizona Justice Project. Petitioner proffers no extraordinary circumstances which prevented him, with such assistance, from

---

[18] *See infra* Section III(C)(2)(b)(2) – General Application [of Discovery of Factual Predicate] to Petitioner.

completing his investigations in time to file timely supplements to the claims in his original Petition.

Third, whether or not acting as retained counsel for Petitioner, at the least the Arizona Justice Project was functioning as his agents, and thus any unjustified delay on their part, including delay resulting from their attention to other matters or limited available time, is attributable to Petitioner.  A habeas petitioner is responsible for the actions of his agents.  "A federal habeas petitioner—who as such does not have a Sixth Amendment right to counsel—is ordinarily bound by his attorney's negligence, because the attorney and the client have an agency relationship under which the principal is bound by the actions of the agent." *Towery v. Ryan*, 673 F.3d 933, 941 (9th Cir. 2012).

**Ineffective Assistance** - Although an attorney's behavior can establish the extraordinary circumstances required for equitable tolling, mere negligence or professional malpractice is insufficient. *Frye v. Hickman*, 273 F.3d 1144, 1146 (9th Cir.2001).   A "garden variety claim of excusable neglect,' such as a simple 'miscalculation' that leads a lawyer to miss a filing deadline does not warrant equitable tolling.' " *Holland v. Florida*, 560 U.S. 631, 651-652 (2010). Rather, the attorney's misconduct must rise to the level of extraordinary circumstances.  *Id.*      For example, in *Holland v. Florida*, 560 U.S. 631 (2010), the Court found that an attorney's repeated failures to respond to a client's inquiries over a period of years, and demands for timely action, might establish equitable tolling.  In that instance, the Court recognized that the agency relationship between the petitioner and the attorney had been severed by the attorney's abandonment of his post.  *Cf. Maples v. Thomas,* 132 S. Ct. 912, 923  (2012) (applying rationale of *Holland* to attorney abandonment as cause to excuse procedural default).

Here, any claim of ineffectiveness of PCR counsel would not establish equitable tolling for two reasons.  First, an attorney's mere failure to bring a claim "is unfortunate, but it amounts to 'garden variety' negligence, not a basis for equitable tolling." *Holland*, 560 U.S. at 667 (discussing counsel's miscalculation or oversight of limitations period

deadline).   Second, and perhaps more importantly, such negligence would not explain Petitioner's failure, after the conclusion of his PCR proceedings, and the conclusion of PCR counsel's representation, to timely file his untimely claims.

**Conclusion re Equitable Tolling** – Based upon the foregoing, the undersigned finds no grounds for equitable tolling.

## 6.  Actual Innocence

To avoid a miscarriage of justice, the habeas statute of limitations in 28 U.S.C. § 2244(d)(1) does not preclude "a court from entertaining an untimely first federal habeas petition raising a convincing claim of actual innocence."  *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1935 (2013).   To invoke this exception to the statute of limitations, a petitioner "'must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" *Id.* at 1935 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).  This exception, referred to as the "*Schlup* gateway," applies "only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.' " *Id.*   at 1936 (quoting *Schlup,* 513 U.S. at 316).

As discussed hereinafter (*see infra*  Sections III(R) (Procedural Actual Innocence) and III(S) (Substantive Actual Innocence), the undersigned concludes that Petitioner fails to make the showing necessary to meet the actual innocence standard.

## 7.  Summary re Statute of Limitations

Taking into account the delayed discovery of the factual predicates of his claims and the available statutory tolling, Petitioner's Supplemental Grounds 2A, 2B, 2C, 2D, 2E, 2G, 2H, 2I, 2J, 2K, 2L and 3 are barred by the habeas statute of limitations. Consequently, those portions of the Supplemental Petition must be dismissed with prejudice.

**D. EXHAUSTION & PROCEDURAL DEFAULT**

Respondents argue that Petitioner has failed to properly exhaust, and now has procedurally defaulted, his state remedies on part or all of original Grounds 2 (Lost Evidence Instruction), 7 (State's Investigation), 8 (Investigator), 9E (IAC re Exculpatory Witnesses), 9F (Closing Arguments), 9G (Sentencing), 9H (Appellate Counsel), 9I (Cumulative Errors), and 12 (Ineffective Assistance), and Supplemental Grounds 2 (Ineffective Assistance) and 3 (Cumulative Errors).[19]

**1. Exhaustion Requirement**

Generally, a federal court has authority to review a state prisoner's claims only if available state remedies have been exhausted. *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981) (*per curiam*). The exhaustion doctrine, first developed in case law, has been codified at 28 U.S.C. § 2254(b) and (c).  When seeking habeas relief, the burden is on the petitioner to show that he has properly exhausted each claim. *Cartwright v. Cupp,* 650 F.2d 1103, 1104 (9th Cir. 1981)(*per curiam*), *cert. denied,* 455 U.S. 1023 (1982). "A petitioner fairly and fully presents a claim to the state court for purposes of satisfying the exhaustion requirement if he presents the claim: (1) to the proper forum, (2) through the proper vehicle, and (3) by providing the proper factual and legal basis for the claim." *Insyxiengmay v. Morgan*, 403 F.3d 657, 668 (9th Cir. 2005).

"A petitioner fairly and fully presents a claim to the state court for purposes of satisfying the exhaustion requirement if he presents the claim: (1) to the proper forum, (2) through the proper vehicle, and (3) by providing the proper factual and legal basis for the claim." *Insyxiengmay v. Morgan*, 403 F.3d 657, 668 (9th Cir. 2005).

**a.  Proper Forum**

---

[19] The undersigned concludes hereinabove that, with the exception of Supplemental Ground 2F, Supplemental Grounds 2 and 3 are barred by the habeas statute of limitations.  As an alternate basis to resolve those grounds, the undersigned also addresses the procedural default defenses to those claims.

"In cases not carrying a life sentence or the death penalty, 'claims of Arizona state prisoners are exhausted for purposes of federal habeas once the Arizona Court of Appeals has ruled on them.'" *Castillo v. McFadden*, 399 F.3d 993, 998 (9th Cir. 2005)(quoting *Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999)).

Effect of Life Sentence - It is true that the Ninth Circuit's decisions like *Swoopes* refer to there being no right of appeal to the Arizona Supreme Court "except in capital cases or when a life sentence is imposed." *Swoopes*, 196 F.3d at 1009.[20]   Indeed, the decision concludes that "except in habeas petitions in life-sentence or capital cases, claims of Arizona state prisoners are exhausted for purposes of federal habeas once the Arizona Court of Appeals has ruled on them." *Id.* at 1010.   Here Petitioner received a life sentence.

However, in reaching its decision, the Ninth Circuit was faced with a habeas petitioner whose appeal to the Arizona Court of Appeals was denied in 1988, prior to the 1989 amendments eliminating life-sentences from the exceptions to Arizona Court of Appeals' jurisdiction. *See State v. Swoopes*, 155 Ariz. 432, 747 P.2d 593 (App. 1988). Similarly, the Ninth Circuit was required to draw on decisions applying the pre-1989 amendments law.  In *State v. Sandon*, 161 Ariz. 157, 777 P.2d 220 (1989), the Arizona Supreme Court considered the review rights of a defendant whose appeal was denied in 1986.  *Sandon*, 161 Ariz. at 157, 777 P.2d at 220.  Although the Sandon court noted the adoption of the 1989 amendments in a footnote, they were not applying that law. *Id.* at 158 n. 1, 777 P.2d at 221 n.1.

Similarly, the decision in *State v. Shattuck*, 140 Ariz. 582, 684 P.2d 154 (1984), also relied on in *Swoopes*, predated the 1989 amendments.  Indeed, the only Arizona decision relied upon in *Swoopes* and made after the 1989 amendments was *Moreno v. Gonzalez*, 192 Ariz. 131, 962 P.2d 205 (1998).   *Moreno* did not, however rely upon Ariz. Rev. Stat. §§ 12-120.21 or 13-4031, or specifically discuss the death/life sentence

---

[20]  Respondents do not argue that presentation to the Arizona Supreme Court was required for Petitioner to exhaust his state remedies.  In an abundance of caution, the undersigned addresses the effect of *Swoopes* on Arizona life sentence cases.

limitation.  Rather, *Moreno* focused on the "nature and scope of discretionary review by petition for review," *Moreno*, 192 Ariz. at 134, 962 P.2d at 133, and was concerned with whether such discretionary review was an "appeal" within the meaning of the exceptions to Arizona's timeliness bar for claims not presented on "appeal" for good cause.

Moreover, the import of *Sandon* was the Arizona Supreme Court's apparent desire to stop the flood of "large numbers of prisoner petitions seeking to exhaust state remedies." *Sandon*, 161 Ariz. at 157, 777 P.2d at 220.    The *Sandon* court concluded that "'[o]nce the defendant has been given the appeal to which he has a right, state remedies have been exhausted." *Id.* at 158, 777 P.2d at 221, quoting *Shattuck*, 140 Ariz. at 585, 684 P.2d at 157.  Thus, their recitation of the death/life sentence limitation is not properly read as the limit of their holding, but as a reiteration of the pre-1989 holding of *Shattuck*.   Thus *Sandon* may only be reasonably read as an attempt by the Arizona Supreme Court to remove their discretionary review from the cycle of review required for exhaustion of Arizona's state remedies.  While a given  respondent may desire to require its Arizona prisoner to file a petition for review with the Arizona Supreme Court, it is not the respondents' desire, however, but that of the Arizona court that is controlling.

Finally, *Swoopes* itself did not hinge on any reading of Ariz. Rev. Stat. §§ 12-120.21 or 13-4031 themselves, but upon the question "whether Arizona has identified discretionary Supreme Court review 'as outside the standard review process and has plainly said that it need not be sought for purpose of exhaustion.' " *Swoopes*, 196 F.3d at 1010, quoting *O'Sullivan*, 526 U.S. 838, 850 (1999).   The only basis for identifying that discretionary review as being tied to death/life sentences was the language of *Shattuck* and *Sandon*, and their reliance upon the then applicable pre-1989 versions of Ariz. Rev. Stat. § § 12-120.21 and 13-4031.

Thus, until this issue is resolved by the Ninth Circuit, the Arizona District Courts are faced with either applying the exact language of *Swoopes*, or applying the principle of *Swoopes* to the facts as they exist in this case.  The latter holds truer to the function of

a trial court in attempting to apply appellate court precedent.

> Using the techniques developed at common law, a court confronted with apparently controlling authority must parse the precedent in light of the facts presented and the rule announced. Insofar as there may be factual differences between the current case and the earlier one, the court must determine whether those differences are material to the application of the rule or allow the precedent to be distinguished on a principled basis.

*Hart v. Massanari*, 266 F.3d 1155, 1172 (9th Cir. 2001).

Applying the rule of *Swoopes*, the undersigned concludes that in light of the 1989 amendments, claims fairly presented by Petitioner to the Arizona Court of Appeals are exhausted notwithstanding any failure to fairly present them to the Arizona Supreme Court.

### b.   Proper Vehicle

Ordinarily, "to exhaust one's state court remedies in Arizona, a petitioner must first raise the claim in a direct appeal or collaterally attack his conviction in a petition for post-conviction relief pursuant to Rule 32." *Roettgen v. Copeland*, 33 F.3d 36, 38 (9th Cir. 1994).   Only one of these avenues of relief must be exhausted before bringing a habeas petition in federal court.   This is true even where alternative avenues of reviewing constitutional issues are still available in state court. *Brown v. Easter*, 68 F.3d 1209, 1211 (9th Cir. 1995); *Turner v. Compoy*, 827 F.2d 526, 528 (9th Cir. 1987), *cert. denied*, 489 U.S. 1059 (1989).

### c.   Factual Basis

A petition must have fairly presented the operative facts of his federal claim to the state courts as part of the same claim.   A petitioner may not broaden the scope of a constitutional claim in the federal courts by asserting additional operative facts that have not yet been fairly presented to the state courts.   Expanded claims not presented in the highest state court are not considered in a federal habeas petition. *Brown v. Easter*, 68 F.3d 1209 (9th Cir. 1995); *see also, Pappageorge v. Sumner*, 688 F.2d 1294 (9th Cir.

1982), cert. denied, 459 U.S. 1219 (1983).   And, while new factual allegations do not

ordinarily render a claim unexhausted, a petitioner may not "fundamentally alter the

legal claim already considered by the state courts." *Vasquez v. Hillery*, 474 U.S. 254, 260

(1986). *See also Chacon v. Wood*, 36 F.3d 1459, 1468 (9th Cir.1994).


### d.   Legal Basis

Failure to alert the state court to the constitutional nature of the claim will amount

to failure to exhaust state remedies.  *Duncan v. Henry*, 513 U.S. 364, 366 (1995).  While

the petitioner need not recite "book and verse on the federal constitution," *Picard v.*

*Connor,* 404 U.S. 270, 277-78 (1971) (quoting *Daugherty v. Gladden*, 257 F.2d 750, 758

(9th Cir. 1958)), it is not enough that all the facts necessary to support the federal claim

were before the state courts or that a "somewhat similar state law claim was made."

*Anderson v. Harless*, 459 U.S. 4, 6 (1982)(*per curiam*).  "[T]he petitioner must make the

federal basis of the claim explicit either by specifying particular provisions of the federal

Constitution or statutes, or by citing to federal case law," *Insyxiengmay v. Morgan*, 403

F.3d 657, 668 (9th Cir. 2005), or by "a citation to a state case analyzing [the] federal

constitutional issue." *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003).  But a

drive-by-citation of a state case applying federal and state law is not sufficient.

> For a federal issue to be presented by the citation of a state decision
> dealing with both state and federal issues relevant to the claim, the
> citation must be accompanied by some clear indication that the case
> involves federal issues. Where, as here, the citation to the state case
> has no signal in the text of the brief that the petitioner raises federal
> claims or relies on state law cases that resolve federal issues, the
> federal claim is not fairly presented.

*Casey v. Moore*, 386 F.3d 896, 912 n. 13  (9th Cir. 2004).


### e.   Fair Presentation

"[O]rdinarily a state prisoner does not 'fairly present' a claim to a state court if that

court must read beyond a petition or a brief (or a similar document) that does not alert it

to the presence of a federal claim in order to find material, such as a lower court opinion

101

in the case, that does so." *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).  The Arizona habeas petitioner "must have presented his federal, constitutional issue before the Arizona Court of Appeals within the four corners of his appellate briefing." *Castillo v. McFadden*, 399 F.3d 993, 1000 (9th Cir. 2005).  *But see Insyxiengmay v. Morgan*, 403 F.3d 657, 668-669 (9th Cir. 2005) (arguments set out in appendix attached to petition and incorporated by reference were fairly presented).

## 2.  Application to Petitioner's Claims

Respondents argue that Petitioner has failed to properly exhaust, and now has procedurally defaulted his state remedies on part or all of original Grounds 2, 7, 8, 9E, 9F, 9G, 9H, 9I, and 12 and Supplemental Ground 3.

Respondents also argue that Petitioner presented his claims in Supplemental Ground 2, but assert that it was barred on independent and adequate state grounds.[21]

### a.   Ground 2 (Lost Evidence Instruction)

In his Ground 2, Petitioner argues that his Due Process rights were violated when the state court failed to give a *Willits* instruction on lost evidence. Petitioner argues that he raised this issue on direct appeal.  (Petition, Doc. 1 at 7.) In his Reply, he again argues that the claim was fairly presented as a federal claim on direct appeal, and that any failure to present it as such was caused by ineffective assistance of appellate counsel and should be excused because of his actual innocence.  (Reply, Doc. 25 at 14-16.)  (The latter two arguments are addressed hereinafter.)

Petitioner did raise his *Willits* claim on direct appeal, both to the Arizona Court of Appeals, and the Arizona Supreme Court.  (Exhibit DD, Opening Brief at 18, *et seq.*; Exhibit HH, Pet. Rev. at 9-11.)  The claim was based on *State v. Willits*, 96 Ariz. 184, 187, 393 P.2d 274, 279 (1964), which held that when the State loses or destroys material

---

[21] Respondents' argument that the claims were procedurally barred on an independent and adequate state ground is addressed hereinafter in Section III(D)(5)(c).

evidence, the contents or quality of which are in issue, the jury may infer that the facts are against the state's interest, and related cases mandating a *Willits* instruction in cases involving lost or destroyed evidence.  *See e.g. State v. Vickers,* 180 Ariz. 521, 885 P.2d 1086 (1994); *State v. Lang*, 176 Ariz. 475, 862 P.2d 235 (1995).

Petitioner did argue to the Arizona Court of Appeals that a failure to give a *Willits* instruction implicated his <u>state</u> due process rights:

> In the absence of bad faith, the Arizona Supreme Court has held that the Willits rule complies with the fundamental fairness component of Arizona due process. *State v. Youngblood*, 173 Ariz. 502, 505,844 P.2d 1152 (1993).

(Exhibit DD, Opening Brief at 22.) However, Petitioner did not make any argument that the error amounted to a violation of <u>federal</u> due process.  Nor did Petitioner cite to any federal case law, constitutional provisions, or other federal authority.  (*See id*.  *See also* Exhibit FF, Reply Brief at 10-15.)

Moreover, none of the state cases cited by Petitioner on direct appeal were based on a federal due process right to a lost evidence instruction.  *See State v. Henry*, 176 Ariz. 569, 583, 863 P.2d 861, 875 (1993) (citing only state law); *Willits*, 96 Ariz. 184, 187, 393 P.2d 274, 279 (same); *State v. Hunter*, 136 Ariz. 45, 664 P.2d 195 (1983) (same); *State v. Eagle*, 196 Ariz. 27, 196 P.2d 1122 (App. 1998) (same); *State v. Murray*, 184 Ariz. 9,906 P.2d 542 (1995)(same).

The only case cited by Petitioner which referenced federal law was *Lang*, 176 Ariz. 475, 862 P.2d 235.  In *Lang*, the Arizona Court of Appeals referenced the Supreme Court's decision in *Arizona v. Youngblood*, 488 U.S. 51 (1988).  However, the Arizona court properly differentiated *Youngblood* as limited to a federal due process right to dismissal in instances of bad faith destruction of evidence, and having no bearing on the requirement for a *Willits* lost evidence instruction under Arizona law.  Here, Petitioner does not assert a due process right to dismissal based upon a bad faith destruction or loss of the evidence, but simply a due process right to a lost evidence instruction.  Thus, the citation to *Lang*, and its reference of *Youngblood* did not convert Petitioner's *Willits*

claim into a federal due process claim.

Similarly, Petitioner's reference to the underlying state court decision in *Youngblood*, 173 Ariz. 502, 505,844 P.2d 1152, did not raise a federal due process claim. Indeed, that decision noted that under Arizona's *Willits* instruction requirement, "the defendant gets more than the process due" under both the federal and state due process clauses. *Id.* at 507-508, 844 P.2d at 1157-1158. Moreover, the holding of *Youngblood* was explicitly limited to a "denial of due process of law under the Arizona Constitution." *Id.* at 508, 844 P.2d at 1158. Petitioner also cited *Vickers,* 180 Ariz. 521, 885 P.2d 1086, an offspring of *Youngblood*, that was based on federal due process only to the extent that it discussed a due process requirement for dismissal for bad faith destruction of evidence.

Based upon the foregoing, the undersigned finds that Petitioner did not fairly present his federal claims in Ground 2 to the state courts.


**b.   Ground 7 (State's Investigation)**

In his Ground 7, Petitioner argues that his "5th, 6th, and 14th Amendment, U.S. Constitutional right to due process and a fair trial" was denied when the trial court precluded Petitioner "from impeaching the homicide detective, Edward Betts, with the State's lack of investigation into potentially exculpatory evidence." (Petition, Doc. 1 at 9:3-A – 9:3-B.) Petitioner alleges he presented this issue on direct appeal. (*Id.* at 9:3-C.) His Reply does not address the issue. (Reply, Doc. 25 at 22.)

Petitioner raised the underlying facts of this claim on direct appeal to the Arizona Court of Appeals. (Exhibit DD, Opening Brief at 53, *et seq.*) Petitioner did not address the claim in his Reply Brief (Exhibit FF). Petitioner explicitly declined to see review of the related state law claim in his Petition for Review. (Exhibit HH, Pet. Rev. at 2.)

Petitioner primarily asserted the facts to the Arizona Court of Appeals in support of a state law claim under Arizona Rules of Evidence 801 (Exclusions from Hearsay) and 401 (Test for Relevant Evidence).

Petitioner did cite the Supreme Court decisions in *Kyles v. Whitley*, 514 U.S. 419,

104

442 n. 13, 445-51 (1995) and *Berger v. United States*, 295 U.S. 78, 88 (1935), *overruled on other grounds*, 361 U.S. 212 (1960).  (Exhibit DD, Opening Brief at 56.)  However, *Kyles* was cited solely for the proposition that the failure to properly investigate is shown to be relevant because it would be subject to disclosure under *Brady v. Maryland*, 373 U.S. 83 (1963), as applied in *Kyles*.  Petitioner does not assert a failure to disclose. *Berger*, a prosecutorial misconduct case, was cited by Petitioner solely for the proposition that prosecution has a duty to avoid wrongful convictions.  The claim in Ground 7 is not based on prosecutorial misconduct.

Most of the state decisions cited by Petitioner would not have alerted the Arizona Court of Appeals to a federal claim, because they were founded wholly on state law.  *See State v. Rivera*, 139 Ariz. 409,413,678 P.2d 1373 (1984) (state law only); *State v. Fulminante*, 161 Ariz. 237, 250, 778 P.2d 602 (1988) (same); *State v. Perez*, 141 Ariz. 459, 687 P.2d 1214, 1219 (1984) (same – discussing *Willits*  issue).

On the other hand, both *State v. Salazar*, 182 Ariz. 604, 898 P.2d 982 (App. 1995) and *State v. Hernandez*, 170 Ariz. 301, 823 P.2d 301 (App. 1991) included discussions of federal confrontation clause issues.  However, they both also relied upon state law.  In *Salazar*, before discussing the confrontation clause concerns, the court determined that the exclusion of the testimony "was an abuse of discretion" under state law. 182 Ariz. at 609, 898 P.2d at 987.   In *Hernandez,* the court found that the admitted testimony was not hearsay because not offered to prove the truth of the matter asserted, and concluded that for the same reason it "does not violate the confrontation clause" of the Arizona or federal constitutions.  170 Ariz. at 307, 823 P.2d at1315.

Petitioner cited *Salazar* solely for the proposition that an abuse of discretion standard applied to admissibility decisions.  (Exhibit DD, Opening Brief at 54.)  He cited *Hernandez* solely for the proposition that statements not offered to prove the truth of the matter asserted are not hearsay.  (*Id.* at 55.)

Petitioner concluded his arguments on the issue by referencing due process:

> Appellant was precluded form [sic] pursuing appropriate
> impeachment of Detective Underwood and presenting this inference
> of a biased and incomplete investigation to jury. As a result, his
> right to present a defense and his due process right to a fair trial
> were violated, and the conviction should be reversed.

(*Id.* at 57.)   However, Petitioner did not identify this as a violation of <u>*federal*</u> due process, as opposed to state due process.   Nor, when added to his citation of state cases applying state law and federal confrontation clause law, did this amount to fair presentation of the claim now presented.

### c.   Ground 8 (Investigator)

In his Ground 8, Petitioner argues that the failure of the PCR court and the special action court to grant him funds for an investigator resulted in the denial of his "5th, 6th and 14th Amendment, U.S. Constitutional rights to due process" (Petition, Doc. 1 at 9:4-C.)   He argues it was presented to the Arizona Court of Appeals in his first PCR proceeding.  (*Id.* at 9:4-D.) Petitioner does not expound in his Reply, other than arguing that all of his PCR proceedings must be viewed as a single proceeding, and he shouldn't be required to present the claim more than once.  (Reply, Doc. 25 at 23.)

Petitioner challenged the denial of an investigator in his Petition for Special Action.  (Petition, Doc. 1, Exhibits at 190 *et seq.*)   However, he did not assert that the denial of the investigator was a federal due process violation.

Moreover, "[s]ubmitting a new claim to the state's highest court in a procedural context in which its merits will not be considered absent special circumstances does not constitute fair presentation."   *Roettgen v. Copeland*, 33 F.3d 36, 38 (9th Cir. 1994) (citing *Castille v. Peoples*, 489 U.S. 346, 351 (1989)).   An Arizona petition for special action is the epitome of such a proceeding.  It is available only where there is no "equally plain, speedy, and adequate remedy by appeal."  17B Ariz. Rev. Stat., Special Actions, Rules of Proc. Rule 1.  "The decision to accept jurisdiction is largely discretionary and should be reserved for 'extraordinary circumstances.'"   *Astorga v. Wing*, 211 Ariz. 139, 142, 118 P.3d 1103, 1106 (Ct. App. 2005).

106

Petitioner also raised the underlying facts in his Petition for Review (Exhibit LL) from the denial of his first PCR petition.  Here he argued that "federal and state constitutional protections mandated this funding," (i*d.* at 12), citing *Ake v. Oklahoma*, 470 U.S. 68 (1985), *Mason v.* Arizona, 504 F.2d 1345, 1351-52 (9th Cir. 1974), and a variety of other federal authorities.  However, as argued by Respondents, the Arizona Court of Appeals granted relief on this claim, and remanded for provision of an investigator and rehearing.  (Exhibit SS, Mem. Dec. 10/18/05 at 11-12.)

Petitioner now asserts that the remedy was too little, too late, and the Petition for Special Action should have been granted.[22]  He asserts he raised these arguments in his "Supplemental Rule 32."  (Reply, Doc. 25 at 23.)  However, Petitioner did not assert such a claim in his second ("Supplemental") PCR petition.  That petition did not argue any claim based upon the denial of an investigator, but simply noted in a footnote that:

> Petitioner also offered the police statements of neighbors Buck Ridley and Robert Hill that both told police that they had heard the shot, looked out their homes and saw no people on the street nor car out in front of the Franz' home. (PCR Exhibits L and K.) On remand, due to the passage of 9 years since the murder, Petitioner's investigator has now been unable to locate and interview either witness at this time.

(Exhibit CCC, 2nd PCR Pet. at 7, n. 1)[23]

Nor did Petitioner's Petition for Review raise an argument based upon the effects of the delay in funding.  It simply noted the reversal and remand based on the lack of an investigator.  (Exhibit NNN, Pet. Rev. at 1, 3.)  And, it repeated the unadorned complaint about the inability to locate the neighbors.  (*Id.* at 8, n. 2.)  His Petition for Review to the Arizona Supreme Court did the same things.  (Exhibit QQQ at 3 and 6, n. 1.)

---

[22] To the extent that Petitioner simply asserts that he was entitled to appointment of an investigator, that claim was rendered moot by the grant of relief upon that claim by the Arizona Court of Appeals, and thus would not entitle Petitioner to habeas relief.

[23] Although 9 years had elapsed since trial (which time period was relevant to the ineffective assistance claims being asserted by Petitioner), only a fraction of that time elapsed between the denial of an investigator and the eventual appointment.  The motion was denied on March 3, 2003.  (Exhibit A-3 at Doc. 284, M.E. 3/3/03.)  The retention of an investigator was authorized on February 3, 2006, following remand, less than three years after the denial.  (Exhibit XX, M.E. 2/3/06.)

Thus, Petitioner never asserted to the Arizona appellate courts his claim based upon irreparable damage from the interim denial of an investigator.  Petitioner argues that he really has had only one PCR proceeding, and his arguments in his first PCR petition for review remained part of the post-remand proceeding.  Regardless of whether viewed as one or two proceedings, the fact remains that Petitioner never argued anywhere to the state courts the critical factual argument in his current claim: that the delay in funding an investigator was harmful.

While new factual allegations do not ordinarily render a claim unexhausted, a petitioner may not "fundamentally alter the legal claim already considered by the state courts." *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986). *See also Chacon v. Wood*, 36 F.3d 1459, 1468 (9th Cir.1994).  The Arizona courts have never been asked to determine if the damage from the delay was irreparable, such that the remand and subsequent appointment was an inadequate remedy.  The addition of such an allegation fundamentally alters the claim presented in the first PCR proceeding from that now being asserted in this habeas proceeding.

Thus Petitioner has not fairly presented the claim he now raises in Ground 8.


### d.   Ground 9E (IAC re Exculpatory Witnesses)

For his Ground 9E, Petitioner argues that trial counsel was ineffective in failing to call exculpatory witnesses: "(1) Griselda Cox; (2) Kristina Cox; (3) Jennifer Seeley; (4) Lena Sinclair; (5) Douglas Johnson; (6) Robert Hill; (7) Buck Ridley; (8) Gloria Gilbert; (9) Tina Malcomson, and (10) Lisa Daily." (Petition, Doc. 1 at 9:5-A.)  Petitioner argues he submitted all of his claims in Ground 9 to the Arizona Court of Appeals in his second petition for review.  (*Id.* at 9:5-I.)   He does not address the exhaustion of this particular claim in his Reply.  (Reply, Doc. 25 at 24-25.)

Respondents concede exhaustion with respect to all of the listed exculpatory witnesses, with the exception of Kristina Cox.   (Answer, Doc. 14 at 213-214.)  Respondents refer to this witness as "Kristine Cox", and suggest that because of the

dearth of references to this witness in this record, Petitioner may have intended to reference the witness Adriana Cox (aka Adriana Scroggins and Adriana Chavira).  (*Id.* at 214, n. 69.)  Petitioner does not reply.  Accordingly, the undersigned construes the Petition as written, *i.e.* referring to "Kristina Cox."

Petitioner argues that he included his argument about Kristina Cox in his "second" PCR petition.  (Petition, Doc. 1 at 4, 4-B.)  And indeed, Petitioner did argue in his Petition for Post-Conviction Relief that counsel was ineffective for not pursuing Kristina Cox.  (Exhibit A-3, Doc. 297, PCR Pet. 6/2/3.)

Petitioner argued in both his first petition for review (Exhibit LL, Pet. Rev. at 13 *et seq.* (citing *Bell v. Cone*, --- U.S. ---, 122 S.Ct. 1843 (2002); *Visciotti v. Woodward*, 288 F.3d 1097, 1108 (9th Cir. 2002), etc.)) and his second PCR petition for review (Exhibit NNN, Pet. Rev. at 15, *et seq.*(same)) that he received ineffective assistance of trial counsel in violation of his federal, Sixth Amendment right to counsel.  In both Petitions for Review, Petitioner asserted two bases for this ineffective assistance claim: (1) trial counsel ineffectively handled jury selection (*id.* at 16); and (2) trial counsel failed to adequately investigate and present a defense, based on the failure to call various witnesses.  (Exhibit NNN, Pet. Rev. at 15, *et seq.*)

However, Petitioner made no reference to a "Kristina Cox" or "Kristine Cox" in either his first Petition for Review (*see generally* Exhibit LL, Pet. Rev.) or in his second Petition for Review (s*ee generally* Exhibit NNN, Pet. Rev.).

The undersigned has found only two other references to Kristina or Kristine Cox in the state court record.  First, Petitioner's Motion for Reconsideration on Appointment of Investigator asserted that Kristina Cox was a witness with "information about other versions of the events."   (Petition, Doc.1, Exhibits at 214.) Second, Petitioner's investigator, John Pizzi, testified in the second PCR proceeding that he was given the name of, found and interviewed a "Kristina Cox."  (Exhibit GGG, R.T. 3/14/08 at 23.)

Thus, Petitioner has never presented to the Arizona Court of Appeals a claim that trial counsel was ineffective for failing to call Kristina Cox, and this portion of

Petitioner's Ground 9E is unexhausted.

### e.   Ground 9F (IAC re Closing Arguments)

In his Ground 9F, Petitioner argues that "trial counsel failed to argue to the jury that the evidence established that Isaacs was the shooter and I am innocent." (Petition, Doc. 1 a 9:5-A.)  This claim was raised in Petitioner's first PCR petition.  (Exhibit A-3, Doc. 297 at 19.)

However, this claim was not presented to the Arizona Court of Appeals in either his first or second PCR petitions for review.  (*See supra* discussion on Ground 9E, outlining arguments in PFRs.)  Thus, Petitioner's state remedies on this claim were not properly exhausted.

### f.   Ground 9G (IAC re Sentencing)

In his Ground 9G, Petitioner argues that trial counsel was "ineffective at sentencing for not advocating for a sentence of less than life without parole and for not objecting to the court's consideration and use of the aggravating circumstances in ARS section 13-702 in sentencing me to natural life." (Petition, Doc. 1 at 9:5-A.)

On direct appeal, Petitioner challenged the aggravating factors at sentencing. (Exhibit DD, Opening Brief at 57, *et seq.*)  However, an assertion of error and an assertion of ineffective assistance in failing to challenge the error "are distinct claims with separate elements of proof, and each claim should have been separately and specifically presented to the state courts." *Rose v. Palmateer*, 395 F.3d 1108, 1112 (9th Cir. 2005) (contrasting Fifth Amendment claim and related ineffective assistance claim). Petitioner's direct appeal did not raise such an ineffective assistance claim.

This claim was raised in Petitioner's first PCR petition. (Exhibit A-3, Doc. 297 at 20.)  However, this claim was not presented to the Arizona Court of Appeals in either his first or second PCR petitions for review. (*See supra* discussion on Ground 9E, outlining arguments in PFRs.)

Thus, Petitioner's state remedies on this claim were not properly exhausted.

**g.   Ground 9H (IAC re Appellate Counsel)**

For his Ground 9H, Petitioner argues:

> (8) Appellate Counsel was ineffective by failing to raise as an issue that I was illegally sentenced to natural life based upon the aggravating circumstances in ARC [sic] section 13-702 and FAILING TO FEDERALIZE AND PRESERVE SEVERAL CLAIMS FOR LATER FEDERAL REVIEW

(Petition, Doc. 1 at 9:5-A.)

As discussed *supra* concerning Claim 9G, Petitioner did challenge his sentence on direct appeal, but that challenge did not fairly present any related ineffective assistance claims.

This claim was raised in Petitioner's first PCR petition.  (Exhibit A-3, Doc. 297 at 21.)  However, this claim was not presented to the Arizona Court of Appeals in either his first or second PCR petitions for review.  (*See supra* discussion on Ground 9E, outlining arguments in PFRs.)

Thus, Petitioner's state remedies on this claim were not properly exhausted.

**h.   Ground 9I (IAC re Cumulative Errors)**

For his Ground 9I, Petitioner argues that "his defense was prejudiced as a result of both counsel's individual and cumulative errors during trial, sentencing and on appeal." (Petition, Doc. 1 at 9:5-B.)   Respondents concede that this issue was raised in Petitioner's first PCR petition for review, but was not reached because the Arizona Court of Appeals ruled that the proceeding had been flawed by the lack of an investigator, and remanded for further consideration.  Respondents argue that the failure to reassert the claim thereafter left the Arizona court's without a fair opportunity to address the claim.

Indeed, in his first PCR petition for review, Petitioner argued that the PCR court's resolution of the ineffective assistance claim was in error because it "did not individually

or cumulatively evaluate all of the witnesses' proposed testimony along with trial counsel's lack of investigation and ineffective presentation at trial" (Exhibit LL, Pet. Rev. at 11.)  He also argued that the "trial court failed to rule upon Petitioner's claims of cumulative error and ineffective assistance of appellate counsel." (*Id.*)

In disposing of the investigator claim and the ineffective assistance claims, the Arizona Court of Appeals noted:

> The two arguments are somewhat intertwined as the requested funding was to be used to investigate and/or interview witnesses whom trial counsel had allegedly failed to pursue, which failure underpinned some of the ineffective assistance of counsel claims.

(Exhibit SS, Mem. Dec. 10/18/05 at 7-8.)  However, the appellate court never reached the ineffective assistance claims in light of its grant of relief on the investigator.  Instead, the Arizona Court of Appeals "vacate[d] the trial court's order denying relief, and remand[ed] with directions to grant the motion allowing an investigator at county expense and for further post-conviction proceedings consistent with this decision." (*Id.* at 12.)

Had the Arizona Court of Appeals denied the petition for review as to the investigator, it would have been in a position to address the cumulative error claim.  Having vacated the trial court's order, Petitioner's challenge to the decision on the merits was premature, and thus was not fairly presented.  His failure to re-urge the argument after remand (despite re-urging other portions of his ineffective assistance claims), denied the Arizona Court of Appeals of a fair opportunity to decide the merits of this claim.

Thus, Petitioner's state remedies on this claim were not properly exhausted.


**i.   Ground 12 (Ineffective Assistance)**

For his Ground 12, Petitioner incorporates by reference his allegations of ineffective assistance in Ground 9, and argues that the PCR court "did not really address this issue."  (Petition, Doc. 1 at 9:8-A.)  Petitioner argues three specific issues of

ineffectiveness, asserting trial counsel: "ineffectively handled jury selection" (*id.*); "did not make an informed decision not to call any of the neighborhood or other known and available exculpatory witnesses" (*id.* at 9:8-B); and was inadequate in his "cross examination of the state's chief witness, Hernandez"(*id.*).

Respondents argue this claim is either repetitive of Ground 9, or if attempting to raise some new claim, it was not fairly presented. (Answer, Doc. 14 at 256-257.) Petitioner's Reply merely argues that Ground 12 has merit. (Reply, Doc. 25 at 27.)

Each of these specific claims was also raised in Ground 9: Ground 9B (jury selection), 9C (impeachment of Hernandez), 9E (exculpatory witnesses). Petitioner concedes that both Grounds 9 and 12 "are treating my ineffective assistance of counsel issues and can be combined." (Petition, Doc. 1 at 9:8-C.) To the extent that Ground 12 is merely supplementary argument on those portions of Ground 9, they will be addressed with that Ground.

To the extent that Petitioner intends to assert some claim for relief on the basis that the PCR court did not again address the merits of his ineffectiveness claims, Petitioner has not asserted any such claim to the state courts. Petitioner argues that the claim was presented to the Arizona Court of Appeals in his third petition. (Petition, Doc. 1 at 9:8-C.) That is a reference to Petitioner's Petition for Review (Exhibit NNN) from his PCR proceeding commenced October 18, 2007. (*Id.* at 5.)

Petitioner did point out the lack of an explicit post-remand ruling on the ineffectiveness claims, and thus again sought review of the earlier rulings. (*See e.g.* Exhibit NNN, Pet. Rev. at 1(again seeking review of the "additional PCR rulings by the trial court dated November 21, 2003") and 16 (arguing trial court denied relief); Exhibit QQQ, Pet. Rev. at 1 (seeking review of "additional PCR rulings in the trial court dated November 21, 2003.) However, Petitioner did not assert that the failure to again rule was in error, and certainly didn't assert it was a federal constitutional violation. Thus, Petitioner's state remedies on this claim were not properly exhausted.

### j.   Supplemental Ground 2 – Ineffective Assistance of Counsel

For his Supplemental Ground 2, Petitioner argues a laundry list of claims of ineffective assistance of counsel.[24]   In Ground 2 of his recent PCR Petition, Petitioner argued that he had been denied effective assistance of counsel "in violation of his rights under the Sixth and Fourteenth Amendments, U.S. Constitution." (Supplemental Records, Doc. 45, Append. 1, PCR Pet. at 3.)  He also arguably asserted the factual claims now underlying his individual claims in Supplemental Grounds 2A through 2L.

However, in Petitioner's Petition for Review to the Arizona Court of Appeals he only made a generic argument regarding ineffective assistance, and asserted no facts to the Arizona Court of Appeals to support the claims.  (2nd Supplemental Records, Doc. 67, Append. A, PFR at 4.)  "To exhaust his claim, [the petitioner] must have presented his federal, constitutional issue before the Arizona Court of Appeals within the four corners of his appellate briefing."  *Castillo v. McFadden*, 399 F.3d 993, 1000 (9th Cir. 2005).  " *A fortiori,* the Arizona Court of Appeals was not required to review the parties' trial court pleadings to see if it could discover for itself a federal, constitutional issue."  *Id.* at 1000.  "Full and fair presentation requires the petitioner to provide the factual ***and*** legal basis for the claim to the state court."  *Greenway v. Schriro*, 653 F.3d 790, 801 (9th Cir. 2011) (emphasis added).  The petitioner must "provide the state court with the operative facts, that is, all of the facts necessary to give application to the constitutional principle upon which [the petitioner] relies.'"  *Davis v. Silva*, 511 F.3d 1005, 1009 (9th Cir. 2008) (quoting *Daugharty v. Gladden*, 257 F.2d 750, 758 (9th Cir.1958)).

Here Petitioner presented to the Arizona Court of Appeals none of the facts underlying his claims of ineffective assistance.  Accordingly, no part of Petitioner's Supplemental Ground 2 was fairly presented to the Arizona Court of Appeals, and his state remedies on these grounds for relief were not properly exhausted.

---

[24] Respondents' assertions of the application of a procedural bar of these claims on independent and adequate state grounds are addressed hereinafter in Section III(D)(5).

### k.   Supplemental Ground 3 – Cumulative Error

For his Supplemental Ground 3, Petitioner argues that the cumulative errors in his pre-trial, trial, sentencing, appeal, and post-conviction relief proceedings denied him due process of law. (Supplemental Petition, Doc. 78 at 5-8.1.)  Petitioner concedes that he has never presented this ground for relief to the Arizona Court of Appeals, and argues that he did not do so because "Arizona does not recognize cumulative error doctrine." (*Id.*)

**Claim Must be Separately Exhausted** – "Briefing a number of isolated errors that turn out to be insufficient to warrant reversal does not automatically require the court to consider whether the cumulative effect of the alleged errors prejudiced the petitioner." *Wooten v. Kirkland*, 540 F.3d 1019, 1025 (9th Cir. 2008).  Accordingly, such claims must be separately fairly presented.  *Id. See also Jimenez v. Walker*, 458 F.3d 130, 149 (9th Cir. 2006);  *Solis v. Garcia*, 219 F.3d 922, 930 (9th Cir.2000). *See also* Brian J. Levy*, Requiring Exhaustion for Cumulative Error Review of Harmlessness Does Not Add Up,* 2014 Wis. L. Rev. Online 20, 20-21 (2014) (differentiating between standalone cumulative error claims, and cumulative error in the nature of cumulative prejudice, and arguing that exhaustion of the latter as a separate claim should not be required).

Here, Petitioner does not merely assert that prejudice from his alleged constitutional violations should be cumulated to find whether they were harmful, but that all errors, constitutional or not, have cumulatively amounted to a denial of due process.

**Claim not Fairly Presented** - The undersigned finds no assertion of this claim to the Arizona Court of Appeals.  At best, Petitioner made limited arguments (related to Ground 9I of the Petition) of a cumulative prejudice from counsel's various deficient performances.  As discussed hereinabove in Subsection (h), however, even this limited "cumulative" claim was not fairly presented to the Arizona Court of Appeals because it was not raised again following remand on the initial review of the first PCR proceeding.

**Only Available and Effective Remedies** - However, it is only "available" and

"effective" remedies that must be exhausted. 28 U.S.C. § 2254(b)(1)(B)(i) and (ii). Under these limitations, the Ninth Circuit has adopted the "futility doctrine," which holds that "a petitioner may be excused from exhausting state remedies if the highest state court has recently addressed the issue raised in the petition and resolved it adversely to the petitioner, in the absence of intervening United States Supreme Court decisions on point or any other indication that the state court intends to depart from its prior decisions." *Sweet v. Cupp*, 640 F.2d 233, 236 (9th Cir. 1981).

Petitioner's Supplemental Ground 3 is founded upon the he so-called "cumulative error doctrine" has been recognized as a constitutional claim by the federal courts.

> The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair. The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal.

*Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citations omitted)(citing *Chambers v. Mississippi*, 410 U.S. 284, 298, 302–03 (1973)). That principle is applicable on habeas review. *See Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000). *See also* Van Cleave, *When Is An Error Not an "Error"? Habeas Corpus and Cumulative Error*, 46 Baylor L. Rev. 59, 60 (1993). *Cf. Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992) (errors must themselves be of constitutional dimensions, mere state error is insufficient).

**Arizona's Cumulative Error Jurisprudence** - In contrast, the Arizona Courts have long declined to recognize a cumulative error doctrine outside the context of prosecutorial misconduct. That conclusion appears to have its genesis in *State v. Fleming*, 117 Ariz. 122, 571 P.2d 268 (1977) (*en banc*). There, the Arizona Supreme Court opined:

> Defendant contends that all other arguments when taken together demonstrate that he did not receive a fair trial. Since we have found that there was no error in any of the claims presented, we cannot say that any prejudice suffered by the defendant indicates that he did not receive a fair hearing. We find no error.

*Id.* at 128, 571 P.3d at 274. This holding was not contradictory of *Chambers* because federal law similarly requires a primary finding of errors.  The holding in *Fleming* simply recognized that in the absence of errors any purported prejudice does not amount to unfairness.  Indeed, the federal courts have recognized that non-errors cannot accumulate into a denial of due process.  *See e.g. United States v. Hall,* 455 F.3d 508, 520 (5th Cir. 2006) ("ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions"); *Miller v. Johnson*, 200 F.3d 274, 286 (5th Cir. 2000) ("Miller has not demonstrated error by trial counsel; thus, by definition, Miller has not demonstrated that cumulative error of counsel deprived him of a fair trial").  *See also*, Ruth A. Moyer, *To Err Is Human; to Cumulate, Judicious: The Need for U.S. Supreme Court Guidance on Whether Federal Habeas Courts Reviewing State Convictions May Cumulatively Assess Strickland Errors*, 61 Drake L. Rev. 447, 463 (2013) ("the accumulation of non-errors generally fails to rise to the level of a due process violation").

Following *Fleming*, however, the Arizona Courts appear to have wandered astray.  In *State v. Prince*, 160 Ariz. 268, 772 P.2d 1121 (1989), the Arizona Supreme Court relied upon *Fleming* to reach the following holding:

> Defendant's final evidentiary argument is that the court made a series of erroneous rulings, which, taken together, constitute "cumulative error." We have never recognized a "cumulative error" theory and decline to do so now. Instead, we evaluate each of defendant's claimed errors and determine if it, independently, requires reversal.

*State v. Prince*, 160 Ariz. 268, 274, 772 P.2d 1121, 1127 (1989).  This formulation not only refused to consider the cumulative prejudice of non-errors, but refused to consider errors cumulatively. No explanation was given by the Arizona Supreme Court for its expansion of the narrow holding of *Fleming*.  *See also State v. White*, 168 Ariz. 500, 508, 815 P.2d 869, 877 (1991) *abrogated on other grounds by State v. Salazar*, 173 Ariz. 399, 844 P.2d 566 (1992) ("To the extent that defendant is arguing for application of the cumulative error doctrine, that argument has been expressly rejected.").

By 1996, the *Prince* formulation was entrenched:

> Moreover, this court has rejected the so-called cumulative error doctrine, reasoning that something that is not prejudicial error in and of itself does not become such error when coupled with something else that is not prejudicial error.

*State v. Roscoe*, 184 Ariz. 484, 497, 910 P.2d 635, 648 (1996).

In 1998, the Arizona Supreme Court recognized that *Prince* had been carried too far, but only with respect to one specie of claim, prosecutorial misconduct.

> We reiterate the general rule that several non-errors and harmless errors cannot add up to one reversible error. We also clarify the fact that this general rule does not apply when the court is evaluating a claim that prosecutorial misconduct deprived defendant of a fair trial…. Unfortunately, two recent cases refused to recognize the **cumulative error** doctrine while denying a claim of prosecutorial misconduct.

*State v. Hughes*, 193 Ariz. 72, 79, 969 P.2d 1184, 1191-1192 (1998) (emphasis in original). One of the cases referenced in *Hughes* was *State v. Duzan*, 176 Ariz. 463, 466, 862 P.2d 223, 226 (Ct. App. 1993). There, Division I of the Arizona Court of Appeals opined:

> The defendant challenges as fundamental error several of the prosecutor's statements during closing argument; she also argues that cumulatively they are prejudicial. We note preliminarily that the doctrine of cumulative error is not recognized in Arizona, *State v. Prince,* 160 Ariz. 268, 274, 772 P.2d 1121, 1127 (1989), absent related errors, *State v. Filipov,* 118 Ariz. 319, 323, 324, 325, 576 P.2d 507, 511, 512, 513 (App.1978).

*Duzan*, 176 Ariz. at 466, 862 P.2d at 226. Oddly, the appellate court recognized that not only had 26 states recognized a cumulative error doctrine in the context of prosecutorial misconduct, but that the Ninth and Tenth Circuits had done so. *Id.* at n. 3. The appellate court did not, however, recognized that the Supreme Court had adopted such a rule as a matter of due process under the 14th Amendment. Even the Ninth Circuit case cited in *Duzan* by the Arizona Appellate Court, *United States v. Wallace*, 848 F.2sd 1464 (9th Cir. 1988), as amended, was not limited to prosecutorial misconduct claims. Instead, the *Wallace* Court considered the cumulative effect of claims of trial error such as impeachment with a stale conviction, and admission of a post-arrest statement in

1    violation of *Miranda*, and only one claim of prosecutorial misconduct by vouching for a

2    witness.

3          In 2006, the Arizona Supreme Court again opined "this court usually does not

4    subscribe to the cumulative error doctrine."  *State v. Ellison*, 213 Ariz. 116, 133, 140

5    P.3d 899, 916 (2006).  *See id.* at n. 11 (recognizing exception for prosecutorial

6    misconduct).

7          As recently as 2013, (albeit in the context of evidentiary errors), the Arizona

8    Supreme Court has affirmed its rejection of the cumulative error doctrine, citing *Hughes*.

9    "We decline to revisit our longstanding precedent."  *State v. Parker*, 231 Ariz. 391, 409,

10   296 P.3d 54, 72 *cert. denied,* 134 S. Ct. 180, 187 L. Ed. 2d 123 (2013).[25]

11   **No Arizona Decisions on Federal Cumulative Error** – However, the pertinent

12   question in this case is not whether Arizona has recognized its own cumulative error

13   doctrine, but whether it would refuse to recognize the federal doctrine.  None of these

14   cases refusing a cumulative error doctrine, at least on their face, reflect that the Arizona

15   courts were considering a federal due process claim when rejecting a claim of

16   cumulative error.

17         In *Prince*, the court made no mention of federal due process in disposing of the

18   cumulative error claim, and the complained of errors were all state evidentiary rulings.[26]

19   160 Ariz. at 274, 772 P.2d at 1127.  The same is true of *White*, 168 Ariz. at 508, 815

20   P.2d at 877, where the issue raised by the defendant was "Is the defendant entitled to a

21   new trial because of the cumulative effect of the evidentiary errors?"  *Id.* at 503, 815

22   P.2d at 872.  Similarly in *Roscoe*, the defendant simply argued that a series of four

23   evidentiary errors and argued "these numerous errors, taken together, deprived him of a

24

25   [25] If these decisions were deemed to be based on a standalone cumulative error claim
     under the federal Due Process Clause, the undersigned has found nothing recent in the
26   cumulative error jurisprudence of the U.S. Supreme Court which would suggest that if
     now presented with Petitioner's claim, the Arizona Courts would have veered from a
27   path of non-recognition.
     [26] Moreover, the defendants brief to the Arizona Supreme Court in that proceeding did
28   not assert a federal due process claim based on cumulative error.  *See Prince v. Ryan*,
     CV-08-1299-PHX-SRB, Answer, Doc. 16, Exhibit M, Opening Brief at 35-37.

fair trial." 184 Ariz. at 497, 910 P.2d at 648.

In contrast, in *Hughes*, where the court was plainly addressing a series of federal claims of prosecutorial misconduct, the Arizona Supreme Court took pains to clarify that cumulative error analysis applied to those types of claims, but otherwise maintaining the rule adopted in *Prince*. 193 Ariz. at 79, 969 P.2d at 1191-1192.

Even in. *Duzan*, which *Hughes overruled,* the analysis was limited to a regurgitation of *Prince* and the refusal to apply a cumulative error analysis to claims of prosecutorial misconduct for purposes of finding prejudice. 176 Ariz. at 466, 862 P.2d at 226. The Arizona Court of Appeals did not address a standalone claim of cumulative error.

Finally, in *Ellison*, the court's analysis reflects no consideration of a federal due process claim of cumulative error, but simply the cumulative effect of 5 claims of evidentiary error, as part of a section of the opinion limited to analyzing those errors. 213 Ariz. at 129-133, 140 P.3d at 912-915.

**Conclusion** - In sum, while the Arizona courts have steadfastly refused to adopt their own standalone claim of cumulative error, Petitioner points to no authority demonstrating that they would refuse to acknowledge a federal claim on the same basis.

Accordingly, the undersigned concludes that presentation of Supplemental Ground 3 to the Arizona Courts would not have been futile, and therefore Petitioner was required to attempt such remedies.

Because he did not, he has not properly exhausted his state remedies with regard to this claim.


**l.   Summary re Exhaustion**

Based upon the foregoing, the undersigned concludes that Petitioner has not fairly presented to the Arizona Court of Appeals his claims in original Grounds 2, 7, 8, the portion of  9E related to failure to call Kristina Cox, 9F, 9G, 9H, 9I, and 12, and in Supplemental Grounds 2 and 3.

### 3.  Procedural Default

Ordinarily, unexhausted claims are dismissed *without prejudice*.  *Johnson v. Lewis*, 929 F.2d 460, 463 (9th Cir. 1991).  However, where a petitioner has failed to properly exhaust his available administrative or judicial remedies, and those remedies are now no longer available because of some procedural bar, the petitioner has "procedurally defaulted" and is generally barred from seeking habeas relief.  Dismissal *with prejudice* of a procedurally barred or procedurally defaulted habeas claim is generally proper absent a "miscarriage of justice" which would excuse the default.  *Reed v. Ross*, 468 U.S. 1, 11 (1984).

Respondents argue that Petitioner may no longer present his unexhausted claims to the state courts.  Respondents rely upon Arizona's preclusion bar, set out in Ariz. R. Crim. P. 32.2(a) and Arizona's timeliness bar in Ariz. R. Crim. P. 32.4 .  (Answer, Doc. 14 at 60-61; Supp. Answer, Doc. 80 at 52.)

#### a.   Remedies by Direct Appeal

Under Arizona Rule of Criminal Procedure 31.3, the time for filing a direct appeal expires twenty days after entry of the judgment and sentence.   The Arizona Rules of Criminal Procedure do not provide for a successive direct appeal.  *See generally* Ariz.R.Crim.P. 31.   Accordingly, direct appeal is no longer available for review of Petitioner's unexhausted claims.

#### b.   Remedies by Post-Conviction Relief

Petitioner can no longer seek review by a subsequent PCR Petition.

##### (1).  Waiver Bar

Under the rules applicable to Arizona's post-conviction process, a claim may not ordinarily be brought in a petition for post-conviction relief that "has been waived at trial, on appeal, or in any previous collateral proceeding."   Ariz.R.Crim.P. 32.2(a)(3). Under this rule, some claims may be deemed waived if the State simply shows "that the

1   defendant did not raise the error at trial, on appeal, or in a previous collateral

2   proceeding." *Stewart v. Smith*, 202 Ariz. 446, 449, 46 P.3d 1067, 1070 (2002) (quoting

3   Ariz.R.Crim.P. 32.2, Comments).   For others of "sufficient constitutional magnitude,"

4   the State "must show that the defendant personally, "knowingly, voluntarily and

5   intelligently' [did] not raise' the ground or denial of a right." *Id.*   That requirement is

6   limited to those constitutional rights "that can only be waived by a defendant

7   personally." *State v. Swoopes* 216 Ariz. 390, 399, 166 P.3d 945, 954 (App.Div. 2, 2007).

8   Indeed, in coming to its prescription in *Stewart v. Smith*, the Arizona Supreme Court

9   identified: (1) waiver of the right to counsel, (2) waiver of the right to a jury trial, and (3)

10   waiver of the right to a twelve-person jury under the Arizona Constitution, as among

11   those rights which require a personal waiver.   202 Ariz. at 450, 46 P.3d at 1071.[27]   None

12   of Petitioner's unexhausted claims fit within those categories.

13

14                               **(2).  Timeliness Bar**

15         Even if not barred by preclusion, Petitioner would now be barred from raising his

16   claims by Arizona's time bars.   Ariz.R.Crim.P. 32.4 requires that petitions for post-

17   conviction relief (other than those which are "of-right") be filed "within ninety days after

18   the entry of judgment and sentence or within thirty days after the issuance of the order

19   and mandate in the direct appeal, whichever is the later."   *See State v. Pruett*, 185 Ariz.

20   128, 912 P.2d 1357 (App. 1995) (applying 32.4 to successive petition, and noting that

21   first petition of pleading defendant deemed direct appeal for purposes of the rule).   That

22   time has long since passed.

23

24   _____

[27] Some other types of claims addressed by the Arizona Courts in resolving the type of
25   waiver required include: ineffective assistance (waived by omission), *Stewart,* 202 Ariz.
    at 450, 46 P.3d at 1071; right to be present at non-critical stages (waived by omission),
26   *Swoopes,* 216Ariz. at 403, 166 P.3d at 958; improper withdrawal of plea offer (waived
    by omission), *State v. Spinosa,* 200 Ariz. 503, 29 P.3d 278 (App. 2001); double jeopardy
27   (waived by omission), *State v. Stokes,* 2007 WL 5596552 (App. 10/16/07); illegal
    sentence (waived by omission), *State v. Brashier,* 2009 WL 794501 (App. 2009); judge
28   conflict of interest (waived by omission), *State v. Westmiller,*  2008 WL 2651659 (App.
    2008) (same).

1

**(3).  Exceptions**

2          Rules 32.2 and  32.4(a) do not bar dilatory claims if they fall within the category

3   of claims specified in Ariz.R.Crim.P. 32.1(d) through (h).  *See* Ariz. R. Crim. P.  32.2(b)

4   (exceptions to preclusion bar); Ariz. R. Crim. P.  32.4(a) (exceptions to timeliness bar).

5   Petitioner has not asserted that any of these exceptions are applicable to his claims.   Nor,

6   with one exception, does it appear that such exceptions would apply.  The rule defines

7   the excepted claims as follows:

8                    d.  The person is being held in custody after the sentence
            imposed has expired;
9                    e.  Newly discovered material facts probably exist and such
            facts probably would have changed the verdict or sentence. Newly
10           discovered material facts exist if:
                     (1)  The newly  discovered material facts were
11           discovered after the trial.
                     (2)  The defendant exercised due diligence in securing
12           the newly discovered material facts.
                     (3)  The newly  discovered material facts are not
13           merely cumulative or used solely for impeachment, unless the
            impeachment evidence substantially undermines testimony which
14           was of critical significance at trial such that the evidence probably
            would have changed the verdict or sentence.
15                   f.  The defendant's failure to file a notice of post-conviction
            relief of-right or notice of appeal within the prescribed time was
16           without fault on the defendant's part; or
                     g.  There has been a significant change in the law that if
17           determined to apply to defendant's case would probably overturn the
            defendant's conviction or sentence; or
18                   h.  The defendant demonstrates by clear and convincing
            evidence that the facts underlying the claim would be sufficient to
19           establish that no reasonable fact-finder would have found defendant
            guilty of the underlying offense beyond a reasonable doubt, or that
20           the court would not have imposed the death penalty.

21   Ariz.R.Crim.P. 32.1.

22          Paragraph 32.1 (d) (expired sentence) generally has no application to an Arizona

23   prisoner who is simply attacking the validity of his conviction or sentence.  Where a

24   claim is based on "newly discovered evidence" that has previously been presented to the

25   state courts, the evidence is no longer "newly discovered" and paragraph (e) has no

26   application.  Here, Petitioner has long ago asserted the facts underlying his unexhausted

27   claims. Paragraph (f) has no application where the petitioner filed a timely notice of

28

appeal.  Paragraph (g) has no application because Petitioner has not asserted a change in the law since his last PCR proceeding.  Finally, paragraph (h), concerning claims of actual innocence, has no application to Petitioner's procedural claims, and Petitioner proffers no new evidence of actual innocence other than what has already been presented and argued in his second PCR proceeding and his most recent PCR proceeding..

Thus, Petitioner's claims that were not fairly presented are all now procedurally defaulted.

**4.  Summary Regarding Procedurally Defaulted Claims**

Petitioner failed to fairly present, and has now procedurally defaulted on the following claims:  Ground 2 (lost evidence instruction); Ground 7 (state's investigation); Ground 8 (investigator); Ground 9E (IAC re exculpatory witnesses) as to Kristina Cox; Ground 9F (IAC re closing arguments); Ground 9G (IAC re Sentencing); Ground 9H (IAC re appellate counsel); Ground 9I (IAC re cumulative errors); Ground 12 (Failure to Rule on Ineffective Assistance), Supplemental Ground 2 (ineffective assistance) and Supplemental Ground 3 (Cumulative Error).

Thus, these claims are precluded from habeas review absent cause and prejudice to avoid the bar.

**5.  Independent and Adequate State Grounds**

Respondents argue Ground 5 (Impeachment of Petitioner) was procedurally barred under an independent and adequate state waiver ground.  (Answer, Doc. 14 at 132-138.)  Similarly, Respondents argue that Supplemental Grounds 2 was procedurally barred in Petitioner's most recent PCR proceeding. (Supplemental Answer, Doc. 80 at 25, *et seq.* and 51, *et seq.*)

**a.   Applicable Law**

"[A]bsent showings of 'cause' and 'prejudice,' federal habeas relief will be

unavailable when (1) 'a state court [has] declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement,' and (2) 'the state judgment rests on independent and adequate state procedural grounds.' " *Walker v. Martin*, 562 U.S. 307, 316 (2011).

In *Bennett v. Mueller*, 322 F.3d 573 (9th Cir.2003), the Ninth Circuit addressed the burden of proving the independence and adequacy of a state procedural bar:

> Once the state has adequately pled the existence of an independent and adequate state procedural ground as an affirmative defense, the burden to place that defense in issue shifts to the petitioner. The petitioner may satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule. Once having done so, however, the ultimate burden is the state's.

*Bennett*, 322 F.3d at 584, 585.

### b.   Ground 5 – Impeachment with Priors

For his Ground 5, Petitioner argues:

> (5) My Constitutional rights were violated when the trial court allowed the state to admit my priors as impeachment if I testified. The court of appeals erred when it found I waived this issue and thereby violated my Constitutional rights.

(Petition, Doc. 1 at 9:1-A.)

Respondents argue that "the Arizona Court of Appeals did not reach the merits of Petitioner's constitutional claims because it found them to be procedurally barred" under Arizona law holding that an objection to admissibility of a prior conviction is waived if the "defendant chooses not to testify at trial."  (Answer, Doc, 14 at 132-133 (quoting *State v. Lee*, 189 Ariz. 608, 617, 944 P.2d 1222, 1231 (1997)).)

Petitioner does not address the procedural bar issue in his Reply, but simply argues that the Arizona courts "misapplied Federal law" when it applied Arizona's waiver.  (Reply, Doc. 25 at 21.)

Indeed, Petitioner argued on direct appeal that because of the decision on

admission of his priors, he was "denied his Sixth and Fourteenth Amendment rights to testify on his own behalf, his right to present a defense, and his right to due process and a fair trial." (Exhibit DD, Opening Brief at 48.) The Arizona Court of Appeals rejected this claim, holding:

> Because defendant did not testify he has waived this issue on appeal. *State v. Lee*, 189 Ariz. 608, 617, 944 P.2d 1222, 1231 (1997).

(Exhibit GG, Mem. Dec. 2/28/02 at 14.) Thus, this claim was denied on the basis of the state procedural bar.

Petitioner argues, without explanation, that the "Court of Appeals erred when it found that I waived the issue because I did not testify at trial." (Reply, Doc. 25 at 21.) Petitioner goes on to argue that the "courts misapplied Federal law." (*Id.*) However, the waiver bar applied to Petitioner's claim was a matter of state, not federal, law. Arizona law has long held that "[i]f a defendant chooses not to testify at trial, he waives the right to challenge the trial court's ruling on the admissibility of a prior conviction." *State v. Lee*, 189 Ariz. 608, 617, 944 P.2d 1222, 1231 (1997) (Ariz. Sup. Ct. *en banc*). Indeed, the federal courts apply the same rule in federal prosecutions. *See Luce v. U.S.*, 469 U.S. 38, 42 (1984) ("Requiring that a defendant testify in order to preserve Rule 609(a) [impeachment with prior conviction] claims will enable the reviewing court to determine the impact any erroneous impeachment may have had in light of the record as a whole; it will also tend to discourage making such motions solely to 'plant' reversible error in the event of conviction."). *See also U.S. v. Williams*, 939 F.2d 721, 724 (9th Cir. 1991) (acknowledging *Luce* as overturning circuit precedent).

Petitioner makes no argument and asserts no facts to show that Arizona's waiver rule on objections to impeachment with prior convictions is not independent and adequate.

Accordingly, this Court must conclude that Petitioner's claim in Ground 5 was procedurally barred on an independent and adequate state ground, and is precluded from

habeas review absent cause and prejudice to avoid the bar.

### c.   Supplemental Ground 2 – Ineffective Assistance of Counsel

For his Supplemental Ground 2, Petitioner argues a laundry list of claims of ineffective assistance of counsel.  Each was fairly presented in his recent PCR petition and his Petition for Review to the Arizona Court of Appeals.

In Ground 2 of that PCR Petition, Petitioner argued that he had been denied effective assistance of counsel "in violation of his rights under the Sixth and Fourteenth Amendments, U.S. Constitution."  (Supplemental Records, Doc. 45, Append. 1, PCR Pet.  at 3.)   The same subclaims (2A through 2L) now asserted were raised in that Petition.  (*Id.* at 3, *et seq.*)

Respondents argue that the claims were precluded because they were not raised in earlier proceedings.  To the contrary, the PCR court ruled:

> The defendant raises twelve (12) separate claims which allege his trial counsel were ineffective. The defendant alleged ineffective assistance of counsel at trial during previous PCR proceedings. Therefore, preclusion of these claims is required even without examining the underlying facts. *See, Stewart v. Smith*, 202 Ariz. 446, 46 P.3d 1067 (2002).
>
> The Court finds that any claims relating to the ineffective assistance of trial counsel were either finally adjudicated on the merits or were waived in any previous collateral proceedings. *See,* Rule 32.2(a). As such, all of the IAC claims under Section II of the defendant's Petition are summarily dismissed.

(Suppl. Exhibits, Doc. 45, Append. 4, Order 1/18/13 at 3.)   The Arizona Court of Appeals concluded to "adopt the court's ruling."  (2nd Suppl. Exhibits, Doc. 67, Append. E, Mem.Dec.7/2/14 at 3.)

Here, the Court did not clearly rule that Petitioner's claims were waived.  To the contrary, the Court concluded they were "precluded," a term of art under Arizona Rule of Criminal Procedure 32.2(a) which can refer either to the presentation of them in a prior proceeding, or the failure to present them in the prior proceeding.  Indeed, the Court went on to recognize the both concepts were included in its ruling, *i.e.* the claims "were either finally adjudicated…or were waived."  (Suppl. Exhibits, Doc. 45, Append.

1  4, Order 1/18/13 at 3.)

2        Of course, if the claims had been previously adjudicated, this Court would be free

3  to address the claims.  "When a state court declines to review the merits of a petitioner's

4  claim on the ground that it has done so already, it creates no bar to federal habeas

5  review."  *Cone v. Bell*, 556 U.S. 449, 466 (2009).  Thus, "[p]reclusion," at least in its

6  traditional sense of a finding that the claim has been presented before, "does not provide

7  a basis for federal courts to apply a procedural bar."  *Ceja v. Stewart*, 97 F.3d 1246, 1253

8  (9th Cir. 1996).

9        Where a state court decision appears to rely on more than one state law grounds,

10  but affords no basis for choosing between a state law ground that would bar federal

11  review, and one that would not (i.e. because it is not "independent"), that decision cannot

12  bar federal review.  *Koerner v. Grigas*, 328 F.3d 1039 (9th Cir. 2003); *Ceja,* 97 F.3d at

13  1253.

14
15
16
17
18

>        A claim cannot be both previously litigated and procedurally
>        defaulted; either it was raised in a prior proceeding or it was not.
>        These cases do not allow for the possibility that the state court relied
>        on *both* grounds for dismissing the relevant claims; only one ground
>        could apply to each claim. The question is not whether the state
>        relied primarily on a particular ground, but on *which* mutually
>        exclusive ground the state court relied. When either ground is a
>        possibility, the choice between them is wholly arbitrary. It is not our
>        role to make such a choice.

19  *Koerner*, 328 F.3d at 1053.  Here, the state argued both forms of preclusion on different

20  grounds within Supplemental Ground 2. (*See* Second Supp. Record, Doc. 67, Appendix

21  B, PFR Response at 11-14.)  *But see Murray v. Schriro*, 745 F.3d 984, 1016 (9th Cir.

22  2014) (general reference to rule with preclusion and waiver provisions not ambiguous

23  when only arguments presented to court were on waiver).[28]

24        Thus, had Petitioner fairly presented his claims in Supplemental Ground 2 to the

25  Arizona Court of Appeals, this Court would appear to be required to conclude that

26  habeas review is not barred.  But Petitioner did not fairly present his claims to the

27  —————————————
28  [28] Of course, if this Court were to construe the state court ruling as finding previously
    presented only the claims argued as such by the State, the outcome would be the same,
    because Petitioner failed to fairly present his claims to the appellate court.

Arizona Court of Appeals.

The Supreme Court addressed this scenario in *Coleman v. Thompson*, 501 U.S. 722 (1991). There, the Court observed the normal rule that under *Cone*, *Koerner*, *Ceja*, and *Murray* would have left this Court free to address Petitioner's claim:

> In habeas, if the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition.

*Coleman*, 501 U.S. at 774. But, in the footnote to that holding, the Court observed:

> This rule does not apply if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred. In such a case there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claims.

*Id.* at 774, n. 1.

Thus, despite the ruling of the PCR court (which would permit this Court review because the ruling was ambiguous), Petitioner's failure to fairly present the claim to the Arizona Court of Appeals renders the claim unexhausted, and now procedurally defaulted.


### d.   Summary regarding Procedural Bar

Based upon the foregoing, the undersigned concludes that Petitioner's original Ground 5 was procedurally barred on an independent and adequate state ground, but his claims in Supplemental Ground 2 were not. The latter, however, were not fairly presented to the Arizona Court of Appeals, and thus are now procedurally defaulted.


## 6.  Cause and Prejudice

If the habeas petitioner has procedurally defaulted on a claim, or it has been procedurally barred on independent and adequate state grounds, he may not obtain

federal habeas review of that claim absent a showing of "cause and prejudice" sufficient to excuse the default.  *Reed v. Ross*, 468 U.S. 1, 11 (1984).

"Cause" is the legitimate excuse for the default.  *Thomas v. Lewis*, 945 F.2d 1119, 1123 (1991). "Because of the wide variety of contexts in which a procedural default can occur, the Supreme Court 'has not given the term "cause" precise content.'" *Harmon v. Barton*, 894 F.2d 1268, 1274 (11th Cir. 1990) (quoting *Reed*, 468 U.S. at 13), *cert. denied*, 498 U.S. 832 (1990).  The Supreme Court has suggested, however, that cause should ordinarily turn on some objective factor external to petitioner, for instance:

> ... a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that "some interference by officials", made compliance impracticable, would constitute cause under this standard.

*Murray v. Carrier*, 477 U.S. 478, 488 (1986) (citations omitted).

Here, Petitioner argues that the ineffective assistance of appellate counsel should excuse his failures to exhaust and procedural default on Grounds 2, 7, 8, 9E, 9F, 9G, 9H, 9I, and 12 or his procedural bar on Ground 5.  In his Supplemental Petition, Petitioner argues that his failure to exhaust his claims of ineffective assistance of trial counsel asserted in Supplemental Ground 2 should be excused because appellate and PCR counsel were ineffective, as provided for in *Martinez v. Ryan*, 132 S.C.t 1309 (2012). Petitioner also makes generalized complaints about his *pro se* status and the constraints of his incarceration.

### a.   Cause

### (1).  Pro Se Status and Constraints of Incarceration

The "cause and prejudice" standard is equally applicable to pro se litigants, *Harmon v. Barton*, 894 F.2d 1268, 1274 (11th Cir. 1990); *Hughes v. Idaho State Board of Corrections*, 800 F.2d 905, 908 (9th Cir. 1986), whether literate and assisted by "jailhouse lawyers", *Tacho*, 862 F.2d at 1381; illiterate and unaided, *Hughes*, 800 F.2d at 909, or even non-English speaking.  *Vasquez v. Lockhart*, 867 F.2d 1056, 1058 (9th Cir.

1988), cert. denied, 490 U.S. 1100 (1989).

Petitioner points to nothing unique or specific in his *pro se* status or in the conditions of his confinement that prevented him from bringing a specific claim.

Moreover, throughout the times when his claims should have been raised (e.g. on direct appeal and in his first and second PCR proceedings), Petitioner was represented by counsel and thus not dependent upon his own legal abilities or resources.

### (2).  Ineffective Assistance of Appellate Counsel

Petitioner asserts that any failure to properly exhaust his original claims was appellate counsel's fault.  (*See* Petition, Doc. 1 at 6-E (Ground 1), 7-D (Ground 2), 8-B (Ground 3), 9-C (Ground 4), 9:1-C (Ground 5), 9:2-A (Ground 6) 9:3-A, 9:3-C (Ground 7); Reply, Doc. 25 at 15 (Ground 2), 24 (Ground 8, by reference to Ground 2) 25 (Ground 9, by reference to Ground 2), 27 (Ground 12, by reference to Ground 2).) Similarly, Petitioner argues that any failure to exhaust state remedies with regard to the claims raised in Supplemental Ground 2 in his Supplemental Petition were caused by ineffective assistance of appellate counsel.  (Supp. Petition, Doc. 78 at 5-7.16.)

However, claims of ineffective assistance of appellate counsel asserted as cause to excuse a procedural default must themselves be properly exhausted. *Murray v. Carrier*, 477 U.S. 478, 492 (1986); *Edwards v. Carpenter*, 529 U.S. 446 (2000).  Accordingly, "[t]o the extent that petitioner is alleging ineffective assistance of appellate counsel as cause for the default, the exhaustion doctrine requires him to first raise this ineffectiveness claim as a separate claim in state court."  *Tacho v. Martinez*, 862 F.2d 1376, 1381 (9th Cir. 1988).

Here, Petitioner did not argue a relevant claim of ineffective assistance of *appellate* counsel in his second direct appeal (Exhibit MM, Open. Brief; Exhibit PP, Supp. Brief), in his second PCR petition for review (Exhibit NNN), or in his third PCR Petition for Review (2nd Suppl., Doc. 67, Append. A).  Rather, in each, any claim of ineffective assistance was directed at either trial counsel or PCR counsel.

Petitioner did argue ineffective assistance of appellate counsel in his first PCR petition.  That claim was limited to a failure to challenge the aggravating factors at sentencing and a generalized claim that appellate counsel "failed to federalize and preserve several claims for later federal review."  (Exhibit A, ROA, Item 297 at 3.)  With regard to the latter, Petitioner argued that appellate counsel had failed to "federalize" his claim concerning the failure to give a *Willits* instruction, "and the remaining 6 issues (See Petition for Review at 2, Exhibit Q)."  (Exhibit A, ROA, Item 297 at 23.)  The latter referred to the Petition for Review by the Arizona Supreme Court, in which appellate counsel expressly excluded from the request for review.  (*See* Exhibit HH, Pet. Rev. at 2.)  These included claims regarding: (1) prosecutorial misconduct from lost crime scene measurements; (2) unduly suggestive pretrial identifications; (3) ruling allowing admission of Petitioner's prior felony convictions if he testified; (4) insufficient evidence; (5) limitations on cross-examination of Betts; and (6) sentencing errors.  In his Petitioner for Review in that first PCR proceeding, Petitioner simply argued that the PCR court "failed to rule upon Petitioner's claims of cumulative error and ineffective assistance of appellate counsel."  (Exhibit LL, Pet. Rev. at 11.)

Of the present habeas grounds related to the claims addressed in Petitioner's first PCR proceeding, the only ones the undersigned has concluded that Petitioner procedurally defaulted his state remedies with regard to were: (1) the *Willits* instruction (Ground 2), and (2) the limitations on cross-examination of Betts (Ground 8).

Accordingly, Petitioner may not now raise the ineffectiveness of appellate counsel to excuse his procedural defaults as to any other of his procedurally defaulted claims.

As to those two claims, for the reasons discussed hereinafter in addressing the merits of those claims, the undersigned has concluded that the claims are without merit.  (*See infra* Sections II(G) (Ground 2: *Willits* Instruction) and II(M) (Ground 8: State's Investigation).)

To establish ineffective assistance of appellate counsel, Petitioner must show that counsel performed deficiently and prejudice resulted.  *See Strickland v. Washington*, 466

U.S. 668, 687-688 (1984).  (The standards for determining ineffective assistance of counsel are set forth at length hereinafter in Section III(N)(1) (Ineffective Assistance Standards).)  "The failure to raise a meritless legal argument does not constitute ineffective assistance of counsel."  *Baumann v. United States*, 692 F.2d 565, 572 (9th Cir. 1982).

Moreover, Petitioner proffers nothing to suggest that appellate counsel could not have reasonably foregone pursuing such claims on the basis that the those raised on appeal were more likely to succeed.  "The law does not require counsel to raise every available nonfrivolous defense. Counsel also is not required to have a tactical reason—above and beyond a reasonable appraisal of a claim's dismal prospects for success—for recommending that a weak claim be dropped altogether." *Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009) (citations omitted).   Thus, Petitioner fails to show that appellate counsel was ineffective for failing to raise these two claims, and thus fails to establish cause to excuse his procedural default.[29]

### (3).  Ineffective Assistance of PCR Counsel

Petitioner asserts that any failure to properly exhaust the claims in his Supplemental Ground 2 was caused by the ineffective assistance of PCR counsel.  (Supp. Petition, Doc. 789 at 5-7.12 *et seq.*)

### (a).  *Ordinarily Not Cause*

Ordinarily, to meet the "cause" requirement, the ineffective assistance of counsel must amount to an independent constitutional violation.  *Ortiz v. Stewart*, 149 F.3d 923, 932, (9th Cir. 1998).  Accordingly, where no constitutional right to an attorney exists, ineffective assistance will not amount to cause excusing the state procedural default.  *Id*. "Ineffective assistance of counsel can constitute cause to excuse a procedural default

---

[29] For the same reasons, Petitioner would not be able to show prejudice with respect to these claims.

only if the petitioner had a constitutional right to counsel in the proceeding in which the default occurred…The fact that counsel is appointed by the state court does not change the result, because counsel is not constitutionally required." *Smith v. State of Idaho*, 392 F.3d 350, 357 (9th Cir. 2004) (emphasis in original, citations omitted).  If there is no federal constitutional right to counsel, a petitioner "cannot establish cause because of the state trial court's failure to appoint him counsel, even if such failure was erroneous as a matter of state law." *Smith*, 392 F.3d at 357 .  In *Patrick Poland v. Stewart*, 169 F. 3d 573 (9th Cir. 1999), the Ninth Circuit held that "[b]ecause there is no right to an attorney in state post-conviction proceedings, there cannot be constitutionally ineffective assistance of counsel in such proceedings." *Id*. at 588 (quoting *Coleman v. Thompson*, 501 U.S. 722, 752 (1991)).

The Supreme Court has recognized two exceptions to the general rule that ineffectiveness of PCR counsel is not cause, the first involves abandonment by PCR counsel, and the second involves ineffective assistance in urging claims of ineffective assistance of trial or appellate counsel.


### (b).  *Exception for Abandonment without Notice*

The first exception was recognized in *Maples v. Thomas*, 132 S.Ct. 912 (2012), where the Supreme Court held that cause could be shown when PCR counsel was not merely negligent (and under the law of agency that negligence being chargeable to the petitioner) but had abandoned the representation without notice to the petitioner, resulting in the loss of his state remedies.

Here, however, Petitioner does not suggest that counsel abandoned the representation without notice, merely that counsel was deficient in not bringing claims Petitioner asserts are meritorious.  Indeed, counsel filed the appropriate notice to the Court when he was unable to find an issue of review. Thus, any such deficiency was external to the defense, and is chargeable to Petitioner.

134

**(c).**  *__Exception for Claims of Ineffectiveness of Trial or Appellate Counsel__*

The second exception to the general rule that ineffectiveness of PCR counsel does not establish cause concerns the failure of PCR counsel to bring claims of ineffective assistance of trial counsel.[30]

### 1. Martinez Decision

In *Martinez v. Ryan,* 132 S.Ct. 1309 (2012), the Court recognized that because courts increasingly reserve review of claims of ineffective assistance of trial counsel to post-conviction relief proceedings, the ineffectiveness of counsel in such PCR proceedings could effectively defeat any review of trial counsel's ineffectiveness.[31] Accordingly, the Court recognized a narrow exception to the Court's ruling in *Coleman, supra,* that the ineffectiveness of PCR counsel cannot provide cause. Arizona, the state at issue in *Martinez*, is just such a state, and accordingly ineffective assistance of PCR counsel can establish cause to excuse a procedural default of a claim of ineffective assistance of trial counsel. In *Ha Van Nguyen*, 736 F.3d 1287 (9th Cir. 2013), the Ninth Circuit extended *Martinez* to PCR counsel's ineffectiveness in failing to bring claims of ineffective assistance of appellate counsel.

However, the *Martinez* court made clear that the limited exception it was creating for ineffectiveness of PCR counsel as "cause" did not extend outside the initial PCR proceeding.

> The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts. It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective

---

[30]  The Ninth Circuit has held that "an ineffective assistance of PCR counsel claim used to establish cause for a procedural default of a claim for ineffective assistance of sentencing counsel need not be exhausted itself." *Dickens v. Ryan*, 740 F.3d 1302, 1322 n.17(9th Cir. 2014).

[31]  In *Trevino v. Thaler*, 133 S.Ct. 1911 (2013), the Court extended *Martinez* to cases where state law did not mandate that claims of ineffectiveness be brought in PCR proceedings, but provided no other meaningful avenue for review.

135

1                assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons.

2    *Martinez*, 132 S.Ct. at 1320.

3       Here, Petitioner functionally had two PCR proceedings in which he was

4 represented by counsel, one pre-resentencing, and one post.  Petitioner contends they

5 were in fact only one such proceeding.  In *Clabourne v.* Ryan, 745 F.3d 362 (9th Cir.

6 2014), the Ninth Circuit addressed claims of ineffectiveness at a resentencing under the

7 rubric of *Martinez*, but did not address whether previous state post-conviction

8 proceedings had been held.   Because the undersigned ultimately concludes that the other

9 requirements of *Martinez* are not met, the undersigned presumes, for purposes of

10 applying *Martinez*, that Petitioner's "second" PCR proceedings were for purposes of

11 *Martinez,* Petitioner's "initial-review" collateral proceeding.

12       For Petitioner to rely upon *Martinez*, Petitioner must "demonstrate[e] two things:

13 (1) 'counsel in the initial-review collateral proceeding, where the claim should have been

14 raised, was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668,

15 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984),' and (2) 'the underlying ineffective-assistance-

16 of-trial-counsel claim is a substantial one, which is to say that the prisoner must

17 demonstrate that the claim has some merit.'"  *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir.

18 2012) (quoting *Martinez*, 132 S.Ct. at 1318).

19

20                 *2.  Trial Counsel's Ineffectiveness*

21      *Martinez* requires "that the underlying ineffective-assistance-of-trial-counsel

22 claim is a substantial one, which is to say that the prisoner must demonstrate that the

23 claim has some merit. *Martinez*, 132 S. Ct. at 1318-19.  In applying that standard, the

24 *Martinez* Court looked to the standard applied to certificates of appealability in *Miller–El*

25 *v. Cockrell,* 537 U.S. 322  (2003).

26      In *Detrich v. Ryan*, 740 F.3d 1237, 1245 (9th Cir. 2013) cert. denied, 134 S. Ct.

27 2662 (2014), the Ninth Circuit elaborated on that standard:

28           Under the standard for issuing a certificate of appealability, which

the Court incorporated in its definition of substantiality, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Stated otherwise, a claim is "insubstantial" if "it does not have any merit or ... is wholly without factual support."

*Id.* (citations omitted).

In deciding to issue a certificate of appealability, a valid claim determination does not require the Court to make a "definitive" determination of the merits of the claims, but rather only a "preliminary" one. *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003). It requires only "a general assessment of their merits," *id.* at 336, and not a "certainty of ultimate relief," *id.* at 337. The Ninth Circuit has taken a particularly broad view of this standard, at least in comparison to some other circuits. *See* David Goodwin, *An Appealing Choice: An Analysis of and A Proposal for Certificates of Appealability in "Procedural" Habeas Appeals*, 68 N.Y.U. Ann. Surv. Am. L. 791, 821 (2013) (comparing circuits). The Ninth Circuit has concluded: "we will simply take a 'quick look' at the face of the complaint to determine whether the petitioner has 'facially allege[d] the denial of a constitutional right.' " *Lambright v. Stewart*, 220 F.3d 1022, 1026 (9th Cir. 2000) (quoting *Jefferson v. Welborn*, 222 F.3d 286, 289 (7th Cir. 2000)). Thus, in resolving the issuance of a certificate of appealability, the court need not evaluate whether a petitioner's claims are ultimately substantiated by the record, but simply whether the Petition has made out a constitutional claim.[32]

Moreover, circuit court precedent is not determinative in deciding whether a claim is substantial. "Even if a question is well settled in our circuit, a constitutional claim is debatable if another circuit has issued a conflicting ruling." *Allen v. Ornoski*, 435 F.3d 946, 951 (9th Cir. 2006).

Thus, in applying the "some merit" standard under *Martinez*, the habeas court is

---

[32] This standard is not unlike the "failure to state a claim" standard applied in evaluating complaints under Federal Rule of Civil Procedure 12(b)(6). "[A] complaint must contain sufficient factual content 'to state a claim to relief that is plausible on its face....' " *Landers v. Quality Communications, Inc.*, 771 F.3d 638, 641 (9th Cir. 2014), as amended (Jan. 26, 2015) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

not required to finally determine the merits of the claim of trial counsel ineffectiveness, but simply to confirm that that the claim is not devoid of potential legal merit or wholly without factual support.

### 3. PCR Counsel's Ineffectiveness

**<u>Prejudice</u>** - In *Detrich*, the plurality opinion by Circuit Judge Fletcher addressed the relationship between the three levels of prejudice at play in a *Martinez* claim, *i.e.* (1) the prejudice necessary to show that the claim of ineffective assistance of trial counsel has some merit; (2) the prejudice necessary to show that PCR counsel was ineffective in failing to raise the claim of ineffectiveness of trial counsel; and (3) assuming that the ineffectiveness of PCR counsel established cause to excuse the procedural default, the prejudice necessary to satisfy the other half of the cause and prejudice standard.  *See* Michael Ellis, *A Tale of Three Prejudices: Restructuring the "Martinez Gateway"*, 90 Wash. L. Rev. 405 (2015).

Judge Fletcher concluded that the showing of prejudice at the second level (ineffectiveness of PCR counsel) was met by the showing of prejudice at the first level (ineffectiveness of trial counsel).  "A prisoner need not show actual prejudice resulting from his PCR counsel's deficient performance, over and above his required showing that the trial-counsel IAC claim be "substantial" under the first *Martinez* requirement." *Detrich*, 740 F.3d at 1245-46.  "[N]o showing of prejudice from PCR counsel's deficient performance is required, over and above a showing that PCR counsel defaulted a 'substantial' claim of trial-counsel IAC, in order to establish 'cause' for the procedural default.  *Id.* at 1246.  Judge Fletcher reasoned that any other approach would mandate a showing of ultimate success at the second level, which would render superfluous the first *Martinez* requirement of showing that the underlying Strickland claims were 'substantial'—that is, that they merely had 'some merit.'"  *Id.* at 1246.[33]

---

[33] Contrary to Judge Fletcher's determination, there is at least an argument that even if a separate showing of prejudice at the PCR counsel stage is required, the "some merit" standard would still serve the worthwhile function of making it clear that the habeas

In *Clabourne v. Ryan*, 745 F.3d 362 (9th Cir. 2014), a three judge panel evaluated whether  that portion of Judge Fletcher's opinion was the decision of the *en banc* court, and concluded that it was not.  "A majority of the panel thus explicitly rejected the view expressed in Judge Fletcher's plurality opinion that 'a prisoner need show only that his PCR [post-conviction relief] counsel performed in a deficient manner' and 'need not show actual prejudice resulting from his PCR counsel's deficient performance, over and above his required showing that the trial-counsel IAC [ineffective assistance of counsel] claim be 'substantial' under the first *Martinez* requirement.'" 745 F.3d at 376.

Thus, the *Clabourne* panel concluded that normal *Strickland* analysis applied at the second, ineffectiveness- of-PCR-counsel, level, not some abbreviated analysis.  "[T]o show ineffective assistance of post-conviction relief counsel, a petitioner must establish a reasonable probability that the result of the postconviction proceeding would have been different."  745 F.3d 377.  "The prejudice at issue is prejudice at the post-conviction relief level, but if the claim of ineffective assistance of trial counsel is implausible, then there could not be a reasonable probability that the result of post-conviction proceedings would have been different." *Id.*

At the third level of prejudice, when finding the prejudice part of cause and prejudice, the *Clabourne* panel observed that the "showing that the trial-level ineffective assistance of counsel claim was 'substantial'" suffices.  Nonetheless, to find cause and prejudice, the habeas court must ultimately address the likelihood that underlying claim of ineffectiveness-of-trial-counsel had more than "some merit."  "To demonstrate that there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different, it will generally be necessary to look through to what happened at the trial stage." *Id.* at 377-78.

**Deficient Performance** – It is undisputed that *Martinez*  and *Detrich* require that

---

court was not required to make a final merits determination on the ineffectiveness of trial counsel before conducting hearings on the ineffectiveness of PCR counsel.  Nor would the habeas court be trapped into such a hearing when the underlying trial counsel claim was plainly meritless.

the petitioner must not only show that the IAC of trial counsel claim have "substantial merit," but must also show that either he did not have PCR counsel or that PCR counsel performed in a deficient manner.  "We conclude, for the narrow purpose of satisfying the second *Martinez* requirement to establish 'cause,' that a prisoner need show only that his PCR counsel performed in a deficient manner."  *Detrich,* 740 F.3d at 1245.

In applying that requirement for deficient performance, *Martinez* directs that the habeas court apply the normal standards of ineffectiveness under *Strickland*.

> From this it follows that, when a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding, a prisoner may establish cause for a default of an ineffective-assistance claim in two circumstances. The first is where the state courts did not appoint counsel in the initial-review collateral proceeding for a claim of ineffective assistance at trial. The second is where appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

*Martinez*, 132 S. Ct. at 1318.

Thus, this Court must also resolve whether, under *Martinez*, Petitioner's PCR counsel performed deficiently within the meaning of *Strickland*.  That includes such things as applying the presumption that counsel made reasonable judgments, declining to second guess strategic choices," *United States v. Pregler*, 233 F.3d 1005, 1009 (7th Cir. 2000); judging counsel from his perspective at the time of the alleged error in light of all the circumstances, *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986); and acknowledging that counsel is not required to raise every available nonfrivolous claim or to have a tactical reason above and beyond a reasonable appraisal of a claim's dismal prospects for success, for failing to bring the claim in favor of more viable arguments, *Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009).

Here, Petitioner contends that at an evidentiary hearing, he would present testimony from PCR counsel Goldberg, consistent with his statements to the volunteers of the Arizona Justice Project,  "that he 'missed' all of these new IAC issues and will offer no valid reason (tactical, strategic, or otherwise) for not identifying and raising

1  these new claims." (Supp. Petition, Doc. 78 at 5-11-B.)

3  ### 4.  AEDPA Limitations

4  Ordinarily, because Petitioner seeks review of a state court judgment, his Petition

5  is subject to various limitations in 28 U.S.C. § 2254 adopted as part of the AEDPA.

6  **Limits on Habeas Relief** - In evaluating the ineffectiveness of PCR counsel (and

7  as part thereof, the ineffectiveness of trial counsel), this habeas Court is not constrained

8  by the limits on grants of habeas relief in 28 U.S.C. **§ 2254(d)**, *i.e.* state court decisions

9  contrary to or unreasonable application of Supreme Court law, etc.. *Cf. Martinez*, 132

10  S.Ct. at 1320 (finding limits on habeas relief for ineffectiveness of PCR counsel not

11  applicable to cause and prejudice determination).   Moreover, such limits only apply

12  where a claim "was adjudicated on the merits in State court proceedings." 28 U.S.C. §

13  2254(d).   Accordingly, those limits would not apply to a procedurally defaulted claim

14  which has never been addressed on its merits.  (Although, they might arguably apply if

15  the state court reached the merits in an alternative holding.)

16  **Limits on New Evidence at Cause & Prejudice Level** - In *Lopez v. Ryan*, 678

17  F.3d 1131 (9th Cir. 2012), the Ninth Circuit noted that it had not been decided whether

18  *Martinez's* extension of cause to excuse a procedural default on the basis of ineffective

19  assistance of PCR counsel would extend to the limits of 28 U.S.C. **§ 2254(e)(2)**.   In

20  *Detrich*, the Ninth Circuit took up the question, at least insofar as it related to efforts to

21  resolve the issue of ineffective assistance of PCR counsel. "Evidentiary hearings to

22  develop the factual basis of a 'claim' are ordinarily governed by 28 U.S.C. § 2254(e)(2).

23  But as we have already noted, a prisoner making a *Martinez* motion is not asserting a

24  'claim' for relief but instead is seeking, on an equitable basis, to excuse a procedural

25  default." *Id.* at 1247.   Moreover, the *Detrich* court found § 2254(e)(2) inapplicable to

26  evaluating trial counsel's ineffectiveness, at least for purposes of finding ineffective

27  assistance of PCR counsel. "The same is true of the factual record of his trial-counsel's

28  ineffectiveness. In deciding whether to excuse the state-court procedural default, the

141

district court thus should, in appropriate circumstances, allow the development of evidence relevant to answering the linked *Martinez* questions of whether there was deficient performance by PCR counsel and whether the underlying trial-counsel IAC claims are substantial." *Id.*

Thus, it is clear that the constraints of § 2254(e)(2) do not apply to this Court's determination of Petitioner's assertions of cause under *Martinez*, and this court is free to consider an expanded record, expand the record further, and/or conduct an evidentiary hearing to address Plaintiff's assertions under *Martinez*.

   **Limits on New Evidence after a *Martinez* Analysis** – On the other hand, *Detrich* did not decide whether the newly developed record would be fair game in deciding (after resolution of the ineffectiveness of PCR counsel question) the issue of granting habeas relief, *i.e.* whether trial counsel was ineffective).  Neither was this point addressed in the follow up to *Detrich*, *Dickens v. Ryan* , 740 F.3d 1302 (9th Cir. 2014). "Thus, § 2254(e)(2) does not bar a cause and prejudice hearing on Dickens's claim of PCR counsel's ineffectiveness, which requires a showing that Dickens's underlying trial-counsel IAC claim is substantial." *Dickens*, 740 F.3d at 1322. *See also Woods v. Sinclair,* 764 F.3d 1109, 1138 and n. 16 (holding only that § 2254(e)(2) did not bar petitioner from "obtaining such a hearing or from presenting extra-record evidence to establish cause and prejudice for the procedural default"). Indeed, none of these decisions have addressed whether a Petitioner asserting a *Martinez* basis for cause is somehow freed from the constraints of § 2254(e)(2) when the merits of the underlying claim of ineffective assistance of trial counsel are reached.

   A number of district court decisions have opined that *Martinez* did not alter § 2254(e)(2).  For example, in *Ford v. McCall*, 2013 WL 4434389 (D.S.C. Aug 14, 2013), the district court concluded that "a court retains discretion to expand the record for purposes of determining whether to excuse a petitioner's procedural default, but § 2254(e)(2) dictates whether a court may expand the record for purposes of establishing

the factual predicate of a ground for relief." *Id.* at *29.[34] But these decisions were not rendered under the influence of *Detrich.*

In *Moore v. Mitchell*, 708 F.3d 760 (6th Cir. 2013), the Sixth Circuit explicitly rejected the argument that *Martinez* somehow permitted any petitioner (whether their claims were procedurally defaulted or not) a "route to circumvent" the limitations of AEDPA when addressing the merits of a claim. *Id.* at 785. "*Pinholster* plainly bans such an attempt to obtain review of the merits of claims presented in state court in light of facts that were not presented in state court. *Martinez* does not alter that conclusion." *Id.* That case, however, dealt with a claim that had been presented to the state courts.

Nonetheless, there is a pre-*Martinez* distinction drawn by several circuit courts in applying § 2254(e)(2) to procedural issues versus claims. For example, in *Cristin v. Brennan*, 281 F.3d 404 (3rd Cir. 2002), *cert. denied*, 537 U.S. 897 (2002), the Third Circuit concluded that because § 2254(e)(2) applies to the failure to develop " the factual basis of a claim," it has no application "to hearings on procedural default." *Id.* at 419. *See also Holloway v. Horn*, 355 F.3d 707, 716 (3rd Cir. 2004) (applying *Cristin* to hearing to determine whether claim had been exhausted). In *Sibley v. Culliver*, 377 F.3d 1196, 1207 n. 9 (11th Cir. 2004), the Eleventh Circuit concluded that because § 2254(e)(2) only applied to a "claim," it did not govern "the availability of evidentiary hearings when petitioners seek to introduce evidence concerning actual innocence." *See also Henry v. Warden, Georgia Diagnostic Prison,* 750 F.3d 1226, 1231 (11th Cir. 2014) (§ 2254(e)(2) did not apply to "an evidentiary hearing on cause and prejudice"). In *Boyko v. Parke*, 259 F.3d 781 (7th Cir. 2001), the Court found that although § 2254(e)(2)

---

[34] *See also Foster v. Oregon,* 2012 WL 3763543 at *2 (D. Or. Aug. 29, 2012) ("*Martinez* does not provide any authority for Petitioner to expand the record"); *Halvorsen v. Parker*, 2012 WL 5866595 at *4 (E.D. Ky. Nov. 19, 2012) (petitioner's claim that pursuant to *Martinez* collateral review counsel's failure to develop the record should serve as cause to excuse lack of diligence is entirely inconsistent with *Williams*); *Williams v. Mitchell*, 2012 WL 4505181 at * 6 (N.D. Ohio Sept. 28, 2012) (rejecting petitioner's proposal of "a significant expansion of *Martinez*'s applicability" to allow claims of ineffective assistance of post-conviction counsel to establish cause to permit expansion of the record despite § 2254(e)(2)); and *Hill v. Anderson*, 2012 WL 2826973 at *3 (N.D. Ohio July 10, 2012).

might preclude new evidence on his claim, it did not preclude an evidentiary hearing to determine whether the petitioner had failed to develop the state record so as to trigger the application of § 2254(e)(2).

The undersigned is not unaware of the apparent incongruity of concluding that a habeas petitioner was given a right to pursue an assertion of cause and prejudice under *Martinez*, including supporting the argument through additions to the record, when he nonetheless might be stripped of the right to rely upon such additions once the cause and prejudice issues are resolved.

Perhaps the source of this circuitous conundrum arises from the distinction asserted by Circuit Judge Callahan in his partial dissent in *Dickens*, joined by Circuit Judges Kozinski and Bybee. Judge Callahan opined that *Martinez* was limited to cases where the ineffectiveness of PCR counsel had actually been raised to the state courts, thus giving the state an opportunity to address the claim. Judge Callahan observed that unlike Dickens, Martinez had filed a second PCR proceeding wherein he attempted to assert the ineffectiveness of PCR counsel. "Thus, when *Martinez* was remanded, the district court could determine on the record presented to the state courts whether Martinez's first PCR counsel had been ineffective, and whether his claim of trial IAC was substantial." *Dickens*, 740 F.3d at 1327 (Callahan, C.J. dissenting in part). In light of that distinction, Judge Callahan concluded that "*Pinholster* requires that a defendant first raise his claim of trial counsel IAC in state court, and *Martinez* provides that when defendant does this, the state court's determination that the successive PCR petition is procedurally barred will not prevent federal court review when the failure to raise trial counsel IAC in the initial PCR petition was due to PCR counsel's IAC." *Id.* at 1328.

Such an approach does not render *Martinez* meaningless. The aspiring habeas petitioner can assert his claims in a subsequent state PCR petition, seeking to develop the record, and if rebuffed by the state courts on procedural grounds, he may rely upon *Martinez* to avoid the procedural bar, and assert his efforts in the state court to avoid the

1    application of § 2254(e)(2).[35]

2        In sum, regardless of this Court's concerns about the internal logic of the

3    approach, there is simply no basis in the language of the statute or the controlling

4    authorities to avoid the application of § 2254(e)(2) to the merits of claims merely

5    because their procedural default has been addressed under *Martinez*.

6

7                        *5. Standards for Ineffective Assistance*

8        The standards for determining ineffective assistance of counsel are set forth

9    hereinafter in Section III(N)(1) (Ineffective Assistance Standards).

10       The undersigned does note, however, a recurrent argument in Petitioner's

11   supplemental briefs that impacts the necessity of an evidentiary hearing to resolve the

12   claims in Supplemental Ground 2.   Petitioner argues that this court cannot justify

13   counsel's actions as a reasonable strategic decision without first conducting an

14   evidentiary hearing to determine the actual reason for counsel's actions.  (Supp. Reply,

15   Doc. 84 at 13.)

16       To the contrary, a reviewing court need not determine the actual reason for an

17   attorney's actions, as long as the act falls within the range of reasonable representation.

18   *Morris v. California*, 966 F.2d 448, 456-457 (9th Cir. 1991), *cert. denied*, 113 S. Ct. 96

19   (1992).  On the other hand, while they need not discern the actual reason for counsel's

20   conduct to deem it reasonable, "courts may not indulge '*post hoc* rationalization' for

21   counsel's decision making that contradicts the available evidence of counsel's actions."

22   *Harrington v. Richter*, 562 U.S. 86, 109 (2011) (quoting *Wiggins v. Smith*, 539 U.S. 510,

23   526–527 (2003)). *See Postconviction Remedies § 35:4 (*citing *Kimmelman v. Morris* and

24

25   _____

     [35] That is not to say that the aspiring habeas petitioner *must* first present to the state
26   courts his claim of ineffective assistance of PCR counsel before raising it as a basis for
     cause and prejudice.  Indeed, the Ninth Circuit has observed that "there seems to be no
27   requirement that the claim of ineffective assistance of PCR counsel as cause for an
     ineffective-assistance-of-sentencing-counsel claim be presented to the state courts."
     *Dickens v. Ryan*, 740 F.3d 1302, 1322, n.17 (9th Cir. 2014).   But, rather that the
28   petitioner may be better served to do so, in light of the limitations under § 2254(e)(2), if
     he is successful in progressing to a merits determination on his claim for relief.

                                          145

1    *Wiggins v. Smith*).

2         But that limitation does not shift to Respondents the obligation to prove the actual

3    reason.  Rather, Petitioner bears the burden of establishing his claims of ineffectiveness.

4    There is a strong presumption counsel's conduct falls within the wide range of

5    reasonable professional assistance and that, under the circumstances, the challenged

6    action might be considered sound trial strategy.  *United States v. Quinterro-Barraza*, 78

7    F.3d 1344, 1348 (9th Cir. 1995), *cert. denied*, 519 U.S. 848 (1996); *United States v.*

8    *Molina*, 934 F.2d 1440, 1447 (9th Cir. 1991).   The court should "presume that the

9    attorneys made reasonable judgments and decline to second guess strategic choices."

10   *United States v. Pregler*, 233 F.3d 1005, 1009 (7th Cir. 2000).

11        Thus, Petitioner bears the burden in the first instance of showing that the actual

12   reason was deficient (or that no non-deficient reason was possible) and may not merely

13   assert that the reason was deficient.   Of course, Petitioner's argument is that an

14   evidentiary hearing would establish that counsel actually had reasons which were

15   deficient.  But Petitioner generally fails to support those assertions with anything other

16   than Petitioner's conjecture.   While the ineffectiveness of PCR counsel excuses

17   Petitioner's failure to develop his claim of ineffectiveness of trial counsel in the state

18   courts, it does not turn this habeas proceeding into a fishing expedition to undertake the

19   initial identification of the vital facts of Petitioner's assertions under *Martinez*.  No more

20   than the claims in chief can, the claims under *Martinez* may not rest on conclusory

21   grounds.

22

23        **(4).    Application of *Martinez* and Merits of Affected Claims**

24        The undersigned will apply *Martinez* to each of the procedurally defaulted claims

25   of ineffective assistance of trial counsel asserted in the Supplemental Petition.  Because

26   the application of *Martinez* requires varying levels of evaluation of the merits of those

27   claims for purposes of finding cause to excuse the procedural default, the undersigned

28   will also simultaneously address, claim by claim, the merits of the claims.

### (a).  *SG 2A –Hernandez Impeachment*

#### *1. Arguments*

In Supplemental Ground 2A, Petitioner argues that trial counsel was ineffective for failing to impeach Hernandez with testimony from an investigator at the Isaacs pre-sentence hearing.  In particular, Petitioner argues: (1) Hernandez testified on direct-examination that Isaacs had offered Petitioner drugs for killing an informant; but (2) counsel did not impeach this testimony by confronting Hernandez with his pretrial interview statement to Isaacs' defense investigator (Blair Abbott) that Isaacs had made no promise of money or drugs.  Petitioner argues that trial counsel Iannone has admitted having the transcript at trial, and being present at Abbott's testimony, and that trial counsel used other portions to impeach Hernandez.  (Supplemental Petition, Doc. 78 at 5-7.1.)

Respondents argue that this claim is not substantial and lacks merit because:

> (1) trial counsel impeached Hernandez on the relevant point by prompting Hernandez to admit on cross-examination that it was *Petitioner, not Isaacs,* that purchased the methamphetamine that they smoked following the murder; and

> (2) trial counsel had tactical reasons for not using the Abbott interview because:

>> (a)  it was conducted without the prosecution's knowledge or presence[36];

>> (b)  Abbott startled Hernandez when he conducted the interview and identified himself as Isaacs' investigator;

---

[36] The undersigned does not understand this to be an assertion that the Abbott interview was legally or ethically improper.  While Arizona's Ethical Rule 4.2 precludes contact with a represented opposing party, Respondents proffer nothing to suggest that the prosecution represented Hernandez.  *See e.g. State ex rel. Arizona Dept. of Health Services v. Gottsfield,* 213 Ariz. 583, 585, 146 P.3d 574, 576 (Ct. App. 2006) (observing no prohibition on contacting witnesses in criminal prosecution).  Nor is there any suggestion that Hernandez was a victim protected under Arizona's Victims Rights Bill, Ariz. Rev. Stat., Ariz. Const., Art. II, § 2.1, or the implementing provisions that mandate that the defense "only initiate contact with the victim through the prosecutor's office." Ariz. Rev. Stat. § 13-4433(B).  Moreover, there is no indication that Petitioner's trial counsel was involved in procuring the interview

(c) circumstances suggested that Hernandez was trying to curry favor with Abbott by providing information helpful to Isaacs;

(d) Hernandez's statements to Abbot on all other points corroborated Hernandez's trial testimony;

(e) Abbott's testimony would show that Petitioner and Isaacs discussed killing the victim after they left the party to buy drugs;

(f) the judge in Isaacs' case (Judge Conn) had found Hernandez's statements to Abbott less credible than his contrary testimony about pecuniary gain; and

(g) Judge Conn gave little weight to the pecuniary gain issue because he had concluded that such gain was not the real motivation.

(Supplemental Answer, Doc. 80 at 33-35.)

Respondents further argue that Petitioner fails to show prejudice from any failure to impeach Hernandez because (1) Hernandez was otherwise thoroughly impeached; (2) there was other evidence to corroborate Hernandez; (3) Petitioner's guilt was shown in other ways; and (4) pecuniary gain was not used as an aggravating circumstance at sentencing.  (*Id.* at 35-37.)

Petitioner replies that "[i]f, as the state argues, Hernandez was 'thoroughly' impeached then the state concedes Hernandez is wholly not a credible witness."  (Supp. Reply, Doc. 84 at 15.)  Petitioner argues that the other evidence against him must be viewed in light of the inconsistencies in Hernandez' testimony set out in his other pleadings, and the court's finding that "the case hinged on the 'jury absolutely believing Hernandez'."  (*Id.*)

## 2. Factual Background

At trial, Bernardo Hernandez testified that at a party the night of the murder, Petitioner asked about getting some methamphetamines.  Hernandez talked to Mugsy (Michael Isaacs), and introduced him to Petitioner, and the three left together to get

148

1  drugs.

2

3       Q. . Did -- was there any conversation between Bill Duncan
and Muggsy?
       A. After we had left the house going out, yes,  there was.

4       Q. Okay. What was said between Bill Duncan and Muggsy?
       A. I don't know exact words or anything, but they were

5  basically exchanging things that they've done, like who they are.
Kind of like bragging about things. Just trying to prove to one

6  another that they're cool, you know. To like don't worry about it,
they can trust each other, whatever.

7       Q. And trust each other regarding this drug deal that they're
about to do?

8       A. Yes.
                          * * *

9       Q. Okay. And what about Bill Duncan, what was he saying?
       A. He said some things about his past, how he had been in

10  Desert Storm and stuff, and how he had –

11       Q. Did he say anything about having killed people in the
past?

12       A. Yes, but just in Desert Storm.
       Q.  Did he say whether that bothered him or not?

13       A. No. He said that it didn't bother him.
       Q.  Okay. Was there any  further  discussions  about  killing

14  anybody in particular?
       A. Yes.

15       Q.  What conversation took place about killing somebody in
particular?

16       A. Muggsy had brought up a person who he  referred to as a
narc, and he said that if Bill would  kill him.

17       Q. So did Muggsy ask Bill to kill this narc?
       A.  Yes.
                          * * *

18       Q. Okay. Now, when Muggsy requested that Bill Duncan kill
this narc, did Muggsy indicate that Bill Duncan would get anything

19  in return?
       A. Basically said that they -- that he would get any speed he

20  wanted, like whenever. That anything he wanted, he would have.

21  (Exhibit L, R.T. 4/26/00 at 8-15.) (*See also id.* at 47-53 (Hernandez cross-examination).)

22  On cross-examination, Hernandez testified that after disposing of the gun, they went and

23  bought some methamphetamine, and Petitioner paid for the drugs.  (*Id.* at 54.)

24       At the sentencing for Isaacs, Blair Abbott testified that he had been retained as an

25  investigator by Isaacs' attorneys, and had interviewed Hernandez.  (Surreply on Mot.

26  Stay, Doc. 40, Exhibit F, R.T. 2/4/00 at 48-50.)   Abbott testified that Hernandez was

27  concerned that Abbott had located him, and as a condition of the interview insisted on a

28  promise that Abbott would not reveal his location to the defense or prosecution.

                                    149

(Surreply, Mot. Stay, Doc. 40 at Exhibit F, R.T. 2/4/00 at 54.)   But the interview described by Abbott was not that of a sudden questioning and startled responses.  Rather, Abbot described a methodical, hour long inquiry, with Abbott repeatedly returning to the subject matter of the purported exchange.  Indeed, Abbott testified that after setting the ground rules for the interview, Hernandez no longer seemed reluctant to be interviewed, but instead relaxed, cordial and talkative.  (*Id.* at 55-56.)

Abbott testified:

> Q. Now, at some point during the May 2nd '99 interview, did you ask him any specific questions about the motive or reason, if any, behind the homicide of Elisha Franz?
> A. Yes. In the course of questioning we took the story from front to back, chronologically, and in that format, when it became appropriate, I asked that question.
> Q.  And did he tell you anything about the reason behind this?
> A. (No response.)
> Q.  Bernie Hernandez?
> A. Yes, he did.
> Q. What did he tell you?
> A.  As far as the reason, it was simply a boasting right there. He described a discussion in the car with these two men that didn't know each other, referring to the defendant and co-defendant, and there was conversation regarding killing someone and it was just a 'matter who was - - as Bernie used the word -- who -- who was the biggest bad ass, and my recollection is Duncan said that he was a bad ass, he had killed people before, and it was purely a boasting right there. Was no promise or there was no future promise, there was no inducements, there was no threat.
> Q. Did you specifically ask him whether or not there was a promise of money prior to the homicide occurring?
> A. Yes, I did.
> Q. What did he tell you?
> A. There was no promise of money.
> Q. Did you specifically ask him whether there was a promise of drugs prior to the homicide?
> A. I specifically asked him that question, and came back and asked him on two other occasions during that same conversation.
> Q. What was his response on each of those occasions?
> A. That there was no promise of drugs whatsoever.
> Q. Did you ask him whether or not there was a promise that if this homicide occurred he would make sure that William Duncan always had access to a supply of drugs?
> A. Bernie said there was no promise of any drugs, there was no discussion of any - - future promise of payment of drugs whatsoever. He repeated it was simply who was going to be a bad ass. It was a prove-it type of a conversation.
> * * *
> Q. Were you here when he testified at the bond hearing?

150

A. Yes, I was.

Q. And did his description on May 2nd '99 change much from his prior statements either to police or under oath?

A. It did.

Q. In what way?

A. Principally in the fact that the -- regarding a promise for speed for life or someone would be always be taking care of supplying speed if the murder was carried out.

Q. Now, other than that, was there any real major inconsistency?

A. Essentially, no, not that 1 can think of.

Q. Now, had I informed you that this particular issue regarding reason behind this in his prior statement was very important to me?

A. Yes.

Q. And so, did you ask Bernie just one time about pecuniary gain aspect, or ask him multiple times on May 2nd?

A. On May 2nd I asked him multiple times.

Q. His answer was consistent?

A. Yes, sir, it was.

Q. That there was no promise of drugs?

A. There was no promise or discussion of drugs.

Q. In Bernie's words it was basically to prove who was the biggest bad ass?

A. Yes, sir, that was his words.

(*Id.* at 57-61.)   When Abbott returned the next day with a statement for Hernandez to sign, Abbott read the statement, and Hernandez specifically assented to the portion asserting the murder "was simply [for] bragging rights; that there was no promise of anything else." (*Id.* at 66.)   However, Hernandez was agitated, expressed concern that some trickery was involved, and threatened to call the prosecutor.   He refused to sign. (*Id.*)

Pecuniary gain was not critical to a finding of guilt. Petitioner was charged only with first degree murder, and pecuniary gain was not an element of the offense.   The trial judge instructed:

The crime of first degree murder requires proof of the following three things: No. 1, the defendant caused the death of another person; and, No.2, the defendant intended or knew that he would cause the other person's death; and, No.3, the defendant acted with premeditation.

(Exhibit S, R.T. 5/4/00 at 7.)

In opening statements, the prosecution made no reference to any pecuniary gain:

The defendant and Muggsy start talking. Start bragging about how bad each one of them is.   Muggsy says, "Well, if you're so bad,

151

prove it. Kill a narc or a snitch." A narc, a snitch is somebody that works for the police department that informs on drug dealers. Muggsy says, "You're so bad, prove it; kill this snitch for me." The defendant agrees.

(Exhibit K, R.T. 4/26/00 at 3-4.)

In closing arguments, the prosecution did not argue pecuniary gain in the form of a payment with drugs as a motive, but instead argued that the murder was a way of Petitioner proving that Isaacs could trust him to sell him drugs.

When Bernie introduced William Duncan, the defendant, to Michael Isaacs, and they left to get drugs together, first Michael Isaacs made Bernie Hernandez go along. He had just introduced them. Michael Isaacs didn't know William Duncan. Wanted somebody there that he knew. And he's probably - somewhat leery, having just been arrested a month and a half before. So in the car on the way there, has to get some assurance that this person is not going to burn him also. That this is not -- this new person that he just met is not a CI. So they start talking. Bragging about the bad things that they've done. The defendant says he's killed people before. He's just bragging. Michael Isaacs says, "All right, .if you're so bad, if you want to prove your trustworthiness to me, kill this snitch. Kill this person that informed on me to the police." The defendant says okay.

(Exhibit R, R.T. 5/4/00 at 3-4.)

While the prosecution did assert pecuniary gain as an aggravating factor at sentencing, the trial judge found the allegation unsubstantiated:

Next the State alleges that the defendant committed the offense in the expectation of receipt of something of pecuniary gain under (F)(5). The only evidence of this motive is the testimony of Mr. Hernandez. However, Mr. Hernandez also testified that it was the defendant, and not Mr. Isaacs, who bought the drugs later that same evening. This is inconsistent with the premise that he committed murder so that Isaacs would then be his supplier of drugs, which would be the pecuniary gain theory. I find some other aspects of the Hernandez testimony to be less than credible also, and therefore I find the State has not proved the (F)(5) aggravating circumstance.

(Exhibit BB, R.T. 1/24/01 at 7.)

### 3. Deficient Performance

Counsel must routinely balance the benefits and risks of any line of questioning. The value of any impeachment from the Abbott testimony was limited. The prosecution was, at most, presenting a theory that the murder was Petitioner's

way of qualifying himself as a buyer.  That was the ultimate position that the state had taken two months prior at the Isaacs hearing.

> Again, with respect to the pecuniary gain aspect of it, you can consider the testimony you heard from Bernie Hernandez.  I think you talked about the intangible gain of promising to be able to deliver illegal drugs, which there might be some gain aspect of the fact that he can deliver something which is illegal, and that was what they were doing.  They were on their way, at the time that all of this came together, to purchase illegal drugs, to purchase methamphetamine.

(Surreply, Mot. Stay, Exhibit F, Isaacs R.T. 2/4/00 1:52 at 128.)  In Petitioner's trial, the prosecution had skirted the entire issue in its opening statement, and ultimately would in closing arguments simply assert that the murder was qualification as a buyer, not *quid pro quo* for drugs. Such an exchange was not an element of the offense, and ultimately would not be accepted by the trial judge as established for sentencing purposes.  At most, it was part of the *res gestae*, explaining Petitioner's motive for the murder.

The trial testimony of Hernandez was ambivalent about the relationship between the murder and the drugs.  His testimony (stripped of the later admission that Petitioner bought the trio drugs later than night) could as easily have been taken as simply the opportunity to purchase rather than a promise of free drugs for life.

It is true that the defense argued in closing that Hernandez's story was not believable because it was irrational that someone would agree to commit a murder just for bragging rights.

> To believe that Bill Duncan is guilty of the murder he's charged with, you have to believe that on July 10th of 1998 he went to a party with someone he  knew from work. Met a man he never met before. That could happen. Asks him to help him buy some drugs. I suppose that happens. Goes with this person he just met to buy some drugs. That may be how they work it.  And then the person who's going to get the drugs says,  "Oh, by the way, there's this man that snitched me off;  would you kill him for me?" and Bill  Duncan says, "Sure, I'll do that."

(Exhibit R, R.T. 5/4/00 at 9-10.) (*See also id.* at 26.)   However, the defense also argued that it was unbelievable that Petitioner would agree to murder for drugs (whatever that meant) given the uncertainty that any such promise could or would be kept.  Petitioner

had only just met Isaacs.

Therefore, the only value of the Abbott testimony in the guilt phase was the extent to which it showed an assertion by Hernandez (contrary to his testimony) that there was absolutely no correlation between the drugs and the murder, even as a means to qualify as a buyer.

This value was limited.  As suggested by Respondents, Hernandez could have been rehabilitated by the prosecution by pointing out that Hernandez (who by that time was an informant to the prosecution) was in hiding when Abbott appeared to interview him, that Hernandez insisted that his whereabouts not be disclosed, that Abbott was there on behalf of Isaacs (someone who had demonstrated to Hernandez he was willing to arrange to have a narc killed), and thus Hernandez was offering statements beneficial to Isaacs by suggesting that Duncan had volunteered to commit the murder purely to prove his mettle.  In sum, the prosecution could have easily shown that even had Hernandez told a different story to Abbott, it was out of fear of Isaacs.

Of course, the real problem lay in the fact that, apart from the drugs-for-murder issue, the net effect of Abbott's testimony was to show that, even when accosted in hiding by a representative of Isaacs, Hernandez had in all other respects been consistent in his story, including Petitioner's commission of the murder.

It might be tempting to conclude that pursuing the impeachment was a no-net-loss venture, *i.e.* that the worst that could happen was that the jury would reject the impeachment and continue to believe Hernandez.  However, the real risk lay in the fear that the jury would believe the version Hernandez told Abbott - - that Petitioner committed the murder purely as a matter of bravado.  Pecuniary gain was only one of the aggravating factors about which counsel needed to be concerned.  And it was one for which the evidence was confused by the vagueness of the evidence, as discussed hereinabove. Indeed, the prosecution was ultimately unsuccessful in this venture.

The other potential aggravating factor was whether the "defendant committed the offense in an especially heinous, cruel or depraved manner."  Ariz. Rev. Stat. § 13-

703(F)(6) (1993).  One of the characteristics that Arizona looks to under this aggravating factor is whether the offense was "senseless."  *State v. Gretzler*, 135 Ariz. 42, 52, 659 P.2d 1, 11 (1983). For example, in *State v. Clark*, 126 Ariz. 428, 437, 616 P.2d 888, 897 (1980) the Arizona court found murders "depraved" when they were committed "totally without regard for human life…[w]ithout justification or excuse."  It is true that Arizona has suggested that senselessness is ordinarily alone insufficient to show depravity.  *See State v. Runningeagle*, 176 Ariz. 59, 65, 859 P.2d 169, 175 (1993) ("While it is true that helplessness and senselessness may be insufficient in some cases…here we have more. Runningeagle relished the murders.") But that is not to say that senselessness is never sufficient.  Moreover, here, the prosecution had substantial evidence that Petitioner had relished the murder, both from his braggadocio prior to the murder in the car with Isaacs and Hernandez, and subsequent bragging to Witzig when they were trying to dispose of the murder weapon.  It is true that at sentencing the trial court ultimately rejected the Witzig testimony and determined that relishing had not been shown.  (Exhibit BB, R.T. 1/24/01 at 8-9.)  But, of course, trial counsel could not know this at the time of the cross-examination of Hernandez.  Indeed, Hernandez was the very first witness in the case.[37]

Based upon the foregoing, the undersigned concludes that counsel could have had a tactical reason for not impeaching Hernandez with the Abbott testimony.  Thus, counsel was not deficient for filing to use the impeachment.

### 4. Prejudice

Respondents further argue that Petitioner fails to show prejudice from any failure to impeach Hernandez because (1) Hernandez was otherwise thoroughly impeached; (2) there was other evidence to corroborate Hernandez; (3) Petitioner's guilt was shown in other ways; and (4) pecuniary gain was not used as an aggravating circumstance at sentencing.  (*Id.* at 35-37.)

---

[37] In some regards, counsel may also have been faced with the tactical quandary of improving the odds at the guilt stage at the expense of decreasing them at the capital sentencing stage.

1    The fourth argument takes too narrow a view of the Abbott impeachment as

2  relevant to only the pecuniary gain.  While the pecuniary gain was the focus of the

3  difference between Hernandez's testimony and his statements to Abbott, the real value of

4  the impeachment was to establish Hernandez's general lack of credibility.  Because

5  Hernandez was so central to the prosecution's case, effectively impeaching him could

6  have altered the guilty verdict, not just the possible sentence.

7    The second and third arguments are true.  The prosecution had the testimony from

8  Witzig, Franz, and the physical evidence of the recovered shotgun to corroborate

9  Hernandez.  Of course, each of these other sources had their own substantial credibility

10  issues.

11    The first argument must be rejected as hyperbole.  Hernandez was not thoroughly

12  impeached.  He remained a lynch pin of the prosecution's case; he was the first witness

13  the prosecution argued to the jury in closing.  (*See* Exhibit R, R.T. 5/4/00 at 6.)

14  Additional impeachment might have shifted the balance on Hernandez's credibility.  But

15  that is not to say that it clearly would have.

16    To establish prejudice, Petitioner "must show that there is a reasonable probability

17  that, but for counsel's unprofessional errors, the result of the proceeding would have been

18  different.  A reasonable probability is a probability sufficient to undermine confidence in

19  the outcome."  *Strickland*, 466 U.S. at 694.

20    The undersigned concludes that Petitioner has failed to undermine confidence in

21  the outcome of the proceeding based upon the absence of impeachment with the Abbott

22  testimony.  The credibility of Hernandez survived far more substantial attacks.  (*See*

23  *infra* Section III(N)(4) (Ground 9C: Impeachment of Hernandez).)  The discrepancy

24  raised by the Abbott testimony was dismissible as momentary fear of Isaacs, or as

25  mincing of words on whether there was an explicit exchange of promises, rather than just

26  the interplay between two strangers attempting to work out an illicit relationship by

27  implications.  More importantly, the Abbott testimony showed that even when faced with

28  an Isaacs representative, outside the protection of the court or the prosecution,

156

Hernandez's story remained consistent on all but the one point.  Moreover, there was substantial evidence corroborating Hernandez's story, including the descriptions of the vehicle, the events inside the victim's house (e.g. the knocking, the questioning of the victim about her husband, the number of shots), the testimony of Witzig and his mother about the attempts to hide the shotgun, the location of the murder weapon, and Petitioner delivering Hernandez to Mexico.

### 5.  Application of Martinez

**Some Merit** - Based upon the foregoing, the undersigned concludes that Petitioner's Supplemental Ground 2A is substantial.  Although the undersigned ultimately concludes that Petitioner fails to present a convincing claim, the claim is not devoid of potential legal merit or wholly without factual support.

**Deficient Performance by PCR Counsel** - Nonetheless, Petitioner proffers nothing to show that PCR counsel performed deficiently in failing to pursue this claim. To the contrary, PCR counsel could have reasonably concluded that the merits of the claim were sufficiently questionable, and that it would have detracted from stronger claims, such that foregoing the claim was a reasonable strategic choice.  "In many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy."  *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).

Here, PCR counsel asserted a variety of claims of ineffective assistance in Petitioner's first PCR proceedings, including claims that trial (and appellate) counsel was ineffective:

1.  in failing to interview exculpatory identified witnesses;

2.  during jury selection;

3.  in cross-examining Hernandez on inconsistencies, reputation for truthfulness, alcoholism and drug abuse, and drug and alcohol impairment;

4.  in cross-examining Robert Franz on inconsistencies, and prior bad acts with the decedent;

5.  in failing to call various exculpatory witnesses;

6.  in failing to argue evidence pointing to Isaacs as the shooter;

7.  in failing to advocate for a sentence less than natural life, and failing to object to reliance on improper aggravating circumstances.

 (*See also* Exhibit A-3 at Item 298, Appendix (Exhibits A thru J); and Exhibit A-4, Appendix cont. (Exhibits K thru Q).)

In particular, PCR counsel was already asserting a laundry list of deficiencies with regard to the impeachment of Hernandez, including other inconsistencies, his reputation for truthfulness, his alcoholism and drug abuse, and his drug and alcohol impairment.  At least some of these were of greater weight.  For example, the PCR court at least found deficient performance with regard to counsel's failure to impeach Hernandez with evidence regarding his intoxication. (Exhibit A-5, ROA Item 314, M.E. 11/20/03 at 6.) (*See infra* Section III(N)(4)(c) (discussing original Ground 9C).)   As discussed hereinabove, the merits of the instant claim of ineffective assistance would ultimately prove illusory.  Coupling with the other claims would have not added to those claims, and counsel could reasonably conclude that it would detract from them.

Petitioner cites *Detrich* and argues that a finding of deficient performance by PCR counsel cannot be avoided by simply pointing out that other claims of ineffective assistance were raised.  (Supp. Reply, Doc. 84 at 4-5.)  But, the issue isn't one of concluding that presentation of any claim of ineffective assistance justifies failing to bring all others.  "[I]neffective assistance claims are not fungible," *Hemmerle v. Schriro*, 495 F.3d 1069, 1075 (9th Cir. 2007), where one does service for all others.  Rather, the question is whether PCR counsel has authority, if not the duty, to make a reasonable tactical decision to choose among various alternatives.  *See Smith v. Robbins*, 528 U.S. 259, 288 (2000) ("counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the

158

1  likelihood of success"). *See also Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986) (cite

2  approvingly in *Smith*, 528 U.S. at 288) ("Generally, only when ignored issues are clearly

3  stronger than those presented, will the presumption of effective assistance of counsel be

4  overcome").

5          In *Jones v. Barnes*, 463 U.S. 745 (1983), the Supreme Court discussed at length

6  the fact that essential to effective representation is choosing among potential claims.

7  While *Jones* dealt with appellate counsel, the same principles apply to PCR counsel who

8  is, effectively, seeking comparable review of the trial proceedings.   "Experienced

9  advocates since time beyond memory have emphasized the importance of winnowing out

10 weaker arguments on appeal and focusing on one central issue if possible, or at most on

11 a few key issues." *Jones*, 463 U.S. at 751-52.

12          "One of the first tests of a discriminating advocate is to select the
           question, or questions, that he will present orally. Legal contentions,
13         like the currency, depreciate through over-issue. The mind of an
           appellate judge is habitually receptive to the suggestion that a lower
14         court committed an error. But receptiveness declines as the number
           of assigned errors increases. Multiplicity hints at lack of confidence
15         in any one.... [E]xperience on the bench convinces me that
           multiplying assignments of error will dilute and weaken a good case
16         and will not save a bad one." Jackson, *Advocacy Before the
           Supreme Court,* 25 Temple L.Q. 115, 119 (1951).
17
   *Jones*, 463 U.S. at 752.
18
19          Petitioner argues that counsel Goldberg has and will admit that he "missed" this

20 and the other claims of ineffective assistance.  As discussed hereinabove in disposing of

   Petitioner's Motion for Evidentiary Hearing (*see supra* Section III(A)(4)(d)(4) (Hearing
21
   on Goldberg Testimony)), the fact that Goldberg "missed" a claim does not establish
22
   ineffective assistance or cause, and indeed means little in light of the objective standard
23
   applicable to addressing deficient performance under the *Strickland* standard.  Here, the
24
   mere fact that PCR counsel did not raise the claim is apparent.  But so too is the fact that
25
   his doing so was not objectively deficient performance.  The same can be said of each of
26
   the other claims in Supplemental Ground 2.
27
          Therefore, the undersigned finds that PCR counsel's failure to raise this claim
28

                                              159

does not establish cause under *Martinez* to excuse Petitioner's failure to exhaust his state remedies on the claim.

### 6. Merits Determination

Even if the undersigned were to sidestep the exhaustion issue and proceed to the merits of this claim, the undersigned would ultimately conclude (for the reasons discussed hereinabove) that this claim is without merit.  Petitioner's Motion for Evidentiary Hearing (Doc. 82) proposes no additional evidence to be offered in support of this claim (beyond Goldberg's admission to "missing the claim" and Petitioner's unsupported contention that he would not have a valid reason), and based on the existing record, the undersigned finds the claim to be without merit.

### (b).  *SG 2B – Isaacs Not Called*

#### 1. Arguments

In Supplemental Ground 2B, Petitioner argues that trial counsel was ineffective for failing to call his co-defendant Michael Isaacs as a witness, and at a minimum forcing him to assert his Fifth Amendment rights before the jury.  Petitioner argues that Isaacs has repeatedly confessed to killing the victim, including confessions to Witzig, Petitioner, Allen, Roinuse, Ellis and Gaines.  He argues Isaacs pled guilty, offered to testify in Petitioner's behalf, and got a tattoo depicting himself killing the victim.  He argues Isaacs was arrested because the victim had informed on him, and evidence matched the killer to a person of Isaacs' height.  (Supp. Petition, Doc. 78 at 5-7.5 - 7.6.)

Respondents argue that counsel had intended to call Isaacs, but Isaacs' counsel forbade trial counsel to communicate with him and advised that Isaacs would rely upon his Fifth Amendment right to silence.  Respondents further argue that counsel could not call Isaacs for the sole purpose of forcing him to invoke his Fifth Amendment rights, and the court would, in any event, have to instruct the jury to disregard any invocation of his rights.  Finally, Respondents argue that reliance on the post-trial events would require

trial counsel to exercise clairvoyance. (Supp. Answer, Doc. 80 at 37-38.)

Petitioner replies only by a conclusory assertion of the violation of his rights. (Supp. Reply, Doc. 84 at 15.)

### 2. Factual Background

On April 10, 2000, two weeks before trial began, trial counsel sought and obtained an order transporting Isaacs from prison to the local jail "so that he can testify." (Exhibit A, ROA Item 122 (Motion to Transport) and 123 (Order 4/11/00).)

During jury selection, trial counsel admitted they had not yet been able to communicate with Isaacs, and broached the potential need to depose Isaacs:

> If Counsel will not permit us to interview Mr. Isaacs, Mr. Baran and I intend to file a motion seeking leave of the Court to depose him. Mr. Carlisle or Mr. McPhillips will certainly be invited, and cordially so, to attend that deposition. We could even do it here in court outside the hearing of the jury. There are some -- some very basic constitutional confrontation issues involved. We, of course, have not yet spoken with Mr. Isaacs, but given the nature of the contacts and given the fact that he has made contact to the defense and not to the State, leads both Mr. Baran and I to the belief that Mr. Isaacs plans to give exculpatory testimony with respect to Mr. Duncan.

(Exhibit G, R.T. 4/24/00 (original) at 8-5-6.)  The trial court agreed that the likely import of Isaacs' testimony was something favorable to the defense:

> THE COURT: All right. Well, it's just fairly obvious to me that if Isaacs has contacted the defense team about testifying, he wouldn't be coming here to buy himself a snitch jacket.
> MR. IANNONE: That would seem unlikely, Your Honor.
> THE COURT: And so it wouldn't be too hard to figure out what his likely testimony -- well, the  details, the specifics would maybe be hard. But the general tone.

(*Id.* at 6-7.)

At the end of the first day of trial, the judge called the parties to a bench conference to relate that his office had received calls from Isaacs' attorneys inquiring about why Isaacs had been brought to the courthouse.  Isaacs purportedly did not know why he was there.  The trial judge commented:  "The one concern I do have is he's not going to be brought in here just to take the Fifth Amendment and sent on his merry

way." (Exhibit L, R.T. 4/26/00 at 152-153.) Trial counsel Baran then explained that counsel had been appointed to represent Isaacs with regards to Petitioner's trial, and "[b]ased on Mr. Everett's communication to me, I have no interest in talking to Mr. Isaacs." (*Id.* at 153.) Mr. Baran did argue, however, that "based on his previous communications to us, I think it was legitimate that we did bring him up." (*Id.*)

### 3. Deficient Performance

Respondents properly argue that the post-trial confessions by Isaacs are irrelevant to any deficient performance by trial counsel. The reasonableness of counsel's actions is judged from counsel's perspective at the time of the alleged error in light of all the circumstances. *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). Apart from clairvoyance, which Petitioner does not allege, Isaacs later confessions would not have been within counsel's perspective. (But that is not to say that they are not relevant to the prejudice prong, or even to inferring the reason for not calling Isaacs, as discussed hereinafter.)

The inference from the trial transcript is that Isaacs' counsel had relayed to trial counsel either that Isaacs would refuse to testify, or that his testimony would be unfavorable. The only thing proffered by Petitioner to counter this inference is that Isaacs made prison confessions to the murder years afterwards. However, at the time of Petitioner's trial, Isaacs' post-conviction relief proceeding (which, as a pleading defendant functioned as his only appeal) was on-going. (*See* Exhibit G, R.T. 4/24/00 (original) at 8; Exhibit L, R.T. 4/26/00 at 154.) Thus, if he were granted a new trial or new sentencing, he still had something to lose at that time by admitting the crime under oath. Moreover, a prison confession bears far less weight than testimony under oath.

The argument that counsel should have forced Isaacs to assert his Fifth Amendment rights in front of the jury fails for six reasons. First, the trial judge had discretion to reject such an effort. "The decision to permit counsel to call a witness who has indicated he or she will refuse to testify is ordinarily discretionary with the trial

court, which must determine whether the interest of the person calling the witness outweighs the possible prejudice resulting from the inferences the jury may draw from the witness' exercise of the privilege." *State v. Corrales*, 138 Ariz. 583, 588, 676 P.2d 615, 620 (1983) (citing *U. S. v. Vandetti*, 623 F.2d 1144, 1147 (6th Cir. 1980).

Second, the trial judge indicated he would not permit such a tactic.  It is clear that the failure to take futile action can never be deficient performance. *See Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir.1996).

Third, and perhaps most importantly, the inference is not clear that Isaacs would refuse to testify rather than testifying unfavorably. Mr. Baran's representation that he was no longer interested in talking to Isaacs based on communications with his counsel suggests the testimony would have been unfavorable.

Fourth, the jury would not have been permitted to draw the very inferences from Isaacs' assertion of his privilege that Petitioner claims he should have been permitted. "It is well settled that in criminal cases the jury is not entitled to draw any inferences from the decision of a witness to exercise his Fifth Amendment privilege." *State v. McDaniel*, 136 Ariz. 188, 194, 665 P.2d 70, 76 (1983) *abrogated on other grounds by State v. Walton*, 159 Ariz. 571, 769 P.2d 1017 (1989).

Fifth, even if it were assumed that counsel should have assumed the jury would nonetheless draw inferences from Isaacs' refusal to testify, it would have been reasonable for counsel to assume that the jury was just as likely (if not more so) to infer that Isaacs was merely an accomplice, not the shooter.

Finally, assuming doing so would have been permitted, Petitioner fails to show that counsel should have called Isaacs simply to reveal his tattoo.  The evidence regarding the tattoo is that Clayton Roinuse wrote a letter to Petitioner's PCR counsel in 2007 asserting that Isaacs had a tattoo depicting "a 'skin head (him) holding a smoking shotgun." (Exhibit CCC, Supp. PCR Pet. at Exhibit B, Letter at 2.)  Roinuse was not even in prison to hear of a tattoo until 2003, long after trial.  (*See* Exhibit LLL, R.T. 5/30/08 at 116, 28.)  Accordingly, there is no evidence that Isaacs had the tattoo at the

163

time of trial.  Second, rather than depicting Isaacs committing the murder, as suggested by Petitioner, the only evidence is that the tattoo depicted Isaacs holding a shotgun.  Any inference of an admission of guilty would have been weak.

Based on the foregoing, the undersigned concludes that trial counsel did not perform deficiently by failing to call Isaacs.

### 4. Prejudice

Finally, for the reasons discussed hereinabove, the undersigned finds that Petitioner has failed to establish prejudice from trial counsel's failure to call Isaacs. Petitioner's conjecture that Isaacs' testimony would have been favorable, based on his subsequent confessions, is belied by events at the time.  And efforts to gain a favorable inference from Isaacs invocation of his Fifth Amendment privilege would have been thwarted, both by the trial judge preventing counsel from calling Isaacs, and from the impropriety of counsel seeking any inferences even if allowed to call Isaacs.

### 5. Application of Martinez

**Some Merit** - Based upon the foregoing, the undersigned concludes that Petitioner's Supplemental Ground 2B is substantial.   Although the undersigned ultimately concludes that Petitioner fails to present a convincing claim, the claim is not devoid of potential legal merit or wholly without factual support.

**Deficient Performance by PCR Counsel** - Nonetheless, Petitioner proffers nothing to show that PCR counsel performed deficiently in failing to pursue this claim. To the contrary, PCR counsel could have reasonably concluded that the merits of the claim were sufficiently questionable, and that it would have detracted from stronger claims, such that foregoing the claim was a reasonable strategic choice.  *See Jones*, 463 U.S. 745, 751-52 (1983); and *Miller*, 882 F.2d at 1434 (9th Cir. 1989).

As discussed with regard to Supplemental Ground 2A, PCR counsel did present other substantial claims.  Petitioner proffers nothing to show that Supplemental Ground

2B was sufficiently superior to the other claims asserted that choosing to omit this ground was not a reasonable tactical choice.

Therefore, the undersigned finds that PCR counsel's failure to raise this claim does not establish cause under *Martinez* to excuse Petitioner's failure to exhaust his state remedies on the claim.

### 6. Merits Determination

Even if the undersigned were to sidestep the exhaustion issue and proceed to the merits of this claim, the undersigned would ultimately conclude (for the reasons discussed hereinabove) that this claim is without merit.   Petitioner's Motion for Evidentiary Hearing (Doc. 82) proposes no additional evidence to be offered in support of this claim, and based on the existing record, the undersigned finds the claim to be without merit.

### (c).  *SG 2C – Britton Not Called*

### 1. Arguments

In his Supplemental Ground 2C, Petitioner argues that trial counsel was ineffective for failing to call Petitioner's girlfriend Rusty Britton to testify at trial (rather than waiting until sentencing) that Hernandez told her that he and Isaacs killed the victim, and that Petitioner was not present.  (Supp. Petition, Doc. 79 at 5-7.6 – 7.7.)

Respondents argue that which witnesses to call and when to call them is a strategic decision, and that the decision to not call Britton was reasonable because: (1) she was Petitioner's girlfriend, and thus her credibility limited; (2) she fled with Petitioner from Tennessee, was aware of his use of an alias, fled with him after the murder, and was present when he abandoned his car; (3) Petitioner's alibi defense had been presented through more credible witnesses; (4) the account Britton gave the FBI contradicted the statement given to Petitioner's uncle, Tom Vandenberg; and (5) she could have been impeached with statements to the FBI that Petitioner had left the

apartment shortly before the murders. (Supp. Answer, Doc. 80 at 38-40.)

Petitioner replies simply that "Britton should have been called." (Supp. Reply, Doc. 84 at 15.)

### 2. Factual Background

In January 1999, Rusty Britton sent an email to Tom Vandenberg, a private investigator and uncle by marriage to Petitioner. In that email, Britton purported to list her activities on the day of the murder, July 10, 1998. She described having dinner with Petitioner at their apartment, and about 9:00 p.m. going to the roof of the apartment complex and drinking with Petitioner, the landscaper, Jesus, and Jesus' friend until sometime between 12:00 and 1:00 a.m. She reported being seen throughout the evening by the two apartment maintenance men, Jerry Daundivier and Kelly Erickson, the night security guard, another maintenance man named Reuben and his girlfriend, and Jesus' girlfriend. They went back to their apartment. Sometime between 1:00 and 2:00 a.m., Petitioner was up sick in the bathroom, after which they both went to bed and were together the rest of the night. (Exhibit CC, Trial Exhibits at State's Exhibit 98; Exhibit U, R.T. 7/25/00 at 22-23.)

The defense did not call Rusty Britton at the guilty phase of trial, resulting in the state's objection that they were surprised by the decision and would have independently subpoenaed her, and asserting that her statement to the FBI should be deemed admissible. (Exhibit Q, R.T. 5/3/00 at 65-75.)

The defense did call Britton to testify at sentencing. She testified that she met Petitioner in Tennessee, became his girlfriend, and move to Nevada with Petitioner in May, 1988. (Exhibit U, R.T. 7/25/00 at 4-8.) She testified that on the night of the murder, she and Petitioner began drinking at about 6:00 p.m., and between then and about 10:00 or 11:00 that evening, Petitioner drank 24 beers. (*Id.* at 8-12.)

On cross-examination, she testified that she had also been drinking, and that Petitioner left their apartment after finishing the beer, around 11:00, and she did not see

him again until the next morning.  Petitioner had left in his car, a white Nissan with Tennessee plates, and she assumed to go with his friends "Bernie" Hernandez and "Bobby".  She was concerned about him driving, and tried to stop him from leaving.  (*Id.* at 12-17, 20-21.)  Petitioner used his brother's name, Austin Duncan, because he was on the run on probation or parole from Tennessee.  Near the end of August, she received a phone call from Hernandez from Mexico.  Three or four days later, at the end of August or beginning of September, she left to go to her mother's home in Tennessee.  When Petitioner joined her, they abandoned the white Nissan in a parking lot in Knoxville, Tennessee, and then went to Florida.  (*Id.* at 18-21.)  She knew Petitioner to take drugs throughout their relationship, but did not see him take any on the day of the murder.  (*Id.* at 21-22.)  She emailed a statement to Tom Vandenberg, which was inaccurate, and her statement to the FBI in November 1998 was not entirely accurate. (*Id.* at 23-25.)  She remembered the night of the murder because it was the only night that Petitioner was not with her the entire night, and the next day he did not go to work.  (*Id.* at 25-26.)

On examination by the court, Britton testified that Petitioner had told her that Hernandez said something about being involved in the murders, and she and Petitioner talked about telling the police about it, but she decided not to.  Based on Petitioner's character, she did not believe he had anything to do with the murder.  (*Id.* at 29-31.)  The Court continued:

> Q.  And so when you wrote this statement out for Mr. Vandenberg, were you confusing the night of July 10th with another night when you stayed in the bathroom with Mr. Duncan?
> A.  The next night. The next night after that.
> Q.  So it was the night after he couldn't go to work that - -
> A.  Right.
> Q.  - - that he was up all night sick?
> A.  Yes.

(*Id.* at 31-32.)

On re-direct, Britton related that Hernandez had been at their apartment saying he knew what had happened, was involved, Petitioner's car had been used, and he wanted to leave the United States.  (*Id.* at 32-33.)

On re-cross, Britton admitted that she had found things in the car, a receipt and

food from a Carl's Jr. showing that the car had been in Bullhead City on the night of July 10th. (*Id.* at 33-34.) Nonetheless, she did not believe Petitioner was involved, and did not report anything to the police. (*Id.* at 34-35.) When they read the article in the paper on the murder, Petitioner said the description fit a guy he had seen with a shotgun on the night of the murder. (*Id.*) Hernandez said the murder had happened because the victim had snitched on the guy with the shotgun. (*Id.* at 36.) Finally, even though Petitioner would drink an average of six to eight beers a day, he was not usually drunk at the end of the day. (*Id.*)

The defense's trial investigator, Robert Pelzer, confirmed that upon interviewing Britton in March, 2000, her story had been that on the night of the murder she and Petitioner had been drinking together, but he left, she went to bed, and she didn't see him until the next morning. (Exhibit AA, R.T. 12/18/00 at 45-46.)

### 3. Deficient Performance

Based upon Britton's testimony at sentencing, counsel had a tactical reason for not calling her to testify at trial. Britton eviscerated Petitioner's alibi by testifying that the party with co-workers occurred on the night after the murder, and that Petitioner had left home in his car sometime before the murder. Moreover, she testified that a receipt and food in the vehicle showed that Petitioner's vehicle had been in Bullhead City (where the murder occurred) that night. Thus, Britton placed Petitioner within range of the murder, and his whereabouts unaccounted for.

Even more, Britton lent credibility to Hernandez's story by attributing it to him shortly after the murder, and tied at least Petitioner's car to the murder, if not Petitioner himself. Finally, Britton tied Petitioner to the unique occurrence of seeing a shotgun on the night of the murder, albeit in the hands of someone else who Petitioner asserted met the newspaper description.[38] She further tied Petitioner to Hernandez both as co-workers

---

[38] The undersigned presumes that Petitioner had not told trial counsel the story he testified to at the PCR hearing, which would have largely tracked the information provided by Britton, other than the time of his departure from the apartment. Had

and friends, and to sharing information about the murder.

Petitioner asserts that Britton would have testified that Hernandez told her that he and Isaacs killed the victim, and that Petitioner was not present.  But Petitioner presents no evidence to suggest that this would have been Britton's testimony.  "[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit.  A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim."   *U.S. v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991).   The testimony Britton did give did not reflect such a statement by Hernandez.  Rather she said Hernandez "was apparently involved in it." (Exhibit U, R.T. 32-33.)   She made no mention of Isaacs, nor any affirmative statement about Petitioner's involvement.  Moreover, she indicated the lack of any such basis for knowing Petitioner's lack of involvement when examined by the trial court:

> Q. And when you say you're positive he wasn't involved in the murder, you're basically saying based on your judgment of his character he couldn't have done it?
> A. Yes.

(*Id.* at 31.)

Even if it were assumed that Britton would have testified to such a statement by Hernandez, given her testimony pertaining to Petitioner's alibi (which counsel could anticipate from her statements to Pelzer), trial counsel could have made a reasonable tactical decision that her hearsay testimony regarding Hernandez was not worth the risk of the impact of the balance of her testimony on Petitioner's alibi.[39]

Finally, cross examination of Britton on the disposition of the vehicle would have risked exposing the jury to Petitioner's criminal record.

Accordingly, the undersigned cannot find deficient performance.

---

petitioner provided that story, counsel's reticence to call Britton would have been even greater.
[39] From the questioning, it appears that counsel's only purpose for calling Britton at all was to try to establish that Petitioner was intoxicated on the night of the murder, and to explain them abandoning the white Nissan in Tennessee (*i.e.* because the payments were not being made, and Petitioner's mother would not sign the car over to him).

### 4. Prejudice

Moreover, even assuming Britton would have given the testimony Petitioner suggests she would, given the impact of her other testimony on Petitioner's alibi defense, the undersigned cannot find a reasonable probability that the outcome of the proceeding would have been different, *i.e.* that the jury would have acquitted.

### 5. Application of Martinez

**Some Merit** - Based upon the foregoing, the undersigned concludes that Petitioner's Supplemental Ground 2C is insubstantial. The facts, particularly as reflected by Britton's testimony at sentencing, demonstrate that there is no factual support for the claim that Britton would have offered exculpatory testimony if called during the guilt phase.

**Deficient Performance by PCR Counsel** - Moreover, Petitioner proffers nothing to show that PCR counsel performed deficiently in failing to pursue this claim. To the contrary, PCR counsel could have reasonably concluded that the merits of the claim were sufficiently questionable, and that it would have detracted from stronger claims, such that foregoing the claim was a reasonable strategic choice. *See Jones*, 463 U.S. 745, 751-52 (1983); and *Miller*, 882 F.2d at 1434 (9th Cir. 1989).

As discussed with regard to Supplemental Ground 2A, PCR counsel did present other substantial claims. Petitioner proffers nothing to show that Supplemental Ground 2C was sufficiently superior to the other claims asserted that choosing to omit this ground was not a reasonable tactical choice.

Therefore, the undersigned finds that PCR counsel's failure to raise this claim does not establish cause under *Martinez* to excuse Petitioner's failure to exhaust his state remedies on the claim.

### 6. Merits Determination

Even if the undersigned were to sidestep the exhaustion issue and proceed to the

merits of this claim, the undersigned would ultimately conclude (for the reasons discussed hereinabove) that this claim is without merit.   Petitioner's Motion for Evidentiary Hearing (Doc. 82) proposes no additional evidence to be offered in support of this claim, and based on the existing record, the undersigned finds the claim to be without merit.

### (d).  *SG 2D – Greenwood Not Called*

#### *1. Arguments*

For his Supplemental Ground 2D, Petitioner argues that trial counsel was ineffective for failing to call to testify Stephen Greenwood who Franz had identified as the murderer.  (Supp. Petition, Doc. 78 at 5-7.7 – 7.8.)

Respondents counter that Petitioner cannot show deficient performance or prejudice because: (1) Franz had already admitted to mis-identifying Greenwood: (2) the misidentification was highlighted in cross examination of Franz and Detective Betts; and (3) counsel offered Greenwood's photograph and physical description in evidence. Thus, Respondents argue that calling Greenwood was merely cumulative evidence. (Supp. Answer, Doc. 80 at 40.)

Petitioner replies that the claim has obvious merit.  (Supp. Reply, Doc. 84 at 15.)

#### *2. Factual Background*

At trial, Robert Franz was called by the prosecution and testified as follows:

> Q. At some point in time did you identify anybody and tell the police that you had seen or found the person that shot your wife?
> A. Yes, sir. I was at the motor vehicles. I was still under a lot of shock, and I have no idea why I said that was the person. I was just still under a tremendous amount of shock over this whole thing.
> Q. How long after this happened was it that you told the police you found the person that shot your wife?
> A. I don't remember. I can't -- I can't take back that far.
> Q. Now, the person that you told the police shot your wife -- the person you saw at motor vehicles that you said shot your wife, did he look anything like the person that actually shot your wife?
> A. No, sir, he does not, since I've had time to re-create this whole thing in my mind to see.  He does not fit that description, sir.

171

(Exhibit L, R.T. 4/26/00 at 81-82.)

On cross-examination, Franz testified:

> Q. Let's jump ahead a few days, July 14th.
> A. Okay.
> Q. You were in Mohave Valley that day, right?
> A. I couldn't tell you where I was on that particular date. I can't recall them dates back there in them days.
> Q. Okay. You recall calling the police from - -
> A. Yes, sir.
> Q. -- somewhere near the Motor Vehicle Division office, right?
> A. At the Motor Vehicle Division, yes, sir.
> Q. And you told the police that you were positive that the man who had murdered your wife was standing in line at the MVD, right?
> A. I was still in shock.
> Q. Is that what you told the police?
> A. I don't know what I told the police at that particular time. I was still in heavy shock.
> Q. You don't recall telling the police that this man was still wearing the same clothes that he was wearing when he shot your wife?
> A. I can't answer that. I -- I don't know  what I said. God help if you ever get in that. position.
> Q. Please, this -- the way this has to work is I have to ask you questions.
> A. Yes, sir.
> Q. And you have to answer them, sir.
>          Do you recall telling the police operator that this man still had Elisha's blood on his shirt?
> A. No, I don't remember that.
> Q. You don't remember that?
> A. No, sir.
> Q. Now, the man that you fingered, if you will, at the Motor Vehicle Division office, didn't look anything like any of the descriptions that you had given to - -
> A. No, sir.
> Q. - - the police earlier?
> A. No, sir.
> Q. In fact, showing you what's been marked for identification as Defendant's Exhibit K-WD, that's the man who you pointed out at the Motor Vehicle Division office, isn't it?
> A. Yes, sir.

(*Id.* at 95-96.)    Counsel then admitted into evidence a photograph of Stephen Greenwood, as defense Exhibit K-WD.  (*Id.* at 96-97.) (*See* Exhibit CC, Trial Exhibits, Exhibit K-WD, at Doc. 18-6, physical page 19.)

The prosecution later called Detective Betts, who on cross-examination testified that on that same day he met with Greenwood at the police department, who said he had

172

been in Nevada, and provided receipts and people he had stayed with to establish his alibi, which checked out.  (Exhibit O, R.T. 5/1/00 at 21-23.)  Betts described Greenwood as 5 feet 10 inches, 190 pounds, in his mid 40s.  (*Id.*at 23.)  Betts testified that Franz later admitted he had been mistaken in identifying Greenwood.  (*Id.* at 24.)  On July 14th, Detective Underwood received a telephone call regarding the mistaken identification of Greenwood, and "Franz admitted that he was under a lot of stress."  (*Id.* at 27.)

In closing arguments, counsel argued that Greenwood did not match the descriptions and did not "look anything like" Petitioner.  (Exhibit R, R.T. 5/4/00 at 13-14.)

### 3.  Deficient Performance

The testimony at trial was unequivocal that Franz misidentified Greenwood as the murderer.  Thus, there was no testimonial purpose for calling Greenwood.

Therefore, the only purpose to be served by calling Greenwood would be to demonstrate stark differences between Greenwood and Petitioner that would make the identification of Greenwood (assuming Franz saw Petitioner the night of the murder) so unreasonable, that the jury could conclude Franz had in fact not seen Petitioner.

The record reflects some specific differences between Greenwood and Petitioner. For example, it was clear that there was some 14 years in age difference.  Petitioner was 26 years old at the time of the murder.   Greenwood was 40.   But the physical dissimilarities between the two were not stark.

In February, 1999, according to prison medical records, Petitioner was 6 feet, 195 pounds.  (Exhibit CC, Trial Exhibits, State's Exhibit 99-WD.)  Petitioner's mugshot and records from the State of Tennessee showed him at or above six feet.[40] (Exhibit CC, Trial Exhibits, State's Exhibit 100-WD, at Doc. 18-3, physical page 16, 17, 18, 19, 21,

_____

[40]  At a hearing on a motion to suppress, Detective Betts testified that Petitioner was approximately 5 feet 10 inches to 11 inches tall. (Exhibit D, R.T. 3/16/00 at 32.) However he acknowledged that Petitioner's drivers license reported six feet (*Id.* at 33). Betts did not, however, provide any basis for his testimony about Petitioner's height.

49.)   However, in his Motion for Reconsideration, Petitioner argued he was 5 feet 10.5 inches.  (Exhibit A, ROA, Item 167, Mot. Reconsider at 3.)   Petitioner's investigator testified that at the time he was booked into jail, and again in March 2000 (shortly before trial), Petitioner's weight was 180 pounds.[41]  (Exhibit AA, R.T. 12/18/00 at 46-47.) That meant Petitioner's demonstrated weight ranged from 180 to 195 pounds.  And his height had been reported at 5 feet 10.5 inches, but measured at no less than six feet.  The difference between any of those heights and weights and Greenwood's 5 feet 10 inches and 190 pounds could have resulted in little visual difference.

The record is devoid of any other pronounced physical differences between Petitioner and Greenwood.  The photograph copies of Greenwood and Petitioner's mugshots, though admittedly poor reproductions, reflect adult white males with broad faces, wide-set, down-sloping eyes, and bushy eyebrows.  (*Compare* Exhibit CC, Trial Exhibits, Defense Exhibit K-WD, at Doc. 18-6, physical page 19 (Greenwood Photo); *id.* at State's Exhibit 100-WD, at Doc. 18-3, physical page 18.)

Counsel could have reasonably concluded that there were sufficient similarities between Petitioner and Greenwood that providing the jury with a prolonged, in person, exposure could have resulted in the jury concluding that Franz's mistake was reasonable, making Franz's later identification of Petitioner more reliable.  In that case, the defense would be far better served by the limited information made available, *i.e.* the age difference and (albeit limited) size difference, and Franz's assertion that the two looked nothing alike.

Accordingly, the undersigned finds no deficient performance.

### 4. Prejudice

Even if it were assumed that counsel performed deficiently by failing to present Greenwood for  physical inspection, the undersigned cannot find a reasonable likelihood

---

[41] Franz testified that Petitioner had lost weight since the night of the murder.  (Exhibit L, R.T. 4/26/00 at 81.)

174

of a different outcome.  The record is rife with evidence that Franz's descriptions and identifications of the assailant were suspect.  His opportunity for observation was limited - - the evidence suggests that he was looking for clothes, and maneuvering without his neck brace, that the assailant entered the home and then turned back around toward the door, and then Franz was scurrying out of the home before the second and third gunshots. (Exhibit L, R.T. 4/26/00 at 70-75.)   Franz gave a laundry list of differing descriptions of the assailant(s) and the involved vehicles.  (*See infra* Section III(N)(5)(b) (Facts on Ground 9D).)  Nonetheless, the jury convicted.

Indeed, in the face of all these conflicting descriptions from Franz, and therefore discounting Franz's identification of Petitioner altogether, the jury still had substantial evidence implicating Petitioner, including the identifying testimony of Hernandez, Witzig, and Witzig's mother, Stambaugh.  The jury also had corroborating information from the location of the gun, the identification of Petitioner by the nickname "Tennessee," that Scroggins placed Petitioner at the party at his house with Hernandez and Isaacs, and Petitioners' admissions to Agent Kerr that he had been with Hernandez and Isaacs the night of the murder.

"It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011).

Given the strength of the remainder of the prosecutions' case, and the other available evidence suggesting Franz's unreliability, the undersigned cannot find a reasonable probability that the outcome of the proceeding would have been different, *i.e.* that the jury would have acquitted, nor that the result of the trial was rendered unreliable.

### 5. Application of Martinez

**Some Merit** - Based upon the foregoing, the undersigned concludes that Petitioner's Supplemental Ground 2D is substantial.   Although the undersigned

ultimately concludes that Petitioner fails to present a convincing claim, the claim is not devoid of potential legal merit or wholly without factual support.

**Deficient Performance by PCR Counsel** - Nonetheless, Petitioner proffers nothing to show that PCR counsel performed deficiently in failing to pursue this claim. To the contrary, PCR counsel could have reasonably concluded that the merits of the claim were sufficiently questionable, and that it would have detracted from stronger claims, such that foregoing the claim was a reasonable strategic choice. *See Jones*, 463 U.S. 745, 751-52 (1983); and *Miller*, 882 F.2d at 1434 (9th Cir. 1989).

As discussed with regard to Supplemental Ground 2A, PCR counsel did present other substantial claims. Petitioner proffers nothing to show that Supplemental Ground 2D was sufficiently superior to the other claims asserted that choosing to omit this ground was not a reasonable tactical choice.

Therefore, the undersigned finds that PCR counsel's failure to raise this claim does not establish cause under *Martinez* to excuse Petitioner's failure to exhaust his state remedies on the claim.

### *6. Merits Determination*

Even if the undersigned were to sidestep the exhaustion issue and proceed to the merits of this claim, the undersigned would ultimately conclude (for the reasons discussed hereinabove) that this claim is without merit. Petitioner's Motion for Evidentiary Hearing (Doc. 82) proposes no additional evidence to be offered in support of this claim, and based on the existing record, the undersigned finds the claim to be without merit.

### (e). *SG 2E – Forensic Expert Not Hired*

#### *1. Arguments*

In his Supplemental Ground 2E, Petitioner argues that trial counsel was ineffective for failing to request a tire and footprint expert to show Petitioner and his

176

white Nissan were not at the scene, problems with the police investigation, and Mr. Franz's movements after the murder.  (Supp. Petition, Doc. 78 at 5-7.8.)

Respondents argue that this claim is without merit because Petitioner has failed to adduce in this proceeding or to provide to the state courts any available expert testimony, and instead offers only speculation about what that testimony would show.  (Supp. Answer, Doc. 80 at 40-41.)

Petitioner replies that he has not had counsel or an investigator to obtain such evidence.  (Supp. Reply, Doc. 84 at 15.)

### 2.  Application of Law

Cursory allegations that are purely speculative cannot support a claim of ineffective assistance of counsel.  *Shah v. United States*, 878 F.2d 1156, 1161 (9th Cir.), *cert. denied*, 493 U.S. 869 (1989).   Thus, a defendant cannot satisfy the Strickland standard by "vague and conclusory allegations that some unspecified and speculative testimony might have established his defense."  *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 298 (3d Cir.), *cert. denied*, 502 U.S. 902 (1991).  In order to prevail on an allegation that defense counsel conducted an insufficient investigation resulting in ineffective assistance, the petitioner must show specifically what that investigation would have produced.  A petitioner may not simply speculate about what a witness' testimony might be, but must adduce evidence to show what it would have been.  *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997).  "[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim."  *U.S. v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991).

Petitioner complains that he has never had counsel or an investigator to pursue such evidence.   To the contrary, Petitioner was appointed PCR counsel and an investigator.  This habeas proceeding is not intended as the one in which a petitioner will

develop the factual predicate of what his claims will be.  Moreover, even during this proceeding, Petitioner has had assistance from a number of sources, including Judge Hall and the Arizona Justice Project. (*See infra* Section III(C)(2)(b) (Factual Predicate).)

On this basis alone, the undersigned concludes that Petitioner has failed to meet his burden of overcoming the "strong presumption" that counsel acted reasonably. *See Harrington v. Richter*, 562 U.S. 86, 108 (2011).

Moreover, "[a]n attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense."  Here, trial counsel had statements given by Petitioner to the FBI indicating that on the night of the murder he had left his vehicle in the hands of Hernandez and Isaacs.   (Exhibit P, R.T. 5/2/00 at 10 -36 (Testimony of Agent Kerr).)  Under those circumstances, reasonable counsel may have concluded that at the minimum a tire track expert might have determined that Petitioner's vehicle was at the scene, lending credence to Hernandez's story.

Based upon the foregoing, the undersigned finds neither deficient performance nor prejudice.


### 3. Application of Martinez

**Some Merit** - Based upon the foregoing, the undersigned concludes that Petitioner's Supplemental Ground 2E is insubstantial.  It is devoid of factual support.

**Deficient Performance by PCR Counsel** - Moreover, Petitioner proffers nothing to show that PCR counsel performed deficiently in failing to pursue this claim.  To the contrary, PCR counsel could have reasonably concluded that the merits of the claim were sufficiently questionable, and that it would have detracted from stronger claims, such that foregoing the claim was a reasonable strategic choice.  *See Jones*, 463 U.S. 745, 751-52 (1983); and *Miller*, 882 F.2d at 1434 (9th Cir. 1989).

As discussed with regard to Supplemental Ground 2A, PCR counsel did present other substantial claims.  Petitioner proffers nothing to show that Supplemental Ground 2E was sufficiently superior to the other claims asserted that choosing to omit this

ground was not a reasonable tactical choice.

Therefore, the undersigned finds that PCR counsel's failure to raise this claim does not establish cause under *Martinez* to excuse Petitioner's failure to exhaust his state remedies on the claim.

### 4. Merits Determination

Even if the undersigned were to sidestep the exhaustion issue and proceed to the merits of this claim, the undersigned would ultimately conclude (for the reasons discussed hereinabove) that this claim is without merit.   Petitioner's Motion for Evidentiary Hearing (Doc. 82) proposes no additional evidence to be offered in support of this claim, and based on the existing record, the undersigned finds the claim to be without merit.

### (f).  *SG 2F – Franz Impeachment*

#### 1. Arguments

In his Supplemental Ground 2F, Petitioner argues that trial counsel was ineffective for failing to impeach Franz with his having a $25,000 life insurance policy on the victim and his plans to divorce the victim.  (Supp. Petition, Doc. 78 at 5-7.8.)

Respondents counter that the PCR court denied relief on the related claim asserted herein in original Ground 9D, concluding that the testimony of other witnesses on this issue would not have been admitted.  Respondents argue that this indicates trial counsel would have similarly been precluded from cross-examining Franz on the issue.  Finally, Respondents argue that trial counsel adequately impeached Franz on other issues.  (Supp. Response, Doc. 80 at 41-42.)

Petitioner replies that this evidence should have been presented because of the different versions of events given by Franz.  (Supp. Reply, Doc. 85 at 16.)

### 2. Factual Background

In Petitioner's PCR proceeding, in disposing of the claim that counsel had not adequately cross-examined and impeached Hernandez and Franz, the PCR court observed that "[e]vidence of mistreatment of the victim by Mr. Franz before the murder would not necessarily have been admitted; upon review of the evidence that was presented during the recent hearing I would not admit it, because I find no credible evidence pointing to Mr. Franz as the killer or a conspirator with the actual killer." (Exhibit A, ROA at Item 319, Order 11/20/03 at 5.)   The PCR court did not explain on what legal basis the evidence would have been precluded.

### 3. Deficient Performance

Given the absence of a legal basis for precluding the evidence regarding mistreatment, it is difficult to conclude that the trial court would have also precluded evidence of a pending divorce and life insurance.   Such evidence would have been asserted for the same reasons, *i.e.* to assert that Franz was the killer, but the mistreatment issue would have required far-ranging inquiries into subjective issues of what constituted mistreatment.   In contrast, the planning of a divorce and availability of life insurance would have been far cleaner evidence to permit counsel some latitude in impeachment.

Even so, the factual reasoning of the PCR court is well taken.   There simply was no evidence (beyond Petitioner's theories of motive) to suggest that Franz was involved in the murder, apart from the discrepancies in his testimony.

Moreover, pinning blame on Franz was directly contradictory of the defense strategy of painting Isaacs, not Franz, as the killer.   In the PCR proceeding, trial counsel Iannone testified:

> Q. Would it be inconsistent trial strategy to present several witnesses who could have elaborated on Mr. Franz' own motivation to be involved in this murder? Is that inconsistent with saying my client wasn't there?
> A. No. It might have been inconsistent with the theory that we were presenting to the jury, though.
> Q. That's what I'm saying. Your theory was my client's not there. He's not in -- at the murder scene, right?

180

1
          A. Well, the rest of the theory was that -- what was his name? Isaacs.

2
          Q. Was the shooter?
          A. Was the guy who had done the shooting.

3
(Exhibit JJ, R.T. 11/10/13 at 151.)  On cross examination, Iannone testified:

4

5
          Q. Okay. So it would have been inconsistent with the theory of the case that you were presenting to the jury to indicate that Mr. Franz was the actual shooter?

6
          A. Yes.
          Q. Now -- and you were trying to convince the jury or at least suggest to the jury that Mr. Isaacs was the actual shooter?

7
          A. That's correct.

8
(*Id.* at 179.)  Similarly, trial counsel Baran testified:

9

10
          Q.  Okay. Now, you indicated that your theory of the case was that your client wasn't there and that Mr. Isaacs is the one that -- that actually shot the victim. Would it have been inconsistent with your theory to get up and present evidence or argue that Robert Franz actually did the killing or did the shooting of Ms. Mrs. Franz?

11

12
          A. It would have ultimately been inconsistent. There was a similarity to height. But that -- that was a road that we went down to investigate Mr. Franz as a possible suspect in the case. And we decided he was not a viable suspect. That just wasn't going to work.

13
          Q. And why did you decide he was not a viable suspect?

14

15

16
          A. Boy, you're going back four· years and asking me.  But we did a lot of investigation, a lot of comparing of times, dates, availability, things about Mr. Franz, his temper, his relationship with his wife.  There was something about a divorce, and we found out later that he wouldn't have known about it. So there were a lot of roads we went down that turned out to be dead ends.

17

18
          And I did not ultimately want to present evidence that Mr. Franz was the shooter.

19
(*Id.* at 197-198.)  Baran continued:

20
          Q. What about in terms of [Lisa Dailey-Sittel] testifying that Mr. -- Ms. Franz was planning to divorce Mr. Franz, that she had physically been threatened by Mr. Franz, was  afraid of Mr. Franz?

21
          A. I remember all that, yes.
          Q.  You recall that now?

22
          A. Uh-huh.
          Q.  And you said on direct you made the decision that it was

23
too tenuous to present that to a jury, right?
          A. Right.

24
(*Id.* at 221.)

25

26
          A. You know, I'm quite familiar with [cases on third party culpability], and as a matter of fact, we did present third party culpability. But I did not present third party culpability as to Mr. Franz. I didn't think Mr. Franz was a viable person to point the finger at. I just –

27

28

181

(*Id.* at 223.)

> A. I remember that I did not consider that to be a viable defense for a number of reasons.
> Q. Okay. Go ahead. Tell us why.
> A. Well, Mrs. Franz was shot in the head by a shotgun. There was no shotgun in the house. Mr. Franz, in fact, ran out of the house. There were footprints that were consistent with somebody approaching the door.  There was a car that pulled up in front of the house at some point.  Mr. Franz was simply not a viable suspect in the case, although certainly I can see how you're going there. But I did not consider that Mr. Franz was -- here was a man who ran out the back door, leaving his children on the floor of the house. I'm sorry, David, that --  that, after all the investigation in this case, did not  seem viable.
> There were also the locations of the bullet holes in the trailer. There were the locations of the  shells on the floor. There were things like that.  And - -
> Q. Okay.
> A. - - why four years ago I came to the conclusion  that I did, I don't know. But I can tell you right now, I did not consider that nobody came to the door and nobody shot her with no gun as a viable defense.

(*Id.* at 225-226.)

Under these circumstances, the decision to forego attempts to paint Franz as the killer was a reasonable strategic decision even with the addition of a divorce action by Mr. Franz and life insurance, and thus was not deficient performance.[42]

### 4. Prejudice

Moreover, given the problems with the evidence from the scene (e.g. lack of gun at the scene, testimony of a vehicle, etc.), as well as the other direct evidence of Petitioner's involvement, the undersigned cannot find a reasonable probability that the outcome of the proceeding would have been different had counsel introduced evidence (on impeachment or otherwise) of Franz's divorce plans and the life insurance, *i.e.* that the jury would have acquitted, nor that the result of the trial was rendered unreliable.

---

[42] The undersigned presumes that Petitioner had not told trial counsel the story he testified to at the PCR hearing, which demonstrated that at least Isaacs and Hernandez were involved in the murder, not Franz. Had petitioner provided that story, counsel's failure to attempt to paint Franz as the murderer would have been even more reasonable, if not implicating ethical concerns.

### 5. Application of Martinez

**Some Merit** - Based upon the foregoing, the undersigned concludes that Petitioner's Supplemental Ground 2F is substantial.  Although the undersigned ultimately concludes that Petitioner fails to present a convincing claim, the claim is not devoid of potential legal merit or wholly without factual support.

**Deficient Performance by PCR Counsel** - Nonetheless, Petitioner proffers nothing to show that PCR counsel performed deficiently in failing to pursue this claim. To the contrary, PCR counsel could have reasonably concluded that the merits of the claim were sufficiently questionable, and that it would have detracted from stronger claims, such that foregoing the claim was a reasonable strategic choice.  *See Jones*, 463 U.S. 745, 751-52 (1983); and *Miller*, 882 F.2d at 1434 (9th Cir. 1989).

As discussed with regard to Supplemental Ground 2A, PCR counsel did present other substantial claims.  Petitioner proffers nothing to show that Supplemental Ground 2F was sufficiently superior to the other claims asserted that choosing to omit this ground was not a reasonable tactical choice.

Therefore, the undersigned finds that PCR counsel's failure to raise this claim does not establish cause under *Martinez* to excuse Petitioner's failure to exhaust his state remedies on the claim.

### 6. Merits Determination

Even if the undersigned were to sidestep the exhaustion issue and proceed to the merits of this claim, the undersigned would ultimately conclude (for the reasons discussed hereinabove) that this claim is without merit.  Petitioner's Motion for Evidentiary Hearing (Doc. 82) proposes no additional evidence to be offered in support of this claim, and based on the existing record, the undersigned finds the claim to be without merit.

/ /

/ /

### (g). *SG 2G – Boston Not Called*

#### 1. Arguments

In his Supplemental Ground 2G, Petitioner argues that trial counsel was ineffective for failing to call Hernandez's friend Amelia Boston.  Petitioner argues he has a cassette taped interview in which detectives tell Boston to tell Hernandez he will receive a death sentence if he does not help the police.  (Supp. Petition, Doc. 78 at 5-7.9.)

Respondents argue that Petitioner fails to present an affidavit from Boston, speculates whether she relayed the purported message to Hernandez, and would be willing to testify.   Respondents further ague that trial counsel impeached Hernandez's motivations by other means, and there was no prejudice because of such other impeachment, the corroboration of Hernandez's testimony, and other evidence of Petitioner's guilt.  (Supp. Answer, Doc. 80 at 42-44.)

Petitioner replies that he has the audio tapes available to provide the Court, but that they have not been transcribed.  (Supp. Reply, Doc. 84 at 16.)

#### 2. Factual Background

The undersigned is perplexed by Petitioner's failure to produce a transcript of the recording purportedly in his possession, or even the relevant portions.  The undersigned is equally perplexed by the failure of Respondents to produce some evidence that the purported exchange did not occur.  Presumably Petitioner obtained the recording from counsel who obtained it from the prosecution, suggesting that it would be available to Respondents directly.

In any event, because it does not affect the outcome, the undersigned presumes, for purposes of this Report and Recommendation that Petitioner does indeed possess tapes of interviews containing the purported exchange between Detective Betts and Boston.

Hernandez testified that he fled to Mexico when he learned that the police were

investigating him and looking for him in connection with the murder.  (Exhibit L, R.T. 4/26/00 at 37-38.)   He testified that on returning from Mexico, "I turned myself in." (*Id.* at 39.)

On cross-examination of Hernandez, trial counsel addressed Hernandez's reason for returning from Mexico:

> Q. BY MR. BARAN: When you were in Mexico, you eventually decided to come turn yourself in to the police, right?
> A. Yes, sir.
> Q. And that was because your sister was in contact with you in Mexico, right?
> A. Yes, sir.
> Q.  And you told me when I interviewed you, that was because your sister told you when you first found out that the person who got killed was –
> A. Woman.
> Q. -- was a woman; is that right?
> A.  Yes. And the reason you turned yourself in and you're telling this jury right now is that your sister  told you that a woman is the person who got killed?
> A. Well, that it was just a woman.

(Exhibit L, R.T. 4/26/00 at 60.)  On direct examination, Hernandez had similarly testified that he came back from Mexico due to his conscience.  (*Id.* at 39-40.)

Detective Betts testified that the police were working through Petitioner's sister, Brie Rivera, to get him to agree to come back from Mexico.

> Q. Now, did Bernie Hernandez come to the Bullhead City Police Department?
> A. Yes, he did.
> Q. And was he arrested and brought there in custody, or did he come there voluntarily?
> A. No, I previously had spoken with his sister, Briz Riviera, and she agreed to go get him. If he was willing to come back, he would come back voluntarily and speak with us and tell us what he knows.

(Exhibit N, R.T. 4/27/00 3:19 p.m. at 46.)

In closing arguments, trial counsel argued that "Bernie Hernandez is a liar." (Exhibit R, R.T. 5/4/00 at 9.)   Counsel argued that the story told by Hernandez was simply unbelievable.  (*Id.* at 9-10.) Counsel argued the inconsistency of Hernandez's claim that he returned because he learned a woman had been killed, but testified that Petitioner told him immediately after the murder that he had killed a man and a woman.

185

(*Id.* at 14.)  Counsel argued that Hernandez asserted "he has no culpability…[b]ut after the police come looking for him he flees to Mexico, doesn't come back for four months." (*Id.* at 15.) Counsel argued that Hernandez was demonstrably wrong on working with Petitioner at the theatre the day of the murder.  (*Id.* at 15-16.)

In rebuttal, the prosecution argues that Hernandez was 18 and didn't know whether he had done something wrong by being in the car, and so fled to Mexico.  (*Id.* at 46.)   The prosecution argued that Hernandez had nothing to gain by lying about Petitioner, his friend, but had a lot to lose because the case involved "the murder of a snitch."  (*Id.* at 46-47.)

### 3.  Deficient Performance

Respondents argue that trial counsel impeached Hernandez in a variety of ways. That is true.   However, Respondents point to no part of the record showing that Hernandez had been threatened with a death sentence or even prosecution to obtain his testimony.

On the other hand, the record was not devoid of evidence suggesting that Hernandez faced prosecution.   He had admitted going to Mexico because he feared prosecution. He described his return as turning himself in. As pointed out by Respondents, the jury was aware that Petitioner faced the death penalty.  It would not have been unlikely, therefore, to assume that the jury understood Hernandez likewise risked prosecution in connection with the murder.  Nor would it have been unreasonable for the jury to assume that a risk of prosecution was at least part of Hernandez's reason for testifying.

But, of course, counsel did not make those risks explicit to the jury, nor did counsel introduce evidence to show that the threats were explicit.  Under the assumption made hereinabove about the testimony to be expected from Boston, there appears no tactical or strategic reason to not present the evidence on this point.

Respondents argue lack of evidence that Boston would testify.  They proffer no

1  reason to believe she would not.  Presumably, she could have been subpoenaed, and if
2  her story varied from the tape, she could have been impeached.

3      On the other hand, Respondents note that Petitioner proffers nothing to show that
4  Boston communicated any threat to Hernandez.  If the threat were not communicated to
5  Hernandez, then it could not have been a motivation for Hernandez to lie about
6  Petitioner's participation.  Petitioner does not address this contention, but leaves the
7  Court to speculate on this point.  Petitioner does not even proffer anything to show that
8  Boston communicated with Hernandez after her interview with police.  It is Petitioner's
9  burden to show such communication.

10     Moreover, Hernandez was outside the country when these threats occurred.
11 Petitioner points to no compulsion for Hernandez to return and risk prosecution and
12 subjection to the death penalty.  Hernandez testified that he was generally content to
13 remain in Mexico.  Nor does Petitioner suggest anything to show that Hernandez
14 believed he risked extradition from Mexico.  Although arguably extradition might have
15 been a risk, the credibility question hinges on what Hernandez believed, not what the
16 actual likelihood might have been.

17     Finally, Petitioner does not suggest that Hernandez fabricated his own
18 participation in events leading up to the murder.  Indeed, Petitioner's own statement to
19 Agent Kerr was that Hernandez and "Bugsy or Mugsy" had taken Petitioner's car and
20 that Hernandez told him that "Bugsy" had shot a snitch and Hernandez was with him and
21 they threw the "pistol" in the reservoir, and that Petitioner later drove Hernandez to
22 Mexico.  (Exhibit P, R.T. 5/2/00 at 25-27.)

23     Accordingly, Boston's testimony would not have been relevant to providing a
24 motivation for Hernandez to implicate Petitioner in the commission of the murder.  No
25 evidence ever suggested that Hernandez had committed the murder.  Fear of prosecution
26 and a death sentence might explain Hernandez implicating Isaacs.  The evidence that
27 Isaacs was involved was essentially undisputed.  There were clear connections between
28 Isaacs and the victim.  But even assuming a threat of prosecution, there was little for

Hernandez to gain from also implicating Petitioner.  Indeed, by implicating Petitioner, Hernandez increased the likelihood that Isaacs might stay alive and/or eventually be freed, *i.e.* by painting Petitioner as the actual killer.  And Isaacs had an undisputed predilection for having snitches killed.

Thus, the only motivation for Hernandez to identify Petitioner was the fact that Witzig had already told police (on July 23) that the involved parties were Isaacs, a Hispanic (Hernandez) and "Tennessee."  (Exhibit M, R.T. 4/27/00 3:03pm at 142-143.) Witzig would eventually testify that "Tennessee" confessed to the shootings.  (*Id.* at 11.) And Witzig identified Petitioner as "Tennessee" in a photo lineup on October 26, 1998. (*Id.* at 18-19.)  This was before Hernandez returned from Mexico and met with police for the first time on October 29, 1998.  (Exhibit O, R.T. 5/1/00 at 39.)

To make any threats of a death sentence relevant, counsel would have had to ask the jury to believe that Hernandez was aware of Witzig's implication of "Tennessee," and fabricated a coinciding story that "Tennessee," Petitioner, had not only participated, but pulled the trigger.  The difficulty with such an approach was the extent to which it highlighted Witzig's implication of Petitioner, and its independence from Hernandez's story.

Indeed, the prosecution highlighted in its closing argument the fact that Witzig had implicated Petitioner from the very beginning, "before the police department  ever talked to Bernie Hernandez."  (Exhibit R, R.T. 5/4/00 at 9.)

Thus, the undersigned concludes that counsel had a tactical reason for not delving into Hernandez's prosecution related motivations for implicating Petitioner.

For these reasons, the undersigned cannot find any deficient performance by counsel in failing to call Boston to testify.

*4. Prejudice*

Even if counsel performed deficiently in failing to call Boston, Petitioner fails to establish prejudice from counsel's failure to present evidence of the purported threat.

188

The evidence corroborating Hernandez's story was substantial, and the evidence supporting Petitioner's alibi was relatively weak and confused.  Moreover, Petitioner fails to proffer anything to show that Boston's testimony would have included communication of the purported threats to Hernandez.

Thus, undersigned cannot find a reasonable probability that the outcome of the proceeding would have been different, *i.e.* that the jury would have acquitted had testimony from Boston on the threats been offered, nor that the result of the trial was rendered unreliable.

### 5. Application of Martinez

**Some Merit** - Based upon the foregoing, the undersigned concludes that Petitioner's Supplemental Ground 2G is substantial.  Although the undersigned ultimately concludes that Petitioner fails to present a convincing claim, the claim is not devoid of potential legal merit or wholly without factual support.

**Deficient Performance by PCR Counsel** - Nonetheless, Petitioner proffers nothing to show that PCR counsel performed deficiently in failing to pursue this claim.  To the contrary, PCR counsel could have reasonably concluded that the merits of the claim were sufficiently questionable, and that it would have detracted from stronger claims, such that foregoing the claim was a reasonable strategic choice.  *See Jones*, 463 U.S. 745, 751-52 (1983); and *Miller*, 882 F.2d at 1434 (9th Cir. 1989).

As discussed with regard to Supplemental Ground 2A, PCR counsel did present other substantial claims.  Petitioner proffers nothing to show that Supplemental Ground 2G was sufficiently superior to the other claims asserted that choosing to omit this ground was not a reasonable tactical choice.

Therefore, the undersigned finds that PCR counsel's failure to raise this claim does not establish cause under *Martinez* to excuse Petitioner's failure to exhaust his state remedies on the claim.

### 6. Merits Determination

Even if the undersigned were to sidestep the exhaustion issue and proceed to the merits of this claim, the undersigned would ultimately conclude (for the reasons discussed hereinabove) that this claim is without merit.   Petitioner's Motion for Evidentiary Hearing (Doc. 82) proposes no additional evidence to be offered in support of this claim, and based on the existing record, the undersigned finds the claim to be without merit.

### (h).  *SG 2H – Brady Material*

#### 1. Arguments

In his Supplemental Ground 2H, Petitioner argues that trial counsel was ineffective for failing to pursue the prosecution's failure to disclose multiple letters from Isaacs to Petitioner.  (Supplemental Petition, Doc. 78 at 5-7.9.)  Petitioner reasons that absent such letters, Gracie Cox would have been called to present various exculpatory testimony.  Petitioner bases the existence of multiple letters on a statement made by trial counsel Iannone in an interview by the Arizona Justice Project.

Respondents argue that the claim is factually without merit because the evidence is uncontroverted that there was only one letter, and that letter was disclosed.  Respondents further argue that Petitioner proffers nothing to show that the letters were exculpatory, and the logical inference is that they would have at least made it harder to call the delivering witness (Griselda Cox), and may have been incriminating.  (Supp. Response, Doc. 80 at 44-47.)

Petitioner replies that trial counsel Iannone will testify at an evidentiary hearing consistent with his statements to the Arizona Justice Project (*i.e.* that the prosecution threatened to use multiple letters if Cox were called to testify).  (Supp. Reply, Doc. 84 at 16.)

//

//

190

*2. Factual Background*

At the PCR evidentiary hearing, trial counsel Iannone testified:

> Q. Do you recall the name Gracie Cox?
> A. Yes, I do.
> Q. And she was a potential witness for the defense in this case, right?
> A. Yes.
> Q. In fact, the defendant subpoenaed her to testify at trial, right?
> A. I believe we did.
> Q. And a decision was made not to call her on the witness stand, correct?
> A. That's correct.
> Q. And can you tell the Court why you or Conrad [Baran, co-counsel] or which of you decided not to call her as a witness?
> A. It was Conrad's call.
> Q. Did you disagree with that call?
> A. Yes, I did.
> Q. Why did you disagree with that?
> A. Ms. Cox was the -- the owner of the home at which the party was held, and allegedly at that party Mugsy Isaacs and Bill Duncan first get introduced to one another at that party. And it builds to Bill asking Mugsy if he knows where he can get some dope, and then everybody talking big in the car as they're going to buy the meth about, you know, who's the biggest bad ass in the southern part of Mohave County. At least that's the Bernie Hernandez version of it.
>      Grace Cox would have testified that, yes, she did throw a lot of parties in her home, and that she made it a point to know and to introduce herself to each and every person who comes into her home for one of these parties. And she would further testify that she had never met Bill Duncan at any affair in her home at any time.
>      That was the testimony that we were expecting to get from her.
>      We found out like a couple of hearings before we were planning to put her in the box, that while she and -- I1m sorry, while Bill and Mugsy were both guests at the county jail, that she had been passing messages back and forth between them. Conrad's concern was that the jury would perceive a connection between Bill and Mugsy and would -- and would see this as, you know -- as something tying the two of them together. Conrad was concerned about that.
>      And at the end of the day, I believe that was the reason that he determined that -- that Ms. Cox and her younger sister, whose name I no longer recall --
> Q. Adriana. Does that ring a bell? Adriana.
> A. No, it doesn't, but I1m not going to argue with you.
> Q. But you said messages. Was there just -- was there something that came to light that was just one letter that had been passed? Is that right?
> A. There was -- yeah, there was one letter. And I believe it was Bill who had written it.
> Q. Let me show you an exhibit that's been admitted in this

hearing.

               I'll show you what we've had admitted as 103.  And has been represented by the State as being a letter that was intercepted.

A.  Yeah, I remember this.

Q.  Is that the message you're speaking of?

A.  Yes, it is.

Q.  Is there more than that, or is that it?

A.  I don't recall there being any more than this.

(Exhibit JJ, R.T. 11/10/3 at 162-165.)  Co-counsel Baran testified:

               Q.  Okay.  At some point in time, did it come out that one of the witnesses that you intended to call -- intended to call would establish some connection between your client and Mugsy?

A.  Yes.

               * * *

               Q.  Okay.  And if I said one of them was Gracie would you either remember that or at least not dispute that that was one of .the witnesses?

A.  I wouldn't dispute it.

               Q.  Okay.  And what were the circumstances surrounding the connection between your client and Mugsy that would come to light if she testified?

A.  There was a letter that had been sent by Mugsy through the witness to Mr. Duncan.

               * * *

               Q.  With respect to that, after the interview, did you ultimately decide not to call each of those witnesses?

A.  I did.

               * * *

               Q.  Why did you ultimately decide not to call them to testify?

A.  There wasn't any connection established between my client and the victim other than what I considered to be very unreliable testimony at that point. I was also concerned about the contents of the communication. If, for instance, it was established that there was a communication from Mugsy to my client but I objected to the content of that communication in front of the jury, or the jury found out that I objected to it, I can only imagine they would not think that would be good information for my client.

               It was -- it was a complicated issue. It didn't just involve one issue. There were several things that we thought about and talked about.

(*Id.* at 193-196.)

       Petitioner now asserts that in an interview with the Arizona Justice Project, trial counsel Iannone referenced the fact the prosecutor "threatened to impeach Ms. Cox using letters (plural) that were allegedly written by Isaacs, mailed to Ms. Cox, then forwarded to Petitioner, but were not delivered as police intercepted them en-route." (Supp. Petition, Doc. 78 at 5-7.9.)    Petitioner has not produced any evidence of such

interview beyond his own statements.

During the third PCR proceeding, former Deputy Mohave County Attorney Derek Carlisle, who prosecuted Petitioner, submitted an affidavit avowing that: (1) the letter that was made part of the state-court record (Hearing Exhibit 103) constitutes the only correspondence between Isaacs and Petitioner that he recalled; and (2) he disclosed to the defense any exculpatory information he received. (Supplement, Docs. 45, 36, Appendix 2, PCR Response, Exhibit U, Carlisle Affidavit.)

### 3. Deficient Performance

The core of Petitioner's claim is that there was a claim to be made under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), which trial counsel was deficient in not pursuing.

In *Brady*, the Supreme Court held that a defendant's due process rights are violated when the state fails to disclose to the defendant prior to trial "evidence favorable to an accused…where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. A failure of the prosecutor to disclose evidence to the defense is a due process violation, only if three conditions are met: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999).

**No Substantial Showing Evidence Existed** - Petitioner's unsupported allegations regarding the number of letters is insufficient to make out a claim of substantial merit. Petitioner fails to support the allegation with any transcripts or other records of the interview. At best, Petitioner leaves this Court with hearsay about an unsworn interview in which Petitioner apparently did not participate. Moreover, Petitioner plucks out a single word, without any context, to argue there were multiple letters. Moreover any such interview would have occurred almost a decade after counsel Iannone's sworn testimony, corroborated by co-counsel Baran, that there was a single letter.

**Suppression Not Shown** - Further, it is unclear how Petitioner contends the multiple letters were suppressed if they were known to counsel Iannone.  For example, Petitioner does not suggest that Iannone conducted an investigation after trial and discovered additional letters.

Petitioner does complain that the letter(s) were not disclosed until just before Cox was called to testify.  "*Brady* does not necessarily require that the prosecution turn over exculpatory material *before* trial. To escape the *Brady* sanction, disclosure 'must be made at a time when disclosure would be of value to the accused.'" *United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1988) (citations omitted, emphasis in original).  Here, the value of the disclosure of the letters to the defense was the opportunity to decline to call Cox.  Had the prosecution waited to disclose them until after Cox testified, then suppression might have been shown (although, as discussed hereinafter, the letters still would not have been favorable to the defense).  But disclosure moments before Cox's testimony still left the defense with the value of the disclosure of the letters, namely the opportunity to decline to call Cox.

**Not Favorable** - Even if Petitioner could provide convincing testimony that there were multiple letters, and that they had been suppressed until after the disclosure would have been useful, a *Brady* claim is not shown anytime evidence is not disclosed.  Rather, such evidence must be favorable.  Petitioner fails to show how the presence of additional letters would have been favorable.

The letters themselves were not favorable.  Petitioner has not shown they were exculpatory – that they suggested that Petitioner was innocent.  Instead, as both Iannone and Baran testified, they established a connection between Petitioner and Isaacs that was anathema to the defense's theory of the case that Petitioner was wholly uninvolved.  Moreover, if one letter precluded calling Cox, multiple letters would have simply compounded the problem.  Nor does Petitioner show that they would have been useful for impeachment of a prosecution witness.  To the contrary, they were impeaching of the expected testimony from Cox tending to show that there was no relationship between

194

1    Isaacs and Petitioner.

2         Petitioner makes the logical leap that asserting a *Brady* claim on the missing

3    letters would have allowed counsel to call Gracie Cox to testify.  This assertion fails in at

4    least two respects.  First, Petitioner fails to show how, had trial counsel asserted a *Brady*

5    claim in the course of the trial, there would have been any prejudice.  "Disclosure, to

6    escape the *Brady* sanction, must be made at a time when the disclosure would be of

7    value to the accused." *United States v. Davenport*, 753 F.2d 1460, 1462 (9th Cir. 1985).

8    Petitioner proffers nothing to suggest that had counsel moved under *Brady* the result

9    would have been anything more than an order requiring the suppression of the additional

10   letters.  *See United States v. Struckman*, 611 F.3d 560, 577 (9th Cir. 2010) (suppression

11   appropriate remedy unless "prejudice to the defendant results and the prosecutorial

12   misconduct is flagrant").  That would have left the one letter admissible, and would not

13   have altered counsel's tactical decision to not present Cox's testimony.

14        Second, evidence does not become favorable under *Brady* merely because it

15   manufactures a *Brady* claim.  Rather, the evidence must, on its own, have been favorable

16   either because it was exculpatory or because it provided a basis for impeaching a

17   prosecution witness.  *Strickler*, 527 U.S. at 281-282.

18        **No Prejudice From Delay** – Finally, Petitioner fails to show prejudice from any

19   delay in disclosure.  Had timely disclosure of the additional letters been made, the

20   outcome would have been the same:  the defense would still have declined to call Cox to

21   testify.

22        For the foregoing reasons, the undersigned finds no deficient performance by trial

23   counsel with regard to this claim.

24

25                                    *4. Prejudice*

26        For many of the same reasons, Petitioner fails to show that any prejudice occurred

27   from trial counsel's failure to assert a *Brady* claim.  A claim related to the disclosed

28   letter would fail because there was no prejudice from any delay in disclosure.  The only

                                          195

potential prejudice, the calling of Cox and resulting impeachment by the prosecution, did not occur.  A claim related to the other letters would have failed because of the same lack of prejudice – Cox was not called.  "The failure to raise a meritless legal argument does not constitute ineffective assistance of counsel."  Baumann v. United States, 692 F.2d 565, 572 (9th Cir. 1982).

Based upon the foregoing, the undersigned concludes that Petitioner has failed to show deficient performance by trial counsel in failing to assert a *Brady* claim, and prejudice from the purported deficiency.

### 5. Application of Martinez

**Some Merit** - Based upon the foregoing, the undersigned concludes that Petitioner's Supplemental Ground 2H is insubstantial.  The claim is founded upon a misunderstanding of *Brady* and is devoid of factual support.

**Deficient Performance by PCR Counsel** – Even so, Petitioner proffers nothing to show that PCR counsel performed deficiently in failing to pursue this claim.  To the contrary, PCR counsel could have reasonably concluded that the merits of the claim were sufficiently questionable, and that it would have detracted from stronger claims, such that foregoing the claim was a reasonable strategic choice.  *See Jones*, 463 U.S. 745, 751-52 (1983); and *Miller*, 882 F.2d at 1434 (9th Cir. 1989).

As discussed with regard to Supplemental Ground 2A, PCR counsel did present other substantial claims.  Petitioner proffers nothing to show that Supplemental Ground 2H was sufficiently superior to the other claims asserted that choosing to omit this ground was not a reasonable tactical choice.

Therefore, the undersigned finds that PCR counsel's failure to raise this claim does not establish cause under *Martinez* to excuse Petitioner's failure to exhaust his state remedies on the claim.

//

//

### 6. *Merits Determination*

Even if the undersigned were to sidestep the exhaustion issue and proceed to the merits of this claim, the undersigned would ultimately conclude (for the reasons discussed hereinabove) that this claim is without merit.   Petitioner's Motion for Evidentiary Hearing (Doc. 82) proposes no additional evidence to be offered in support of this claim, and based on the existing record, the undersigned finds the claim to be without merit.

### (i).  *SG 2I – Rivera Not Called*

#### 1. *Arguments*

In his Supplemental Ground 2I, Petitioner argues that trial counsel was ineffective for failing to call Hernandez's sister, Briz Rivera, to testify at trial.  Petitioner argues that the police were "feeding Mr. Hernandez information about the 'facts' of this case," enabling Hernandez "to tailor a self-serving 'story'."   Petitioner further argues that police communicated that by "cooperating" Hernandez would go from being a suspect to being a witness, and that Rivera had a long car ride from Mexico with Hernandez to relay all this information.  (Supp. Petition, Doc. 78 at 5-7.9 – 7.10.)

Respondents mount the same arguments about Rivera as asserted about the Boston testimony, *i.e.* that Petitioner has failed to submit an affidavit from Rivera about her expected testimony, and that counsel pursued other means of impeaching Hernandez. (Supp. Response, Doc. 70 at 43-44.)

Petitioner replies only by asserting that Rivera was repeatedly interviewed by the police.[43]

//

//

---

[43]  Petitioner's Supplemental Reply argues collectively with regard to Boston (Ground 2G), Rivera (Ground 2I), and various neighborhood witnesses (Ground 2K).  (Doc. 84 at 16.)  In that argument Petitioner references the "cassette tapes."   However, neither his Supplemental Petition nor his Supplemental Reply makes an affirmative assertion that such cassette tapes include support for his Ground 2I.

### 2. Factual Background

At trial, on cross examination by defense counsel, Hernandez testified:

> Q. BY MR. BARAN: When you were in Mexico, you eventually decided to come turn yourself in to the police, right?
> A. Yes, sir.
> Q. And that was because your sister was in contact with you in Mexico, right?
> A. Yes, sir.
> Q. And you told me when I interviewed you, that was because your sister told you when you first found out that the person who got killed was –
> A. Woman.
> Q. -- was a woman; is that right?
> A. Yes.
> Q. And the reason you turned yourself in and you're telling this jury right now is that your sister told you that a woman is the person who got killed?
> A. Well, that it was just a woman.

(Exhibit L, R.T. 4/26/00 at 60.)   On re-cross examination, counsel again pursued the issue:

> Q. So you told the police during the tape recorded interview that a man and a woman got killed, right?
> A. Yes, sir.
> Q. But you didn't know a woman got killed till your sister told you when you were in Mexico?
> A. Yes, sir.

(*Id.* at 62.)  Detective Betts testified:

> Q. Now, did Bernie Hernandez come to the Bullhead City Police Department?
> A. Yes, he did.
> Q. And was he arrested and brought there in custody, or did he come there voluntarily?
> A. No, I previously had spoken with his sister, Briz Riviera, and she agreed to go get him. If he was willing to come back, he would come back  voluntarily and speak with us and tell us what he knows.

(Exhibit N, R.T. 4/27/00 3:19pm at 46.)

### 3. Deficient Performance

Petitioner fails to support this claim in three important respects.

First, Petitioner fails to proffer any evidence of information about the investigation provided to Rivera by the police.  The only fact of the investigation

referenced in the testimony was that the only victim was a woman.   There is no indication this information was not publicly available.

Second Petitioner fails to proffer any evidence of the "suspect" to "witness" offer.

Third, Petitioner proffers nothing to show that Rivera communicated any such additional information or offers from the police to Hernandez.

Petitioner's speculation about Rivera's testimony in insufficient to support a claim that counsel should have called her to testify.  *Ashimi*, 932 F.2d at 650.

Moreover, as with the Boston testimony in Supplemental Ground 2G, trial counsel had a tactical reason to not pursue arguments that Hernandez's story was an adoption of the evidence from Witzig and Stambaugh. (*See infra* Section III(D)(6)(a)(3)(g) (Boston Not Called).)

The undersigned finds no deficient performance.

### 4. Prejudice

Even more so than with the purported Boston testimony about a threat of a death sentence in Supplemental Ground 2G, the undersigned cannot find that the absence of evidence of an offer to a simple shift from "suspect" to "witness" or the feeding of information resulted in prejudice to Petitioner.  (*See infra* Section III(D)(6)(a)(3)(g).)

### 5. Application of Martinez

**Some Merit** - Based upon the foregoing, the undersigned concludes that Petitioner's Supplemental Ground 2I is substantial.  Although the undersigned ultimately concludes that Petitioner fails to present a convincing claim, the claim is not devoid of potential legal merit or wholly without factual support.

**Deficient Performance by PCR Counsel** - Nonetheless, Petitioner proffers nothing to show that PCR counsel performed deficiently in failing to pursue this claim. To the contrary, PCR counsel could have reasonably concluded that the merits of the claim were sufficiently questionable, and that it would have detracted from stronger

199

claims, such that foregoing the claim was a reasonable strategic choice.  *See Jones*, 463 U.S. 745, 751-52 (1983); and *Miller*, 882 F.2d at 1434 (9th Cir. 1989).

As discussed with regard to Supplemental Ground 2A, PCR counsel did present other substantial claims.  Petitioner proffers nothing to show that Supplemental Ground 2I was sufficiently superior to the other claims asserted that choosing to omit this ground was not a reasonable tactical choice.

Therefore, the undersigned finds that PCR counsel's failure to raise this claim does not establish cause under *Martinez* to excuse Petitioner's failure to exhaust his state remedies on the claim.

### 6.  Merits Determination

Even if the undersigned were to sidestep the exhaustion issue and proceed to the merits of this claim, the undersigned would ultimately conclude (for the reasons discussed hereinabove) that this claim is without merit.  Petitioner's Motion for Evidentiary Hearing (Doc. 82) proposes no additional evidence to be offered in support of this claim, and based on the existing record, the undersigned finds the claim to be without merit.

### (j).  *SG 2J – Rule 11 Exam*

#### 1.  Arguments

In his Supplemental Ground 2J, Petitioner argues trial counsel was ineffective in failing to request a psychological exam of Petitioner under Ariz. R. Crim. P. 11, based on Petitioner's history of head injuries, multiple concussions, frequent and sever migraine headaches, and history of playing football for 10 years.  Petitioner argues that he would not have been convicted if the jury had known those facts. (Supp. Petition, Doc. 78 at 5-7.10.)

Respondents argue that the alleged history of head injuries and ailments would not have supported a claim of incompetence to stand trial, Petitioner proffers nothing to

support his allegations of head injuries and ailments, and other contemporaneous evidence supports a conclusion that Petitioner was competent at the time of trial. Respondents argue that to the extent that Petitioner contends counsel should have developed mental-state (*mens rea*) evidence to introduce at trial, such evidence was inconsistent with the alibi/misidentification defense, choosing that defense to the exclusion of a *mens rea* defense was a reasonable strategic decision, and Arizona does not recognize a diminished capacity defense to murder. (Supp. Response, Doc. 80 at 47-50.)

Petitioner replies that the only way to have countered Respondents arguments was with a contemporaneous exam, which counsel failed to request. (Supp. Reply, Doc. 84 at 16.)

### 2. Factual Background

Petitioner proffers nothing beyond his own description of his injuries and ailments to suggest that he was, at any time, incompetent or suffered from any mental impairment.

The record is devoid of anything (beyond the simple commission of the murder), to suggest that Petitioner was incompetent to stand trial or incapable of forming the requisite *mens rea*. .

At best, at sentencing, Petitioner's mother, Joann Sykes testified that Petitioner had been thrown through the windshield of a car when he was eight years old, but he continued to do well in school afterward, and the only changes in his behavior happened when he was 17 and began to be involved in drugs. (Exhibit AA, R.T. 12/18/00 at 27-30, 34.)

On the other hand, at sentencing, Petitioner called a neuropsychologist, Dr. Daniel Blackwood, who testified that he had conducted a neuropsychological evaluation of Petitioner on September 28, 2000 (between trial and sentencing). Despite Petitioner's history of traumatic brain injuries (*i.e.* being knocked out in one accident, and thrown through the windshield in another), and drug usage (including inhalants) going back to

age 12, "his brain is in remarkably good shape."  (Exhibit AA, R.T. 12/18/00 at 60.)  Dr.
Blackwood testified:

> A.   I -- I think that he must have some effects of all the things he's done to himself. So his brain function I'm sure has been compromised. And I would have to infer that at one point he had a really good brain when he was younger, if he's still looking this good after all the things he's been through.

(*Id.* at 61.)

He did opine that someone with Petitioner's substance abuse history would have on the one hand a tolerance that allowed them to remain functional when drinking, but also a susceptibility to at the same time having "amnesia for a substantial period of time."  (*Id.* at 64.) It may take them a lot to become intoxicated, but when they do, "it's just magnified and heightened." (*Id.* at 79.) In addition, when they were intoxicated, their judgment and behavioral controls would be impaired, they would tend toward impulsiveness. (*Id.* at 64)   While he found Petitioner to have a "me-against-the-world orientation," which he attributed to his troubled upbringing. (*Id.* at 65-68.)  He found no antisocial or psychopathic tendencies beyond his history of troublesome behaviors. (*Id.*)  Petitioner was above normal "[i]n terms of his cognitive abilities."  (*Id.* at 70.)  He had an IQ of 108, on the high side of average, which was higher than his IQ at age 13. Petitioner was able to describe the events surrounding the charges in detail, but Nelson did not know if he was accurate, and it was possible Petitioner was filing in gaps in his memory from blackouts. (*Id.* at 73-74.)   But Petitioner did not describe ever having blacked out. (*Id.* at 74.)  But he would expect those experiencing such blackouts to deny them, especially when accused of something terrible during the unaccounted for period. (*Id.* at 80.)   When a person is in a blackout state and "confabulates" a memory, they believe what they are saying, and think they have a continuous recollection and remember things that didn't happen.  They are not consciously lying, just mistaken.  (*Id.* at 78.)

//
//

202

### 3.  Ineffective Assistance of Trial Counsel

Petitioner miscomprehends the function of a "Rule 11" evaluation.  Petitioner argues that he would not have been convicted had the jury known of his various head related health complaints.  But Rule 11 is not directed at exculpatory evidence (e.g. attacks on the ability to form the requisite *mens rea* of the crime), but upon identifying defendants who are not competent to stand trial.

> Rule 11 of the Arizona Rules of Criminal Procedure allows any party to move for a competency hearing. Ariz. R. Crim. P. 11.2. A competency hearing may be had for the purpose of determining whether the defendant is mentally able to stand trial, as well as to determine whether the defendant is competent to conduct his own defense.

*State v. Djerf*, 191 Ariz. 583, 591, 959 P.2d 1274, 1282 (1998).

Moreover, the remedy in a Rule 11 proceeding is a delay in the trial while the defendant is restored to competency, not the presentation of evidence to the jury that the defendant could not have formed the requisite *mens rea*.

> Once this initial determination is made the trial court must (1) decide whether to order restoration treatment, (2) evaluate the progress of any ordered restoration, and (3) ultimately conclude the process after the defendant has been restored to competency or remains incompetent.

*Nowell v. Rees*, 219 Ariz. 399, 404, 199 P.3d 654, 659 (Ct. App. 2008).

The standard under Arizona' Rule 11 is the same as that applicable under the Supreme Court's Due Process analysis.

> In *Dusky v. United States*, [362 U.S. 402 (1960)], the United States Supreme Court directly addressed the issue of competency to stand trial. "'(The) test must be whether (the defendant) has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding-and whether he has a rational as well as factual understanding of the proceedings against him.'" 362 U.S. at 402, 82 S.Ct. at 789.  This is the standard incorporated by Rule 11.1 and is the test to be met in deciding competency to stand trial.

*State v. Contreras*, 112 Ariz. 358, 360, 542 P.2d 17, 19 (1975).  "Not all people who have a mental problem are rendered by it legally incompetent."  *Bouchillon v. Collins*, 907 F.2d 589, 593 (5th Cir. 1990).  In a footnote, the *Bouchillon* court noted: "We venture to guess that if every accused were to be adjudged incompetent who was

rendered depressed or apathetic at finding himself incarcerated and indicted on felony charges, few would ever be tried." *Id*. at 594, note 17.  Rather than attempting to assess mental health, "[r]equiring that a criminal defendant be competent has a modest aim:  It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel."  *Godinez v. Moran*, 509 U.S. 389, 402 (1993).

Here, Petitioner does not contend that he lacked the capacity to understand the proceedings and to assist counsel.  Nothing in the record, including his litany of head injuries and ailments, suggests a basis for such a finding.  In *Harris v. Kuhlman*, 346 F.3d 330 (2nd Cir. 2003), the Second Circuit addressed the competency claims of a defendant who had recently been shot in the head, and who still had a bullet lodged in his brain.  The *Harris* court observed:

> Although it is reasonable to assume (perhaps even to expect) that a person who suffers a gunshot wound to the head might, at least for a time, have a diminished mental capacity relative to that person's mental capacity before the gunshot wound, the mere existence of Harris's head injury was not enough to require a competence examination. Harris's head injury is only relevant if it actually produced a diminished capacity at the time of Harris's trial.

*Harris*, 346 F.3d at 353.  Similarly in *Boag v. Raines*, 769 F.2d 1341 (9th Cir. 1985), the court found insufficient evidence to support a claim of incompetency based on: (1) five suicide attempts in the proceeding 13 years; (2) repeated head injuries; (3) a story of bizarre behavior; and (4) a history of alcoholism.  *Id.* at 1343.  Those claims had even been further bolstered by a psychiatrist's diagnosis with "sociopathic personality disturbance, anti-social reaction," and a trial judge's conclusion that the defendant "needed 'intensive psychiatric treatment.'" *Id.*

Here, Petitioner's injuries and ailments approach neither the recency nor the severity of the bullet-in-the-brain in *Harris*, nor the pervasiveness and evidence of actual effect proffered in *Boag*. And yet even in *Harris* and *Boag*, the courts found no evidence to support a finding of incompetence.

Certainly Petitioner's competency since commencing this habeas action in 2011 cannot be questioned.  Petitioner has shown himself to not only be capable of consulting

with counsel and maintaining a factual understanding of the proceedings, but has shown himself an able litigator in his own right.  Petitioner proffers nothing to suggest his capacity was any less at the time of trial.  Indeed, Petitioner appeared more than competent at the time of his testimony in his second PCR proceedings in 2008.  (*See* Exhibit LLL (Doc. 35), R.T. 5/30/08 at 83, *et seq.*)  Moreover, Petitioner proffers nothing to suggest that his injuries and ailments have actually resulted in any impairment, treatment, or diagnoses.

Petitioner attempts to dismiss his lack of evidence by blaming it on counsel's failure to seek a competency exam.  But Petitioner has other means to support a claim of incompetence.  In *Boag*, the court observed:

> In cases finding sufficient evidence of incompetency, the petitioners have been able to show either extremely erratic and irrational behavior during the course of the trial, *e.g., Tillery v. Eyman*, 492 F.2d 1056, 1057-58 (9th Cir.1974) (defendant screamed throughout the nights, laughed at the jury, made gestures at the bailiff, disrobed in the courtroom and butted his head through a glass window), or lengthy histories of acute psychosis and psychiatric treatment, *e.g., Moore v. United States*, 464 F.2d 663, 665 (9th Cir.1972) (defendant repeatedly hospitalized for acute mental illness and hallucinations).

769 F.2d at 1343.  Petitioner would not need a competency evaluation to provide similar types of evidence of incompetency.

Finally, to the extent that the Court might liberally construe Petitioner's assertions to be directed at his capacity for the requisite *mens rea* rather than competency to stand trial, Petitioner fails to show that such evidence would have been admissible before the jury.  "Arizona does not recognize a 'diminished capacity' defense, and (absent a guilty except insane defense) a defendant may not present evidence of a mental disease or defect alleged to have rendered him incapable of forming the requisite *mens rea*."  *State v. Lopez*, 234 Ariz. 465, 469, 323 P.3d 748, 752 (Ct. App. 2014).  *See also State v. Mott*, 187 Ariz. 536, 539–45, 931 P.2d 1046, 1049–55 (1997).  Petitioner has not suggested that counsel should have pursued a guilty except insane plea.

Moreover, as argued by Respondents, Petitioner proffers nothing to suggest that

counsel could not reasonably have made the strategic decision to pursue their alibi/misidentification defense, rather than pursuing a guilty except insane defense.  The two defenses would have been inconsistent, leaving Petitioner to simultaneously admit and deny his commission of the acts.  Moreover, given the dearth of evidence, even now, to suggest a basis for such a defense, counsel could have reasonably concluded that the defense they mounted was the better choice.  *See e.g. Williams v. Woodford*, 384 F.3d 567, 611 (9th Cir. 2002) ("Having reasonably selected an alibi defense as the primary defense theory, [counsel] no longer had a duty to investigate a conflicting mental-state defense."); and *Correll v. Stewart*, 137 F.3d 1404, 1411 (9th Cir. 1998) ("it was within the broad range of professionally competent assistance for Correll's attorney to choose not to present psychiatric evidence which would have contradicted the primary defense theory").

Based upon the foregoing, the undersigned concludes that Petitioner has failed to show ineffective assistance by trial counsel in failing to seek evaluations of Petitioner's mental capacity or competence.

### 4. *Application of Martinez*

**Some Merit** - Based upon the foregoing, the undersigned concludes that Petitioner's Supplemental Ground 2J is insubstantial.  The claim is based upon a misunderstanding of the nature of a Rule 11 examination and/or the availability of a diminished capacity defense, and the record is devoid of any factual support to show that Petitioner was either incompetent at the time of trial, or that was insane at the time of the murder.

**Deficient Performance by PCR Counsel** – Moreover, Petitioner proffers nothing to show that PCR counsel performed deficiently in failing to pursue this claim.  To the contrary, PCR counsel could have reasonably concluded that the merits of the claim were sufficiently questionable, and that it would have detracted from stronger claims, such that foregoing the claim was a reasonable strategic choice.  *See Jones*, 463 U.S. 745,

751-52 (1983); and *Miller*, 882 F.2d at 1434 (9th Cir. 1989).

As discussed with regard to Supplemental Ground 2A, PCR counsel did present other substantial claims. Petitioner proffers nothing to show that Supplemental Ground 2J was sufficiently superior to the other claims asserted that choosing to omit this ground was not a reasonable tactical choice.

Therefore, the undersigned finds that PCR counsel's failure to raise this claim does not establish cause under *Martinez* to excuse Petitioner's failure to exhaust his state remedies on the claim.

### 5. Merits Determination

Even if the undersigned were to sidestep the exhaustion issue and proceed to the merits of this claim, the undersigned would ultimately conclude (for the reasons discussed hereinabove) that this claim is without merit. Petitioner's Motion for Evidentiary Hearing (Doc. 82) proposes no additional evidence to be offered in support of this claim, and based on the existing record, the undersigned finds the claim to be without merit.

### (k). *SG 2K – Neighborhood Witnesses*

#### 1. Arguments

In Supplemental Ground 2K, Petitioner argues that trial counsel was ineffective for failing to canvass the neighborhood around the Franz home. Petitioner opines that it is a cramped neighborhood, shotgun fire would have drawn attention, and witnesses would have looked and seen that the shooter was not Petitioner, and the escape vehicle was not his car. (Supplemental Petition, Doc. 78 at 5-7.10 – 7.11.)

Respondents argue in connection with Supplemental Grounds 2G (Boston) and 2I (Rivera) that Petitioner has failed to submit affidavits from the purported witnesses to support his claim. (Supp. Response, Doc. 70 at 43-44.)

Petitioner does not address this claim in his Supplemental Reply, but instead only

addresses his claims regarding Boston and Rivera.  (Supp. Reply, Doc. 84 at 16.)

### 2.  Merits of Claim

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  However, a habeas petitioner may not rest on a conclusory assertion that the investigation was inadequate.  "Absent an account of what beneficial evidence investigation into any of these issues would have turned up, [the petitioner] cannot meet the prejudice prong of the *Strickland* test."  *Hendricks v. Calderon*, 70 F.3d 1032, 1042 (9th Cir. 1995). Moreover, mere speculation about that evidence is insufficient. "[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense."   *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).  Petitioner's self-serving speculation, with no affidavits from the alleged witnesses, is not sufficient evidence of ineffective assistance of counsel.  *Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000).

Petitioner fails to name his witnesses and offers nothing more than his speculation about what they might have seen and might have testified about, and that it would have been beneficial to Petitioner.

Petitioner fails to show both deficient performance and prejudice with respect to this claim.

### 3.  Application of Martinez

**Some Merit** - Based upon the foregoing, the undersigned concludes that Petitioner's Supplemental Ground 2K is insubstantial.  Petitioner fails to proffer any factual support for this conclusory and speculative claim.

**Deficient Performance by PCR Counsel** – Moreover, Petitioner proffers nothing

to show that PCR counsel performed deficiently in failing to pursue this claim.  To the contrary, PCR counsel could have reasonably concluded that the merits of the claim were sufficiently questionable, and that it would have detracted from stronger claims, such that foregoing the claim was a reasonable strategic choice.  *See Jones*, 463 U.S. 745, 751-52 (1983); and *Miller*, 882 F.2d at 1434 (9th Cir. 1989).

As discussed with regard to Supplemental Ground 2A, PCR counsel did present other substantial claims.  Petitioner proffers nothing to show that Supplemental Ground 2K was sufficiently superior to the other claims asserted that choosing to omit this ground was not a reasonable tactical choice.

Therefore, the undersigned finds that PCR counsel's failure to raise this claim does not establish cause under *Martinez* to excuse Petitioner's failure to exhaust his state remedies on the claim.

### 4. Merits Determination

Even if the undersigned were to sidestep the exhaustion issue and proceed to the merits of this claim, the undersigned would ultimately conclude (for the reasons discussed hereinabove) that this claim is without merit.  Petitioner's Motion for Evidentiary Hearing (Doc. 82) proposes no additional evidence to be offered in support of this claim, and based on the existing record, the undersigned finds the claim to be without merit.

### (l).  *SG-2L – Aiding and Abetting Instruction*

#### 1. Arguments

In his Supplemental Ground 2L, Petitioner argues that trial counsel was ineffective for failing to request an "aiding and abetting" or "lesser included offense" jury instruction based upon the volume of evidence showing Isaacs committed the murder and that Petitioner was not present.  (Supp. Petition, Doc. 78 at 5-7.11.)

Respondents argue that such an instruction would have increased the likelihood of Petitioner's conviction by allowing the prosecution to argue the alternative theory that while Isaacs pulled the trigger, Petitioner was an accomplice who knew of the plan to commit the murder, drove Isaacs to get the shotgun, drove Isaacs to the victim's house, waited outside in the car, and helped Isaacs escape and dispose of the weapon. Respondents further argue that such a defense would have undermined Petitioner's alibi defense.  (Supp. Response, Doc. 80 at 50-51.)

Petitioner argues that Respondents misstate the claim, and that the instruction would have resulted in an acquittal of murder, and perhaps conviction of the lesser included offense of helping Hernandez flee to Mexico.

### 2. Ineffective Assistance of Trial Counsel

The undersigned understands Petitioner to argue that trial counsel should have sought a jury instruction on lesser offenses, such as aiding and abetting, or simply as an accessory-after-the-fact by assisting Hernandez to flee to Mexico to evade prosecution.

With regard to the latter, Petitioner confuses the right of a defendant to demand an instruction on a lesser included offense, *see State v. Wall*, 126 P.3d 148, 212 Ariz. 1 (2006), with the ability to demand to be charged with a lesser, unrelated crime. Petitioner was never charged with any crime related to driving Hernandez to Mexico. While part of the *res gestae* of the prosecution's case, such assistance to Hernandez was not a lesser included offense of first degree murder.  "An offense is 'lesser included' when the 'greater offense cannot be committed without necessarily committing the lesser offense.'"  *Wall*, 212 Ariz. at 3, 126 P.3d at 150.  Petitioner does not argue, and the undersigned has not discerned, any basis on which it could be said that Petitioner's assistance to Hernandez was necessarily part of the charged offense of first degree murder.  The mere fact that the two acts were part of an ongoing chain of events does not establish the kind of necessary relationship required to allow a defendant to demand an instruction on the offense.  Else, for example, defendants could insist on being charged

with double-parking, speeding from the bank, and littering the bank bags on the side of the road, in the hopes of conviction on such offenses rather than the armed robbery with which they were charged.

If, as argued by Respondents, Petitioner intends to assert that counsel should have sought an instruction on an accomplice theory, the undersigned concludes that trial counsel could have reasonably rejected such an approach based on a strategic determination that it was contrary to Petitioner's alibi/misidentification defense. "The decision not to request a lesser included offense instruction falls within the wide range of reasonable professional representation." *Woratzeck v. Ricketts*, 820 F.2d 1450, 1455 (9th Cir.1987), *vacated on other grounds*, 486 U.S. 1051 (1988); *see also Clabourne v. Lewis*, 64 F.3d 1373, 1382–83 (9th Cir.1995) (analyzing failure to request jury instruction as tactical decision by counsel). Petitioner's defense was not to say "I was there but I didn't pull the trigger." Rather, he has steadfastly insisted he had no part in the events of the murder.

Thus, however Petitioner's claim is to be understood, Petitioner fails to show that trial counsel performed deficiently by failing to request a lesser offense instruction.

Based upon the foregoing, the undersigned concludes that Petitioner has failed to support his claim of ineffective assistance by trial counsel in failing to pursue an aiding abetting or lesser included offense instruction at trial.

### 3. Application of Martinez

**Some Merit** - Based upon the foregoing, the undersigned concludes that Petitioner's Supplemental Ground 2G is insubstantial. The claim is based upon a misunderstanding of the applicable legal principles and is wholly without factual support.

**Deficient Performance by PCR Counsel** - Moreover, Petitioner proffers nothing to show that PCR counsel performed deficiently in failing to pursue this claim. To the contrary, PCR counsel could have reasonably concluded that the merits of the claim were

sufficiently questionable, and that it would have detracted from stronger claims, such that foregoing the claim was a reasonable strategic choice.  *See Jones*, 463 U.S. 745, 751-52 (1983); and *Miller*, 882 F.2d at 1434 (9th Cir. 1989).

As discussed with regard to Supplemental Ground 2A, PCR counsel did present other substantial claims.  Petitioner proffers nothing to show that Supplemental Ground 2L was sufficiently superior to the other claims asserted that choosing to omit this ground was not a reasonable tactical choice.

Therefore, the undersigned finds that PCR counsel's failure to raise this claim does not establish cause under *Martinez* to excuse Petitioner's failure to exhaust his state remedies on the claim.

### 4. Merits Determination

Even if the undersigned were to sidestep the exhaustion issue and proceed to the merits of this claim, the undersigned would ultimately conclude (for the reasons discussed hereinabove) that this claim is without merit.  Petitioner's Motion for Evidentiary Hearing (Doc. 82) proposes no additional evidence to be offered in support of this claim, and based on the existing record, the undersigned finds the claim to be without merit.

### (m).  *Summary re Supplemental Ground 2*

While Petitioner has asserted claims of "some merit" in his Supplemental Grounds, Petitioner has failed to establish that PCR counsel performed deficiently in failing to bring any of his 12 new claims of ineffective assistance.

Moreover, even assuming the procedural default of such claims could be excused, each of the claims is without merit, and would in any event be denied.

### b.   Prejudice Required to Excuse Procedural Default

Both "cause" and "prejudice" must be shown to excuse a procedural default,

although a court need not examine the existence of prejudice if the petitioner fails to establish cause. *Engle v. Isaac*, 456 U.S. 107, 134 n. 43 (1982); *Thomas v. Lewis*, 945 F.2d 1119, 1123 n. 10 (9th Cir.1991).  Petitioner has filed to establish cause for his procedural default.  Accordingly, this Court need not separately examine the merits of Petitioner's claims or the purported "prejudice" to find an absence of cause and prejudice.

### c.   Summary regarding Cause and Prejudice

Based upon the foregoing, the undersigned concludes that Petitioner has failed to establish cause to excuse any procedural default of his unexhausted or procedurally barred claims.

## 7. Actual Innocence

The standard for "cause and prejudice" is one of discretion intended to be flexible and yielding to exceptional circumstances, to avoid a "miscarriage of justice."  *Hughes v. Idaho State Board of Corrections*, 800 F.2d 905, 909 (9th Cir. 1986).  Accordingly, failure to establish cause may be excused "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent."  *Murray v. Carrier*, 477 U.S. 478, 496 (1986) (emphasis added).  Although not explicitly limited to actual innocence claims, the Supreme Court has not yet recognized a "miscarriage of justice" exception to exhaustion outside of actual innocence.  *See* Hertz & Lieberman, *Federal Habeas Corpus Pract. & Proc.*, §26.4 at 1229, n. 6 (4th ed. 2002 Cumm. Supp.).  The Ninth Circuit has expressly limited it to claims of actual innocence.  *Johnson v. Knowles*, 541 F.3d 933, 937 (9th Cir. 2008).

Petitioner asserts his actual innocence. However, in *Dretke v. Haley*, 541 U.S. 386, 393-394 (2004), the Court held that "a federal court faced with allegations of actual innocence, whether of the sentence or of the crime charged, must first address all nondefaulted claims for comparable relief and other grounds for cause to excuse the procedural default." Accordingly, the undersigned will not address Petitioner's assertion

of actual innocence until first addressing Petitioner's other claims.

However, as determined hereinafter, the undersigned ultimately concludes that Petitioner fails to meet the standard for claims of procedural actual innocence.  (*See infra* Section III(R) (Procedural Actual Innocence).)

**8.  Conclusions regarding Exhaustion**

Based upon the foregoing, the undersigned concludes that Petitioner has now procedurally defaulted on the following claims:  Ground 2 (lost evidence instruction); Ground 7 (state's investigation); Ground 8 (investigator); Ground 9E (IAC re exculpatory witnesses) as to Kristina Cox; Ground 9F (IAC re closing arguments); Ground 9G (IAC re Sentencing); Ground 9H (IAC re appellate counsel); Ground 9I (IAC re cumulative errors); Ground 12 (Failure to Rule on Ineffective Assistance), Supplemental Ground 2 (ineffective assistance) and Supplemental Ground 3 (Cumulative Error), and that he was procedurally barred from presenting his claims in Ground 5 (Impeachment of Petitioner) on independent and adequate state grounds.

He has failed to show cause and prejudice or actual innocence to excuse his procedural defaults or procedural bar.

Accordingly, these claims must be dismissed with prejudice.

## E.  PRESUMPTIONS AND STANDARDS FOR RELIEF ON MERITS

Petitioner argues that the Arizona courts' decisions are not entitled to deference under the AEDPA because: (1) Arizona has not qualified under the special review provisions for capital cases; (2) the statutes do not authorize the federal courts to "rubber stamp" state court decisions; and (3) the limitations in § 2254(d) establish a "standard of review", and habeas courts do not undertake "review" of state court decisions, but operate in a new civil case.  (Reply, Doc. 25 at 11-12 (arguing with regard to Ground 1).)

**Standard Applicable on Habeas** - While the purpose of a federal habeas proceeding is to search for violations of federal law, in the context of a prisoner "in custody pursuant to the judgment a State court," 28 U.S.C. § 2254(d) and (e), not every error justifies relief.[44]

While that does not mean that the habeas court may simply "rubber stamp" the state courts, neither is the habeas court free to undertake a *de novo* analysis of claims the state courts have already decided on the merits.

**Errors of Law** - "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [the law] incorrectly." *Woodford v. Visciotti*, 537 U. S. 19, 24– 25 (2002) (per curiam).  To justify habeas relief on a claim decided by the state courts on the merits, a state court's decision must be "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" before relief may be granted.  28 U.S.C. §2254(d)(1).

**Errors of Fact** -  Federal courts are further authorized to grant habeas relief in cases where the state-court decision was on the merits, where that decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  "Or, to put it conversely, a federal

---

[44] The limitations on habeas review are discussed in detail throughout this Report and Recommendation.  (*See e.g. supra* Section III(A)(3)(b) (AEDPA limitations on Evidentiary Hearings).)  They are revisited here in summary fashion for clarity and ease of reference.

1   court may not second-guess a state court's fact-finding process unless, after review of the

2   state-court record, it determines that the state court was not merely wrong, but actually

3   unreasonable."  *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).

4        Further, in evaluating Petitioner's claims under § 2254(d)(2), this Court must be

5   careful to not incorporate evidence adduced in later state court proceedings, or in this

6   habeas case.  Rather, such decisions must be evaluated solely on the basis of the record

7   available to the state court at the time it rendered its decision.

8        **No Decision on the Merits** – The limitations of 28 U.S.C. § 2254(d) only apply

9   where a claim has been "adjudicated on the merits in State court."  Thus, where a

10  petitioner has raised a federal claim to the state courts, but they have not addressed it on

11  its merits, then the federal habeas court must address the claim *de novo*, and the

12  restrictive standards of review in § 2254(d) do not apply.  *Johnson v. Williams*, 133 S.Ct.

13  1088, 1091-92 (2013). *See id.* (adopting a rebuttable presumption that a federal claim

14  rejected by a state court without being expressly addressed was adjudicated on the

15  merits).

16       **<u>New Facts</u>** - Moreover, a state prisoner is not free to attempt to retry his case in

17  the federal courts by presenting new evidence.  There is a well-established presumption

18  of correctness of state court findings of fact.  This presumption has been codified at 28

19  U.S.C. § 2254(e)(1), which states that "a determination of a factual issue made by a State

20  court shall be presumed to be correct" and the petitioner has the burden of proof to rebut

21  the presumption by "clear and convincing evidence."

22       Finally, the habeas court must take into account the absolute prohibition on

23  evidentiary hearings in 28 U.S.C. § 2254(e)(2).  Under this section, "the court shall not

24  hold an evidentiary hearing" if the petitioner "has failed to develop the factual basis of a

25  claim in State court proceedings."  28 U.S.C. § 2254(e)(2).

26       It is important to note, however, that § 2254(e)(2) is limited to evidentiary

27  hearings on "a claim" and does not apply to other relevant evidentiary matters, *e.g.*

28  establishing cause and prejudice to excuse a procedural default, etc.  *Dickens v. Ryan*,

216

740 F.3d 1302, 1321 (9th Cir. 2014).

**Applicable Decisions** – In evaluating state court decisions, the federal habeas court looks through summary opinions to the last reasoned decision. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

**Harmless Error** - In *Chapman v. California,* 386 U.S. 18, 24 (1967), the Supreme Court held that the standard for determining whether a conviction must be set aside because of federal constitutional error is whether the error "was harmless beyond a reasonable doubt."  However, in *Arizona v. Fulminante*, 499 U.S. 279 (1991), the Court acknowledge that this standard only applied to "trial error" and that there were some errors, "structural error," which could never be deemed harmless. " The existence of such defects—deprivation of the right to counsel, for example—requires automatic reversal of the conviction because they infect the entire trial process." *Brecht v. Abrahamson*, 507 U.S. 619, 629-630 (1993). In *Neder v. United States*, the Supreme Court explained the limited range of structural errors:

> [W]e have found an error to be "structural" and thus subject to automatic reversal only in a "very limited class of cases." *Johnson v. United States*, 520 U.S. 461, 468 (1997) (citing *Gideon v. Wainwright*, 372 U.S. 335 (1963) (complete denial of counsel); *Tumey v. Ohio*, 273 U.S. 510 (1927) (biased trial judge); *Vasquez v. Hillery*, 474 U.S. 254 (1986) (racial discrimination in selection of grand jury); *McKaskle v. Wiggins*, 465 U.S. 168 (1984) (denial of self representation at trial); *Waller v. Georgia*, 467 U.S. 39 (1984) (denial of public trial); *Sullivan v. Louisiana*, 508 U.S. 275 (1993) (defective reasonable doubt instruction)).

*Neder*, 527 U.S. 1, 8 (1999).

> There is also a hybrid, which is laid out in footnote nine of *Brecht* as follows: "the unusual case" in which there occurs "a deliberate and especially egregious error of the trial type, or one that is so combined with a pattern of prosecutorial conduct" as to "infect the integrity of the proceedings" and "warrant the grant of habeas relief even if it did not substantially affect the jury's verdict." This hybrid, Footnote Nine error as we denominate it, is thus assimilated to structural error and declared to be incapable of redemption by actual prejudice analysis. The integrity of the trial, having been destroyed, cannot be reconstituted by an appellate court. We assume that the facts set out in Footnote Nine are illustrative, not exhaustive, and that the key consideration is whether the integrity of the proceeding

217

was so infected that the entire trial was unfair. *Hardnett v. Marshall*, 25 F.3d 875, 879 (9th Cir. 1994) (internal citations omitted) (quoting *Brecht*, 507 U.S. at 638). Petitioner does not assert any of these types of claims.

In *Brecht*, the Court held that relief is warranted only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637–38. In *Fry v. Pliler*, 551 U.S. 112, 121–22 (2007), the Supreme Court held that this *Brecht* test was the proper one to be applied by a federal habeas court. *See Merolillo v. Yates*, 683 F.3d 444 (9th Cir. 2011).

Nonetheless, the habeas court need not conduct a harmless error review of *Strickland* violations under *Brecht*, because "[t]he *Strickland* prejudice analysis is complete in itself; there is no place for an additional harmless-error review." *Jackson v. Calderon*, 211 F.3d 1148, 1154 n.2 (9th Cir. 2000), *cert. denied*, 531 U.S. 1072 (2001).

Accordingly, (other than for his claims of ineffective assistance) not only must Petitioner show that his federal constitutional rights have been violated, but must show that such error was not harmless.

**Capital Case Certifications** – Petitioner argues Arizona has not qualified under the special review provisions for capital cases. Special habeas review provisions are made applicable to cases brought by petitioners "who are subject to a capital sentence." 28 U.S.C. § 2261(a). One of the requirements for application of those special procedures is that the Attorney General of the United States has certified that the state has established a mechanism for providing counsel in postconviction proceedings. 28 U.S.C. § 2261(b)(1). Those certification procedures are laid out in 28 U.S.C. § 2265.

Regardless whether Arizona has been certified under these provisions, they are not applicable to Petitioner because he is not "subject to a capital sentence," but has been sentenced to prison. While the undersigned has found no authority to support that contention, the plain language of the statue and the purposes behind the statue support such a reading.

Moreover, it is unclear why Petitioner would seek to invoke these provisions. They generally provide for stays of execution, 28 U.S.C. § 2262, shorter time limits for petitions to be filed, 29 U.S.C. § 2263, heightened exhaustion requirements, 28 U.S.C. § 2264, limits on amendments to the petition, 28 U.S.C. § 2266(3)(B), and constraints on the time to resolve the matter, 28 U.S.C. § 2266, none of which would appear to benefit Petitioner.  They do not, however, apply to the limitations on all habeas review provided in 28 U.S.C. § 2254.

## F.  GROUND ONE: CONFRONTATION

### 1.  Arguments

For his Ground 1 for relief, Petitioner argues that his "rights were violated when the trial court deprived me of my 6th Amendment right to confrontation by improperly precluding impeachment of the State's primary witness, Bernardo Hernandez." (Petition, Doc. 1 at 6.)

Respondents argue that the claim is without merit because any error in applying Arizona Rules of Evidence is not subject to review in a federal habeas case, and the Confrontation Clause does not prohibit the imposition of "well-established rules of evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." (Answer, Doc. 14 at 76 (quoting *Clark v. Arizona*, 548 U.S. 735, 770 (2006).)   Respondents further argue that any constitutional error was harmless. (*Id.* at 80.)

Petitioner's Reply argues that errors of state law are cognizable in habeas review if they rise to the level of a due process violation. (Reply, Doc. 25 at 7-8.) He argues that his proposed examination of Hernandez was not prejudicial, irrelevant, cumulative, or collateral, and therefore not properly precluded. (*Id.* at 8-10.) And, he argues that the error was not harmless. (*Id.* at 12-13.)

### 2.  Background

#### a.   Facts Underlying Claim

At trial, Petitioner was given an opportunity to cross examine Hernandez, who had directly incriminated Petitioner, was in the vehicle when Petitioner went to kill the victim, and led police to the weapon in the Colorado River. During the course of that examination, defense counsel sought to inquire about Hernandez's employment between the murder and his departure to Mexico. The Arizona Court of Appeals noted: "As far as the record reflects, Hernandez's drug-selling activities involved neither defendant nor

Isaacs and did not result in Hernandez being convicted of any crime." (Exhibit GG Mem. Dec. 2/28/02 at 5.)

The prosecution objected, asserting that the answer would be that Hernandez was selling drugs, and arguing that Hernandez's drug selling was irrelevant. The defense argued that it went to credibility of the witness. The trial court sustained the objection, finding that under Arizona Rule of Evidence 404(b) the evidence was unfairly prejudicial and not very probative. (Exhibit L-1, R.T. 4/26/00 at 57-60.)

Petitioner subsequently filed a Motion for Reconsideration (Exhibit A-2, ROA Item 168), which was denied, with the trial court again ruling that the evidence should be excluded under the Arizona Rules of Evidence. (Exhibit O, R.T. 5/1/00 at 97-101.)

### b.   State Court Decision

Petitioner raised the issue on direct appeal, arguing that the preclusion of the testimony was a violation of the Confrontation Clause. (Exhibit DD, Open. Brief at 7-18.) The Arizona Court of Appeals rejected the claim, finding that: (1) the evidence was inadmissible under Arizona Rules of Evidence 608 and 609 because "specific acts of misconduct of a witness resulting in a criminal conviction are inadmissible unless probative of truthfulness" and "misconduct involving drugs, without more, is not probative of credibility." (*Id.* at 8.) The court further found that even if probative of truthfulness, the evidence was properly precluded under Arizona Rule of Evidence 403, because "its probative value is substantially outweighed by the danger of unfair prejudice." (*Id.* at 9.)

### 3.  Due Process - State Evidentiary Law Claims

The parties spar over whether the ruling was correct under state law, and whether, if so, it justifies habeas relief.[45]

---

[45] It does not appear that Petitioner has fairly presented to the state courts a due process or equal protection claim. Respondents do not challenge the claim as procedurally defaulted. Because the undersigned finds the claims clearly without merit, and the

### a.   Applicable Standard

A state prisoner is entitled to habeas relief under 28 U.S.C. § 2254 only if he is held in custody in violation of the Constitution, laws or treaties of the United States. Federal habeas relief is not available for alleged errors in the interpretation or application of state law.

> "But it is only noncompliance with federal law that renders a State's criminal judgment susceptible to collateral attack in the federal courts. The habeas statute unambiguously provides that a federal court may issue the writ to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). And we have repeatedly held that " 'federal habeas corpus relief does not lie for errors of state law.' " "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."

*Wilson v. Corcoran*, 131 S.Ct. 13, 16 (2010).

And, it has long been understood that a state may violate its own law without violating the United States Constitution. *Gryger v. Burke*, 334 U.S. 728, 731 (1948).

> We cannot treat a mere error of state law, if one occurred, as a denial of due process; otherwise, every erroneous decision by a state court on state law would come here as a federal constitutional question.

*Id.* at 731.

Petitioner argues that the violations in this instance amounted to constitutional violations.  Violations of state law, without more, do not deprive a petitioner of due process.  *Cooks v. Spalding*, 660 F.2d 738, 739 (9th Cir. 1981), *cert. denied*, 455 U.S. 1026, 102 S.Ct. 1729 (1982).  To qualify for federal habeas relief, an error of state law must be "sufficiently egregious to amount to a denial of equal protection or of due process of law guaranteed by the Fourteenth Amendment." *Pully v. Harris*, 465 U.S. 37,

---

merits must largely be reached to dispose of the properly exhausted Confrontation Clause claim, the undersigned does not raise the exhaustion or procedural default issue *sua sponte*. *See* 28 U.S.C. § 2254(b)(2) (habeas court may deny on merits despite failure to exhaust); *Morrison v. Mahoney*, 399 F.3d 1042, 1046 (9th Cir. 2005) (procedural default is affirmative defense that must be raised in first responsive pleading); and *Franklin v. Johnson,* 290 F.3d 1223, 1231 (9th Cir. 2002) (28 U.S.C. § 2254(b)(3)'s requirement for an explicit waiver of exhaustion "has no bearing on procedural default defenses").

41 (1984).

To sustain such a due process claim founded on state law error, Petitioner must show that the state court "error" was "so arbitrary and fundamentally unfair that it violated federal due process." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (quoting *Reiger v. Christensen*, 789 F.2d 1425, 1430 (9th Cir.1986)).   To receive review of what otherwise amounts to nothing more than an error of state law, a petitioner must argue "not that it is wrong, but that it is so wrong, so surprising, that the error violates principles of due process"; that a state court's decision was "such a gross abuse of discretion" that it was unconstitutional. *Brooks v. Zimmerman*, 712 F.Supp. 496, 498 (W.D.Pa.1989).

Petitioner fails to show that Arizona's evidentiary law was violated, let alone showing that any violation was a "gross abuse of discretion."

### b.   Correct Decision under Rule 608

Arizona Rule of Evidence 608 permits cross-examination on "specific instances of a witness's conduct" only "if they are probative of the character for truthfulness or untruthfulness." (An exception is provided for criminal convictions admitted under Rule 609, but Petitioner has not suggested that Hernandez was convicted of selling drugs in that period.)

In applying Rule 608, the Arizona Supreme Court has held:

> The rule has three requirements: (1) the conduct may not be proved by extrinsic evidence, (2) the conduct must be probative of the character of the witness for truthfulness, and (3) the trial court must exercise discretion to determine whether the probative value of the conduct is substantially outweighed by the danger of unfair prejudice, confusion, or waste of time.

*State v. Murray*, 184 Ariz. 9, 30, 906 P.2d 542, 563 (1995).

Here, the first requirement is met because the testimony was to be elicited from Hernandez himself.

However, with regard to the second, the authorities indicate that indeed

223

Hernandez's drug dealing would not qualify as "probative" on credibility.

> But the use of the words "probative of," rather than merely "relevant to," suggests that something more than mere relevance is required, and the cases so far decided under Rule 608(b) seem to require that the specific instances of conduct being inquired into on cross-examination involve dishonesty or a willingness to falsify. Thus, Arizona's appellate courts have held sexual misconduct, drug-dealing, wife-beating, other assaultive conduct, and traffic citations as not "probative of truthfulness or untruthfulness" and, therefore, inadmissible to impeach credibility.

1 *Ariz. Prac., Law of Evidence* § 608:3 (4th ed.).  Federal authorities accord with regard to drug conduct.  *See   U.S. v. Bentley*, 706 F.2d 1498, 1510 (8th Cir. 1983) ("We cannot say the activity in question here—a drug operation—is necessarily indicative of a lack of truthfulness under the standard imposed by rule 608.")

Petitioner complains that the trial court "admitted there was a logical connection between dealing drugs and not being truthful." (Petition, Doc. 1 at 6-D (citing Exhibit O, R.T. 5/1/00 at 97-98 ("And so I'm saying I agree there's a. logical connection between dealing drugs and not being truthful.")  However, Petitioner cherry picks the discussion, and ignores the fact that the trial court shortly concluded that the link between selling drugs and untruthfulness was not sufficient to justify admission.

> For example, there are people who will sell drugs and who if get caught by the police will routinely give full, accurate, you know, account of their drug selling. So it's not an automatic drug seller, not truthful relationship.

(Exhibit O, R.T. 5/1/00 at 100.)  Moreover, as discussed above, the trial court's ultimate conclusion that it was not probative was the correct ruling under Arizona law.  Further, it is no longer the trial court's decision which is relevant in this proceeding, but that of the Arizona Court of Appeals, which is the last reasoned decision.

The third requirement under Arizona's Rule 608 was addressed when the Arizona Court of Appeals concluded that the probative value of the evidence was outweighed by its prejudicial effect.  Petitioner argues at some length that Hernandez's testimony and credibility were critical to the prosecution's case.  (Petition, Doc. 1 at 6-B – 6-C.)  That

simply heightens the potential for prejudice to the prosecution from admitting the evidence, but does not alter the limited probativeness of the excluded evidence.

### c.   Cumulativeness

Petitioner complains that the desired testimony has not been shown to be "prejudicial, irrelevant, cumulative or collateral." (Reply, Doc. 25 at 9.) However, the Arizona Court of Appeals concluded that the evidence was not only prejudicial, but was cumulative:

> Furthermore, the jury already had before it abundant evidence that defendant was involved in at least the use of illegal drugs. He had already testified on direct examination that he had introduced defendant to Isaacs and had tried to facilitate a drug deal between them earlier on the night of the murder.

(Exhibit GG, Mem. Dec. 2/28/02 at 8-9.)

Petitioner argues that the cumulative nature of the evidence is irrelevant because Arizona does not recognize "cumulative error," referencing arguments on his claim of cumulative prejudice from the ineffective assistance of counsel. (Reply, Doc. 25 at 10.) Petitioner confuses "cumulative evidence" with "cumulative error" and "cumulative prejudice."   Arizona law (like Federal law) has long permitted the exclusion of cumulative evidence.  *See* Ariz. R. Evid. 403; and *State v. Soto-Fong*, 187 Ariz. 186, 199, 928 P.2d 610, 623 (1996) ("considerations of undue delay, waste of time, or needless presentation of cumulative evidence").

### d.   Correct Decision under 403(b)

In addition to finding the evidence excludable under Ariz. R. Evid. 608, the Arizona Court of Appeals found that it was excludable because its potential for prejudice outweighed its probative value.

Prejudice - The Arizona Court of Appeals made no additional explicit finding as to the prejudice from the evidence. The trial court, however, discussed the type of

prejudice that results from such testimony, *i.e.* that the jury would automatically conclude that Hernandez was not credible from his bad acts despite the lack of probativeness on that issue:

> And what I -- I meant that in the context that I also agree with what the State would usually advance, which is that a person with prior criminal record is much more likely to commit future crimes. That is a fact of life that nobody can dispute.
> However, the Supreme Court in drafting the rules of evidence has said, perhaps in part because it is such a strongly uncontrovertable fact, it's unfair to the defendants to let the jury hear about the prior record because they will so -- they are so likely to conclude guilt in this case regardless of the strength of the evidence. And if you round up the usual suspects and prove one of them was in town, his prior record might be all they need.

(Exhibit O, R.T. 5/1/00 at 97.) Petitioner offers nothing to refute that argument, or to suggest that the Arizona Court of Appeals would have abused its discretion to adopt such an analysis.

<u>Probativeness</u> – As discussed above, Arizona law holds that Hernandez's drug dealing was not of itself probative as to truthfulness.  Petitioner now argues that not only was Hernandez's drug selling probative of his truthfulness based upon the propensity of drug dealers to be untruthful, but it was also probative on specific issues in the prosecution's case.

For example, Petitioner now argues that Hernandez's status as a drug dealer would increase the probability that Hernandez had a motive to kill the victim.  "The Bullhead City, Arizona / Laughlin, Nevada area is small and Hernandez likely knew several of his drug dealing 'colleagues' who were 'snitched on' by Mrs. Franz." (Reply, Doc. 25 at 9.)  Petitioner also originally argued that the evidence was relevant to discredit Hernandez on the basis that it was incongruous for Hernandez, a drug dealer himself, to connect Petitioner to Isaacs to purchase methamphetamines.  (Exhibit L-1, R.T. 4/26/00 at 59.)

However, the question proposed by Petitioner's counsel was not whether, at the time of the murder, Hernandez was selling drugs, but whether was he doing so in the ensuing time until he left for Mexico.  "Hernandez disclosed that he was fired from his

226

job at the movie theater approximately one week after the murder and then sold drugs for approximately two months to make a living until he fled to Mexico."[46]   (Exhibit GG, Mem. Dec. 2/28/02 at 4.)  Hernandez' status as a drug dealer at that time would not be relevant to any earlier motive to kill the victim or propensity to connect Petitioner to Isaacs, unless Petitioner could have gotten Hernandez to testify or the jury to infer that Hernandez was dealing at the earlier time.   Thus, to pursue these other theories of relevance would have required a whole new line of evidence in the case.

> THE COURT: Well I understand that argument also. However, we would then have to spin off into a trial as to when did you start doing it, was it -- you doing it before, did you start doing it after, why, et cetera.

(Exhibit L-1, R.T. 4/26/00 at 59-60.)

Moreover, the probative value on these issues is limited. All the evidence showed only that the victim had informed on Isaacs, not Hernandez.  And, drug trafficking is seldom as neat as neighboring stores competing for business. Supply streams come and go, dealers buy and sell to and with each other, and addicted customers are maintained by providing them a source, even if that means taking them  to another dealer.

In light of the prejudicial effect arising from the improper equation of drug dealing and untruthfulness, the state courts could have easily still concluded that the probative value on the other bases was outweighed by the prejudicial effect

### e.   Summary re Due Process Claim

Thus, Petitioner fails to show that the evidence should have been admitted under state law.  Thus, there is no abuse of discretion from which this Court could find a denial

---

[46]   Petitioner argues in his Reply that testimony from Hernandez showed that there was no time lapse, but rather Hernandez quit his job the day after the murder and immediately fled to Mexico. (Reply, Doc. 25 at 13 (citing R.T. 4/26/00 at 37-40).)  To the contrary, Hernandez testified in the referenced transcript that after the murder he worked at the theatre "for about a week more" and continued to live in Laughlin for approximately six to seven months, when he "went to Mexico."  (Exhibit L-1, R.T. 4/26/00 at 37.)  At best, Hernandez conceded that his departure could have been sooner than six to seven months after the murder.  (*Id.*)

of due process or equal protection.

### 4.  Confrontation Clause

Inadmissibility or admissibility under state evidentiary law does not control the constitutional issue whether Petitioner was denied his rights under the Confrontation Clause.   The Arizona Court of Appeals gave little discussion to the standards applicable under that clause.

"The Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination." *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987).   A witness's mere presence at trial is not sufficient to meet the demands of the Confrontation Clause.  On the other hand, the required opportunity for cross-examination need not be ideal. "Generally speaking, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).

> It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant

*Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

Thus, application of the normal rules of evidence does not automatically create a Confrontation Clause claim.

> "While the Constitution ... prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as

228

unfair prejudice, confusion of the issues, or potential to mislead the jury."

*Holmes v. South Carolina*, 547 U.S. 319, 326 (2006).   "When substantial cross-examination has taken place, courts are less inclined to find confrontation clause violations," and even less so where the evidence is of a "collateral nature." *Bright v. Shimoda*, 819 F.2d 227, 229 (9th Cir. 1987).

Here, the Arizona courts applied "well-established rules of evidence" to exclude evidence whose probative value was deemed "outweighed by…unfair prejudice." Petitioner does not show that Arizona's rules "serve no legitimate purpose" or that they are "disproportionate" to their ends.   Accordingly, the Confrontation Clause was not offended by the exclusion of the question on Hernandez's drug dealing.  *See Bright*, 819 F.2d at 229-230 (detailing cases upholding exclusion of other bad act evidence).

Even if this Court could conclude to the contrary, Petitioner fails to offer anything to show that the Arizona Court of Appeals' rejection of his Confrontation Clause claim was not merely wrong, but contrary to or an unreasonable application of Supreme Court law or an unreasonable determination of the facts.

**5.  Conclusion re Ground One**

Petitioner's Ground 1 is without merit, and must be denied.

## G.  GROUNDS TWO: *WILLITS* LOST EVIDENCE INSTRUCTION

### 1. Arguments

For Ground 2 of his Petition, Petitioner argues that he was denied Due Process when the trial court denied his request for a lost-evidence instruction.  (Pet. Doc. 1 at 7 to 7-D.)

Respondents argue, and the undersigned has found hereinabove that this claim is procedurally defaulted, Petitioner having argued it solely under state law. (*See supra* Section III(D)(2)(a) (Lost Evidence Instruction).)   Moreover, based on the determination hereinafter that the claim is without merit, the undersigned has concluded that any failure of appellate counsel to raise this claim on direct appeal was not ineffective assistance, and did not establish cause or prejudice to excuse such procedural default.  (*See supra* Section III(D)(6)(a)(2) (Ineffective Assistance of Appellate Counsel as Cause).)

Respondents further argue that even if properly exhausted, the claim is without merit, and address the merits, in part, because it underlies Petitioner's claim of ineffective assistance of appellate counsel.  (Answer, Doc. 14 at 90 *et. seq.*)

Respondents contend that the lack of any Supreme Court holding mandating a lost-evidence instruction precludes any relief on this claim, and argue that even in those jurisdictions where one is required, it is not extended in the absence of a bad faith, intentional destruction of evidence. Further, they contend that the requirements under Arizona's constitutional guarantee were not met because: (1) Petitioner has failed to show that the exculpatory value was apparent before the evidence was destroyed; (2) comparable evidence was available; and (3) Petitioner has not shown bad faith.   (*Id.*)

Petitioner argues in his Reply that due process mandates that trial judges "give proper jury instructions."  (Reply, Doc. 25 at 17 (citing *U.S. v. Frady*, 456 U.S. 152 (1982).)

Because this Court must in any events address the merits of this claim to resolve the related ineffective assistance claims, the undersigned does so at this juncture and as an alternative basis to resolve the claim.

**2. Background**

    **a.   Facts Underlying Claim**

In disposing of the related state law claim, the Arizona Court of Appeals described the factual background of this claim as follows:

> Defendant's argument is based primarily on the testimony of Bullhead City Police Department forensic specialist Virgil Walters ("Walters") who "processed" the crime scene. Walters made a videotape of the scene and also took numerous still photos of both the inside and outside of the trailer. In the trailer, Elisha's body was found next to a wall---her head and left shoulder were actually lying against it. There was a bullet hole in the wall above the body that was four-feet six-inches above the floor. There were two other bullet holes in the ceiling. Additionally, three empty shotgun shells were found in the room. The round that made the hole in the wall apparently had been the fatal one---going into the right side of the victim's jaw, exiting through the back of her' neck, and. then passing through the wall.
>
> Walters said that while he was photographing the scene some detectives were taking measurements regarding the location of the bullet holes, of the body, and so forth. Walters testified that he never saw the actual results of these measurements and, subsequently, they were lost.

(Exhibit GG, Mem. Dec. 2/28/02 at 10-11.)   The testimony of officer Underwood indicated that the measurements taken included: (1) the distance between the location where the victim's body was found, and the fatal round in the wall behind her; (2) distances between walls; (3) locations of collected evidence; (4) distances from bullet holes in the ceilings to walls and floor; and (5) the bullet hole in the wall, including its distance from the door and the floor.[47]  (*See* Exhibit N, R.T. 4/27/00 at 10-13. (testimony of Officer Underwood, detailing measurements taken.)

Petitioner complains that the loss of this evidence precluded his expert, criminalist Michael Sweedo, from fully developing evidence on the height of the shooter, opening

---

[47] Petitioner also argued on direct appeal that the lost information included whether the measurements "began from the top of the carpet or from the floor beneath, and any measurement of the thickness of the carpet and padding on which the victim was standing when shot." (Exhibit DD, Open. Brief at 18 (citing R.T. 4/27/00 Vol. II at 10-13).)  However, Underwood made no reference to the carpet.

1  him up to impeachment by the prosecution.[48]

2

3      **b.   State Court Ruling**

4      The Arizona Court of Appeals rejected the related state law claim, finding that

5  although the lost measurements were "'obviously material' to the investigation,

6  defendant did not suffer any prejudice from their loss" because Petitioner's expert,

7  Sweedo, was able to calculate the various measurements from other evidence, and the

8  height evidence was equivocal and the prosecutions' experts' opinion "tended to confirm

9  the defense criminalist's conclusions."  (Exhibit GG, Mem. Dec. 2/28/02 at 11-12.)

10

11 **3.  Applicable Law**

12      Petitioner contends that due process mandated that the trial court explicitly

13 instruct the jury that they could infer that the lost evidence was in Petitioner's favor.  In

14 evaluating this claim it is critical to note that Petitioner has never offered anything to

15 show that the loss of the measurements was in bad faith, or even that it was intentional.

16      In a related vein, in *Arizona v. Youngblood*, 488 U.S. 51 (1988),  the Supreme

17 Court reversed a decision by the Arizona Court of Appeals that vacated a conviction

18 based upon the loss of potentially exculpatory DNA evidence.  The Court held that

19 "unless a criminal defendant can show bad faith on the part of the police, failure to

20 preserve potentially useful evidence does not constitute a denial of due process of law."

21 However, *Youngblood* did not deal with an unintentional loss of evidence, and made no

22 requirement for jury instructions in the face of lost evidence.

23      No Supreme Court decision has been located which mandates an instruction or

24 any action in the face of lost evidence absent an allegation of bad faith.  Between his

25

26 [48] Petitioner argues as if the measurements would have absolutely precluded him as
being the shooter.  Petitioner ignores, however, the variety of unknown variables that
27 would make any such absolute conclusions impossible, *e.g.* the position of the victim at
the time of the shots, the manner in which the shooter held the gun, etc. (*See infra*
28 discussion on merits of Ground 3).  Even with the lost measurements, changes in these
variables would provide differences in the calculated height of the shooter.

Petition and his Reply, Petitioner cites a single authority for the proposition that failure to give a lost-evidence instruction amounts to a violation of due process, *i.e. Frady*. However, *Frady* did not mandate or even deal with such an instruction, nor did it even hold that every error in jury instructions amounted to a denial of due process.  At most, *Frady* observed in *dicta* that an instructional error justifies collateral relief only if the error so infected the entire trial that the conviction violates due process.  456 U.S. at 169.

Indeed, the Ninth Circuit has held that a lost evidence instruction is required only "if the defendant can show (1) bad faith or connivance on the part of the government, and (2) that he was prejudiced by the loss or destruction of the evidence."  *U.S. v. Jennell*, 749 F.2d 1302, 1308 (9th Cir. 1984).

Thus, without a showing of bad faith, Petitioner has failed to establish that he would be entitled to a lost evidence jury instruction, and his Ground 2 is without merit.

**4.  Conclusion re Ground Two**

Therefore, if the Court concludes that Petitioner's Ground 2 is not barred by a procedural default, it must be denied as without merit.

## H.  GROUND THREE: PROSECUTORIAL MISCONDUCT

### 1.  Arguments

For his Ground 3, Petitioner argues that he was denied due process when the prosecution, despite promises to the contrary, relied upon the lost measurements evidence in closing arguments to discredit Petitioner's expert. (Petition, Doc. 1 at 8 to 8-D.)

Respondents concede that the claim was presented to and rejected by the Arizona Court of Appeals, and argue that court's conclusion was not improper because the prosecutor made no reference to the lost measurements, and no prejudice resulted from the arguments the prosecutor did make. (Answer, Doc. 14 at 101-109.)

Petitioner replies that the Arizona Court of Appeals' decision was based upon an unreasonable determination of the facts, and prejudice is shown because the lost evidence would have exonerated him.  (Reply, Doc. 25 at 17-19.)

### 2.  Background

#### a.   Facts Underlying Claim

During cross examination by the prosecution, Petitioner's criminalist, Michael Sweedo testified to the unknown variables which could affect his conclusion that the shooter was taller than Petitioner.  The variables included: (1) whether the gun was fired from a standard shooting position; (2) the bend in the shooter's knees; (3) whether the bullet was deflected within the body; (4) whether the victim was crouched or bent over at all; (5) the distance to the shooter; (6) the depth of the carpet and padding under the shooter and victim; and (7) the kinds of shoes worn.  (Exhibit Q, R.T. 5/3/00 at 116-124).

During closing arguments, the prosecution made the following arguments:

> When you look at all the testimony in this case—you look at the testimony of Mike Sweedo, and he says, "Well, you're holding the gun at your shoulder, it has to be somebody that's six foot three." He makes too many assumptions. He assumes the gun's

234

being held at the shoulder. He assumes that the victim is standing up straight. If she ducks, if she's cowering in fear, she's shorter. Closer, the shooter is shorter.

Doesn't take into account the shoes that are worn. Doesn't take into account the carpeting. Doesn't take into account whether it hit the jawbone and was deflected. All of these things change the calculations. His calculations are based on if you just shoot a gun and nothing deflects it and you're holding it at shoulder height.

Ladies and gentlemen, this isn't skeet shooting. This isn't target shooting. Maybe Mr. Sweedo, if he was in that situation, with his thirty-plus years of training in guns, might hold it at the shoulder. Somebody that just comes bursting in—and think about it. Use your common sense. You burst in, you're pushing somebody back with the gun, you're not going to be holding it at your shoulder. You don't have to aim if you're six inches away. You put the gun barrel in the direction of somebody's neck. You got a shotgun. It's going to do the job. And if you're in a hurry, you don't take the time, nice and line up your sights and put it snug up against your shoulder. You put it up there and you shoot.

(Exhibit R, R.T. 5/4/00 at 47-48.)

### b.   State Court Ruling

The Arizona Court of Appeals rejected Petitioner's claim that this argument by the prosecution amounted to prosecutorial misconduct because based upon the lost evidence.  The court found so because the arguments were not based upon any lost evidence.  (Exhibit GG, Mem. Dec. 2/28/02 at 13-14.)

## 3.  Applicable Law

Petitioner asserts that his claim arises under a right to "due process and a fair trial" under the "5th, 6th, and 14th Amendment." (Petition, Doc. 1 at 8-A.)  However, Petitioner does not elucidate the 5th or 6th Amendment bases for his claim.

The Fifth Amendment encompasses: the right to a grand jury in federal cases; double jeopardy; self-incrimination; and due process.  U.S.C. Const. Amend. V.  Other than the related 14th Amended due process claim, none of these protections would be implicated by the prosecutorial misconduct alleged by Petitioner.

The Sixth Amendment encompasses the rights to: a speedy and public trial; an impartial local jury; notice of the charges; confrontation of witnesses; compulsory attendance of witnesses; and counsel.   U.S.C. Const. Amend. VI.   None of these protections would be implicated by the prosecutorial misconduct alleged by Petitioner.

The most analogous specific right implicated by Petitioner's claims is his right, under *Brady*, to the disclosure of exculpatory evidence.   But that right arises under the due process clause of the Fourteenth Amendment.   *See Brady v. Maryland*, 373 U.S. 83, 86 (1963) (failure to disclose confession "was a violation of the Due Process Clause of the Fourteenth Amendment").

Absent an infringement of other specific rights (e.g. the right to counsel, right to remain silent, etc.), the appropriate standard of review for claims of prosecutorial misconduct raised "on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.' " *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)).   *See also Donnelly*, 416 U.S. 637, 642 (1974) (not every trial error which might call for supervisory power violates fundamental fairness). A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *Darden*, 477 U.S. at 181.

Thus, "[t]his court reviews claims of prosecutorial conduct made in a habeas petition 'on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (quoting *Hall v. Whitley*, 935 F.2d 164, 165 (9th Cir.1991)).

**4.  Application of Law to Facts**

Here, the state court rejected Petitioner's claim, not on the basis of a failure to show that the prosecutor's conduct in closing arguments rendered the trial fundamentally unfair, but on the basis that the prosecutor had not engaged in misconduct.  This was

based upon their factual determination that the prosecution's argument was not based upon the lost evidence.  Petitioner contends that was an unreasonable determination of the facts.  (Reply, Doc. 25 at 18.)

Petitioner offers no analysis or facts in the record to show that the Arizona Court of Appeals' factual determination was wrong, let alone unreasonable.

Petitioner complains that the prosecution agreed that it would not "argue in closing that the expert's figures were inaccurate," and on this basis the trial court concluded to take no action on Petitioner's request for a lost evidence instruction. (Petition, Doc. 1 at 8-A (citing R.T. 5/3/00 at 147-151).) However, Petitioner misstates the prosecution's representations, which in context were as follows.

> MR. BARAN (defense counsel): May I add one thing for the record?
> THE COURT:  Yes.
> MR. BARAN:  Actually as a request too. If the State does argue that Mr. Sweedo's figures were inaccurate, I would ask the Court to reconsider at that point giving a lost evidence instruction, because our harm then is that the State is saying we don't have accurate figures, and yet we don't get a lost evidence instruction against them and they're allowed to attack our calculations as being faulty because our figures aren't accurate because we never had a measurement.
> THE COURT: Are you planning to argue something along those lines? That his assumptions are wrong? Or just that he was making assumptions and therefore it's not an exact science? Or what kind of an argument were you planning to make?
> Let me just ask you this way: Do you think you'll run afoul of his concern?
> MR. CARLISLE (prosecution): I don't think that I'm going to argue that his measurements are mistaken. I think I'm going to argue that his conclusions are erroneous.
> Obviously I kind of have to argue that, I would think, at some point in time. But I don't think I was going to argue with his -- with his measurements necessarily.

(Exhibit Q, R.T. 5/3/00 at 147-148.)

Thus, the prosecutor's only representation was that he was not going to attack the measurements made by Sweedo, but that he intended to argue that Sweedo ultimately

came to an erroneous conclusion. And indeed, the prosecution's closing argument did not challenge the measurements made by Sweedo, but simply attacked his conclusions based upon the other unknown variables upon which they were based.

Perhaps, Petitioner's logic runs thus: Sweedo didn't have access to the precise measurements which were lost, and thus any attack on Sweedo's conclusions derived from those lost measurements. Such logic is flawed.

Even with the lost measurements, none of the variables cited by the prosecution (and those testified to by Sweedo) would have gone away. The calculations of the shooter's height would have still been affected by the position of the gun, the position of the victim,[49] the position and location of the shooter, the distance between the shooter and the victim, the shoes worn, and the deflection of the bullet. Indeed, the prosecution's own witness (Walters), who had the benefit of immediate investigation at the same time the measurements were being taken (Exhibit M, R.T. 4/27/00 at 80-81), testified to having to make assumptions as to some of the same variables, including the position of the gun and the stance of the shooter (*id.* at 102), the distance from the victim in relation to the shooter and the wall (*id.* at 103), and the distance from the shooter to the wall (*id.* at 104).

To obtain the kind of precision that would have made the prosecutions' arguments a use of the lost measurements, those measurements would have had to have included the equivalent of a freeze-frame – measuring the exact locations and positions of the victim, the shooter, and the weapon, in relation to each other and the room, at the exact moment of firing. Of course, those measurements were not what was lost. Rather they were assumptions that both Sweedo and Walters were required to make to offer an opinion as to the height of the shooter.

---

[49] It is interesting to note that the prosecutor did not reference the location of the victim in relation to the wall, which was a measurement arguably discernible from the lost measurements of the location of the victim's body. (*See* Exhibit DD, Opening Brief, at 28.) However, such an implication would have to be based on assumptions as to any movement of the victim's body after the shot was fired, e.g. as a result of the impact of the slug, voluntary or involuntary muscular movements, any reflection from impacting the wall, or by police or emergency personnel.

Indeed, the only thing referenced by the prosecution's closing argument that involved a "lost" or missing item at all was his statement that Sweedo's calculation "[d]oesn't take into account the carpeting." (Exhibit R, R..T. 5/4/00 at 47.) At trial, defense counsel pointed out that a large chunk of carpeting had been removed from the home, and placed in an evidence locker, and complained that the homeowners were unlikely to permit its return to the home.  The Court observed, however, that there was no evidence that the carpet was not still in the evidence locker, and thus "Mr. Sweedo would have had access to it."  (Exhibit Q, R.T. 5/3/00 at 149-150.) Thus, even the carpet was not "lost," it was simply not currently in the home.  And yet, Sweedo testified that his measurements did not account for the carpeting.  (Exhibit Q, R.T. 5/3/00 at 120-121.) Indeed, he testified that his calculations would be affected by the type of carpeting and padding, and yet his measurements were "to the point of the floor underneath the carpet." (*Id.* at 90-91.)

**5.  Conclusion re Ground Three**

In sum, Petitioner fails to show that the Arizona Court of Appeals got it wrong when it found that the prosecution did not reference the lost evidence, let alone that its determination of the facts was unreasonable.  Without such a reference, there was no "misconduct" which could result in a violation of due process. Consequently, this claim is without merit, and must be denied.

239

# I. GROUND FOUR: IDENTIFICATIONS

## 1. Arguments

For his Ground 4, Petitioner argues that his due process rights were violated when the trial court failed to suppress an unduly suggestive photo-lineup used to have Robert Franz and Larry Witzig identify Petitioner.   Petitioner bases his allegations of suggestiveness on the basis of the usage of the same photos in the various groups of lineups, with the exception of Petitioner who was only in the final lineup.  With regard to Franz, Petitioner cites as evidence of harm Franz's prior inconsistent descriptions and identifications of others as the shooter, and his Franz's observations of Petitioner in the courtroom.  With regard to Witzig, Petitioner cites as evidence of harm Witzig's perception problems at the time of meeting Petitioner, inability to identify Petitioner from the first eight photo-lineups and in the courtroom, allegations that Witzig was afraid to be labeled a snitch, and the jury's unanswered question about potential charges against Witzig.  (Petition, Doc. 1 at 9 to 9-B.)

Respondents argue that the Arizona Court of Appeals' decision that the identifications were not unduly suggestive was not contrary to nor an unreasonable application of Supreme Court law, and that even if so, the claim is without merits because Petitioner would not be entitled to relief under the limitations in *Neil v. Biggers*, 409 U.S. 188 (1972), and has not shown he suffered prejudice from the error.  (Answer, Doc. 14 at 109-132.)

Petitioner replies that the repetition of five photos in the lineups was unduly suggestive, the *Biggers* limitation has been met, and he has shown prejudice.  Petitioner also complains that Respondents have failed to provide transcripts of the March 16, 2000 evidentiary hearing addressing this issue.  (Reply, Doc. 25 at 19-21.)[50]

/ /

/ /

---

[50] To the contrary, the suppression hearing appears to be provided in Exhibit D, R.T. 3/16/00.

240

## 2.  Background

### a.   Facts Underlying Claim

In disposing of this claim, the Arizona Court of Appeals made the following factual findings:

> Robert [Franz] and Witzig were shown a total of nine photographic lineups each containing six photographs before they identified defendant. Robert was shown lineups one and two on August 11, 1998, lineups three through eight on August 20, 1998, and lineup nine on November 5, 1998. Witzig was shown these lineups in the same order as Robert on August 10, 1998, August 20,. 1998, and October 26, 1998. A total of fifty-four photographs depicting thirty-five different men were shown to Robert and Witzig. Eleven individual photographs were repeated in the lineups between two to three times and one individual photograph was repeated four times. Twenty-three photographs, including defendant's, appeared only once. The final lineup, in which Robert and Witzig identified defendant, contained five repeat photographs and defendant's photograph.

(Exhibit GG, Mem. Dec. 2/28/02 at 17.)  Petitioner points to no factual errors in those findings.

### b.   State Court Ruling

The trial court and the Arizona Court of Appeals rejected this claim on the basis that undue suggestiveness had not been shown because of the number of persons depicted in the lineups, and the time gap of two months between the earlier lineups and presentation of the final lineup with Petitioner.  (Exhibit GG, Mem. Dec. 2/28/03 at 14-17.)  The trial court had proceeded to also find that the identifications were nonetheless reliable under the test in *Neil v. Biggers*, 409 U.S. 188 (1972), and thus remained admissible despite any suggestiveness. (Exhibit GG at 15.)

## 3.  Application of Law

### a.   Two-Step Analysis

In *Stovall v. Denno*, 388 U.S. 293 (1967), the Supreme Court held that an

identification process may be "so unnecessarily suggestive and conducive to irreparable mistaken identification" that it results in a denial of "due process of law." *Id.* at 302. "However, a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it." *Id.* In *Stovall*, the court held that presenting just the defendant in the hospital to the victim's wife was not unnecessarily suggestive, given that the witness was the only eyewitness, was considered near death, and could not attend a line up at the police station.

Thus, to be a violation of due process, an identification process must be "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. U.S.*, 390 U.S. 377, 384 (1968). In *Simmons*, the Court found that the procedure was not unnecessarily suggestive, because the crime was a "serious felony", the "perpetrators were still at large," and "inconclusive clues" had led to the defendant. *Id.* The *Simmons* Court went on to conclude that there was "little chance that the procedure utilized led to misidentification." *Id.* at 385. The Court based this determination on the number of eyewitnesses to the bank robbery, the length of time they observed the perpetrator, the timeliness of the identification, the use of group photographs, the separation of the witnesses, and the absence of any apparent attempts at suggestion.

In *Neil v. Biggers*, 409 U.S. 188 (1972), the Court distinguished between suggestive and unnecessarily suggestive identification processes. The Court observed that the former are impermissible if resulting in an increased likelihood of mistake, and while the latter may call for extra condemnation, the latter still must be coupled with a showing of harm to the reliability of the identification process. The Court enumerated "the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* at 199-200. These factors have come to

be referred to as the "*Biggers* factors."

> Those cases mandate a two-step inquiry into pretrial identification procedures. First, it must be determined whether the procedures used were impermissibly suggestive. If so, it must then be determined whether the identification was nonetheless reliable.

*U.S. v. Love*, 746 F.2d 477, 478 (9th Cir. 1984).

**b.   Rejection at First Step Permissible**

In this case, the Arizona Court of Appeals rejected Petitioner's claim on the sole basis that the identification process was not "suggestive."  They declined to reach the second requirement, the *Biggers* factors, *i.e.* whether there was an increase in the likelihood of mistake.

Such a one-step resolution is permissible.  "Having concluded that the one-on-one show-up was a legitimate identification procedure, we need not reach the question whether the teller's identification was reliable under the test enunciated in *Biggers*."  *U.S. v. Bagley*, 772 F.2d 482, 493 (9th Cir. 1985).  *See also U.S. v. Davenport*, 753 F.2d 1460, 1463 n. 2 (9th Cir. 1985) ("Because we do not regard the confrontation procedures as unnecessarily suggestive, we need not consider the reliability of the identification in determining whether the procedures gave rise to a substantial likelihood of mistaken identification.")

Thus, the law applied by the Arizona Court of Appeals was not contrary to Supreme Court law.  Therefore, to be entitled to relief, Petitioner must show that the state court made an "unreasonable application" of the law in finding that the identification was not "suggestive."

**c.   Lack of Suggestiveness**

As noted above, the suggestiveness of an identification process must be determined from the "totality of circumstances."

The state court determined that suggestiveness had not been shown because the

243

number of persons depicted in the lineups, and because of the time gap of two months between the earlier lineups and presentation of the final lineup with Petitioner.  (Exhibit GG, Mem. Dec. 2/28/03 at 14-17.)

Petitioner asserts a number of arguments about the reliability of the identifications under *Biggers*. For example, with regard to the witnesses' opportunity to perceive, he points to: Franz's brief viewing of the shooter while in state of panic and shock (Petition, Doc. 1 at 9-A); and, that Witzig was "pretty buzzed" and the lighting was poor when they visited his home (*id.* at 9-B).  With regard to the accuracy of the witness' prior description of the criminal, Petitioner points to:  Franz's original description of the shooter as tall and big (*id.*); his description referring to California Hells Angels, three to five men, and a black Firebird car (*id.* at 9-B); and his misidentification of another person at the Department of Motor Vehicles (*id.*).  With regard to the level of certainty demonstrated by the witness at the confrontation, Petitioner points to: Franz's hesitance to identify Petitioner from the lineup and desire for reassurance from the police (*id* at 9-A); and Witzig's assertion that he "never positively identified anyone" and that he wasn't sure about his identification (*id.* at 9-B).

However, none of these are indicative of whether the identification process itself was suggestive.

Petitioner complains that the final line-up procedure was not tape recorded, while the earlier ones were.  (*Id.* at 9-A.)  While this might suggest an attempt to avoid creating evidence of a suggestive procedure, by itself it does not show that he procedure was suggestive.

Petitioner complains that he was not permitted to resolve a jury question about whether Witzig faced imprisonment, to avert the inference that Witzig was afraid of returning to prison as a "snitch."  (*Id.* at 9-B.)  While that might increase the likelihood that the jury would surmise that Witzig's recantation at trial of his identification at the lineup was driven by fear not truth, it would not affect the suggestiveness of the identification itself.  Similarly, Petitioner's complaint about Franz's presence in the

Courtroom has nothing to do with the suggestiveness of the lineup.

The only complaint made by Petitioner as to the suggestiveness of the lineup is his assertion that "[a]ll of the photos which were used in line-up number 9, except my photo, repeatedly appear in line-ups 1 through 8 between one and three times each." (*Id.* at 9-A.)  However, that does not contradict the finding of the Arizona Court of Appeals that repeat photographs had been used in the final lineup (with the exception of Petitioners).

Petitioner makes no response to the critical finding by the state court which led to their determination of no suggestiveness:

> Given the total number of persons depicted in the lineups and the gap of more than two months before the final lineup was shown to the witnesses, we conclude that the court did not abuse its discretion when it found that the lineups were not unduly suggestive.

(Exhibit GG, Mem. Dec. 2/28/02 at 17.)

Prior to their identifications of Petitioner, the witnesses were shown 8 lineups, including photographs of some 35 different men, in two separate sessions, with 9 to 10 days between the first two sessions, and  either 67 or 77 days elapsing since they last saw the photographs.   No photograph had been used more than 3 times.   Under those circumstances, the Arizona Court of Appeals could reasonably conclude that the memory of the witnesses at the time they looked at the ninth lineup would not have been sufficient to recall the five repeated photographs, and thus to have suggested that Petitioner was the perpetrator.   Petitioner proffers nothing to conclude to the contrary.

Petitioner does make the logical argument that if it is suggestive to show a defendant's photo in a lineup repeatedly, it must be suggestive to use the defendant's photo as the sole changed photo.   The Arizona Court of Appeals was willing to consider such logic to be "plausible."   They even noted that "taken to the extreme, such a procedure could be tantamount to a one-person photographic lineup."   (Exhibit GG, Mem. Dec. 2/28/02 at 16-17.)   However, such a logical implication would only appear

true if each pre-identification lineup was identical.[51]  If any of the photos changed, the witness would still logically be left to select the defendant as the perpetrator from among the changing photos.  In this instance, if only one photo was changed in each of the 9 lineups, then the witness was still required to select Petitioner from among the 9 changing photos.

**4.  Conclusion re Ground Four**

Having failed to establish suggestiveness of the photo lineups, Petitioner's Ground 4 is without merit and must be denied.

In the absence of any suggestiveness, the undersigned (like the Arizona Court of Appeals) does not reach the *Biggers* factors.

Moreover even if this Court could conclude to the contrary, Petitioner fails to show that the state court decision was sufficiently wrong to merit relief under 28 U.S.C. § 2254(d).

---

[51] Even in this instance, the witness would have to surmise that the break in repetition of identical lineups signaled that the new photograph was indeed the suspect.  It seems just as likely (barring some other suggestiveness) that a witness might conclude that the suspect was among those being continually presented, and the changing photograph was intended to focus him on the repeating photos.

**J.  GROUND FIVE: IMPEACHMENT**

As discussed hereinabove, Petitioner's Ground 5 was procedurally barred on an independent and adequate state ground, and is precluded from habeas review absent a showing of actual innocence.  Because the undersigned finds no actual innocence, and that the procedural bar is plain, the undersigned does not reach the merits of this claim.

**K.  GROUND SIX: INSUFFICIENT EVIDENCE**

**1.  Arguments**

For his Ground 6, Petitioner argues that his rights under the "5th, 6th and 14th Amendment" were violated because there was insufficient evidence to convict him. (Petition, Doc. 1 at -9:2-D.)  In support of this claim, Petitioner argues: (1) the lack of credibility of Bernardo Hernandez and Robert Franz; (2) that Larry Witzig only testified to post-murder events; (3) evidence showed Petitioner was in Laughlin, Nevada at the time of the murder; and (4) evidence showed the shooter was taller than Petitioner. (*Id.* at 9:2-B to 9:2-C.)

Respondents argue that the state courts applied the proper standard and their determination of sufficient evidence was reasonable.  (Answer, Doc. 14 at 138-142.)

Petitioner replies by referencing his arguments in his Petition and points to his assertions in his reply in support of Ground 11 that Isaacs subsequently confessed, and Petitioner became a police informant and thus would have no motive to kill a fellow informant.  (Reply, Doc. 25 at 21-22, and 26-27.)

**2.  State Court Ruling**

Petitioner raised this claim on direct appeal, and the Arizona Court of Appeals rejected it finding that Petitioner's attacks on the credibility of Hernandez and Franz were not sufficient to overcome the deference due the jury's resolution of credibility disputes and the favorableness with which the court was required to view the evidence

247

1    presented by the prosecution.  (Exhibit GG, Mem. Dec. 2/28/02 at 18.)

2

3    **3.  Applicable Law**

4         The Due Process Clause of the Fourteenth Amendment protects a defendant

5    against conviction "except upon proof beyond a reasonable doubt of every fact necessary

6    to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364

7    (1970).  "The Due Process Clause of the Fourteenth Amendment denies States the power

8    to deprive the accused of liberty unless the prosecution proves beyond a reasonable

9    doubt every element of the charged offense." *Carella v. California*, 491 U.S. 263, 265

10   (1989) (citation omitted).

11        Accordingly, in the face of a sufficiency of the evidence claim, the habeas court

12   must determine whether any rational trier of fact could have found proof of guilt beyond

13   a reasonable doubt.  *Wright v. West*, 505 U.S. 277, 290 (1992); Jackson v. Virginia, 443

14   U.S. 307, 324 (1979).    Under *Jackson*, on habeas, "the relevant question is whether,

15   after viewing the evidence in the light most favorable to the prosecution, any rational

16   trier of fact could have found the essential elements of the crime beyond a reasonable

17   doubt." *Jackson*, 443 U.S. at 319.  In making this evaluation, the court must view the

18   evidence in the light most favorable to the prosecution, and must presume the trier of fact

19   resolved conflicting evidence in favor of the prosecution.  *Wright*, 505 U.S. at 295-296;

20   *Jackson*, 443 U.S. at 319, 326; *Taylor v. Stainer*, 31 F.3d 907, 908-09 (9th Cir. 1994).

21        The application of these principles has been modified by the adoption of the

22   AEDPA.  Under the standard set forth in 28 U.S.C. § 2254(d), to overturn a state court

23   conviction for insufficient evidence, the habeas court must not only determine for itself

24   that no rational trier of fact could have convicted the petitioner, but also that an opposite

25   conclusion by the state court was "contrary to, or an unreasonable application of, clearly

26   established Federal law, as determined by the Supreme Court of the United States" or

27   "was based on an unreasonable determination of the facts in light of the evidence

28   presented in the State court proceeding."  28 U.S.C. §2254(e)(1) and (2). *See Martinez v.*

*Johnson*, 255 F.3d 229 (5th Cir. 2001) (habeas court resolves limited question whether the state court's decision to reject a sufficiency of the evidence claim was an objectively unreasonable application of the clearly established federal law").

The Ninth Circuit has recently explained the relationship between *Jackson's* deference to the jury, and the AEDPA's deference to the state court:

> Thus, when we assess a sufficiency of evidence challenge in the case of a state prisoner seeking federal habeas corpus relief subject to the strictures of AEDPA, there is a double dose of deference that can rarely be surmounted…Stated another way, to grant relief, we must conclude that the state court's determination that a rational jury could have found that there was sufficient evidence of guilt, i.e., that each required element was proven beyond a reasonable doubt, was objectively unreasonable.

*Boyer v. Belleque*, 659 F.3d 957, 964-65 (9ᵗʰ Cir. 2011).

However, the First Circuit has noted that "[e]ven with the deference due by statute to the state court's determinations, the federal habeas court must itself look to 'the totality of the evidence' in evaluating the state court's decision. *Hurtado v. Tucker*, 245 F.3d 7, 18 (1st Cir. 2001). Accordingly, the habeas court's analysis still begins with an independent evaluation of the sufficiency of the evidence. If the habeas court concludes that the *Jackson* rational-trier-of-fact standard has been breached, it must then proceed to determine whether the state court's contrary decision is entitled to deference under 28 U.S.C. § 2254(d).

Here, the undersigned cannot find any basis to conclude that no rational trier of fact could have found Petitioner guilty beyond a reasonable doubt.

Petitioner does not suggest that evidence of a particular element was lacking. Rather, he simply contends that given the conflicts between witnesses there was insufficient evidence to prove he was the shooter.

Some of the evidence that Petitioner points to is evidence arising after trial, *e.g.* Isaac's prison confession. While such post-trial evidence may be relevant to an assertion of actual innocence, it is not considered when determining the sufficiency of the evidence to convict. "*Jackson* does not extend to nonrecord evidence, including

249

newly discovered evidence." *Herrera v. Collins*, 506 U.S. 390, 402 (1993).

Much of the evidence that Petitioner points to simply suggests that the prosecutions' witnesses (Hernandez and Franz in particular) were not credible, *e.g.* because they were impeached on cross-examination, or other witnesses offered contradictory stories.

> If confronted by a record that supports conflicting inferences, federal habeas courts "must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." A jury's credibility determinations are therefore entitled to near-total deference under *Jackson*.

*Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004). Here, Petitioner offers nothing more than routine contradictions in and to the witnesses' testimony, *e.g.* testimony about Petitioner's employment contradicted by records, testimony about being in a home contradicted by the owner, assertions the agreement was to kill Robert Franz when his wife was killed, testimony about the shooter's height that contradicted with Petitioner's height, etc. This habeas court has no basis to reject the jury's resolution of those factual disputes and determinations of the credibility of the witnesses.

Petitioner complains that some of the testimony "related to events that occurred well after the murder and is not evidence that supports my conviction." (Petition, Doc. 1 at 9:2-B.) Petitioner points to Hernandez's testimony in general, and specifically the testimony of Larry Witzig, who had been asked to hide the murder weapon. However, not only was the presentation of such after-the-fact circumstantial evidence competent as part of the prosecution's case, "circumstantial evidence alone can be sufficient to demonstrate a defendant's guilt." *U.S. v. Cordova Barajas*, 360 F.3d 1037, 1041 (9th Cir. 2004). Moreover, that evidence does not denigrate the direct evidence supplied by Hernandez and Franz testifying based upon their observation of events at the time of the murder, that Petitioner was the shooter.

Finally, Petitioner complains that the evidence showed that the shooter was taller than Petitioner. (Petition, Doc. 1 at 9:2-B.) However, such testimony was contradicted

by other evidence.  Although Franz described the shooter as tall and stocky, he later identified Petitioner as the shooter.  Although Petitioner's criminalist maintained that the shooter was taller than Petitioner, and the police criminalist had made assertions at one point that suggested the same thing, there were reasons to doubt the determinations of both, including the uncertainties discussed hereinabove with regard to Ground 2 (*Willits Lost* Evidence Instruction).  Again, a reviewing court must view the evidence in the light most favorable to the prosecution, and must presume the trier of fact resolved conflicting evidence in favor of the prosecution. *Wright*, 505 U.S. at 295-296.

In short, Petitioner has failed to point to any element of the crime of which there was not sufficient (albeit contradicted) evidence for a rational trier of fact to find guilt beyond a reasonable doubt.

Moreover even if this Court could conclude to the contrary, Petitioner fails to show that the state court decision was sufficiently wrong to merit relief under 28 U.S.C. § 2254(d).

**4.  Conclusion re Ground 6**

Accordingly, Petitioner's Ground 6 is without merit, and must be denied.

**L.  GROUND SEVEN: STATE'S INVESTIGATION**

**1. Arguments**

In his Ground 7, Petitioner argues that his "5th, 6th, and 14th Amendment, U.S. Constitutional right to due process and a fair trial" was denied when the trial court precluded Petitioner "from impeaching the homicide detective, Edward Betts, with the State's lack of investigation into potentially exculpatory evidence." (Petition, Doc. 1 at 9:3-A – 9:3-B.)

Respondents contend, and the undersigned has agreed hereinabove, that this claim is procedurally defaulted. (*See supra* Section III(D)(2)(b) (Ground 7: State's Investigation).) Moreover, based on the determination hereinafter that the claim is without merit, the undersigned has concluded that any failure of appellate counsel to raise this claim on direct appeal was not ineffective assistance, and did not establish cause or prejudice to excuse such procedural default.  (*See supra* Section III(D)(6)(a)(2) (Ineffective Assistance of Appellate Counsel as Cause).)

Respondents also contend that the Petitioner's claim is at its heart a non-cognizable state evidentiary law claim, and even if rising to a due process claim, any error was harmless because other evidence of the lack of investigation was otherwise introduced.  (Answer, Doc. 14 at 142-147.)

Petitioner replies by referencing his Petition and all of the factual assertions in his Reply.  (Reply, Doc. 25 at 22.)

To the extent that Petitioner's presentation of this federal claim to the state courts might be subject to debate, the undersigned will address the merits.


**2. Background**

    **a.   Facts Underlying Claim**

During the course of the defense's cross-examination of Detective Underwood, defense counsel asked if "there were witnesses that Mr. Duncan was elsewhere on July the 10th, 1998." (Exhibit N, R.T. 4/27/00 at 8.)  The prosecution objected on the basis of

hearsay and relevance, and indicated that the detective would respond that the county attorney had agreed to follow up on the witnesses.  Defense counsel argued that the purpose of the testimony was not to prove the truth of the matter asserted, but "to establish…that the police investigation in this case was inadequate…these witnesses were identified to you, and you didn't go interview them." (*Id* at 9.)  Eventually, the Court ruled:

> THE COURT: I'm going to sustain the objection. You -- I might allow you to do it after you presented some of that competent evidence about his whereabouts, but right now I think it is calling for hearsay.

(Exhibit N, R.T. 4/27/00 at 10.)

The next day, on cross examination of Detective Betts, defense counsel elicited testimony that Betts had been provided with the names of three witnesses (Arnold Burdett, Kelly Erickson, and Jerry Daundivier), but he had never asked any of them if they knew where Petitioner was at the time of the murder.  (Exhibit O, R.T. 5/1/00 at 36-39.)  This testimony was shortly after testimony by Betts that he had interviewed people to confirm the alibi of Stephen Greenwood (who Robert Franz had identified as the murderer), and as a result Greenwood was eliminated as a suspect.  (*Id.* at 22-24.)  Betts testified:

> Q. So part of your job as a police detective is to check out and, where possible, confirm Suspect's [sic] alibi?
> A. That's correct.
> Q. That's an important part of your job, isn't it?
> A.  I think so.

(*Id.* at 23-24.)

Each of the un-interviewed witnesses testified at trial.  (*See* Exhibit P, R.T. 5/2/00 at 65 (Daundivier), 86 (Burdett), and 102 (Erickson).)  **Daundivier** testified that the night of the murder he was with Petitioner from 8:45 or 9:00 pm until midnight, and Petitioner and the landscaper, Jesus got in a slap-fight.  (*Id.* at 70-74.)  **Burdett** testified that he knew nothing of Petitioner's whereabouts that evening.  (*Id.* at 92.)  He also testified that that he had told Detective Underwood  and the prosecutor that the other two

witnesses (Erickson and Daundivier) who worked for Burdett, had said they had been with Petitioner on the night of the murder, and that he was told they would be interviewed, but they never were.  (*Id.* at 95-96.)  **Erickson** testified that he was with Petitioner from approximately 7:00 p.m. until shortly after 12:30 p.m., although he couldn't remember the exact night, Petitioner and Jesus had gotten into a slap fight.  (*Id.* at 105-112.)

Petitioner did not recall Detective Underwood.

In closing arguments, defense counsel referenced the failure to investigate:

> This truly is not a complex case. The police department learned of some information about Bill Duncan's whereabouts on July the 10th a long time ago, and they never followed up on it.

(Exhibit R, R.T. 5/4/00 at 31.)

### b.   State Court Ruling

Petitioner raised this claim on direct appeal as a state law evidentiary claim.  The parties agreed that the trial court's exclusion on hearsay grounds was erroneous, because the out of court statement was not offered to prove the truth of the matter asserted. Nonetheless, the Arizona Court of Appeals found that "the trial judge explicitly stated he would revisit the matter if defendant actually produced alibi evidence."  (Exhibit GG, Mem. Dec. 2/28/02 at 20.)  Accordingly, any error was deemed harmless.

### 3.  Application of Law

To the extent that Petitioner simply argues that the Arizona Court of Appeals erred in rejecting this claim under state law, such an argument would not justify habeas relief which extends only to violations of federal law.  *Wilson v. Corcoran*, 131 S.Ct. 13, 16 (2010).  (*See infra* discussion on Ground One.)

In evaluating this claim, the undersigned presumes that the testimony was not properly excludable on hearsay grounds.  That, however, was not the basis on which the argument was rejected.  Rather the Arizona Court of Appeals rejected the claim on the

1   basis that any error was harmless. It is the "last reasoned decision" in this case, that of
2   the Arizona appellate court and not that of the trial court, that this habeas court reviews.
3   *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

4        Petitioner fails to proffer anything to show that the Arizona Court of Appeals was
5   wrong in its harmlessness decision.  To be sure, Petitioner protests that "[t]his was not
6   harmless error."  (Petition, Doc. 1 at 9:3-B.)  However, Petitioner's only attacks on the
7   decision focus on the potential that the un-interviewed witnesses might have exonerated
8   Petitioner had they been interviewed.  (*Id.*)  (*See also* Reply, Doc. 25 at 22.)  In focusing
9   on that issue, Petitioner jumps too far along in the process.

10        The Arizona Court of Appeals' decision was not based upon the ultimate effect,
11   or lack thereof, of Detective Underwood's answer, or even of the failure to investigate
12   that it was intended to prove.  Rather, the court's conclusion was based upon the fact that
13   any harm was averted by the trial court's offer to revisit the matter.  "After the testimony
14   by his alibi witnesses, defendant could have asked to re-open his cross-examination of
15   the detective--as the trial judge had specifically invited him to do."  (Exhibit GG, Mem.
16   Dec. 2/28/02 at 20.)  Thus, as observed by the Arizona Court of Appeals, the trial court's
17   decision amounted to little more than direction over the "order in which a trial is
18   conducted and proof is presented."  (*Id.*)  Petitioner offers nothing to show this was in
19   error, *e.g.* by showing that he did not have an opportunity to later present the evidence,
20   or that any later presentation would have been ineffective.

21        Thus, Petitioner has failed to show any error by the Arizona Court of Appeals.

22        Moreover, skipping ahead, the undersigned would find any error harmless
23   because Petitioner was ultimately able to introduce evidence of through Detective Betts
24   of the failure to investigate these purportedly exculpatory witnesses.   Further, the
25   witnesses themselves testified as to Petitioner's alibi, and at least Burdette as to the
26   failure to interview Daundivier and Erickson.

27        **Due Process Claim**  - To the extent that Petitioner argues that any state law error
28   amounted to a violation of due process, he must show that the state court "error" was "so

255

arbitrary and fundamentally unfair that it violated federal due process," *Jammal,* 926 F.2d at 920, that it was "such a gross abuse of discretion" that it was unconstitutional. *Brooks*, 712 F.Supp. at 498. Petitioner fails to show that Arizona's evidentiary law was violated by the Arizona Court of Appeals' decision, let alone showing that any violation was a "gross abuse of discretion."

**4.  Conclusion re Ground 7**

Accordingly, this claim, if not procedurally defaulted, is without merit and should be denied.

## M.  GROUND EIGHT: PCR INVESTIGATOR

### 1.  Arguments

In his Ground 8, Petitioner argues that the failure of the PCR court and the special action court to grant him funds for an investigator resulted in the denial of his "5th, 6th and 14th Amendment, U.S. Constitutional rights to due process" (Petition, Doc. 1 at 9:4-C.)

Respondents contend, and the undersigned has agreed hereinabove, that this claim is procedurally defaulted because of Petitioner's failure to reassert it after remand for appointment of an investigator.  Respondents also contend: (1)  the decision to deny special action jurisdiction is a non-cognizable state law claim; (2) the Supreme Court has never recognized a right to court-appointed investigators for post-conviction relief proceedings; (3) deficiencies in state post-conviction relief proceedings is not a federal constitutional violation; and (4) Petitioner offers nothing to establish that earlier appointment of an investigator would have located his missing witnesses, that they would have offered favorable testimony, and that the testimony would have been admissible, noncumulative and probative.   (Answer, Doc. 14 at 142-147.)

Petitioner replies by referencing his Petition. (Reply, Doc. 25 at 22.)

To the extent that Petitioner's presentation of this federal claim to the state courts might be subject to debate, the undersigned will address the merits.

### 2.  Factual Background

During Petitioner's first PCR proceeding, counsel sought funding or appointment of an investigator (Exhibit A-3 at Item 283, Motion), which request was denied on the basis that counsel had not proffered sufficient information to support the request, nor shown authority for the request (*id.* at Item 284, M.E. 3/3/03).

In his Motion for Reconsideration, Petitioner identified the following witnesses he hoped to locate:

1) witnesses in the area of the murder scene –Buck Ridley, Douglas

257

Johnson, and Robert Hill. 2) witnesses who had information about other versions of the events and other suspects and refute whether Bill Duncan was the shooter-Kristina Cox, Lisa Dailey, Gloria Gilbert, Jennifer Seeley, Tracy Parks, Lena Sinclair and Drew Witzig.

(Petition, Doc. 1, Exhibits at 214 (Pet. Spec. Act., Exhibit C, Motion at 2).)

Counsel then moved to stay the proceedings to allow time to file a special action to challenge the court's decision (*id.* at Item 291), which stay was granted.  In the Petition for Special Action, Petitioner did not identify the unlocated witnesses but referenced the identifications in his motion and motion for reconsideration. (Petition, Doc. 1, Exhibits at 190, Pet. Spec. Act. at 8.)  The Court of Appeals declined jurisdiction over the Special Action, and the deadline for a petition was reset. (Exhibit A-3 at Item 294, Mot. to Reinstate; *id.* at Item 300, Order 4/30/03; *id.* at Item 295, M.E. 5/5/03.)

Counsel located and sought funding for travel for the witnesses Tina Malcomson (Exhibit A-5, ROA Item 308, Motion), Jennifer Seeley (Weston) (*id.* at Item 309, Motion), and Buck Ridley  (*id.* at Item 321, Mot. Reconsider at 4).  Counsel stipulated that these witnesses "would testify the same as in their statements to the police or in affidavits", and accordingly the court took no action on the motions for travel funding. (*Id.* at Item 317, M.E. 11/4/03.)

At the PCR hearing, Petitioner's counsel asked the Court to consider the written statements of the out of court witnesses:

> MR. GOLDBERG: No other witnesses, Judge. I just did want to make sure, so if this record is ever reviewed, what we had started with. And that is just that the Court can consider, as evidence, subject to Mr. Carlisle's -- I'm assuming objections on relevancy and other arguments, what I attached to the petition for post-conviction relief terms of Buck Ridley, Jennifer Seeley, Tina Malcomson.
> And just so we're clear on the record, that's exhibit -- my appendices -- I have a minute here. I have it written down.
> MR. CARLISLE: K, L, and P, I think. I'm sorry.
> MR. GOLDBERG: P, M, and K.

(Exhibit JJ, R.T. 11/10/03 at 187.)  The referenced exhibits were for Malcomson (Exhibit A-4, ROA Item 298, Append. to PCR Pet., Exhibit P), Seeley (*id.* at Exhibit M), and Ridley (*id.* at Exhibit K).

Counsel went on to ask for consideration of all of the statements submitted with the Petition, including those of the unlocated witnesses:

> MR. GOLDBERG: And the other issue would be that because of the nature of post-conviction proceedings, I've attached a lot of things to the -- to my appendices, and I would believe and would move the Court to consider these as long as I can just -- rather than have them marked as exhibits and entered through Mr. Baran, that just by showing him these exhibits that are already part of the appendices, which is already part of the record, that he was provided these in discovery, as counsel already agreed, and that he knew they existed and he read them. I'll get into specific questions. Otherwise I think it takes up additional time needlessly to go through the foundation and admit them all separately.
>
> THE COURT: Are there any exhibits in the appendix that constitute materials you would have disclosed to the defense team or reports from their own investigators that you object to me considering as1 evidence on the issue of what [defense trial counsel] Baran did compared to what he knew?
>
> MR. CARLISLE: No.
>
> THE COURT: Technically they're hearsay, but considered in that vain [sic], they're not.
>
> MR. CARLISLE: I believe, if I understand your question, all the things that are in here that are either exhibits from -- I'm sorry, that were – not everything in here are something I generated.. But all the disclosure that I provided to him I would agree is disclosure that I was -- that he had and was available to him.
>
> I'm sure all the letters from his office or the subpoenas are things that he had.  So, yes, I believe that the answer to that is correct.
>
> THE COURT: So do you object, then, I guess, to me considering as evidence anything that's shown to have been received and considered by Mr. Baran that's in this appendix that you don't object to specifically during the examination?
>
> MR. CARLISLE: No.
>
> THE COURT: All right. So that's what I'll do, then. I'll just consider all those things as evidence.

(*See* Exhibit JJ, R.T. 11/10/03 at 7-9; 188-190.)

In his Motion for Rehearing, Petitioner argued that the trial court improperly failed to consider the submitted statements of the testifying witnesses and the absent ones.  (Exhibit A-5, ROA Item 321, Motion.)  The PCR court rejected that contention, concluding:

> I did consider the evidence presented by the written witness statements as well, and while I was unable to assess the demeanor of any of the authors, their statements were also considered in light of other evidence presented by live witnesses or exhibits, and found to be similarly lacking in weight.

(Exhibit A-5, ROA Item 325, M.E. 2/10/04 at 1.)

In his Petition for Review, counsel explicitly argued that the stipulation extended not just to the located out-of-state witnesses, but to all the submitted statements.

> It was ultimately agreed by the court and counsel that the trial court would consider both the live testimony and the various police reports and interviews of the witnesses identified in the Petition along with all of the other submitted documents in determining the merits of the PCR.

(Exhibit LL, PFR at 5 (referencing "R.T. 11/10/03 at 8-9, 187-90, Appendix to PCR , exhibits A-Q").)  (*See* Exhibit JJ, R.T. 11/10/03 at 7-9; 187-190; Exhibit A-5 at Item 317, M.E. 11/4/03.)  However, Petitioner identified specifically only Lena Sinclair and Gloria Gilbert as witnesses he could not locate.  (Exhibit LL, Pet. Rev. at 9-10, and n. 2.)

The Arizona Court of Appeals granted relief on this claim, and remanded for provision of an investigator and rehearing.  (Exhibit SS, Mem. Dec. 10/18/05 at 11-12.) In doing so, the appellate court noted that the PCR court seemed to have equivocated on considering the proffered police reports and interviews.

> Because some of the witnesses listed in Duncan's petition for postconviction relief had re-located out-of-state or were otherwise unable to attend the evidentiary hearing, the court authorized the introduction of affidavits by those witnesses at the evidentiary hearing.  However, following the evidentiary hearing, the court concluded:
>
> > The testimony presented during the evidentiary hearing supports the allegation that neither the lawyers or the defense investigators interviewed the witnesses proposed by the defendant now. Whether this omission constituted ineffective assistance, and whether the defendant was prejudiced under the applicable legal standard, is determined by the court's evaluation of the evidence which could have been adduced at trial.
> >
> > *This type of issue can not be litigated by affidavit*, …, Three of the most important witnesses cited in the petition did testify at the evidentiary hearing. As I indicated on the record at the hearing, I attribute no credibility to any of those three witnesses. . .
> >
> > . . .

260

1

2

3

4

5

> *The remaining witnesses listed in the petition were presented only by affidavit or unsworn pretrial statements, a fair amount of their statements constituted hearsay or otherwise lacked foundation for their basis of knowledge or belief. . . .*
>
> . . .
>
> [E]ven if counsel's performance was found to be deficient, *the defendant has not demonstrated prejudice, primarily because of the lack of credibility of those witnesses he has been able to present in court.*

6

7

8

9

(Emphasis added.) The court denied Duncan's request for funding of an investigator to locate and interview witnesses alleged by Duncan to be necessary in determining whether his trial counsel's alleged errors fell below levels of reasonable competency, but seemingly relied in part on the witnesses' absence at the evidentiary hearing to conclude that Duncan failed to establish prejudice as a result of ineffective assistance of counsel.

10

(Exhibit SS, Mem. Dec. 10/18/05 at 10-11 (quoting Exhibit A-5, ROA Item 319, M.E.

11

11/21/03 at 2-4).)

12

In his second ("Supplemental") PCR petition, filed after remand, Petitioner did

13

not again challenge the denial of an investigator, but in a footnote observed:

14

15

16

17

Petitioner also offered the police statements of neighbors Buck Ridley and Robert Hill that both told police that they had heard the shot, looked out their homes and saw no people on the street 25 nor car out in front of the Franz' home. (PCR Exhibits L and K.) On remand, due to the passage of 9 years since the murder, Petitioner's investigator has now been unable to locate and interview either witness at this time.

18

(Exhibit CCC, 2nd PCR Pet. at 7, n. 1)  Eventually, Petitioner's investigator was able to

19

locate and interview some of missing witnesses, including Tina Malcomson, Douglas

20

Johnson, and the elusive Kristina Cox.  (Exhibit GGG, R.T. 3/14/08 at 23.)  In addition,

21

he located Robert Hill, who refused to talk to him.  He made contact with Buck Ridley

22

through his ex-wife, but Ridley refused to return his calls.  He made contact with Drew

23

Witzig through family members, but he did not return calls.  (*Id.* at 24.)

24

This left Petitioner with no statement or testimony or refusal from Gloria Gilbert,

25

and Tracy Parks. In summary, here was the end result with each of Petitioner's ten

26

"missing" witnesses:

27

28

1.  Buck Ridley – refused request through ex-wife for interview, but statement submitted

2.   Douglas Johnson – testified at first hearing

3.   Robert Hill – refused request for interview, but statement submitted

4.   Kristina Cox – interviewed

5.   Lisa Dailey – testified at first hearing

6.   Gloria Gilbert – Not located and no statement

7.   Jennifer Seeley – not located but statement submitted

8.   Tracy Parks – not located and no statement

9.   Lena Sinclair – not located but statement submitted

10. Drew Witzig - refused request through relatives for interview

Based on the foregoing, the only remaining witnesses left with no testimony, no statement and unlocated were Gloria Gilbert and Tracy Parks.

In their Answer, Respondents construe Ground 8 as applying to Sinclair, Gilbert, and Robert Hill.  Respondents contend that the other seven of the ten witnesses either testified, or their statements were submitted on stipulation. (Answer, Doc. 14 at 159, and n. 44.)  This is based on the conclusion that testimony from Seeley and Ridley (and others) had been submitted through their statements on stipulation and Johnson and Dailey (and others) had eventually testified.   However, Respondents include in their calculations a number of witnesses not identified by Petitioner as "missing," including Tina Malcomson, Gracie Cox, and Adriana Cox (Scroggins/Chavira).

Nonetheless, the undersigned will adopt Respondents' construction of the witnesses covered by this claim, for the following reasons.   First, Petitioner does not oppose Respondents' construction. (S*ee* Reply, Doc. 25 at 22-24.) Second, there is no other explanation offered by Petitioner.  Third, the only witness which the undersigned would find excluded by Respondents is Tracy Parks, and Petitioner proffers nothing to suggest the nature of that Parks' testimony or to show that it would have been beneficial. Parks was identified by Detective Betts as the victim's brother's girlfriend.  (Exhibit N, R.T. 4/27/00 at 25.)  No other mention of Parks is made in the record, other than in arguments over the "lost" witnesses.  Fourth, this claim fails on multiple grounds which

do not require identification of the specific witnesses.

### 3.  State Court Decision

After remand for appointment of an investigator, Petitioner did not again assert a claim based on prejudice from the failure to provide an investigator.  Insofar as Ground Eight is based on such a claim, it has never been fairly presented to or decided on the merits by the state courts.[52]

### 4.  Application of Law

#### a.   Special Action Jurisdiction

Respondents contend that a declination to exercise discretionary jurisdiction is a state law issue not cognizable on habeas.   Indeed, "Federal habeas courts lack jurisdiction, however, to review state court applications of state procedural rules." *Poland v. Stewart*, 169 F.3d 573, 584 (9th Cir. 1999).   Federal habeas courts have consistently refused to hear challenges to a state court's jurisdictional determinations. See *Angelone v. Wright*, 151 F.3d 151, 157–58 (4th Cir. 1998) (collecting cases).

Moreover, Petitioner proffers nothing to show that the decision was erroneous. In Arizona, "[s]pecial action jurisdiction is discretionary and is appropriate only when a party has no equally plain, speedy, and adequate remedy by appeal." *Robinson v. Hotham*, 211 Ariz. 165, 167-68, 118 P.3d 1129, 1131-32 (Ariz.App.2005). "Special action jurisdiction is highly discretionary."  *Blake v. Schwartz*, 202 Ariz. 120, 122, 42 P.3d 6, 8 (Ariz.App. 2002).

---

[52] Arguably, therefore, Petitioner has failed to exhaust his state remedies with regard to this claim, and has now procedurally defaulted on it.  However, Respondents have not argued that the claim is procedurally defaulted, but at most assert Petitioner did not present such a claim. (*See* Answer, Doc. 14 at 159.) "Procedural default, like the statute of limitations, is an affirmative defense. We therefore …hold that the defense of procedural default should be raised in the first responsive pleading in order to avoid waiver." *Morrison v. Mahoney*, 399 F.3d 1042, 1046 (9th Cir. 2005).  *See Franklin v. Johnson,* 290 F.3d 1223, 1231 (9th Cir. 2002) (28 U.S.C. § 2254(b)(3)'s requirement for an explicit waiver of exhaustion "has no bearing on procedural default defenses"). Despite the assertion of a failure to exhaust, the habeas court may deny the claim on its merits. 28 U.S.C. § 2254(b)(2).  In lieu of raising procedural default of this claim *sua sponte*, the undersigned addresses it on the merits *de novo* to deny it.

Although Petitioner now argues that jurisdiction should have been accepted because of the delay that resulted until the PCR court's decision was overturned and an investigator appointed, Petitioner made no such argument to the Arizona Court of Appeals in his special action petition. (*See* Petition, Doc. 1, Exhibits at 190, *et seq.*, Pet. Spec. Act.)  (Such an argument would have been illogical, no investigator having yet been appointed.)  Rather, Petitioner simply argued on the basis of the risk of litigating the PCR proceeding without counsel and the risk of being denied review of a resulting denial. (*Id.* at 2.)  It seems doubtful that Petitioner or the Court would anticipate the three year delay that eventually ensued.

Moreover, even had Petitioner shown that he met the requirements to allow the court to accept special action jurisdiction (e.g. because of the lack of an effective remedy on appeal), that would simply authorize and not mandate the court of appeals to accept jurisdiction. *See Dream Palace v. Maricopa County*, 384 F.3d 990, 1005-1006 (9th Cir. 2003) (discussing limits on discretion over special actions where no other avenue for review is available.)

Thus, Petitioner has failed to show that the Arizona Court of Appeals erred when it declined to exercise its special action jurisdiction.

### b.   Right to Investigator

Petitioner has also failed to show that any effective denial of an investigator (because of the delay) amounted to a constitutional violation.

### (1).  No right to Investigator

First, as noted by Respondents, the U.S. Supreme Court has never explicitly held that a criminal defendant is entitled to court appointment of an investigator, whether in a PCR proceeding, on appeal, or even at trial.   The Ninth Circuit has concluded that the right to effective assistance of counsel at trial may require appointment of an investigator or allowance of investigative expenses. *Mason v. State of Arizona*, 504 F.2d 1345, 1351

(9th Cir. 1974).    But, the Supreme Court has not done so.  *See Right of indigent defendant in state criminal case to assistance of investigators,* 81 A.L.R.4th 259 (2012 Supp.)

It is true that the note in *Caldwell* referenced the Court's then recent decision in *Ake v. Oklahoma*, 470 U.S. 68 (1985) which held that a capital defendant asserting an insanity defense was entitled to provision of a psychological expert.  This lends some credence to an assertion that *Ake* established a general rule that requires the provision of whatever assistance a defendant's counsel might need to render effective assistance.  However, the Ninth Circuit's finding of a right to an investigator in *Mason* was based upon "the effective assistance of counsel guarantee of the Due Process Clause."  504 F.2d at 1351.  *Ake*, on the other hand, was founded upon general concepts of due process and equal protection, and adopted no sweeping rule, but instead recognized a general rule that a defendant be provided the "basic tools of an adequate defense or appeal," and then sought to decide whether psychiatric assistance was one of those tools.  470 U.S. at 77.  Thus, a denial of an investigator would not be "contrary to" *Ake*.

The closest the Supreme Court has come was in *Caldwell v. Mississippi*, 472 U.S. 320 (1985), where the court declined to "determine as a matter of federal constitutional law what if any showing would have entitled a defendant to assistance" of a criminal investigator, etc. at trial, because "petitioner offered little more than undeveloped assertions that the requested assistance would be beneficial."  472 U.S. at 323, n. 1.

Circuit courts remain divided on whether *Ake* extends beyond the appointment of psychiatric assistance.  *See Babick v. Berghuis*, 620 F.3d 571, 579 (6th Cir. 2010) (compiling cases).  In *Jackson v. Ylst*, 921 F.2d 882 (9th Cir. 1990), the Ninth Circuit concluded that *Ake* was limited to psychiatric experts, and that expansion of *Ake* to other types of assistance (in that case an expert on eyewitness identification) would amount to the creation of a "new rule." *Id.* at 886.

Moreover, *Mason* found its right to assistance to flow from the right to effective assistance of counsel.  Here, Petitioner asserts a right to assistance on post-conviction

relief.  The courts have not yet found a constitutional right to counsel on post-conviction review.  *See Cook v. Schriro*, 538 F.3d 1000, 1027 (9th Cir. 2008) ("There is no constitutional right to counsel, however, in state collateral proceedings after exhaustion of direct review.").  *But s*ee *Martinez v.* Ryan, 132 S.Ct. 1309, 1315 (2012) (noting open question on whether there was a constitutional right to counsel in initial-review collateral proceedings asserting ineffective assistance at trial, where such proceedings were the first opportunity to present such claims).  Thus, even if it were concluded that Petitioner had fairly presented Ground 8 to the Arizona Court of Appeals, and that the court simply failed to reach the merits of his decisions, and thus the "as determined by the Supreme Court" limitation of 28 U.S.C. § 2254(d)(1) did not apply, this Court would still have to find that under the law of the Ninth Circuit Petitioner has failed to show a right to an investigator in a PCR proceeding.

### (2).  Absence of Prejudice

Second, Petitioner has failed to show a constitutional violation because any failure to appoint such an expert would arise to a constitutional violation only upon a showing of substantial prejudice.  *Mason*, 504 F.2d at 1352.  Petitioner points to the inability to contact certain witnesses and loss of their testimony as evidence of the prejudice.  It is important to note that the relevant prejudice question is not whether the outcome of the trial would have been different with testimony of these witnesses (although that is an underlying consideration).  Rather, the relevant question is whether Petitioner's PCR proceeding would have been resolved differently.

### (a).  *No Effect from Delay*

Petitioner fails to show that the inability to contact the witnesses was the result of the lack of an investigator. Although at the time the investigator was finally appointed, nine years had elapsed since trial (which time period was relevant to the ineffective assistance claims being asserted by Petitioner), only a portion of that time elapsed

between the denial of an investigator and the eventual appointment.  The motion was denied on March 3, 2003.  (Exhibit A-3 at Item 284, M.E. 3/3/03.)  The retention of an investigator was authorized on February 3, 2006, following remand, less than three years after the denial.  (Exhibit XX, M.E. 2/3/06.)

Respondents point out that a significant portion of that delay was the result of Petitioner's counsel troubles.  The Arizona Court of Appeals mandated the furnishing of an investigator on October 18, 2005.  (Exhibit SS, Mem. Dec. 10/18/05.)  Thus some three and a half months of the three year delay was attributable to the defense.

Petitioner proffers nothing to show that his inability to locate Sinclair, Gilbert and Hill was the result of the three years delay after his initial request for an investigator, as opposed to the preceding seven years.

### (b).  *No Effect on Actual Innocence Claim*

Petitioner also fails to connect the delay in locating these witnesses to the failure of his actual innocence claim.  The claims post-date the eventual provision of an investigator. The actual innocence claim was not presented by Petitioner until after remand and after the order granting funding for an investigator.  (*See* Exhibit CCC, Supplemental Petition (dated October 18, 2007.)  Indeed, the claim was based upon the "newly discovered evidence" of the February, 2007 letter from inmate Roinuse, and the November, 2006 interview of inmate Allen.  (*Id.* at 9.)  Thus, the delay from 2003 to February, 2006 was not the cause of delay in presenting Petitioner's actual innocence claim.

### (c).  *No Effect on Ineffective Assistance Claim*

Petitioner also fails to offer anything to show that the ability to locate the "missing" witnesses would have altered the outcome on his ineffective assistance claim.

With regard to **Lena Sinclair**, Petitioner argues that Sinclair would have testified as follows:

LANA [sic] SINCLAIR would have testified that she lived with the Franz family on three occasions prior to the murder and that they had a volatile and violent relationship. She would have further testified that Robert Franz continued to deal drugs and stolen property out of the home even though his wife was a police informant. Ms. Sinclair personally witnessed Robert's physical abuse of the children and Elisha; and Robert's fight with Elisha on the day prior to the homicide when Elisha called him" Jacky" (her ex-partner's name, whom she was continuing to have an extramarital relationship with). Ms. Sinclair also knew that Elisha was filing for divorce and that Robert had obtained and collected upon a life insurance policy on Elisha after her death.

(Petition, Doc. 1 at 9:5-E to 9:5-F.)  Petitioner draws this from the transcript of the police interview of Sinclair conducted on July 14, 1998.  (Exhibit A-4, Cont. Append. to PCR Pet., Exhibit N.)

With regard to **Gloria Gilbert**, Petitioner argues that she would have testified as follows:

GLORIA GILBERT would have testified that Robert Franz lived with her for a short time after the murder and told her various versions of what occurred on the night of the homicide, including variations on what the shooter looked like; whether he saw the shooter at all; the number of people involved; and that he ran from the home after he heard the first shot and "jumped" over the fence. (This is in contrast to his claim that he had had neck surgery and could not move well.)

(Petition, Doc. 1 at 9:5-F.)  Petitioner apparently also draws this from the transcript of the police interview of Sinclair conducted on July 14, 1998.  (Exhibit A-4, Cont. Append. to PCR Pet., Exhibit H.)

With regard to **Robert Hill**, Petitioner argues he would have testified as follows:

ROBERT HILL lived across the street from the Franz home and would have testified that he came outside his home immediately after hearing shots and saw no car outside his home immediately after hearing the shots and saw no car out in front of the Franz' home; no one outside walking around, and nothing unusual.

(Petition, Doc. 1 at 9:5-D.) Portions of this summary are apparently drawn from Officer Hemingway's report of his interview with Hill:

I then spoke with Robert Hill who lives at 956 Sandy Beach, across the street and to the west. Hill said at approx 1200 midnight he heard a gunshot. He said approx 30 seconds later he heard two more

268

shots. Hill said that he did not hear or see anything.
(Exhibit A-4, Cont. Append. to PCR Pet., Exhibit L.)  Petitioner does not explain upon what he bases his determination that Hill "came outside his home immediately."

However, the PCR court had the interviews of Sinclair, Gilbert and Hill available, and considered them in connection with the ineffective assistance claim.  It is true that the Arizona Court of Appeals expressed concern that the trial court had erred (presumably in light of the stipulation) by failing to consider these statements.  (Exhibit SS, Mem. Dec. 10/18/05 at 11.)  However, Petitioner proffers nothing to suggest that the trial court's initial hesitance to rely upon the statements continued after remand. Nor does Petitioner suggest any reason to believe that live testimony of these witnesses would have been any more persuasive on the ineffective assistance claim.

The last reasoned decision on this claim was the PCR court's original disposition, prior to remand.  In that order, the PCR court observed with regard to this genre of evidence that "a fair amount of their statements constituted hearsay or otherwise lacked foundation for their basis of knowledge or belief."  (Exhibit A-5, ROA Item 319, M.E. 11/20/03 at 4.)  The PCR court further concluded: "I have not seen, either during trial or the postconviction evidentiary hearing, even a scintilla of evidence pointing to Mr. Franz as the killer. In fact, the trial evidence supported a theory that he was actually the intended murder victim." (*Id.*)

Upon review, the undersigned finds no basis to conclude that trial counsel would have been found to have performed deficiently by not pursuing these witnesses, nor that the outcome of the trial would have been different with the purported testimony from them.  In reaching this conclusion, the undersigned has no choice but to assume that had these witnesses been located and called to testify, their testimony would have been consistent with their statements.  Petitioner proffers no other evidence of any expected testimony.

Sinclair offers little more than testimony that in its worst light might be seen as evidence for a motive for Mr. Franz to kill the victim.  Mostly, however, it amounts to

1   little more than showing a troubled marriage.

2       Gilbert only offers testimony of out-of-court statements by Mr. Franz that tend to

3   impeach his trial testimony.   Assuming these are admissible, Gilbert is far less

4   damning that Petitioner seems to suppose.  For example, Petitioner contends that Franz's

5   statements to Gilbert were inconsistent on various details such as the number of people

6   involved in the shooting.   Gilbert's actual statement was itself unconvincing on this

7   point:

8           Betts:       How many people did he say was there?
            Gilbert:     The first time he told me he said he only in his mind
9                        he only saw one then I really can't remember if it was
                         other people telling me the stories or Tina and Lisa or
10                       who but then there was suppose to be a driver and two
                         in the house a short one and a tall one.
11          Betts:       Who told you that?
            Gilbert:     It could have been Bob, it could have been Tina or it
12                       could have been a lady who lives close to them who
                         one of the persons that I work, work on knows her but
13                       I really don't know anything about her.

14  (Exhibit A-4, ROA Item 298, Append. PCR Pet., Exhibit H at 3.)  Indeed, when pressed,

15  Gilbert stated that she had compared stories with others about the accounts Franz had

16  given them, and concluded:

17          Betts:       Was, was the stories the same?
            Gilbert:     No, they probably weren't verbatim the same but I
18                       really can't remember a significant difference I never
                         really thought about it that much he's …
19
    (*Id.* at 4.)
20
        The interview of Hill offers no more than that he heard three shots fired.
21
        Counsel had the statements of these witnesses available to him.  To the extent that
22
    Sinclair and Gilbert tended to suggest a motive for Franz to kill his wife, they simply did
23
    not fit into the defense's theory of the case:  "Bernie Hernandez is a liar. And Robert
24
    Franz is wrong."  (Exhibit R, R.T. 5/4/00 at 9.)  To the extent that they impeached
25
    Franz's testimony, they were cumulative and much less persuasive than other evidence
26
    of Franz's lack of credibility, including his incongruous statements on the size and build
27
    of the shooter, his identification of an innocent man, etc.  Counsel could have made a
28

reasonable tactical decision that presentation of evidence from these witnesses would not significantly bolster, or would even detract from, the defense's case. For the same reasons, the undersigned cannot conclude that the result of the trial would have been different with these witnesses' testimony.

Having been unable to find that the presentation of live testimony from these witnesses would have altered the outcome of the PCR proceeding, the undersigned cannot find prejudice from the failure to provide an investigator.

## 5.  Summary re Ground 8

Assuming Petitioner's Ground 8 is not procedurally defaulted, the claim is without merit.  Petitioner has failed to show that denial of special action jurisdiction is an actionable habeas claim, and Petitioner has failed to show a right to appointment of an investigator in a PCR proceeding.  Petitioner has failed to show any effect on his actual innocence claim.  And, in light of the affected witnesses, Petitioner has failed to show prejudice from the denial of an investigator.   Accordingly, Petitioner's Ground 8 is without merit.

**N.  GROUND NINE: INEFFECTIVE ASSISTANCE**

The undersigned has concluded that Petitioner's Grounds 9E (IAC re exculpatory witnesses) as to Kristina Cox, 9F (IAC re closing arguments), 9G (IAC re Sentencing), 9H (IAC re appellate counsel), and 9I (IAC re cumulative errors), are procedurally defaulted.

**1.  Standard on Ineffective Assistance Claims**

Generally, claims of ineffective assistance of counsel are analyzed pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984).  In order to prevail on such a claim, Petitioner must show:  (1) deficient performance - counsel's representation fell below the objective standard for reasonableness; and (2) prejudice - there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at  687-88.  Although the petitioner must prove both elements, a court may reject his claim upon finding either that counsel's performance was reasonable or that the claimed error was not prejudicial.  *Id.* at 697.

**Deficient Performance** - An objective standard applies to proving such deficient performance, and requires a petitioner to demonstrate that counsel's actions were "outside the wide range of professionally competent assistance, and that the deficient performance prejudiced the defense." *United States v. Houtcens*, 926 F.2d 824, 828 (9th Cir. 1991) (quoting *Strickland*, 466 U.S. at 687-90).    The reasonableness of counsel's actions is judged from counsel's perspective at the time of the alleged error in light of all the circumstances.  *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986); *Strickland*, 466 U.S. at 689.

Moreover, there is a strong presumption counsel's conduct falls within the wide range of reasonable professional assistance and that, under the circumstances, the challenged action might be considered sound trial strategy.  *U.S. v. Quinterro-Barraza*, 78 F.3d 1344, 1348 (9th Cir. 1995), *cert. denied*, 519 U.S. 848 (1996); *U.S. v. Molina*, 934 F.2d 1440, 1447 (9th Cir. 1991).    The court should "presume that the attorneys

1   made reasonable judgments and decline to second guess strategic choices." *U.S. v.*

2   *Pregler*, 233 F.3d 1005, 1009 (7th Cir. 2000).

3         "The law does not require counsel to raise every available nonfrivolous defense.

4   Counsel also is not required to have a tactical reason—above and beyond a reasonable

5   appraisal of a claim's dismal prospects for success—for recommending that a weak claim

6   be dropped altogether." *Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009) (citations

7   omitted).

8         Moreover, it is clear that the failure to take futile action can never be deficient

9   performance. *See Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir.1996); *Sexton v. Cozner*,

10   679 F.3d 1150, 1157 (9th Cir. 2012). "The failure to raise a meritless legal argument

11   does not constitute ineffective assistance of counsel." *Baumann v. United States*, 692

12   F.2d 565, 572 (9th Cir. 1982).

13         Moreover, tactical decisions with which a defendant disagrees cannot form the

14   basis for a claim of ineffective assistance of counsel. *Morris v. California*, 966 F.2d 448,

15   456 (9th Cir. 1991). "Mere criticism of a tactic or strategy is not in itself sufficient to

16   support a charge of inadequate representation." *Gustave v. United States*, 627 F.2d 901,

17   904 (9th Cir. 1980). Rather, Petitioner must establish that failure to pursue the tactic was

18   "outside the wide range of professionally competent assistance." *Houtcens*, 926 F.2d

19   824, 828 (9th Cir. 1991).

20         Petitioner argues in his Supplemental Reply that this court cannot justify

21   counsel's actions as a reasonable strategic decision without first conducting an

22   evidentiary hearing to determine the actual reason for counsel's actions. (Supp. Reply,

23   Doc. 84 at 13.) To the contrary, a reviewing court need not determine the actual reason

24   for an attorney's actions, as long as the act falls within the range of reasonable

25   representation. *Morris v. California*, 966 F.2d 448, 456-457 (9th Cir. 1991), *cert.*

26   *denied*, 113 S. Ct. 96 (1992).

27         On the other hand, while they need not discern the actual reason for counsel's

28   conduct to deem it reasonable, "courts may not indulge '*post hoc* rationalization' for

counsel's decisionmaking that contradicts the available evidence of counsel's actions." *Harrington v. Richter*, 562 U.S. 86, 109 (2011) (quoting *Wiggins v. Smith*, 539 U.S. 510, 526–527 (2003)). *See Postconviction Remedies § 35:4 (*citing *Kimmelman v. Morris* and *Wiggins v. Smith*).   But that limitation does not shift to Respondents the obligation to prove the actual reason.   Rather, Petitioner bears the burden of establishing his claims of ineffectiveness and overcoming the presumption of reasonableness.

**Prejudice** - To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

**2.  Ground 9A (Investigation)**

    **a.   Arguments**

For his Ground 9A, Petitioner argues:

> Trial counsel ineffectively investigated my case prior to trial by failing to interview several identified witnesses whose testimony would have either corroborated my defense (that a third party was the shooter) or significantly impeached and undermined the testimony of the state witnesses Bernie Hernandez and Robert Franz.

(Petition, Doc. 1 at 9:5-A.)   In his original PCR petition, Petitioner referenced "many potential defense witnesses," but generally identified only "anyone in the neighborhood where the shooting occurred," and specifically identified only Douglas Johnson. (Exhibit A-3, ROA Item 297 at 9.)   In his first Petition for Review, Petitioner referenced the failure to call "the three additional neighborhood witness[es]"  (Exhibit LL, PFR at 17), which his Petition identified as Douglas Johnson, Buck Ridley and Robert Hill (*id.* at 6). Petitioner's second PCR Petition for Review again referenced the failure to call "any of the neighborhood witnesses" (Exhibit NNN at 18), who were identified as Johnson, Ridley, and Hill (*id.* at 8-9).

Thus, Respondents construe this claim as referring to "three neighbors of the

Franz residence - - Douglas Johnson, Buck Ridley, and Robert Hill." (Answer, Doc. 14 at 163.)   Respondents argue the claim is without merit "because trial counsel made a reasonable tactical decision to not interview and call these three witnesses," and the state court's decision rejecting the claim was not contrary to or an unreasonable application of federal law. (*Id.* at 168-169.)

Petitioner does not challenge Respondents' construction of his claim, and simply points to his Petition and general allegations in support of this claim. (*See* Reply, Doc. 25 at 24-25.)

### b.   Facts Underlying Claim

Police officers conducted interviews of three neighbors living near the Franz house, *i.e.* Douglas Johnson, Buck Ridley, and Robert Hill.  The reports filed contained the following summaries of their statements:

> On 7-11-98, at about 0730 hrs, I met with Mr. **Buck Ridley**, who lives on the east side of the victim's house (965 Sandy Beach) and identified myself and advised him we were conducting a homicide investigation. 1 asked for consent to do a more thorough search of his yard, and he consented. The search included both outside storage sheds. I searched for any evidence of the crime, or identity of the suspect(s) involved, which met with negative results.
>
> While there, I questioned Mr. Ridley, who said on 7-10-98, at about 11:40 PM, he heard the sound of something like someone slamming a car hood really loud twice. He got up and looked around, but saw and heard nothing. He said he exited his house on the west side porch, which faces the victim's house.  He said the moon was full and everything was lit up very bright outside.  It was very quiet, and he heard no one talking, no one running away, no dogs barking, no car engines racing, no tires squealing, etc. He said he heard nothing unusual. I asked him if he could hear anyone talking from the house behind him, referring to Mr. Franz, who was allegedly attempting to ask to use the phone to call 911 at the residence behind him; however he said he did not hear any voices coming from that area. He said afterwards he went back inside the house and back to bed.

(Exhibit A-4, ROA Item 298 Append. PCR Pet. Exhibit K, Suppl. Report (emphasis added).)

> I then spoke with **Douglas Johnson** who lives at 957 Sandy Beach, just west of 961 Sandy Beach. Johnson said he had just went to bed when he heard a large boom. Johnson did not note the time. He said

275

that he went outside because he thought it might be a transformer. Johnson said that everything looked ok so he went back inside. Johnson said once inside he heard two more booms a short time later. Johnson said that he did not hear anything outside.

(Exhibit A-4, ROA Item 298, Append. PCR Pet., Exhibit L, Hemingway Report (emphasis added).)

I then spoke with **Robert Hill** who lives at 956 Sandy Beach, across the street and to the west. Hill said at approx 1200 midnight he heard a gunshot. He said approx 30 seconds later he heard two more shots. Hill said that he did not hear or see anything.

(*Id.* (emphasis added).)

In addition, Douglas Johnson had given a written statement dated July 15th, 1998. (Exhibit A-3, ROA Item 298, Exhibit B.)

None of these individuals testified at trial.

In the PCR proceeding, Johnson testified that upon leaving his house to check on a broken air conditioner, he heard a boom, went to the other side of the house and saw a woman lying in the doorway of the neighbor's house.  He saw and heard no cars or people in the street or area.  He went back inside and stayed until the police arrived. Johnson testified that after he spoke with the police the next day, he was not interviewed by anyone.  (Exhibit JJ-1, R.T. 11/10/03 at 11-12, 16-21.)   Johnson admitted not previously mentioning seeing the woman in the doorway, and denied seeing Mr. Franz or anyone else leaving the Franz house.  (*Id.* at 23-26.)  He heard the first shot when he was halfway to his air conditioner and thought it was the air conditioner breaking, and he heard the second and third shots while he was by the air conditioner.  (*Id.* at 28.)

At the PCR hearing, Robert Pelzer testified that he was a private investigator retained by defense counsel in the fall of 1998.  (Exhibit JJ-2, R.T. 11/10/03 at 108-109.) He was never instructed to interview the neighbors, and never contacted Johnson, Hill or Ridley.  (*Id*. at 112-114.)    Rick Eyestone testified that he had also been retained by defense counsel (*id.* at 118-119), and that he was never instructed to interview the neighbors, and never contacted Johnson, Hill or Ridley.  (*Id*. at 124-125.)

Trial counsel Iannone testified that he did not recall whether Johnson, Hill or

276

Ridley were interviewed.  (*Id.* at 153-156.)  Trial counsel Baran testified that he believed the investigators had done a neighborhood investigation.  (*Id.* at 215-216.)

### c.   State Court Ruling

The last reasoned decision on this claim was the PCR court's rejection of the claim.  The court reasoned:

> I have not seen, either during trial or the postconviction evidentiary hearing, even a scintilla of evidence pointing to Mr. Franz as the killer.  In fact, the trial evidence supported a theory that he was actually the intended murder victim. The conspiracy theory requires one to overlook the absurdity of Mr. Franz going around town telling the police and others the name of the one person, apparently Mr. Isaacs, who could then implicate Franz as the co-conspirator. While there is no requirement that any theory of either party's case be supported by logic, the defendant has failed to demonstrate that it was ineffective assistance of counsel to not pursue these witnesses. If they had been presented, there is no evidence to support a finding of prejudice to the defendant since those who have testified are of no benefit to the defendant.

(Exhibit A-5, ROA Item 319, M.E. 11/20/03 at 4.)

### d.   Applicable Law

A failure to investigate a meritorious defense may constitute ineffective assistance of counsel.  *See Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *Morris v. California*, 966 F.2d 448 (9th Cir. 1991), *cert. denied*, 113 S. Ct. 96 (1992); *United States v. Tucker*, 716 F.2d 576, 583 n.16 (9th Cir. 1983). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. Thus, failure to interview key defense witnesses to make an informed judgment on whether to call them to testify, may be deficient performance.

"Of course, counsel need not interview every possible witness to have performed proficiently." *Riley v. Payne*, 352 F.3d 1313, 1318 (9th Cir. 2003)  "A claim of failure to

interview a witness may sound impressive in the abstract, but it cannot establish ineffective assistance when the person's account is otherwise fairly known to defense counsel." *United States v. Decoster*, 624 F.2d 196, 209 (D.C.Cir.1976) (*en banc*), as quoted in *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir.1986).

And, a habeas petitioner may not leave a court to speculate what evidence the deficient investigation would have discovered.  In order to prevail on an allegation that defense counsel conducted an insufficient investigation resulting in ineffective assistance, the petitioner must show specifically what that investigation would have produced.  A petitioner may not simply speculate about what a witness' testimony might be, but must adduce evidence to show what it would have been.  *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997).  "[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim."  *U.S. v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991).

### e.   Application to Ground 9A

Petitioner fails to show that defense counsel's failure to further investigate these witnesses was deficient performance.  Defense counsel knew, via the disclosed police investigations and the statement from Johnson, what the substance of these witnesses' testimony would be. (Exhibit JJ, R.T. 11/10/03 at 155.)  Petitioner proffers nothing to show that further investigation would have revealed additional significant facts.

It is true that during the PCR hearing, Douglas Johnson for the first time testified that he left his house "right *before* 11:30," and heard the first gunshot as he walked back toward his air conditioner.  (Exhibit JJ-1, R.T. 11/10/03 at 26-27 (emphasis added).) PCR counsel argued that in light of the time of the 911 call at 11:43, this created a 13 minute gap, suggesting that Franz had not run out of the house and immediately called 911 as he had testified.  (*Id.* at 254-255.) However, trial counsel already had available

Johnson's statement placing his trek to the air conditioner "just moments *after* 11:30 P M." (Exhibit A-3, ROA Item 298, Exhibit B (emphasis added).)  It might be tempting to make something of the distinction between "moments before" and "moments after", and suggest that further investigation would have discovered that Johnson would testify it was "before."  However, Johnson's own affidavit, prepared in May, 2003, placed the trek at "just moments *after* the time of 11:30 p.m." (*Id.*, emphasis added; Petition, Exhibits, Doc. 1-5 at physical page 8 (signed affidavit).)  Thus, his testimony at the hearing of "before" would likely have not been discovered by a timely investigation by trial counsel.

Moreover, PCR counsel oversimplified Johnson's testimony on the timing issue.

> Q. What time did you actually leave your house the first instance?
> A. It was right before 11:30.
> Q. How do you know that it was at 11:30?
> A. I actually don't.  I'm - - I'm saying it's close to as 11:30 as - - -you know - -
> Q. You wrote that in your statement back on July 15th, 1998. So what I'm trying to gather from you is what the basis of that time was in -- in this – in this statement.
> A. Well, I have a clock hanging by my -- on the side of my garage. And that's what I had to walk past to go back to my air-conditioner.
> I just -- because it's a unique clock, a one-of-a-kind clock. I like it, and I usually look at it.

(Exhibit JJ-1, R.T. 11/10/03 at 27.)  Thus, Johnson was far less precise in his testimony on the time issue than PCR counsel suggested.

Plaintiff has failed to show what additional information Ridley and Hill would have provided had trial counsel investigated.  Nor does Petitioner show that counsel performed deficiently for failing to call these witnesses to testify.

Johnson would have been subject to substantial impeachment, because his written statement dated July 15, 1998 (and his testimony at the PCR hearing) directly contradicted his statement to the police on the night of the murder.  Although he testified in the PCR hearing that he was certain of the time because he had looked at his clock, he told Officer Hemingway on the night of the murder that he "did not note the time." In his

statement he claims to have heard the second and third shots while he was outside checking on his air conditioner, and then inspected the Franz property, and saw no one and no vehicle.  But, he told Hemingway that he had already gone back inside and "once inside he heard two more booms a short time later." (Exhibit A-4, ROA Item 298, Append. PCR Pet., Exhibit L, Hemingway Rep.)  Further, Johnson claimed to have seen the victim's body partially outside the front door doorway.  This directly contradicted all of the other evidence about the location of the shooting and the position of the victim's body.

Moreover, as noted by the PCR court, there was no evidence that the various "clocks were synchronized so that they said the same time."  (Exhibit A-5, ROA Item 314, M.E. 11/20/03 at 4.)  Even if Johnson were right, his clock could have been wrong.

Further, Johnson, Hill and Ridley's testimony did nothing to exonerate Petitioner or to discredit the prosecution's witnesses, except to the extent they claimed to have seen nothing, implying that Robert Franz had killed his wife, there had been no intruder(s) in the home or car outside, and Franz had not escaped to the neighbors until sometime after the shooting.  However, trial counsel testified at the PCR hearing that the defense's theory was not that Franz had killed his wife, but that Mugsy Isaacs had done so.  (Exhibit JJ, R.T. 11/10/03 at 151, 178-179, and 197.)  Testimony that there was no vehicle, and no one outside or leaving the Franz home would have been inconsistent with that theory.

At the PCR hearing, both trial counsel at first offered various testimony that there would have been no inconsistency in presenting such evidence.  (Exhibit JJ, R.T. 11/10/03 at 153-154, 157, 159-161 (Iannone), and at 216-219.)  However, when Iannone was cross-examined on the issue, he admitted that testimony that no one left the home "would not have been consistent with our theory." (*Id.* at 179-180.)  And, on redirect, Iannone testified it would have been inconsistent, or less than credible if forced to argue that the shooter  left after the witnesses returned to their homes.  (*Id.* at 183-184.) Trial counsel Baran testified that attempts to paint Franz as the killer would have been

1    inconsistent with their theory of the case.  (*Id.* at 197.)

2          Finally, Baran testified that counsel made a tactical decision to not attempt to

3    ascribe blame to Franz:

4                Q.  Okay. Now, you indicated that your theory of the case
          was that your client wasn't there and that Mr. Isaacs is the one that
5          that actually shot the victim. Would it have been inconsistent with
          your theory to get up and present evidence or argue that Robert
6          Franz actually did the killing or did the shooting of Ms. Mrs. Franz?
                A.  It would have ultimately been inconsistent. There was a
7          similarity to height. But that -- that was a road that we went down to
          investigate Mr. Franz as a possible suspect in the case.
8                And we decided he was not a viable suspect. That just wasn't
          going to work.
9                Q. And why did you decide he was not a viable suspect?
                A. Boy, you're going back four years and asking me.
10               But we did a lot of investigation, a lot of comparing of times,
          dates, availability, things about Mr. Franz, his temper, his
11          relationship with his wife. There was something about a divorce,
          and we found out later that he wouldn't have known about it. So
12          there  were a lot of roads we went down that turned out to be dead
          ends.
13               And I did not ultimately want to present evidence that Mr.
          Franz was the shooter.
14
     (Exhibit JJ, R.T. 11/10/03 at 197-198.) More specifically, Baran explained the difficulty
15
     in relying upon testimony that no car and no one were seen at the home, and thus Franz
16
     was the shooter.
17
                A. I remember that I did not consider that to be a viable
18          defense for a number of reasons.
                Q. Okay. Go ahead. Tell us why.
19               A. Well, Mrs. Franz was shot in the head by a shotgun.
          There was no shotgun in the house. Mr. Franz, in fact, ran out of the
20          house. There were footprints that were consistent with somebody
          approaching the door.
21               There was a car that pulled up in front of the house at some
          point.
22               Mr. Franz was simply not a viable suspect in the case,
          although certainly I can see how you're going there. But I did not
23          consider that Mr. Franz was – here was a man who ran out the back
          door, leaving his children on the floor of the house. I'm sorry,
24          David, that -- that, after all the investigation in this case, did not
          seem viable.
25               There were also the locations of the bullet holes in the trailer.
          There were the locations of the shells on the floor. There were
26          things like that.
                And - -
27               Q. Okay.
                A. Why four years ago I came to the conclusion that I did, I
28          don't know. But I can tell you right now, I did not consider that

                                       281

nobody came to the door and nobody shot her with no gun as a viable defense.

(*Id.* at 225-226.)

Regardless of trial counsel's after-the-fact opinion, the undersigned finds such testimony could reasonably have been deemed inconsistent with the defense theory, and counsel could have reasonably made the strategic determination that attempting to convince the jury that Franz was the shooter would be detrimental to the defense. This court need not determine the actual reason for the attorney's actions, as long as the act falls within the range of reasonable representation. *Morris v. California*, 966 F.2d 448, 456-457 (9th Cir. 1991), *cert. denied*, 113 S. Ct. 96 (1992).

Moreover, in light of: (1) the available impeachment and lack of credibility of Johnson, (2) the unlikelihood that the jury would believe that Franz was the shooter (for the reasons expressed by counsel Baran), (3) the unconvincing nature of the testimony that the witnesses saw nothing, and (4) the other available evidence, the undersigned finds no reasonable probability that the outcome of the trial would have been different had these witnesses been called to testify.

### f.   Conclusion re Ground 9A

Based upon the foregoing, the undersigned concludes that Ground 9A is without merit.

## 3.  Ground 9B (Jury Selection)

### a.   Arguments

For his Ground 9B, Petitioner argues that trial counsel was ineffective for failing "to object to the juror questionnaire and voir dire that only death qualified the prospective jurors", and the "court's removal for cause of all jurors who voiced general opposition to the death penalty on their questionnaires without insisting on rehabilitation voir dire." (Petition, Doc. 1 at 9:5-A.)

Respondents concede exhaustion and argue that the claim is without merit

282

because: (1) death qualifying juries is permissible under *Lockhart v. McCree*, 476 U.S. 162 (1986), etc.; (2) the right to "life-qualify" a jury does not make a request to do so obligatory on counsel; (3) counsel's actions during voir dire are considered trial strategy; (4) there was no prejudice from loss of the removed jurors because they had other unfavorable characteristics; (5) the trial court confirmed that all serving jurors would decide the case based solely on the evidence; and (6) there was no prejudice because the remedy for improper death qualification is vacation of a death sentence, not a conviction, and Petitioner was sentenced to life in prison.  (Answer, Doc. 14 at 182-187.)

Petitioner makes no reply to this specific claim 9B.  (*See* Reply, Doc. 25 at 24-25.)

### b.   Facts Underlying Claim

At trial, the defense sought a jury selection procedure utilizing a juror questionnaire and follow up questioning "to expose bias or prejudice." (Exhibit A-1, ROA Item 91 at 4.)[53]   The prosecution sought juror questions to identify prospective jurors' biases in favor or against the death penalty. (Exhibit A-1, ROA Item 97, Resp. re Juror Quest. at 2.)

The trial court adopted a juror questionnaire procedure, providing for follow up voir dire by counsel after reviewing the responses.  (Exhibit C, R.T. 2/22/00 at 10.)  The questionnaire ultimately included the following question:

> The defendant is charged with First Degree Murder. If he is found guilty of that charge, the court may impose a sentence of life imprisonment or the death penalty. In the event of a guilty verdict, the imposition of sentence is the judge's responsibility and the jury would have no role in that process or decision. However, since a guilty verdict for First Degree Murder could result in the imposition of the death sentence by the court, do you have any conscientious or religious beliefs or other feelings about the subject of the death

---

[53] Respondents argue that defense counsel also proposed questions on the death penalty issue, and cite "Exhibit A: R.O.A., Item 118, page 2". (Answer, Doc. 14 at 176.)  The undersigned is unable to locate any "Item 118" in Defendants' Exhibit A.  The Index of Record identifies item 118 as a "Certification of Service. (Exhibit A-2, ROA Item 264, Index,  at physical 6.)  The defense's Proposed Juror Questionnaire" is included at Exhibit A-1, ROA Item 87.  However, it contains no death (or life) penalty questions.

penalty that would affect your ability to be fair and impartial in deciding guilt or innocence?

If so, please explain.

If you answered yes, are your feelings or beliefs so strong you would be unable or unwilling to return a guilty verdict on First Degree Murder even if you were convinced that the state had proven the defendant's guilt beyond a reasonable doubt?

If so, please explain.

(Exhibit A-4, ROA Item 298, PCR Append., Exhibit C, Diaz Juror Question. at 2.) Three jurors, Diaz (number 60), Frederickson (number 72), and Campbell (number 90) indicated concerns on this question.

Prospective Juror Diaz responded "yes" and explained: "I am against the death penalty because I think it's a [sic] easy way out.  I believe a person should pay for a crime for the rest of their life."  (*Id.*) As to whether this made her unable to convict, she responded "No."  (*Id.*at 3.)  No further explanation was given.

Prospective Juror Frederickson responded "yes," explained "religous [sic] beliefs" and said he was "unsure" if he could convict.  (*Id.* at Frederickson Juror Question. at 2-3.)  The prosecution also observed that he expressed concerns about losing commission sales, making him "a little bitter and impartial [sic]."  (Exhibit H, R.T. 4/24/00 at 13.) (*See also* Exhibit A-4, ROA Item 298, PCR Append., Exhibit C, Frederickson Juror Question. at 1.)

Prospective Juror Campbell responded "yes," explained "I do not believe in the death penalty," and said she was "not sure" if she could convict, explaining "I just feel strongly about the death penalty."  (Exhibit A-4, ROA Item 298, PCR Append., Exhibit C, Campbell Juror Question. at 2-3.)   She also disclosed that she was diabetic, with required monitoring and medication, including shots.  (*Id.* at 1.)

The state moved to strike these three jurors based on their responses.  (Exhibit H, R.T. 4/24/00 at 12-14.)  Defense counsel indicated they had "no objection to the State's motion to strike" these three, among others. (*Id.* at 16.)  The court struck them.  (*Id.* at 20.)

//

//

### c.   State Court Ruling

Petitioner raised the instant claim in his first PCR proceeding.  (Exhibit A-3, ROA Item 297, PCR Pet. at 10-12.)  The PCR court rejected the claim finding:

> The jury was not selected on the basis of the questionnaire alone, nor was oral voir dire limited to follow up questions to the answers given in the questionnaire. The defendant has not alleged any deficiency in the oral voir dire, and I am satisfied that the combination of written and oral questions was adequate to guarantee a fair trial. Likewise, the evidence does not support the allegation that all persons who voiced general opposition to the death penalty were removed. Three members of the panel were cited in the petition, and their questionnaires were presented as evidence. All three presented circumstances from which a legitimate tactical reason for agreeing to their removal could arise. One felt that the death penalty is "too easy" on the murderer; surely she would not be seen as a desirable juror for the defendant. One felt that it would cost him too much in lost commissions and customer contacts in his auto sales business, and he might be bitter about being required to serve. The third, a sixty-two year old with diabetes, might have health-related reasons to be excused regardless of her views on the death penalty.
> In sum, the defendant has not proved that counsel's performance was deficient in jury selection.

(Exhibit A-5, ROA Item 314, M.E. 11/20/03 at 1-2.)  This was the last reasoned decision on this claim.

### d.   Applicable Federal Law

In evaluating the effectiveness of counsel, this Court must generally consider the legal tools available to counsel under both federal and state law.

### (1).  Cannot Exclude Dissenters

In *Witherspoon v. Illinois*, 391 U.S. 510 (1968), the Court addressed the issue of the prosecution "death qualifying" a jury, and held that under the limitations of due process, "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction."  *Id.* at 522.  The Court reserved however, the question whether the Constitution also prohibited excluding jurors who not only harbored "doubts

about the wisdom of capital punishment," but who "would not even consider returning a verdict of death." *Id.* at 520.

The Court rejected the contention that "the kind of juror who would be unperturbed by the prospect of sending a man to his death…is the kind of juror who would too readily ignore the presumption of the defendant's innocence, accept the prosecution's version of the facts, and return a verdict of guilt." *Id.* at 516-17.

In *Wainwright v. Witt*, 469 U.S. 412 (1985), the Court expressed concern that lower courts were being too exacting in determining when a juror could properly be excluded under *Witherspoon*. The Court clarified that the standard under *Witherspoon* does not require that the juror confess "automatic decision making" or that there be "unmistakable clarity" as to a juror's bias. Rather, the standard for exclusion "is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* at 424.

### (2).  Can Exclude Nullifiers Against Death

In *Lockhart v. McCree*, 476 U.S. 162 (1986) ("*McCree*") the Court returned to the question left open in *Witherspoon*, and affirmatively held that a state could exclude jurors "whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors." *Id.* at 165. The Court referred to these people as "nullifiers." *Id.* at 185.

### (3).  Can Exclude Nullifiers Against Life

In *Morgan v. Illinois*, 504 U.S. 719 (1992), the Court addressed the converse question - - whether a defendant was entitled to "life qualify" a jury, *i.e.* remove for cause jurors who would "automatically vote for the death penalty irrespective of the facts or the trial court's instructions of law." *Id.* at 726. The Court concluded that the defense could.

The Court further reiterated its conclusion in *Lockhart* that each side must be

permitted to conduct voir dire to weed out those jurors whose views would not permit them to decide the case on the evidence and the law.  *Id.* at 733.

> Were voir dire not available to lay bare the foundation of petitioner's challenge for cause against those prospective jurors who would always impose death following conviction, his right not to be tried by such jurors would be rendered as nugatory and  meaningless as the State's right, in the absence of questioning, to strike those who would never do so.

*Id.* at 733-34.

### (4).  Doesn't Affect Guilt Determination

*Witherspoon* dealt with the question whether a state could "entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death."  391 U.S. at 521.  The Court carefully limited its holding:

> Nor does the decision in this case affect the validity of any sentence other than one of death. Nor, finally, does today's holding render invalid the conviction, as oppose to the sentence, in this or any other case.

*Id.* at 523, n. 21.  In *McCree*, the Court specifically declined to extend the *Witherspoon* rationale to "the jury's more traditional role of finding the facts and determining the guilt or innocence of a criminal defendant, where jury discretion is more channeled."  476 U.S. at 183.  *See Evans v. Lewis*, 855 F.2d 631, 635 (9th Cir. 1988) (finding *Witherspoon* inapplicable because "the jury played no role in Evans' sentencing" but its "sole function was to determine Evans' guilt or innocence").  *See also LaGrand v. Lewis*, 883 F.Supp. 451, 461-62 (D.Ariz.,1995) (citing *Evans*) ("the right vindicated by the progeny of *Witherspoon*… is the right to be impartially sentenced. As a jury plays no role in Arizona in determining the sentence, this right cannot be infringed even were a prospective juror to be improperly excluded.")

### (5).  Doesn't Create Fair Cross-Section Right

In his PCR Petition, Petitioner founded his arguments at least in part upon the assertion that the questionnaire denied him a jury "selected from a fair cross section of

287

the community." (Exhibit A, ROA Item 297, PCR Pet. at 11-12.) As noted by Respondents, the Supreme Court has consistently refused to extend the "fair cross section" requirement to petit juries. "We have never invoked the fair-cross-section principle to invalidate the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large." *McCree*, 476 U.S. at 173.

Moreover, *McCree* found that even if the "fair cross section" requirement extended to a petit jury, "'*Witherspoon*-excludables' do not constitute a 'distinctive group' for fair-cross-section purposes, and [held] that 'death qualification' does not violate the fair-cross-section requirement." 476 U.S. at 177.

Arizona has done the same. *See State v. Morris*, 215 Ariz. 324, 334, 160 P.3d 203, 213 (2007) (applying "distinctive group" limitation to fair-cross-section claims). .

### e.   Applicable State Law

In *State v. Anderson*, 197 Ariz. 314, 319, 4 P.3d 369, 374 (2000), the Arizona Supreme Court observed that the state had long ago "adopted an identical standard" to that adopted in *Witt*, 469 U.S. at 424, for determining when a juror's attitudes against the death penalty could be used to disqualify them.

However, Arizona has made several significant exceptions.

### (1).  Extended to  Guilt Determination in Judge Sentencing Case

In *Anderson*, the Arizona Supreme Court considered whether the *Witherspoon-Witt* standards were " applicable to a state like Arizona, in which the judge sentences defendants convicted of a capital crime."[54]  197 Ariz. at 319-320, 4 P.3d at

---

[54] In 2002, in response to the Supreme Court striking down Arizona's capital sentencing scheme in *Ring v. Arizona*, 536 U.S. 584 (2002), the Arizona legislature amended the capital sentencing procedures so "the jury serving during the guilt phase of the trial also serves as the trier of fact during the sentencing phase" and functions to "find and consider the effect of aggravating and mitigating circumstances and decide whether the defendant should receive a sentence of death." *State v. Ring*, 204 Ariz. 534, 545, 65 P.3d 915, 926 (2003).

374-375.   The Court eventually observed that "the Supreme Court has not made *Witherspoon* applicable to judge-sentencing states."  *Id.* at 322, 4 P.3d at 377.

But, the Court also observed that "[e]ven if *Witherspoon* and its progeny are not binding in Arizona, a judge-sentencing state, the fact is we have adopted them."  *Id*. at 320, 4 P.3d at 375.  The court reasoned:

> It would, we think, defy reality to conclude that the jury's determination of guilt or innocence in a first-degree murder prosecution is unaffected after—as in this case—the jurors have learned from the voir dire process itself that death is a potential result of a guilty verdict. Arizona's system implicitly and explicitly acknowledges that jurors' views in opposition to the death penalty could affect their ability to impartially evaluate the defendant's guilt.

*Id.*

Thus, Arizona has gone where the *Witherspoon* Court would not, and has accepted that views on sentencing can lead to bias in guilt determinations, and thus the right to qualify juries on such views must be honored.  Because the trial court's failure to permit rehabilitation of jurors with only general objections to the death penalty was considered "structural error," the court reversed the conviction.

Accordingly, not only has Arizona extended the rule of *Witherspoon-Witt* to its judge sentencing model, but has acknowledge that violations of the rule call for vacating the finding of guilt.

Although *Anderson* was decided on June 15, 2000, just after the conclusion of Petitioner's trial, the *Anderson* court observed that the court had applied *Witherspoon-Witt* in Arizona (despite the use of judge-sentencing) as early as 1987, citing State v. LaGrand, 153 Ariz. 21, 33, 734 P.2d 563, 575 (1987).  In *LaGrand,* the Arizona Supreme Court had observed that "[b]ecause in Arizona the judge alone determines the sentence, *Witherspoon* and its progeny would appear to have little applicability to Arizona jury selection in capital cases."  153 Ariz. at 33, 734 P.2d at 575.  However, the court went on to conclude "Arizona has consistently rejected the rigid distinction between guilt determination and sentencing," and proceeded to address the *Witherspoon* issue.  Moreover, by the time *State v. Van Adams*, 194 Ariz. 408, 984 P.2d 16 (1999) was

decided (on June 18, 1999, some ten months before voir dire in Petitioner's case), the Arizona Supreme Court had plainly resolved the issue.  "As Appellant concedes, we have previously rejected the argument that, because the judge determines the defendant's sentence, the jury should not be death qualified." *Van Adams*, 194 Ariz. at 417, 984 P.2d at 25 (citing *LaGrand*).

### (2).  Extended to Life Qualifying Jurors

The court in *Anderson* went on to recognize that the right to qualify jurors on their sentencing views must be symmetrical.  "There are, of course, two sides to the coin. Just as the State believes death qualification is necessary to a fair trial so that it may remove potential jurors whose opposition to the death penalty would prevent or impair their willingness to convict, we must also acknowledge Defendant's contention that removal of all jurors opposed to the death penalty but willing to set aside their views might produce a jury 'organized to return a verdict' of guilt." *Anderson*, 197 Ariz. at 320, 4 P.3d at 375.

The Arizona Court has since repeatedly recognized that just as it had applied *Witherspoon-Witt's* standards on death qualifying juries, it similarly found the "life-qualifying" provisions under *Morgan v. Illinois* to apply.  *See State v. Jones,* 197 Ariz. 290, 303, 4 P.3d 345, 358 (2000) ("defendants have a right to know whether a potential juror will automatically impose the death penalty once guilt is found"); *State v. Moore*, 222 Ariz. 1, 9, 213 P.3d 150, 158 (2009) ("capital defendant is entitled, upon request, to inquire whether prospective jurors believe death should always be imposed for the conviction of a capital offense").

While it might be contended that because *Anderson* was decided after Petitioner's guilt determination, counsel could not have relied upon this argument.  But *Anderson's* did not effect any extension of the reasoning of *Morgan* beyond the recognition of what it had long ago decided: that *Witherspoon* and its progeny applied even though Arizona used judges to decide capital sentences.

1

2      **f.   Application to Facts**

3      Petitioner's complaint is that trial counsel failed to protect his rights under *to* an

4      unbiased jury by failing to object to the questionnaire used by the trial court because it

5      "only death qualified" the jurors, and by failing to attempt rehabilitation of those jurors

6      sought to be struck on the basis of their responses.  (Petition, Doc. 1 at 9:5-A.)

7

8              **(1).  Failure to Object to Questionnaire**

9      **Right to "Life Qualify"** - Plaintiff complains that the juror questionnaire failed to

10     "life qualify" the jury.

11             Respondents argue that this is irrelevant, even though *Morgan* provided for just

12     such voir dire, Arizona is a judge-sentencing state and therefore *Morgan* did not apply to

13     Petitioner.  Indeed, federal law under *Morgan* applies only if the jurors were part of the

14     sentencing phase.  504 U.S. at 721.  In Petitioner's case, the choice between life and

15     death was left to the judge.  *See State v. Willoughby*, 181 Ariz. 530, 546, 892 P.2d 1319,

16     1335 (1995) ("Arizona excludes jurors from the sentencing process"). *But see* Ariz. Rev.

17     Stat. § 13-752 (added as § 13-703.01 by Ariz. Sess. Laws 2002, 5th Sess. Ch. 1, § 3, eff.

18     Aug. 1, 2002 (providing for jury determination of aggravating and mitigating facts).)

19     Thus, Petitioner's case did not present a *Morgan* problem, *i.e.* weeding out jurors who,

20     having found guilt, would lawlessly apply the death penalty out of a belief that the guilty

21     must die even if the law doesn't provide for it.

22             Instead, as argued by Respondents (Answer, Doc. 14 at 182), Petitioner's

23     argument sounds under the second half of *Witherspoon*, *i.e.* whether a juror in favor of

24     the death penalty would convict even an innocent person because they believed the

25     guilty should die.  The *McCree* and *Witherspoon* Courts were unwilling to make such a

26     logical leap, even in the face of studies that were purported to show such a correlation.

27     Accordingly, any effort to seek to "life-qualify" the jury under federal law, *e.g. Morgan*

28     would have been futile.

On the other hand, Arizona has gone where the U.S. Supreme Court would not, and has explicitly recognized that views on sentencing can affect a juror's bias at the guilt stage.  Accordingly, Petitioner had the right, under Arizona law, to demand that his guilt-phase-only jury be life-qualified.  And of course, trial counsel was obligated to protect Petitioner's rights under not only federal law, but also state law, in order to provide the counsel guaranteed under the Sixth Amendment.

**Counsel's Obligation to Life Qualify** - Respondents argue that nonetheless, that there is no constitutional obligation on counsel to always "life qualify" a jury, and any attempt to pose such a requirement would be a novel extension of *Morgan*.  (Answer, Doc. 14 at 183.)  However, the fact that neither *Morgan* nor Arizona precedent require counsel to life qualify jurors in every case does not resolve whether, in the circumstances of a given case, counsel performed deficiently by failing to do so.  No novel law is involved in saying that counsel is obligated under *Strickland* to utilize rights and defenses available to a defendant in the absence of strategic reasons no to do so.

It is true that trial counsel Iannone suggested that there were none:

> Q. And would you say that it is sound trial  strategy to not ask life qualifying questions in your  opinion?
> A. Typically, no, I would say not a very good  idea at all.
> Q. And why would you say that?
> A. There is -- there is a -- a profound  statistical correlation between people who are avidly in  favor of -- of the death sentence, capital punishment,  and persons who are prone to convict regarding -- regardless of the level of evidence.
> So even pre-*Ring*, the responses to death  qualification and life qualification kinds of questions  could tell an attorney a great deal about that person's  predisposition to return a verdict of guilty or not  guilty.
> * * *
> Obviously a person who believes that every first degree murder conviction should be accompanied by  a death sentence is -- is strikable for cause. And if you don't ask those kinds of questions, you're not going to identify to people who, under the law as it exists today, have absolutely no business on that jury.

(Exhibit JJ, R.T. 11/10/13 at 134-135.)  But this was Iannone's first capital case, at the time of his testimony, he had since tried only one other, and co-counsel Baran had primary responsibility for voir dire in this case.  (*Id.* at 134, 137.)

292

The Sixth Circuit has recognized that " *"Morgan* does not mandate that life-qualifying questions be asked of potential jurors in every case," and that "failure to life-qualify a jury is not per se ineffective assistance of counsel." *Stanford v. Parker*, 266 F.3d 442, 454 (6th Cir. 2001).   The court went on to identify strategic reasons for foregoing life-qualifying questions, including: (1) avoiding having "individual jurors to hear one another's answers to life-qualifying questions"; (2) being already "satisfied with the composition of the jury and confident in its ability to honestly and ably perform its duties"; (3) having "calculated that asking additional life-qualifying questions might aid the *prosecution* in deciding how to use its peremptory challenges." *Stanford v. Parker*, 266 F.3d 442, 454 (6th Cir. 2001) (emphasis in original).   In addressing a claim of ineffectiveness in failing to life qualify a jury, he Eleventh Circuit has observed that "it seems reasonable for trial counsel to want to focus the jury on the idea of the death penalty as little as possible." *Brown v. Jones*, 255 F.3d 1273, 1279 (11th Cir. 2001).

Indeed, here, counsel Baran testified that he preferred to conduct sequestered voir dire in a death case, but had not been permitted to do so in this case.  (Exhibit JJ, R.T. 11/10/13 at 207.)  He also refused to agree that he should always request that the court ask a life-qualifying question:

> Q. So now if the State was going to have that  right -- and in this case let's -- I don't know whether you disagree with me or not, but the record reflects that  Mr. Carlisle submitted a death question in this case to   the judge -- death qualifying. You would not as sound  trial strategy ask for a life qualifying question?
> A. Not necessarily. I might have, I might not have. I don't recall.

(*Id.* at 208.)

Petitioner proffers nothing to suggest that, in this case, particularly given the fact that jury would not, in any event, chose the sentence, counsel could not have concluded that asking additional questions focused on the death penalty was not good strategy.

**<u>Manner of Exercising Right</u>** – The PCR court rejected this claim, finding that even though the permissible life-qualifying questions had not been included in the questionnaire, counsel was permitted to ask questions during oral voir dire, and the PCR

1  court was "satisfied that the combination of written and oral questions was adequate to
2  guarantee a fair trial." (Exhibit A-5, ROA Item 314, M.E. 11/20/03 at 1-2.)

3        Indeed, nothing under federal or state law mandates the manner in which a
4  defendant's rights to weed out biased jurors is exercised.  *Morgan*  merely recognized
5  that the defendant "was entitled, upon his request, to inquiry discerning those jurors
6  who…had predetermined the terminating issue of his trial, that being whether to impose
7  the death penalty." *Morgan*, 504 U.S. at 736. *See e.g. Stanford v. Parker,* 266 F.3d 442,
8  453 (6th Cir. 2001) (recognizing propriety of permitting life-qualifying questions during
9  general voir dire, but not during individual voir dire).

10        Similarly, in *Moore*, the Arizona Supreme Court recognized only "that a capital
11 defendant is entitled, upon request, to inquire whether prospective jurors believe death
12 should always be imposed." *Moore*, 222 Ariz. at 9, 213 P.3d at 158.  Indeed, in *Moore*,
13 the "trial court did not prevent defense counsel from asking life-qualifying questions, but
14 instead refused to ask them in a written questionnaire and invited counsel to ask such
15 questions in oral voir dire." *Moore*, 222 Ariz. at 10, 213 P.3d at 159.

16        Moreover, no particular form of questions has ever been prescribed.

17        Here, Petitioner fails to show that the juror questionnaire in this case was
18 inadequate to exercise his rights to life-qualify the jury.   The subject of the panel's
19 attitudes towards the death penalty were addressed by the court when it laid out the
20 potential for imposition of the death penalty, and asked "do you have any conscientious
21 or religious beliefs or other feelings about the subject of the death penalty that would
22 affect your ability to be fair and impartial in deciding guilt or innocence?" (Exhibit A-4,
23 ROA Item 298, PCR Append., Exhibit C, Diaz Juror Question. at 2.)  This question
24 addressed both sides of the death penalty issue without presupposing the nature of the
25 bias, *i.e.* whether the prospective juror was in favor of or opposed to the death penalty –
26 whether the juror's views would prevent a decision of guilt or innocence.

27        At the PCR hearing, although apparently confused about the portion of the juror
28 questionnaire referred to, trial counsel expressed the belief that this constituted a life-

294

qualifying question:

> Q. Looking at the second part of that question where it states -- where it states -- it starts with if you answered yes -- and that's about person, whether their opinions on the death penalty will affect their ability to be fair and impartial.
> A. Yes.
> Q. That second part of that question, is that a life qualifying question or death qualifying question, in your opinion, or neither?
> A. Or both. I think -- I think it -- it serves as either death or life qualifying depending upon the answer given by the -- the veneerman [sic].

(Exhibit JJ, R.T. 11/10/3 at 141.)

It is true that the *Morgan* Court found that "general fairness and 'follow the law' questions [are not] enough to detect those in the venire" who would act on their prejudices. *Id.* at 734. "It may be that a juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so." *Id.* at 735. But here, the trial court's question was not such a generic inquiry, but was uniquely directed at opinions about the death penalty.

It is also true that the court's questionnaire went on to follow with a purely "death-qualifying" question. "If you answered yes, are your feelings or beliefs so strong you would be unable or unwilling to return a guilty verdict on First Degree Murder even if you were convinced that the state had proven the defendant's guilt beyond a reasonable doubt?" (Exhibit A-4, ROA Item 298, PCR Append., Exhibit C, Diaz Juror Question. at 2.) And, it is true that no similar "life-qualifying" question was asked. But Petitioner proffers nothing to show that the general question was not adequate, nor that declining to insist on ever more questions focused on the death penalty was not sound strategy.

Further, during oral voir dire (after granting the prosecution's motion to strike the jurors who had responded on the written question), the trial court addressed both sides of the coin:

> THE COURT: All right. One of the things about a criminal case that I'm - - you're going to be given in the instructions is that in the event of a conviction, the sentencing is completely my

295

responsibility. And the jury would have no participation, even advisory, in that decision.

I mentioned in the questionnaire the death penalty is one possible result of a conviction for first degree murder. It is one of three possibilities. And as I said, 'the jury would have no participation in that decision. And I will be instructing you that you are not to consider or even -- not to discuss or even consider the possible punishment in serving as a juror in deciding guilt or innocence.

Now, in a case like this, we do tell you that the death penalty is one possibility, but once we start in the trial, in deciding guilt or innocence, you are not to allow the possible sentence to affect your deliberations in reaching that guilty or not guilty verdict.

So with that guideline, do you think that your beliefs or your feelings would hamper your ability to be fair and impartial?

PROSPECTIVE JUROR OOSTERHART: No, sir.

THE COURT: Would they make you unable to reach a guilty or not guilty decision?

PROSPECTIVE JUROR OOSTERHART: No, sir.

THE COURT: Okay. Do any of you have any kind of beliefs that would prevent you from returning a verdict of guilty if -- after hearing all the evidence and my legal instructions and after due deliberations, if you were convinced beyond a reasonable doubt of a defendant's guilt? (No response.)

THE COURT: There are no hands shown.

PROSPECTIVE JUROR CALLAHAN: Run that by us one more time.

THE COURT: If you were convinced of the defendant's guilt after hearing all the evidence and after listening and considering the instructions of law and after deliberating with your fellow jurors -- if you were convinced beyond a reasonable doubt of the defendant's guilt, do you have any beliefs that would prevent you from returning a verdict of guilty?

(No response.)

THE COURT: And there are no hands shown.

Now, the converse. Do any of you have any beliefs that would prevent you from returning a verdict of not guilty if after hearing all the evidence and the instructions and after due deliberations you were not convinced beyond a reasonable doubt of the defendant's guilt?

(No response.)

THE COURT: There are no hands shown.

(Exhibit I, R.T. 4/25/00 at 65-67.)  Petitioner proffers nothing to show that this was inadequate to "life-qualify" the jury, or that counsel should have insisted on belaboring the point further.

### (2).  Failure to Rehabilitate Jurors

Petitioner also complains that counsel failed to attempt to rehabilitate these jurors, but instead simply reported "no objection" to the motion to strike them.  Counsel cannot

be found to have performed deficiently on this basis.

Second, as recognized by the PCR court, there were sound tactical reasons for counsel to nonetheless have stipulated to the dismissal of these jurors, *i.e.* Diaz's anti-crime sentiments, Frederickson's fear of losing income, and Campbell's health condition.[55]

Respondents contend that the PCR Court found that these were the actual reasons relied upon by counsel.  (Answer Doc. 14 at 184-185.)  To the contrary, the PCR Court made no finding about what counsel actually did, but only (and properly) concluded that these were merely "circumstances from which a legitimate tactical reason for agreeing to their removal *could arise*."  (Exhibit A-5, ROA Item 319, M.E. 11/20/03 at 2 (emphasis added).)

On the other hand, trial counsel Iannone testified that he would have found he would not have wanted **Diaz (Juror 60)** on the jury because of the responses to the written questions.

> THE WITNESS: This veneer [sic] person writes that her opposition to the death penalty is -- is based on the fact that it's -- it's too easy a way out for -- for the convicted person.
> I might have been inclined in fact, I would probably be inclined to view it today as is as this being a person I don't want on the jury if I can avoid it.

(Exhibit JJ, R.T. 11/10/3 at 145.)  Petitioner proffers nothing to suggest that this was not an accurate assessment.

With regard to **Frederickson (Juror 72)**, Iannone observed:

> Q. Do you - - is there a reason to not ask to voir dire this juror?
> A. If so, they would probably arise in the answer to Question 4. On individual -- this man says that -- that service on the jury would not only cost him money, but also cus-- -- customer relations and it may make him a little bitter. And that would concern me, you know, being somebody who wants to rush though a verdict one way or the other before the evidence has been fully considered.

---

[55] In addition, trial counsel Iannone testified that he would have considered Campbell's having heard of the murder from the media, which Iannone characterized as "distinctly" unfavorable to Petitioner.  (Exhibit JJ, R.T. 11/10/03 at 176-177.)

I don't know that that was the analysis back in 2000.   But that is something I see in that questionnaire that causes me some concern.

(*Id.* at 145-146.)  Petitioner proffers nothing to suggest that foregoing this juror was not a reasonable strategic decision.

With regard to **Campbell (Juror 90)**, Iannone first agreed that rehabilitation of this juror would have been appropriate (albeit not in front of other jurors), but admitted he did not recall why they did not object striking this juror.  (*Id.*  at 146-148.)  Moreover, on cross examination, Iannone conceded that he may have considered this juror's diabetes condition in view of the length of the trial. (*Id.*at 176.)  Co-counsel Baran also expressed concerns (at least in hindsight) about this juror's health:

A. I think he was sick. There was something about the diabetes that -- you know, I can't tell you I remember anything about this juror. But I look at the questionnaire, and it raises a red flag to me that this person couldn't pay attention to a trial because his   blood sugar levels are varying. But I don't remember that.

(*Id.* at 210.)

Iannone also testified that he would have considered Campbell's having heard of the murder from the media, which Iannone characterized as "distinctly" unfavorable to Petitioner.  (*Id.* at 176-177.)  He concluded that although he didn't "specifically recall," he didn't think that any of these three jurors were ones that they were concerned about rehabilitating and keeping on the jury. (*Id.* at 177-178.)

Similarly, co-counsel Baran testified:

Q. …Do you recall any specific jurors that were struck, why you did  not object to them being stricken?
A. There were some very general death penalty answers, and I don't remember any names and I don't remember what they said. But I remember we didn't -- there weren't any in that group that we wanted on the jury.

(*Id.* at 199-200.)  Moreover, Baran testified that the attorneys had carefully ranked each juror on the basis of their responses, and that they would have objected to efforts to strike favorable jurors:

Q. In your recollection, were any of the jurors that were struck based solely on their answers to the questionnaire -- were any

of those jurors either fives or fours jurors that would be on the better scale for you?

    A. If I didn't object, that didn't happen.

(*Id.* at 200-201.)

In sum, Petitioner fails to show that trial counsel did not have had a reasonable, strategic basis, for not attempting to rehabilitate these jurors.

Based upon the foregoing, the undersigned concludes that Petitioner has failed to show that the actions of counsel, either with regard to the questionnaire, or counsel's failure to rehabilitate the jurors, was deficient.


### (3).  Prejudice

Respondents argue that Petitioner has failed to show prejudice under *Witherspoon*, *etc.* because Petitioner was not sentenced to death.  Indeed, vacating of the conviction is not ordinarily an available remedy under federal law. "The law is clear that a *Witt–Witherspoon* error precludes the government from imposing the death penalty. It does not, however, mandate reversal of the underlying conviction." *United States v. Quinones*, 511 F.3d 289, 305 (2d Cir. 2007).  But, such a remedy was available under Arizona law.  *See Anderson*, *supra*.

Nonetheless, having found no deficient performance, this Court need not find an absence of prejudice to reject Petitioner's claim.  *Strickland*, 466 U.S. at 697.


### g.   Conclusion re Ground 9B

Based upon the foregoing, the undersigned finds no deficient performance from counsel's actions with regard to juror selection, and Ground 9B must be denied as without merit.


## 4.  Ground 9C (Impeachment of Hernandez)

### a.   Arguments

For his Ground 9C, Petitioner argues that trial counsel was ineffective in cross-

examining Hernandez because counsel failed to impeach him with his "numerous prior inconsistent versions of the events, reputation for untruthfulness, alcoholism and drug abuse, and by drug and alcohol impairment on the night of the alleged offense." (Petition, Doc. 1 at 9:5-A.)

As pointed out by Respondents (Answer, Doc. 14 at 187), Petitioner does not provide any factual specifics with this claim.   Respondents fill in the blanks by referencing Petitioner's first PCR Petition, identifying some 6 categories of impeachment material.   (Answer, Doc. 14 at 187-188.)   However, only those claims raised in Petitioner's Petition for Review on that PCR Petition would be properly exhausted.   Accordingly, it is at best that Petition for Review to which this Court may look to elucidate Petitioner's claim, and thus the undersigned construes Petitioner's Ground 9C as asserting those allegations as the basis for the claim.

In his Petition for Review, Petitioner pointed to four sources of impeachment of Hernandez in his Petition for review:

(1) The missing "neighborhood witnesses" (Exhibit LL, PCR Pet. Rev. at 17);

(2) Testimony of Gracie Cox and Adriana Cox that Petitioner was not at their home the night of the shooting (*id.* at 18);

(3) Cross-examination of Hernandez on his "drug and alcohol intoxication" (*id.* at 20); and

(4) Cross-examination of Hernandez on "other inconsistent statements" (*id*).

The undersigned has already herein addressed the claimed ineffectiveness of counsel with regard to the missing "neighborhood witnesses" in connection with Petitioner's Ground 9A.   For the reasons expressed in that discussion, the undersigned finds no merit to the assertion that these witnesses would have provided meaningful cross-examination of Hernandez.   Accordingly, that allegation will not be further discussed in connection with this Ground 9C.

Respondents argue that the claim is without merit.  (Answer, Doc. 14 at 187-213.)

Petitioner makes no reply to this specific claim 9C.  (*See* Reply, Doc. 25 at 24-

25.)

### b.   Presence at Scroggins' Party

**Factual Background** - Hernandez testified at trial that on the night of the murder, Petitioner went with him to a party at the home of Travis Scroggins, Petitioner asked about getting methamphetamine, and Hernandez introduced him to Isaacs who was at the party.  (Exhibit L, R.T. 4/26/00 at 7-10.)  The three of them then left the party (*id.* at 11), and ultimately travelled to the Franz home where Petitioner shot the victim (*id.* at 24-26.)

At the PCR hearing, Petitioner presented testimony from Griselda (Gracie) Cox and Adriana Cox (Scroggins/Chavira) that (contrary to Hernandez's testimony), Petitioner was not at the party at Scroggins' house the night of the murder.

Although disclaiming any recollection of specific dates, Griselda Cox testified that she for a time lived with her sister Adriana Cox while Adriana was married to Travis Scroggins, that she had a romantic relationship with Isaacs, (Exhibit JJ, R.T. 11/10/03 at 31), that she had never seen or met Petitioner before the PCR hearing (*id.* at 29-31), and that Petitioner had never attended a party at her house (*id.* at 34-35).   She would sometimes have two or three parties a week at her house, and some lasted all night.  (*Id.* at 50).  Her parties were attended by 10 to 15 people.  (*Id.* at 61-62.)

Griselda also testified that Isaacs had mailed a letter to her from jail and asked her to deliver it to Petitioner.  (*Id.* at 51-52.) The letter was admitted into evidence.  (*Id.*at 56.) It read:

> Hey – check it out!  You need to get a continuance.  I'm not sure if you have yet or not.  But if you haven't I suggest you do.
> I haven't' had a chance to go over things with Ron yet.  I spoke with him briefly on the phone today.  But the discussion was limited.  I'm suppose [sic] to meet with him within the next week!  So get a continuance for as long as possible.  I will send you a letter after I find out more.  - - Write me back & let me know your thoughts – or suggestions.
> I believe I have a good plan – we'll find out soon.

(Exhibit CCCC, Supp. PCR Pet., Exhibit A.)

Adriana Cox testified that she had never seen Petitioner before the hearing.  (*Id.* at

301

69.)  She was married to Travis Scroggins in July, 10, 1998, when they had a party at their home, attended by Travis Scroggins, Michael Isaacs, and Gracie Cox.  But she didn't know whether a "Bill Duncan" had ever attended.  (*Id.* at 74.)  She could testify that Petitioner had never attended a party at her house.  (*Id.* at 75.)  The parties may have been held as much as two or three times per week.  (*Id.* at 76.)  In general though, she denied any independent recollection of events at the time.  (*Id.* at 82-83.)

At the PCR hearing, trial counsel Iannone testified that, although the Cox sisters has been subpoenaed, counsel Baran had made the decision not to call Griselda Cox to testify because of concerns that she would have been cross-examined about the letter from Isaacs to Petitioner.  Iannone believed the letter would have been excludable on hearsay and confrontation clause grounds.  He believed Baran made the "wrong call" but not a "bad call" in deciding not to have Griselda Cox testify.  Although Adriana Cox had nothing to do with the Isaacs letter, she was much less convincing of a witness, and thus they determined not to call her.  (*Id.* at 162-170.)

Defense counsel Baran testified that the letter had been intercepted by law enforcement and recently disclosed to counsel.  (*Id.* at 232-234.)  He testified that both Griselda and Adriana Cox had knowledge of the Isaacs letter, and that was why neither was called, and that evidence of the letter by itself was dangerous, and exclusion of the contents of the letter would not resolve the concern. This was because the defense's theory of the case was that there was no relationship between Petitioner and Isaacs.  (*Id.* at 192-196, 235-237.)

**PCR Court's Ruling** – On the specific issue, the PCR court concluded:

> There was a specific strategic reason for lead counsel's decision not to call Griselda Cox and her sister as witnesses during trial. She would have testified, according to her testimony during the evidentiary hearing and pretrial statements, that the defendant was never at any of her parties. However, she never has admitted that she had a party on the night of the murder, or that she even knows what night that was. She denies that Mr. Isaacs would ever have associated with Hernandez, and indirectly asserts that Isaacs is innocent, in the face of substantial evidence including his own guilty plea to second degree murder. She does not acknowledge any acquaintanceship between Isaacs and the defendant, and yet she was

a messenger between the two of them prior to trial. The intercepted note note, exhibit 103, would not have been precluded on hearsay objection, as the state would not have offered it to prove the truth of any of the statements. Nor would there be a confrontation clause basis to preclude it; it is the fact that such a note was sent by Isaacs to the defendant, and delivered by this defense witness, that has relevance to the case. It would impeach Cox's testimony that the two men did not know each other, although it could be suggested that they only struck up a friendship in jail, pending trial, but that is an issue that goes to the weight rather than the admissibility of the exhibit.

(Exhibit A-5, ROA Item 314, M.E. 11/20/03 at 3.)

On the testimony by Gracie Cox concerning Petitioner's reputation, the court simply noted it would have "relied upon the same witnesses I have already found to be totally lacking in credibility themselves." (Exhibit A-5, ROA Item 314, M.E. 11/20/03 at 4-5.) Indeed, the PCR court stated: "As I indicated on the record at the close of the hearing, I attribute no credibility to any of those three witnesses and I give no weight to their respective testimony for that reason." (*Id.* at 2-3.)

**Application of Law to Facts** - The PCR court's credibility determination is a finding of fact entitled to great deference in this proceeding.  "We can think of no sort of factual finding that is more appropriate for deferential treatment than is a state court's credibility determination." *Knaubert v. Goldsmith*, 791 F.2d 722, 727 (9th Cir. 1986). Petitioner offers nothing to overcome the presumption of correctness.

The undersigned is not wholly convinced that trial testimony by the Cox sisters would have been as lacking in credibility if elicited at trial, as opposed to the PCR hearing some three years later.  The PCR court's primary concern seemed to be with their repeated denial of knowing specific dates, and was expressed in its observation at the hearing: "The two sisters, likewise, know nothing about anything except that they don't know this person." (Exhibit JJ, R.T. 11/10/03 at 265.)  If this were the only basis for questioning their credibility, it might be tempting to conclude that at least Griselda Cox would have been more likely to adopt her pretrial statements which were specific on dates. (*See e.g.* Exhibit A-3, ROA Item 298, Append. PCR Pet., Exhibit G, Cox Interv. at 7 (discussing "the party held on the DOI" (date of incident))).) However, in ruling on

303

the Motion for Rehearing, the PCR Court put this issue to bed:

> I did not reject the three witnesses' in-court testimony because they
> have forgotten some details over the years, but rather because those
> witnesses either lack credibility by their demeanor or by the
> comparison of their testimony with the rest of the evidence
> presented during the hearing or trial.

(Exhibit A-5, ROA Item 325, M.E. 2/10/04 at 1.)

Moreover, there were other cogent reasons to question the sisters' credibility. For example, Griselda admitted a romantic relationship with Isaacs, and corroboration of Hernandez's story would have implicated not only Petitioner but Isaacs as well. Further, as observed by the PCR court at the evidentiary hearing, the denial of any significant memory but absolute certainty at having never seen Petitioner, despite testimony that they "party their brains out on a regular basis," suggested fabrication. (Exhibit JJ, R.T. 11/20/03 at 265.) Further, the court observed that Griselda continually referenced Defendant as "William Duncan" despite information that Petitioner utilized a different first name at the time of the murder, suggesting that she "was relying on semantics" to exclude him. (*Id.*; *see also id.* at 31 ("I've never met William Duncan"), 34 ("I don't know who William is"), 45 ("William I don't know"), 48 ("I just know William wasn't there for sure", 57 ("I don't know William"), 62 ("they keep saying that's the night that William was there, and he was never there").) Even defense counsel Iannone, who was generally in favor of calling the Cox sisters to testify, admitted that Adriana Cox was not a particularly credible witness at the time of the trial.

Even if this Court could reject the PCR court's credibility determination, counsel could still have made a reasonable tactical decision not to attempt to impeach Hernandez through either Cox sister's testimony given their mutual knowledge of the jail house correspondence between Isaacs and Petitioner, and the resulting implication of a prior association between them.

Based upon the foregoing, the undersigned cannot find that counsel performed deficiently by failing to call the Cox sisters to testify as to Petitioner's presence or absence from the party at the Scroggins house on the night of the murder.

Therefore, this portion of Ground 9C is without merit.

### c.   Hernandez's Intoxication

**Factual Background** - At trial, Hernandez admitted that at the Scroggins' party he had drunk a "[b]eer or two beers" and had smoked marijuana.  (Exhibit L, R.T. 4/26/00 at 47-48.)

In his interview with Detective Betts, Hernandez had stated that he had "had about maybe five beers."  (Exhibit A-3, ROA Item 298, Append. PCR Pet., Exhibit D at 27.)  In his interview with defense counsel Baran, Hernandez claimed he had "had like a beer and a half" and had smoked enough marijuana to have a "buzz."  (*Id.* at Exhibit E at 18.)

In the PCR proceeding, Petitioner's counsel asked if Griselda Cox had an opinion on Hernandez's "usual or customary behavior" at her parties.  (Exhibit JJ, R.T. 11/10/03 at 37.)  The state objected on the basis of relevance, and PCR counsel made an offer of proof that she would testify that Hernandez "was a significant or serious drug and alcohol user on a regular basis."  (*Id.* at 38.)  (*See* Exhibit A-3, ROA Item 298, Append. PCR Pet. at Exhibit G, Cox Interview, at 7-9, 15 (stating Hernandez was a habitual drunkard at the parties).)  The PCR court sustained the objection on the basis of a lack of foundation, given Cox's professed inability to recall the party on the specific night of the murder.  (Exhibit JJ, R.T. 11/10/03 at 38.)

**PCR Court's Ruling** – The PCR court found no deficient performance with regard to the reputation testimony:  "Some of the proposed impeachment of Hernandez, with reputation or opinion evidence concerning truthfulness, would have relied upon the same witnesses I have already found to be totally lacking in credibility themselves." (Exhibit A-5, ROA Item 314, M.E. 11/20/03 at 4.)

On the other hand, the PCR court did find deficient performance with regard to the evidence of Petitioner's drug and alcohol usage on the night of the murder. "The evidence of drug and alcohol consumption on the night of the murder would have been

305

admissible, and should have been used during cross-examination of Hernandez." (*Id.* at 5.)

Nonetheless, the PCR concluded that Petitioner had failed to show "actual prejudice." (*Id.* at 5.)

**Application of Law to Facts** – Petitioner does not suggest where the PCR court erred.

For the reasons discussed hereinabove, the undersigned finds no reason to reject the PCR court's credibility determination on the Cox sisters.  Moreover, such reputation evidence would have been excludable under Arizona Rule of Evidence 404(a) which generally precludes character evidence on a witness, except as provided in Rules 607, 608 and 609. Rule 607 simply defines who may impeach a witness. Rule 608(a)  permits reputation evidence only if it refers to "character for truthfulness or untruthfulness."  No provision is made for a reputation for being intoxicated.   Moreover, Rule 608(b) precludes extrinsic evidence of specific acts of conduct other than convictions.  Rule 609 only applies to convictions.

With regard to Hernandez's usage on the night of the murder, the difference between the testimony at trial and the other evidence was insignificant.  On the amount of beer, the trial testimony was of one or two beers, which was essentially the same as the Baran Interview, "like a beer and a half."  In the Betts interview Hernandez said "about maybe five beers."  On the marijuana, there was no discrepancy. Detective Betts had explicitly asked about "alcohol," and did not ask Hernandez about any drug usage. In the Baran interview, Petitioner admitted to smoking marijuana.  Thus, the inference from the trial testimony was the same as the inference from each of the other statements, individually and combined, *i.e.* that Petitioner was under the influence of intoxicating substances on the night of the murder.

The only additional impeachment to be gained from further questioning based on the interviews was the incremental level of intoxication from having had "about maybe five beers" as opposed to two.  Given the purported frequency of Hernandez's partying

escapades, the undersigned cannot find a reasonable probability that this difference would have altered the jury's determination that Hernandez was a credible witness.

Accordingly, the undersigned can find neither deficient performance on the part of counsel for failing to pursue this line of questioning, nor prejudice from the failure.

### d.   Inconsistent Statements

In his PCR Petition, Petitioner pointed to discrepancies between Hernandez's testimony and other evidence concerning (i) Petitioner working at the theater the night of the murder, (ii) Hernandez's ability to hear the conversation between Petitioner and Isaacs in the car, (iii) the words used by Petitioner with the victim, and (iv) the precise handling of the murder weapon at Witzig's house.

In evaluating these purported discrepancies, the undersigned finds useful the observation by Judge Nelson in *Johnson v. v. Nagle*, 58 F.Supp.2d 1303, 1356, and n. 43 (N.D.Ala.1999) that "making too much of a few small errors [in a witness's testimony] often has little positive benefit except to display for the jury the lawyer's skill at splitting hairs" and "juries often don't respond well to this kind of approach."

### (1).   Employment

Petitioner complains that trial counsel failed to impeach Hernandez on whether Petitioner was working at the theater the night of the murder.  In trial counsel's interview of Hernandez, Hernandez had testified that he, Petitioner, and Bobby Day had been working at the theater when they made plans to go to Scroggins' party.  (Exhibit A-3, ROA Item 298, Append. PCR Pet. at Exhibit E, Hernandez/Baran Interv. at 8.)

Hernandez testified at trial that on the day of the murder he had worked at Cinema Nine Theater.  (Exhibit L, R.T. 4/26/00 at 7.)  On cross-examination, trial counsel asked "And on the day of that party, you told me that you and Mr. Duncan had been working together at this cinema, whatever the name is, right?"  (*Id.* at 44.)  After repeatedly asking for clarification of the question, Hernandez responded:

A. Actually I don't really remember that I -- I think we were, because -- I might be confused, because it's been a while. He might have just picked us up.

Q. When you talked to me and I interviewed you, you told me, though, that you had worked with him that day, right?

A. Yeah. But I've been trying to think about everything, so I won't say anything that really didn't happen. And I really don't -- I can't really get a clear picture of him working or me and him working that day. But just trying to be --

Q. When you talked to me, though, you didn't try to tell me things that really didn't happen either, did you?

A. Yeah, but I really want to say the truth, and this is where it counts. There's a lot of things that I need to say that have to be true. And I just don't really remember him in his suit. But he was there.

(*Id.* at 45.)

The PCR Court made no explicit reference to this argument in its order, but did observe "[s]ome of the omissions alleged in the petition are in error."  (Exhibit A-5, ROA Item 314, M.E. 11/20/03 at 5.)

Assuming the PCR court was referencing this particular issue, the court would have been dead on.  Defense counsel did seek to impeach Hernandez on this point. Petitioner fails to show what more counsel could have done on this issue. Therefore, the undersigned finds no deficient performance by counsel.

This portion of Ground 9C is without merit.


**(2).  Car Conversation**

Petitioner argued in his PCR Petition that Hernandez had stated in a pretrial interview that while in the vehicle with Petitioner and Isaacs that "the car had a bad stereo system that was turned up and he could not hear the conversation very clearly." (Exhibit A-3, ROA Item  297, PCR Pet. at 13-14 (citing Hernandez/Baran Interview at 37).)  In contrast, at trial, Hernandez testified at length about the conversation between Petitioner and Isaacs in the car on the way to acquire drugs, and to the Franz home. (Exhibit L, R.T. 4/26/00 at 12-22.)

However, the actual interview transcript does not indicate that Hernandez could not hear:

| BARAN | Were you, could you hear everything they said in the car that night pretty much, you said it was a small car. |
| HERNANDEZ | Yeah. |
| BARAN | Was there music playing? |
| HERNANDEZ | No, but it was down. |
| BARAN | There was a radio going but the music was down so you could hear almost everything? |
| HERNANDEZ | He had like a little tiny thing.  It doesn't even matter, um even if you [sic] all the way up you could hardly hear it, it was really messed up. |
| BARAN | I don't know what you mean… |
| HERNANDEZ | The stereo was messed up, it was a messed up stereo. |
| BARAN | So it didn't have much volume. |
| HERNANDEZ | Yeah, it could have been all the way up for all I know. |
| BARAN | So you heard all of their conversation that night? |
| HERNANDEZ | Yeah. |

(Exhibit A-3, ROA Item 298, Append. PCR Pet., Exhibit E, Hernandez/Baran Interv. at 37.)   Thus, contrary to Petitioner's assertions, Hernandez had not asserted that his hearing was impeded by the stereo.  This appears to be another deficiency that the PCR Court rejected as "in error."  (Exhibit A-5, ROA Item 314, M.E. 11/20/03 at 5.)

Therefore, the undersigned finds there was nothing in the record with which counsel could impeach Hernandez on this point.   Accordingly, the undersigned concludes there was no deficient performance by counsel.

This portion of Ground 9C is without merit.


**(3).  Words with Victim**

In his PCR Petition, Petitioner argued that Hernandez's version of the demands he heard Petitioner make to the victim changed.  At trial, Hernandez testified:

| Q. | Did you hear Bill Duncan say anything? |
| A. | Not when he was inside. |
| Q. | Did you hear him say anything before he went inside? |
| A. | "Where's your man at?" like a few times. |
| Q. | "Where's your man at?" |
| A. | "Where's your man at?" "Where's your old man at?" |
| Q. | Okay. And how many times did he say that? |
| A. | I'm not -- I don't remember exactly how many times. |
| Q. | More than once, though? |
| A. | More than once, yes. |

(Exhibit L, R.T. 4/26/00 at 26.)  In contrast, Robert Franz testified that the demand was "Where is your husband?" (*Id.* at 74.)  In his pretrial interview, Hernandez had told trial counsel Baran that he "heard [Petitioner] scream where's your old man at where's your old man at."  (Exhibit A-3, ROA Item 298, Append. PCR Pet., Exhibit E, Hernandez/Baran Interv. at 26.)

In disposing of this claim, the PCR court reasoned:

> Whether the murderer asked the victim where her husband was, or where her "man" was or where her "old man" was would not be a critical area of impeachment, as those are all commonly used terms for the same person; since Franz' credibility is under attack by the defense, conflict between what he said and what Hernandez said would not necessarily make Hernandez a liar.

(Exhibit A-5, ROA Item 314, M.E. 11/20/03 at 5.)

Petitioner points to no error in the PCR court's reasoning.

Trial counsel could not have impeached Hernandez with Franz's subsequent testimony.  Hernandez had been excused before Franz took the stand.  (Exhibit L., R.T. 4/26/00 at 64 ("So, Mr. Hernandez you are excused from your subpoena, so you can go about your business.").)

Moreover, the difference between Hernandez's trial testimony (using both "your man" and "your old man") and his interview (using just "your old man") was not so significant as to mandate belaboring it.  As noted by the PCR Court, "those are all commonly used terms for the same person."  (Exhibit A-5, ROA Item 314, M.E. 11/20/03 at 5.)  Counsel could have made a reasonable tactical decision to avoid losing credibility with the jury by distracting them with such an insignificant distinction.  *See e.g. Florida v. Nixon*, 543 U.S. 175, 192 (2004) ("counsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in 'a useless charade'"); and *Yarborough v. Gentry*, 540 U.S. 1, 9 (2003) ("By candidly acknowledging his client's shortcomings, counsel might have built credibility with the jury and persuaded it to focus on the relevant issues in the case").

Perhaps the distinction would have been worth making if Hernandez had in his

interview explicitly denied that Petitioner had used the phrase "your man."  But, he did not.

Therefore, the undersigned finds no deficient performance by counsel.

Further, in light of the minor distinction between the interview and trial testimony by Hernandez, the undersigned cannot find prejudice from counsel's failure to pursue this issue.  The jury had far more significant reasons to reject Hernandez's testimony (such as whether Petitioner was still employed at the theatre, etc.), and instead chose to believe Hernandez, Franz, Witzig and Stambaugh.  The undersigned cannot find a reasonable probability that this additional impeachment would have made the difference.  Therefore, the undersigned concludes that Petitioner has failed to show prejudice from counsel's actions on this issue.

Even if inclined to find to the contrary, the undersigned could not say that the PCR Court's determination was an unreasonable determination of the facts or an unreasonable application of or contrary to federal law.

This portion of Ground 9C is without merit.

### (4).  Weapon Handling

In his PCR Petition, Petitioner complained that counsel was ineffective for failing to impeach Hernandez on his inconsistent versions on the handling of the shotgun at Witzig's house, and after.

At trial, Hernandez testified that when they arrived at Witzig's house, they initially left the shotgun in the car, and Isaacs had to go back to the car and retrieve the gun from the trunk, and he did not remembering anyone else handling the shotgun. (Exhibit L, R.T. 4/26/00 at 31-32.)   When asked what happened to the shotgun after they left Witzig's, Hernandez responded "I have a vague memory, but I think it was still between [Isaacs's] legs." (*Id.* at 33.)

Petitioner argued to the PCR Court that (contrary to the claim that Isaacs kept the gun with him after they left) Hernandez said in his pretrial interviews that Isaacs "walked

out of Witzig's with the shotgun, unlocked the trunk with the key and placed it in the trunk."  (Exhibit A-3, ROA Item 297, PCR Pet. at 14 (Citing Hernandez/Baran Interview at 50-53.)   To the contrary, the only trip to the car referenced in the pretrial interview was not to return the gun to the car, but to get it out of the car.

> HERNANDEZ    Well yeah, then [Isaacs] asked if he could put the shotgun underneath the house.
> BARAN        Alright.
> HERNANDEZ    and the one guy said sure and then Mugsy went out, uh, with the keys, opened the trunk, got the shotgun out and brought it into the house with the towel.

(Exhibit A-3, ROA Item 298, Append. PCR Pet., Exhibit E, Hernandez/Baran Interv. at 53.)   Nowhere in the referenced pages of the interview did Hernandez make any reference to the handling the gun after they left the Witzig house.   Thus, rather than being inconsistent with Hernandez's trial testimony, his pretrial interview was essentially identical to his trial testimony.

Petitioner also argued to the PCR Court that (contrary to the claim that Isaacs had to leave the Witzig home to get the gun from the car), Hernandez testified in a hearing in the prosecution of Isaacs that Mugsy had it with them as they entered to house for the first time.  The actual testimony is less clear.  Hernandez testified as follows:

> Q.  Did all three of you go into the house?
> A.  Yes.
> Q.  When you went into the house, were you - - did anybody have anything with them?
> A.  Yes.
> Q.  What did they have?
> A.  Shotgun.
> Q.  Who was carrying the shotgun?
> A.  Mugsy.

(Exhibit A-3, ROA Item 298, Append. PCR Pet., Exhibit F, R.T. Isaacs Hearing. at 64.) Thus, to find a discrepancy one would have to infer that Hernandez was testifying not simply that Isaacs had the shotgun in the home, and not just that he had it when he "went into the home," but that he had it with him when he *first* went into the home.  Given the broken nature of the question, it is just as plausible to conclude that Hernandez was simply testifying that while in the home Isaacs had the shotgun.

The PCR Court concluded that "The inconsistent statements about how the gun was handled after the murder should have been exposed." (Exhibit A-5, ROA Item 314, M.E. 11/20/03 at 5.)   Nonetheless, the PCR Court rejected the claim finding that Petitioner had not shown "actual prejudice as a result of those few errors." (*Id.*)

Here, the undersigned is unconvinced that there were inconsistences to expose.

Moreover, given the deference this habeas Court must to show to the PCR Court's implicit factual finding that there was an actual inconsistency, and assuming that the finding is not "clearly erroneous," the undersigned would still find this claim to be without merit given the lack of prejudice.   The undersigned finds no reasonable probability that the outcome of the trial would have been different had counsel attempted to impeach Hernandez with his less than clear extra-trial statements on this issue.

Therefore, this portion of Ground 9C is without merit.


### e.   Summary re Ground 9C

Based upon the foregoing, the undersigned concludes that Petitioner's Ground 9C is without merit, and must be denied.


### 5.  Ground 9D (Incrimination of Franz)

#### a.   Arguments

For his Ground 9D, Petitioner argues that trial counsel was ineffective in cross-examining Franz, because counsel failed to impeach him with his prior inconsistent statements, and on the basis of his troubled relationship with the victim. (Petition, Doc. 1 at 9:5-A, ¶ 4.)

Respondents argue that the PCR Court properly rejected these claims because: (1) trial counsel did seek to impeach Franz with his inconsistent statements; and (2) there was no evidence to support painting Franz as the killer, and it conflicted with the defense's theory of the case.  (Answer, Doc. 14 at 205-213.)

Petitioner makes no reply to this specific claim 9D.  (*See* Reply, Doc. 25 at 24-

25.)

### b.   Facts Underlying Claim

With regard to Franz's inconsistent statements, the record is rife with examples. At trial, counsel elicited testimony from Franz that:

- He originally described the shooter to the 911 operator as "tall and big," and denied seeing any cars outside his home.  (Exhibit L, R.T. 4/26/00 at 85-88, 93.)

- He told Officer Poor at the scene that the shooter was "stocky" and approximately 6'5" tall.  (*Id.* at 88-89.)

- Franz told Detective Betts at the police station that the shooter was approximately 200 pounds, between 6' and 6'5", with short grey hair. (*Id.* at 91, 94-100.)

- Some 4 days after the murder, he identified Greenwood as the murderer, and Greenwood was 5'10", with short grey hair, and in his mid-40's. (*Id.* at 95-97, 100-101.)

- A week after the murder, he told the victim's grandmother that five people were involved in the murder.  (*Id.* at 97-98.)

- He told Tina Malcomson that the shooter was a tall, stocky man with wavy blond hair, was accompanied by two other men in the car, which was a black Corvette or Firebird with a gold eagle on the hood.  (*Id.* at 98-99.)

In addition there was testimony presented through the police officers to show such discrepancies:

- Detective Betts confirmed Franz's description to Betts and Officer Poor, testified that Franz told the 911 operator "he's got red and white" and that "red and white" were colors associated with the Hells Angels, Franz's misidentification of Greenwood, and a recording of the description given to Malcomson.  (Exhibit O, R.T. 5/1/00 at 9, 12-14, 21-24, 27, 29-34, 63-64.)

- Officer Poor confirmed Franz's description at the scene.  (Exhibit P, R.T. 5/2/00 at 55-58.)

Additionally, there was evidence of inconsistencies available from other, uncalled, witnesses:

- Jennifer Seeley (the sister of Lisa Sittel-Dailey) stated in her police interview that Franz described the vehicle as a black Trans-Am with an eagle on the hood, with the driver staying in the car, there were two people and at other times three people coming into the house, and that he altered his story on whether the children were asleep or awake.  (Exhibit A-4, ROA Item 298, Append. PCR Pet., Exhibit M, Seeley Interview at 4-5.)

- Gloria Gilbert stated in her police interview that Franz described the shooter as a tall blonde, and said he saw only one person (Exhibit A-3, ROA Item 298, Append. PCR Pet., Exhibit H, Gilbert Interview at 4, 12.)

- Tina Malcomson stated in her police interview that Franz told her the car involved was a brown or black Trans-Am or Corvette with an eagle on it, that one person stayed in the car and two came in the house, and the shooter was tall, stocky and blonde.  (Exhibit A-4, ROA Item 298, Append. PCR Pet. Exhibit P, Malcomson Interv. at 4, 7-8.)

- Lisa Sittel-Dailey testified at the PCR hearing that Franz told her the day after the shooting that he heard arguing, and was on the way out the back door when he heard the shots, having not seen the shooter.  Two days later, Franz claimed to have gotten to the kitchen, having seen the face of the shooter, a short stocky blonde, ant there were three people in the house.  He also told her that a black Trans Am with a gold eagle on it was involved.  (Exhibit JJ, R.T. 4/26/00 at 87-91.)  Her police interview was similar.  (*See* Exhibit A-4, ROA Item 298, Append. PCR Pet. Exhibit O, Sittel-Dailey Interv. at 6, 17-18.)

Finally, there was unpresented evidence of a volatile relationship between Franz and the victim, including allegations of infidelity, physical abuse, disputes over the

victim's serving as a police informant, and a divorce filed by the victim.  (*See* Exhibit A-4, ROA Item 298, Append. PCR Pet., Exhibit N, Sinclair Interview at 8-10, 18-19, 23-25; *Id.* at Exhibit O, Sittel Interv. at 10-11; *Id.* at Exhibit P, Malcomson Interv. at 3-4, 8, 14-17.)

### c.   State Court Ruling

In rejecting this claim, the PCR Court stated:

> Evidence of mistreatment of the victim by Mr. Franz before the murder would not necessarily have been admitted; upon review of the evidence that was presented during the recent hearing I would not admit it, because I find no credible evidence pointing to Mr. Franz as the killer or a conspirator with the actual killer. Without that theory, there is no known theory by which Mr. Franz would identify the wrong person other than mistake. Trial counsel adequately demonstrated to the jury that Mr. Franz made a number of mistaken: or inconsistent statements throughout the investigation.

(Exhibit A-5, ROA Item 314, M.E. 11/20/03 at 5.)

### d.   Application of Law

As noted by the PCR court, trial counsel elicited testimony on many discrepancies in Franz's testimony, both through Franz himself and through the police officers.  The tenor of the cross-examination of Franz was set from the outset:

> CROSS-EXAMINATION
> BY MR. IANNONE:
>         Q. You all set, sir?
>         A. Pardon?
>         Q. Are you all set?
>         A. Yes, sir.
>         Q. I just want to make sure I have something clear.  You knew from moment one, right after the shooting, that the shooter was between five foot eight and six inches - - six feet tall, correct?
>         A. Yes, sir.
>         Q. That's what your testimony was?
>         A. That's what I'm saying.
>         Q. Okay. But that's not what you told the police, is it, Mr. Franz?
>         A. I was strictly in shock. I couldn't honestly tell you what I told the police at that moment the time.
>                         * * *
>         Q. BY MR. IANNONE: Now, Mr. Franz, that was the entire telephone conversation you had with the 9-1-1 operator, isn't it?

1

2

3

4

5

        A.  Yes, sir.
        Q.  And three times she asked you to describe the men, correct?
        A. I was in shock. That's all I can say.
        Q.  That wasn't my question sir. Three  times -- you just heard it. Three times she asked you to describe the man; each time you said he was tall and big, correct?
        A. Yes, sir.
        Q.  You didn't say anything about him being five foot eight did you?
        A.  No, sir.

6  (Exhibit L, R.T. 4/26/00 at 84-85, 87-88.)

7        It is true that trial counsel did not call the five women who would have introduced

8  further discrepancies (Jennifer Seeley, Gloria Gilbert, Tina Malcomson, and Lisa Sittel-

9  Daily).  However, Petitioner fails to explain how the cumulative evidence from the group

10  would have made a difference.

11        Moreover, such witnesses, if called, would have had limited credibility.  All but

12  Seeley displayed a strong distrust of Franz, if not downright fear and animosity. (*See*

13  Exhibit A-3, ROA Item 298, Append. PCR Pet., Exhibit H, Gilbert Interview at 28

14  (asking Franz if he killed Elisha); *id.* at Exhibit P, Malcomson Interv. at 13-16 (Franz

15  violent and accused her of having affair with Elisha); Exhibit O, Sittel-Dailey Interv. at

16  10-11 (describing threats by Franz); Exhibit JJ, R.T. 11/10/03 94-95 (Settle-Daily

17  testifying about stalking and threats).)  However, even Seeley was the sister of Sittel-

18  Daily, suggesting her bias would be applied to Seeley.

19        Further, all that testimony would have fed into the theory that Franz, not Isaacs,

20  was the real perpetrator, a defense theory that counsel reasonably chose to avoid given

21  the inherent problems in it.

22        Instead trial counsel effectively impeached the reliability of Franz's identification

23  of Petitioner without risking losing credibility with and distracting the jury with, the

24  "Franz did it" theory,

25        Under these circumstances, the undersigned can find neither deficient

26  performance nor prejudice from trial counsel's failure to add the quartet's testimony to

27  what was already an extensive (if perhaps not ultimately effective) impeachment of

28  Franz.

Moreover, the undersigned cannot find deficient performance in counsel's tactical decision to forego the "Franz did it" theory, for the reasons discussed herein above in connection with Supplemental Ground 2F.  (*See supra* Section III(D)(6)(a)(4)(f) (Franz Impeachment).)

Even if the undersigned could harbor doubts, the undersigned could not find that the PCR court's rejection of this claim was an unreasonable determination of the facts or contrary to or an unreasonable application of federal law.

Accordingly, the undersigned concludes that Petitioner's Ground 9D is without merit and must be denied.

**6.  Ground 9E (Exculpatory Witnesses)**

For his Ground 9E, Petitioner argues that trial counsel was ineffective for failing bolster his third-party culpability and alibi defenses by calling:  (1) Griselda Cox; (2) Kristina Cox; (3) Jennifer Seeley; (4) Lena Sinclair; (5) Douglas Johnson; (6) Robert Hill; (7) Buck Ridley; (8) Gloria Gilbert; (9) Tina Malcomson; and (10) Lisa Daily. (Petition, Doc. 1 at 9:5-A, ¶ 5.)

As discussed in Section III(D)(2)(d) hereinabove, Respondents assert and the undersigned has concluded, that this claim is procedurally defaulted as to Kristina Cox. Respondents further assert that the claim is without merit, referencing as to the other nine witnesses their arguments on other claims.  (Answer, Doc, 14 at 213-215.)

Petitioner makes no reply to this specific claim 9C.  (*See* Reply, Doc. 25 at 24-25.)

The undersigned finds this claim to be without merit as to each witness, for the reasons set forth in the discussions herein on such witnesses, as follows:

(1) Griselda Cox – *See* hereinabove Section III(N)(4) concerning Ground 9C (impeachment of Hernandez).

(2) Jennifer Seeley, Gloria Gilbert; Tina Malcomson, and Lisa Daily – *See* hereinabove Section III(N)(5) concerning Ground 9D (ineffective assistance re

318

incrimination of Franz), as well as the discussion in Section III(M) concerning Ground 8 (PCR investigator), on the failure to pursue the "Franz did it" theory.

(3) Lena Sinclair – *See* hereinabove Section III(M) concerning Ground 8 (denial of investigator) on the failure to pursue the "Franz did it" theory.

(4) Douglas Johnson - see hereinabove Section III(N)(2)concerning Ground 9A (investigation).

(5) Robert Hill - *See* hereinabove Section III(M) concerning Ground 8 (PCR investigator),  and Section III(N)(2) concerning Ground 9A (investigation)..

(6) Buck Ridley – *See* hereinabove Section III(N)(2) concerning Ground 9A (investigation).

Accordingly, the undersigned concludes that Ground 9E is without merit and that it must be denied.


**7.  Summary re Ground 9 (Ineffective Assistance)**

As discussed in Section III(D) , the undersigned has concluded that Grounds 9E as to Kristina Cox, 9F, 9G, 9H, and 9I are procedurally defaulted, and must be dismissed with prejudice.   For the reasons expressed in this Section III(N) the undersigned concludes that the remaining portions of Ground 9 are without merit and must be denied.

1  **O.  GROUND TEN: SENTENCE**

2  **1.  Arguments**

3         For his Ground 10 for relief, Petitioner argues that: (A) the trial court relied on

4  improper aggravating circumstances; (B) failed to acknowledge the absence of evidence

5  on likelihood of rehabilitation; (C) abused its discretion because the mitigating

6  circumstances outweighed the proper aggravating circumstances; and (D) improperly

7  relied on facts not found by a jury or admitted.  (Petition, Doc. 1 at 9:6-A, *et seq.*)

8         Respondents argue the first three subclaims (10A, 10B, and 10C) are non-

9  cognizable state law claims, and that the state court properly denied the final claim

10  (10D).[56]  (Answer, Doc. 14 at 234-249).

11         Petitioner replies that he is capable of rehabilitation, and should have been

12  sentenced in accordance with *Blakely v. Washington*, 542 U.S. 296 (2004).  (Reply, Doc.

13  25 at 25.)

14

15  **2. Factual Background**

16         Originally, after conducting a pre-sentence hearing, the court sentenced Petitioner

17  to "Life, without release on any basis for the rest of his life."  (Exhibit A-2, ROA Item

18  252, Sentence at 2.)   As a result of Petitioner's original PCR petition arguing that

19  counsel was ineffective for failing to challenge the trial court's use of aggravating

20  circumstances under Ariz. Rev. Stat. §  13-702, the PCR court set aside his original

21  sentence, and on February 10, 2004, again sentenced Petitioner to "natural life, without

22  possibility of release on parole, community supervision or any other basis."  (Exhibit A-

23  5, ROA Item 325, Order 2/10/04 at 3.)

24

25  [56] It appears to the undersigned that Grounds 10A, 10B, and 10C were presented to the
Arizona Court of Appeals only as state law claims, and the due process claims
considered herein were not fairly presented.  Indeed, the only discussion of federal law in
26  Petitioner's briefs consisted of a discussion of an Eighth Amendment right to
consideration of mitigating evidence.  (Exhibit MM, Pen. Brief at 16.)   Nonetheless,
27  because Respondents do not assert a failure to exhaust on these claims, and the claims
are plainly without merit, the undersigned proceeds to the merits. *See* 28 U.S.C. §
28  2254(b)(2) (claim may be denied on merits despite failure to exhaust).

320

In reaching that conclusion, the court found as follows:

> I have reconsidered the choice between natural life and life with parole eligibility, without considering the 13-702 aggravating circumstances as support for natural life. The *Viramontes* opinion, while it prohibits the consideration of those circumstances, permits, in noncapital sentencing, application of the standard sentencing burden of proof, less than beyond a reasonable doubt or even clear and convincing, for aggravating circumstances. And, in that opinion, the supreme court did not disagree with the court of appeals' opinion that Viramontes could have been sentenced to natural life because he killed for fun and posed a threat to society; neither is an aggravating circumstance under either statutory scheme.
>
> I must reconsider and reweigh the aggravating circumstances and mitigating circumstances presented under 13-703. Applying the preponderance of the evidence burden of proof to the state's evidence of aggravating circumstances, I still find only the (F)(2) serious prior offense and (F)(7) authorized release as aggravating circumstances. I find the same mitigating circumstances I found previously.
>
> While I gave the aggravating circumstances relatively little weight in deciding whether to impose the death penalty, I find them to be entitled to more weight in deciding whether the defendant should ever be released to society. A first degree murder with two aggravating circumstances, balanced against the mitigating circumstances I have found, and considered in the context of the reason, or lack thereof for the murder, and the negligible possibility of the defendant ever being rehabilitated, lead me to again conclude that he should serve the remainder of his life in prison.

(*Id.* at 2-3.)

## 2.  State Court Ruling

Petitioner raised the instant claims in his second direct appeal.  (Exhibit MM, Open. Brief at 5-18 (Grounds 10A, 10B, and 10C; Exhibit PP, Supp. Open. Brief at 2-7 (Ground 10D).)  The Arizona Court of Appeals rejected each on its merits.  (Exhibit SS, Mem. Dec. 10/18/05.)

//

//

321

### 3.  Ground 10A, 10B, and 10C

Petitioner argues that the trial court abused its discretion under state law when it: (A) relied on improper aggravating circumstances; (B) failed to acknowledge the absence of evidence on likelihood of rehabilitation; and (C) found that the proper aggravating circumstances outweighed the mitigating circumstances.   Although Petitioner makes broad references to "due process and a fair trial," and cites the Fifth, Sixth and Fourteenth Amendments, Petitioner does not elaborate on how any such conduct amounted to a violation of federal law.

As discussed hereinabove, violations of state law, without more, do not deprive a petitioner of due process.  *Cooks*, 660 F.2d at 739.  And, to qualify for federal habeas relief, an error of state law must be "sufficiently egregious to amount to a denial of equal protection or of due process of law guaranteed by the Fourteenth Amendment." *Pully*, 465 U.S. at 41.

Here, Plaintiff fails to even show that there was an error of state law.

With regard to **Ground 10A**, the Arizona Court of Appeals concluded that in resentencing Petitioner, the trial court "correctly considered only A.R.S. § 13-703 statutory factors in deciding that natural life was appropriate."  (Exhibit SS, Mem.Dec. 10/18/05 at 6.)  Petitioner does not explain why this conclusion was in error.  To the extent that Petitioner refers to the original sentence, any error was rendered harmless by the re-sentencing.  *See Brecht*, 507 U.S. at 629.

With regard to **Ground 10B**, the Arizona Court of Appeals found that the trial court relied only on permissible statutory factors, and interpreted the discussion of Petitioner's rehabilitative capacity "as additional considerations the court voiced as expressing its reasons for balancing the mitigating and aggravating factors as it did and not as constituting additional 'aggravating circumstances.'"  (*Id.* at 6-7.)  Petitioner does not explain why this conclusion was in error.  Moreover, any assertion that there was no evidence on rehabilitation must fail in light of Petitioner's extensive criminal history.

With regard to **Ground 10C**, the Arizona Court of Appeals found not only that

322

the trial court had only relied upon proper aggravating circumstances, but the court had properly exercised its discretion in weighing the aggravating and mitigating circumstances. (*Id.* at 7.) Petitioner does not explain why this conclusion was in error.

Moreover, even if this court were inclined to find that the Arizona Court of Appeals resolved these claims incorrectly, Petitioner offers nothing to show that any such state court "error" was "so arbitrary and fundamentally unfair that it violated federal due process." *Jammal*, 926 F.2d at 920.

Petitioner's Grounds 10A, 10B, and 10C are without merit and must be denied.

## 4. Ground 10D (Blakely)

Petitioner argues that under *Blakely* he was entitled to a jury determination of all aggravating circumstances relied upon to select a natural life sentence. The Arizona Court of Appeals rejected this claim, finding that "the trial court is authorized by a first degree murder verdict, without more, to impose a natural life sentence." (Exhibit SS, Mem. Dec. 10/18/05 at 5.) Petitioner does not explain what was erroneous in this decision.

*Blakely* was based upon the premise, expressed in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Blakely* extended *Apprendi* to determinate sentencing schemes where the maximum authorized sentence within the statutory range expands based upon the existence of certain facts.

The Supreme Court has made clear that despite *Blakely* and its related cases, the Constitution does not preclude courts from relying upon judge determined facts in selecting among the authorized sentences. The Sixth Amendment does not "automatically forbid a sentencing court to take account of factual matters not determined by a jury and to increase the sentence in consequence." *Rita v. U.S.*, 127 S.Ct. 2456, 2465-2466 (2007) Indeed, it is not the final sentence that *Blakely* and the

Sixth Amendment are concerned with, but the maximum sentence the judge is authorized to impose "solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely*, 542 U.S. at 303. Rather it is only when a sentence is not authorized until a specific factual finding is made that a jury determination of the fact is required.

The sentencing statute provided at the time:

> A. A person guilty of first degree murder as defined in section 13–1105 shall suffer death or imprisonment in the custody of the state department of corrections for life as determined and in accordance with the procedures provided in subsections B through G of this section. **If the court imposes a life sentence, the court may order that the defendant not be released on any basis for the remainder of the defendant's natural life.** An order sentencing the defendant to natural life is not subject to commutation or parole, work furlough or work release. If the court does not sentence the defendant to natural life, the defendant shall not be released on any basis until the completion of the service of twenty-five calendar years if the victim was fifteen or more years of age and thirty-five years if the victim was under fifteen years of age.

Ariz. Rev. Stat. § 13-703(A) (1998) (as amended by Ariz. Sess. Laws 1993, Ch. 153, § 1, subsequently renumbered as § 13-751) (emphasis added).

As noted by the Arizona Court of Appeals, the Arizona Supreme Court has held that this statute authorizes a natural life sentence upon conviction for first degree murder. "[N]othing in § 13-703 required the finding of any fact beyond those reflected in the jury's verdict of guilt as a prerequisite to the imposition of a natural life sentence." *State v. Fell*, 210 Ariz. 554, 558, 115 P.3d 594, 598 (2005).[57] Petitioner does not suggest any error in that state law determination. *See Dunlap v. Ryan*, 2011 WL 5075101, 4 (D.Ariz.,2011) (Martone, D.J.) (applying *Fell* to find no *Blakely* issue in imposition of natural life sentence).

**5. Summary re Ground 10**

Grounds 10A, 10B, and 10C are either non-cognizable state law claims, or unsupported due process claims, and are without merit. Ground 10D (*Blakely*) is without

---

[57] *Fell* applied the version of Ariz. Rev. Stat. § 13-703 in effect in 2000. Although §13-703 was amended in 1999, no substantive revision to paragraph (A) had been adopted in the interim.

merit.  Accordingly, Ground 10 must be denied.

**P.  SUPPLEMENAL GROUND 2: INEFFECTIVE ASSISTANCE**

Petitioner's Supplemental Ground 2 asserts 12 instances of ineffective assistance of trial counsel.  Although the undersigned concludes that these claims are barred from habeas review because they are procedurally defaulted, the merits of these twelve grounds (2A through 2L) are addressed hereinabove in Section III(D)(6)(a)(3) as part of resolving Petitioner's assertions under *Martinez v. Ryan*.

The undersigned has concluded that each of them is without merit.  Thus, if these claims are found to be properly exhausted, or a failure to exhaust excused, the undersigned recommends in the alternative that they be denied on the merits.

## Q.  SUPPLEMENTAL GROUND 3: CUMULATIVE EFFECT

### 1.  Arguments

In his Supplemental Ground 3, Petitioner argues that   the   cumulative   errors   in his pre-trial, trial, sentencing, appeal, and post-conviction relief proceedings denied him due process of law. (Supplemental Petition, Doc. 78 at 5-8.1.)

The undersigned has concluded hereinabove that this claim was not fairly presented to the Arizona Court of Appeals because it was not raised again following remand on the initial review of the first PCR proceeding.  However, the undersigned has also concluded that Arizona does not recognize a claim of cumulative error, and therefore under the "futility doctrine" Petitioner there is no available state remedy and therefore Petitioner has exhausted his available state remedies on this claim.

In addition to arguing procedural default, Respondents argue that Petitioner's claim of cumulative error cannot be based on any alleged violation of due process in his PCR proceeding, because there is no requirement for such proceedings.   (Supp. Response, Doc. 80 at 52-53.)   Respondents further argue that Petitioner is not entitled to relief because "the Supreme Court has never recognized the cumulative-error doctrine, as manifested by numerous lower-court decisions rejecting claims like Supplemental Ground Three."  (*Id.* at 53-54.)  Finally, Respondents argue that any cumulative-error claim would fail because no error occurred.

### 2.  Procedurally Defaulted

The undersigned concludes hereinabove that this claim is barred from habeas review because Petitioner's state remedies on the claim were not properly exhausted and are now procedurally defaulted. (*See supra* Section III(D)(2)(k).)

Nonetheless, because those conclusions rest upon fine distinctions in Arizona jurisprudence regarding the availability of a state remedy on such a claim, the undersigned will, in the alternative address the merits of the claim.

### 3.  AEDPA Deference

Respondents argue that this claim is without merit because there is no Supreme Court law allowing claims based on cumulative error.  Presumably, Respondents are relying on the deference to state court decisions in 28 U.S.C. § 2254(d)(1), limiting the habeas court to evaluating claims based on "clearly established Federal law, as determined by the Supreme Court of the United States."

However, the Ninth Circuit has concluded that the Supreme Court has "clearly established that the cumulative effect of trial errors can violate due process."  *Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007).  *But see Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) ("The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief.").  *Cf.* Ruth A. Moyer*, To Err Is Human; to Cumulate, Judicious: The Need for U.S. Supreme Court Guidance on Whether Federal Habeas Courts Reviewing State Convictions May Cumulatively Assess Strickland Errors*, 61 Drake L. Rev. 447, 466 (2013) (noting circuit split on cumulative error from ineffective assistance claims).

Moreover, AEDPA deference to a state court decision only applies where the claim was "adjudicated on the merits."  28 U.S.C. § 2254(d).  Here, this claim was never presented nor adjudicated on any grounds by the Arizona courts.  Accordingly, neither the legal nor the factual deference provided for under 28 U.S.C. § 2254(d) apply to this Court's analysis of Supplemental Ground 3.

On the other hand, the presumption of correctness in 28 U.S.C. § 2254(e)(1) does not depend upon a state court adjudication of the claim, and would apply.   But, Respondents point to no relevant factual findings.

Ordinarily, the limits on evidentiary hearings in 28 U.S.C. § 2254(e)(2) would apply, but that provision is not triggered until it is shown that Petitioner failed to develop the factual basis of the claim.  The relevant determination of diligence is not made in a vacuum, but in light of the opportunities afforded by the state procedures.  *See e.g. Horton v. Mayle*, 508 F.3d 570, 582 n. 6 (9th Cir. 2005).  To the extent the Arizona

Courts would not recognize this claim, any efforts by Petitioner to develop the factual basis would have been spurned.

On the other hand, to the extent that Petitioner failed to develop the factual basis of the underlying claims of error, § 2254(e)(2) do apply.

## 4. Applicable Law

"The cumulative error doctrine allows a petitioner to present a standalone claim asserting the cumulative effect of errors at trial that so undermined the verdict as to constitute a denial of his constitutional right to due process." *Collins v. Sec'y of Pennsylvania Dept. of Corr.*, 742 F.3d 528, 542 (3rd Cir. 2014). Cumulative error applies where, "although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors [has] still prejudice[d] a defendant." *Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000) (quoting *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir.1996).

> The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair. The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal.

*Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citations omitted)(citing *Chambers v. Mississippi*, 410 U.S. 284, 298, 302–03 (1973)). That principle is applicable on habeas review. *See Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000). *See also* Van Cleave, *When Is An Error Not an "Error"? Habeas Corpus and Cumulative Error*, 46 Baylor L.Rev. 59, 60 (1993).

A standalone claim of cumulative error is at least logically distinguishable from those circumstances where courts are called upon to cumulate the effect of a series of constitutional violations to ascertain whether there was harmless error. *See e.g. Turner v. Duncan*, 158 F.3d 449, 457 (9th Cir. 1998), *as amended on denial of reh'g* (Nov. 24, 1998) ("When an attorney has made a series of errors that prevents the proper

presentation of a defense, it is appropriate to consider the cumulative impact of the errors in assessing prejudice."); *Harris By & Through Ramseyer v. Wood*, 64 F.3d 1432, 1439 (9th Cir. 1995) (finding cumulative prejudice from multiple deficiencies of counsel, and thus declining to address prejudice from individual deficiencies); *Middleton v. Roper*, 455 F.3d 838, 851 (8th Cir. 2006) (same). *See also* John H. Blume, Christopher Seeds, *Reliability Matters: Reassociating Bagley Materiality, Strickland Prejudice, and Cumulative Harmless Error*, 95 J. Crim. L. & Criminology 1153, 1184-85 (2005) (discussing cumulating separately the errors from ineffective assistance and prosecutorial misconduct, and cumulating errors for purposes of a harmless error analysis and proposing a global analysis of prejudice). It is not clear, however, that the courts manage to clearly distinguish between the two (cumulative error v. cumulative prejudice) in their analysis.

It is important to note that review for cumulative error is "the narrow one of due process, and not the broad exercise of supervisory power that [a federal court of appeals] would possess in regard to (its) own trial court…for not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a failure to observe that fundamental fairness essential to the very concept of justice." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974).

Finally, the review is limited to actual errors.

> First, any cumulative error theory must refer only to *errors* committed in the state trial court. A habeas petitioner may not just complain of unfavorable rulings or events in the effort to cumulate errors. If an action of the trial court cured a putative error, the petitioner is complaining only of an adverse event rather than actual error.

*Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992) (citations omitted). "Twenty times zero equals zero." *Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir. 1987) (rejecting claim of cumulative error in absence of actual errors).

//

//

330

**5. Application to Petitioner**

    **a.   Construing Petitioner's Claim**

Here, liberally construing the Supplemental Petition, *Laws v. Lamarque*, 351 F.3d 919, 924 (9th Cir. 2003), the fundamental nature of Petitioner's claim is one of standalone cumulative error. He simply argues that all of the errors throughout his state court proceedings amounted to a denial of due process.  This would arguably encompass not only federal, constitutional errors, but state law errors as well.

Of course, the problem lies in Petitioner's failure to enumerate those errors. Conclusory allegations that are not supported by specific facts do not merit habeas relief. *James v. Borg*, 24 F.3d 20, 26 (9th Cir.1994).  This habeas court is obligated to liberally construe Petitioner's *pro se* filings.   "Prisoner *pro se* pleadings are given the benefit of liberal construction." *Porter v. Ollison*, 620 F.3d 952, 958 (9th Cir. 2010) "However, in construing *pro se* petitions liberally, the petitioner is not entitled to the benefit of every conceivable doubt; the court is obligated to draw only reasonable factual inferences in the petitioner's favor." *Id.* "While the courts liberally construe pro se pleadings as a matter of course, judges are not also required to construct a  party's legal arguments for him." *Small v. Endicott*, 998 F.2d 411, 417-18 (7th Cir. 1993).   A petitioner's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

On this basis alone, the undersigned would find Ground Three to be without merit.

The most that could be implied about Petitioner's Supplemental Ground Three, given Petitioner's failure to identify the specific errors to which he refers, is that he relies upon the other errors asserted in his Petition and Supplemental Petition.  Accordingly, the undersigned will address this claim on that basis.

/ /

/ /

### b.   No Errors to Cumulate From Claims Otherwise Addressed

Petitioner's claims of actual innocence in **Ground 11** and **Supplemental Ground 1** are not founded upon errors, but upon new evidence of actual innocence.  Accordingly, there is no error with regard to these claims to be cumulated.

In Section III(F), *supra,* addressing **Ground 1** (Confrontation Clause) the undersigned concludes that not only has Petitioner failed to show the denial of due process and or a violation of the Confrontation Clause, but that he has failed to show any state law evidentiary errors.  Accordingly, Petitioner has shown no federal or state error with regard to this claim, and there is no prejudice to be cumulated.

In Section III(G), *supra*, addressing **Ground 2** (*Willits* Lost Evidence Instruction) the undersigned concludes that Petitioner failed to show his entitlement to such an instruction under federal law.  The Arizona Court of Appeals found that he had not shown any prejudice from the lack of lost measurements, and thus was not entitled, under state law, to a *Willits* instruction. (Exhibit GG, Mem. Dec. 2/28/02 at 11-12.) Accordingly, Petitioner has shown no federal or state error with regard to this claim, and there is no prejudice to be cumulated.

In Section III(H), *supra*, addressing **Ground 3** (Prosecutorial Misconduct re Lost Evidence) the undersigned concludes that Petitioner failed to show prosecutorial misconduct under federal law because Petitioner failed to show that the prosecution commented on the lost evidence.  The Arizona Court of Appeals reached the same conclusion.  (Exhibit GG, Mem. Dec. 2/28/02 at 13-14.)  Accordingly, Petitioner has shown no federal or state error with regard to this claim, and there is no prejudice to be cumulated

In Section III(I), *supra*, addressing **Ground 4** (Identifications), the undersigned concludes that Petitioner fails to show that the photo lineups were suggestive, and thus no error.  The Arizona Court of Appeals reached the same conclusion, and even proceeded to address the *Biggers* factors and decide the disputed evidence was admissible even if the lineups were suggestive.  (Exhibit GG, Mem. Dec. 2/28/02 at 14-

17.)  Accordingly, Petitioner has shown no federal or state error with regard to this claim, and there is no prejudice to be cumulated.

In Section III(K), *supra*, addressing **Ground 6** (Insufficient Evidence), the undersigned concludes that Petitioner fails to show any element of the crime of which there was not sufficient evidence for a rational trier of fact to find guilt beyond a reasonable doubt.   The Arizona Court of Appeals reached the same conclusion. (Exhibit GG, Mem. Dec. 2/28/02 at 18.) Accordingly, Petitioner has shown no federal or state error with regard to this claim, and there is no prejudice to be cumulated.

In Section III(L), *supra*, addressing (despite the procedural default) **Ground 7** (State's Investigation), the undersigned concludes that Petitioner fails to show any state court error in precluding questioning of Detective Betts directed at an inadequate investigation, until after Petitioner's presentation of alibi evidence   The Arizona Court of Appeals rejected the related state law claim, considering the trial court's order a scheduling order, and finding any error in declining effort to introduce such evidence was harmless because "[a]fter the testimony by his alibi witnesses, defendant could have asked to re-open his cross-examination of the detective--as the trial judge had specifically invited him to do."   (Exhibit GG, Mem. Dec. 2/28/02 at 20.)   Thus, Petitioner has shown, at best, an adverse ruling, and not any error. *Derden*, 978 F.2d at 1458.   Accordingly, Petitioner has shown no federal or state error with regard to this claim, and there is no prejudice to be cumulated.

In Section III(M), *supra*, addressing (despite the procedural default) **Ground 8** (Investigator), the undersigned concludes that Petitioner fails to show any state court error in denying Petitioner's Petition for Special Action regarding the appointment of an investigator, and no federal right to appointment of an investigator in his PCR proceeding.   Accordingly, Petitioner has shown no federal or state error with regard to this claim, and there is no prejudice to be cumulated.  (Additionally, the undersigned concludes that Petitioner has failed to show prejudice from the failure to appoint an investigator.   While that individual prejudice determination is not conclusive in this

cumulative error determination, the analysis in reaching that conclusion suggests that the effect of any purported error, when considered in combination with other errors, would be limited, if not nonexistent.)

In Section III(N)(2), *supra*, addressing **Ground 9A** (IAC re Investigation), the undersigned concludes that Petitioner fails to show deficient performance by trial counsel.  The PCR court reached the same conclusion.  (Exhibit A-5, ROA Item 319, M.E. 11/20/03 at 4.)  Accordingly, Petitioner has shown no federal or state error with regard to this claim, and there is no prejudice to be cumulated.

In Section III(N)(3), *supra*, addressing **Ground 9B** (Jury Selection), the undersigned concludes that Petitioner fails to show deficient performance by trial counsel.  The PCR court reached the same conclusion.  (Exhibit A-5, ROA Item 314, M.E. 11/20/03 at 1-2.)  Accordingly, Petitioner has shown no federal or state error with regard to this claim, and there is no prejudice to be cumulated.

In Section III(N)(4), *supra*, addressing **Ground 9C** (Impeachment of Hernandez), the undersigned concludes that Petitioner fails to show deficient performance by trial counsel.  As discussed in that section, the PCR court reached the same conclusions.  (Exhibit A-5, ROA Item 314, M.E. 11/20/03 at 3-5.)  Accordingly, Petitioner has shown no federal or state error with regard to this claim, and there is no prejudice to be cumulated.

In Section III(N)(5), *supra*, addressing **Ground 9D** (Incrimination of Franz), the undersigned concludes that Petitioner fails to show deficient performance by trial counsel.  The PCR court reached the same conclusion.  (Exhibit A-5, ROA Item 314, M.E. 11/20/03 at 5.)  Accordingly, Petitioner has shown no federal or state error with regard to this claim, and there is no prejudice to be cumulated.

In Section III(N)(6), *supra*, addressing **Ground 9E** (Exculpatory Witnesses), the undersigned concludes that Petitioner fails to show deficient performance by trial counsel.  As discussed in the other sections referenced in the analysis of this claim, the PCR court reached the same conclusions.  Accordingly, Petitioner has shown no federal

or state error with regard to this claim, and there is no prejudice to be cumulated.

In Section III(O), *supra*, addressing **Ground 10** (Sentence), the undersigned concludes that Petitioner fails to show any state court error in parts 10A, 10B, and 10C, and no *Blakely* error in part 10D.  The Arizona Court of Appeals court reached the same conclusions.  (Exhibit SS, Mem. Dec. 10/18/05.)  Accordingly, Petitioner has shown no federal or state error with regard to this claim, and there is no prejudice to be cumulated.

In Section III(D)(6)(a)(4)(a), *supra*, addressing **Supplemental Ground 2A** (Impeachment of Hernandez), the undersigned concludes that Petitioner fails to show deficient performance.  No state law error has been alleged.  Accordingly, there is no prejudice to be cumulated.

In Section III(D)(6)(a)(4)(b), *supra*, addressing **Supplemental Ground 2B** (Isaacs Not Called), the undersigned concludes that Petitioner fails to show deficient performance.  No state law error has been alleged.  Accordingly, there is no prejudice to be cumulated.

In Section III(D)(6)(a)(4)(c), *supra*, addressing **Supplemental Ground 2C** (Britton Not Called), the undersigned concludes that Petitioner fails to show deficient performance.  No state law error has been alleged.  Accordingly, there is no prejudice to be cumulated.

In Section III(D)(6)(a)(4)(d), *supra*, addressing **Supplemental Ground 2D** (Greenwood Not Called), the undersigned concludes that Petitioner fails to show deficient performance.  No state law error has been alleged.  Accordingly, there is no prejudice to be cumulated.

In Section III(D)(6)(a)(4)(e), *supra*, addressing **Supplemental Ground 2E** (Forensic Expert Not Hired), the undersigned concludes that Petitioner fails to show deficient performance.  No state law error has been alleged.  Accordingly, there is no prejudice to be cumulated.

In Section III(D)(6)(a)(4)(f), *supra*, addressing **Supplemental Ground 2F** (Franz Impeachment), the undersigned concludes that Petitioner fails to show deficient

performance.  No state law error has been alleged.  Accordingly, there is no prejudice to be cumulated.

In Section III(D)(6)(a)(4)(g), *supra*, addressing **Supplemental Ground 2G** (Boston Not Called), the undersigned concludes that Petitioner fails to show deficient performance.  No state law error has been alleged.  Accordingly, there is no prejudice to be cumulated.

In Section III(D)(6)(a)(4)(h), *supra*, addressing **Supplemental Ground 2H** (*Brady* Material), the undersigned concludes that Petitioner fails to show a *Brady* violation and thus fails to show deficient performance.  No state law error has been alleged.  Accordingly, there is no prejudice to be cumulated.

In Section III(D)(6)(a)(4)(i), *supra*, addressing **Supplemental Ground 2I** (Rivera Not Called), the undersigned concludes that Petitioner fails to show deficient performance.  No state law error has been alleged.  Accordingly, there is no prejudice to be cumulated.

In Section III(D)(6)(a)(4)(j), *supra*, addressing **Supplemental Ground 2J** (Rule 11 Exam), the undersigned concludes that Petitioner fails to show deficient performance. Moreover, the undersigned has determined that no related state law error occurred. Accordingly, there is no prejudice to be cumulated.

In Section III(D)(6)(a)(4)(k), *supra*, addressing **Supplemental Ground 2K** (Neighborhood Witnesses), the undersigned concludes that Petitioner fails to show deficient performance.  No state law error has been alleged.  Accordingly, there is no prejudice to be cumulated.

In Section III(D)(6)(a)(4)(l), *supra*, addressing **Supplemental Ground 2L** (Aiding and Abetting/Lesser Included Offense Instruction), the undersigned concludes that Petitioner fails to show he was entitled to the suggested instructions, and counsel was not deficient for failing to pursue them. Accordingly, Petitioner has shown no federal or state error with regard to this claim, and there is no prejudice to be cumulated.

In sum, in none of the above claims has Petitioner demonstrated any error (federal

or state) from which this Court could cumulate prejudice to find a denial of due process.

### c.   No Errors to Cumulate from Claims Not Addressed

The undersigned has not hereinabove addressed the merits of Petitioner's claims in Grounds 5 (Impeachment), Grounds 9E (IAC re exculpatory witnesses) as to Kristina Cox, 9F (IAC re closing arguments), 9G (IAC re Sentencing), 9H (IAC re appellate counsel), and 9I (IAC re cumulative errors), because the undersigned has concluded that these claims were procedurally defaulted or procedurally barred.  The undersigned will now address these grounds for purposes of identifying any errors from which harm could be cumulated.

None of these claims were addressed on the merits by the state courts, and accordingly, deference under 28 U.S.C. § 2254(d) does not apply.


### (1).  Ground 5 (Impeachment)

In Ground 5, Petitioner argues:

> (5) My Constitutional rights were violated when the trial court allowed the state to admit my priors as impeachment if I testified. The court of appeals erred when it found I waived this issue and thereby violated my Constitutional rights.

(Petition, Doc. 1 at 9:1-A.)  The other arguments on this claim are summarized as part of the discussion of it hereinabove in Section III(D)(5) (Independent and Adequate State Grounds re Ground 5).

The Arizona Court of Appeals disposed of this claim by finding it waived by failure to object at trial.  (Exhibit GG, Mem. Dec. 2/28/02 at 14.)  Petitioner argues, without explanation, that the "Court of Appeals erred when it found that I waived the issue because I did not testify at trial."  (Reply, Doc. 25 at 21.)  Petitioner goes on to argue that the "courts misapplied Federal law."  (*Id.*)  However, the waiver bar applied to Petitioner's claim was a matter of state, not federal, law.

As discussed hereinabove, Arizona law has long held that "[i]f a defendant

337

chooses not to testify at trial, he waives the right to challenge the trial court's ruling on the admissibility of a prior conviction." *State v. Lee*, 189 Ariz. 608, 617, 944 P.2d 1222, 1231 (1997) (Ariz. Sup. Ct. *en banc*). Thus there was no error of state law.

Moreover, as discussed hereinabove, the federal courts apply the same rule. *See Luce v. U.S.*, 469 U.S. 38, 42 (1984) ("Requiring that a defendant testify in order to preserve Rule 609(a) [impeachment with prior conviction] claims will enable the reviewing court to determine the impact any erroneous impeachment may have had in light of the record as a whole; it will also tend to discourage making such motions solely to 'plant' reversible error in the event of conviction."). *See also U.S. v. Williams*, 939 F.2d 721, 724 (9th Cir. 1991) (acknowledging *Luce* as overturning circuit precedent). Thus, Petitioner has failed to show an error of federal law.

Accordingly, Petitioner has shown no federal or state error with regard to his claim in Ground 5, and there is no prejudice to be cumulated.

### (2). Ground 9E (IAC re Kristina Cox)

As discussed hereinabove in Section III(D)(2)(d), Petitioner argues in his Ground 9E that trial counsel was ineffective in failing to call exculpatory witness "(2) Kristina Cox."   The undersigned has found only two other references to Kristina or Kristine Cox in the state court record.  First, Petitioner's Motion for Reconsideration on Appointment of Investigator asserted that Kristina Cox was a witness with "information about other versions of the events."   (Petition, Doc.1, Exhibits at 214.) Second, Petitioner's investigator, John Pizzi, testified in the second PCR proceeding that he was given the name of, found and interviewed a "Kristina Cox."  (Exhibit GGG, R.T. 3/14/08 at 23.) Otherwise, Petitioner has never offered any suggestion of the testimony to be offered by Kristina Cox.

 "[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed

testimony, and show that the testimony would have been favorable to a particular defense." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). Petitioner's self-serving speculation, with no affidavits from the alleged witnesses, is not sufficient evidence of ineffective assistance of counsel. *Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000).

Accordingly, the undersigned can find no deficient performance with respect to trial counsel's failure to call Kristina Cox to testify.

### (3).  Ground 9F (IAC re Closing Arguments)

In his Ground 9F, Petitioner argues that "trial counsel failed to argue to the jury that the evidence established that Isaacs was the shooter and I am innocent." (Petition, Doc. 1 a 9:5-A.)   Respondents observe that the PCR court rejected this claim, concluding:

> The defendant alleges that trial counsel were ineffective for failing to accuse Isaacs of the murder during the trial. The statement during trial counsel's opening statement, that he would not be able to tell them who did the shooting, might have been acknowledgment of the prohibition against stating personal beliefs or opinions during jury trial; no one asked Mr. Baran about this during the evidentiary hearing, though. Regardless of the failure to say the words "Isaacs committed the murder" in closing argument, it was obvious to me that he was the logical suspect to the defense team, and I find that this message was conveyed to the jury as well. Counsel was not ineffective for failing to say the precise words of accusation.

(Exhibit A-5, ROA Item 319, p. 6.)  Respondents argue that the claim is without merit because this court must apply a presumption that the failure to make this argument was sound trial strategy.  (Answer, Doc. 14 at 217-218.) Respondents further argue that implying Isaacs guilt, rather than affirmatively asserting it, could have been sound strategy because: (1) the defense only needed to establish reasonable doubt that it was Petitioner, and there was danger to insisting it was Isaacs not Petitioner, which was avoided by relying on the implication; and (2) the lack of clear proof that Isaacs was the killer meant arguing he was risked credibility with the jury.  Respondents argue a lack of prejudice given the unlikelihood that the argument would have resulted in acquittal.  (*Id.*

at 219-221.

Petitioner does not reply directly concerning this claim beyond asserting the merits of Ground 9.  (Reply, Doc. 25 at 24-25.)

In his closing arguments, trial counsel Baran argued:

> You heard the [911] tape, and on the tape, Mr. Franz is asked to describe the gunman on several occasions. And his description us— and you can listen to the tape and read the transcript—that the gunman is tall and big. Tall, big, has a shotgun. Big build, big fella. Big fella with a shotgun. Mr. Franz also tells us that he knows a fella named Muggsy [Isaacs] who's about 6-3 and that he immediately knew that Muggsy was involved.

(Exhibit R: R.T. 5/4/00 at 12.)

Conversely, Baran also strongly attacked Franz's ability to make any identification at all by pointing out: (1) his false identification of Greenwood, (2) his inability to see the shooter from the location he described; (3) his flight from the home; and (4) his inconsistent testimony about his phone. (*Id.* at 12-14.) He concluded:

> But I submit to you that what happened is Mr. Franz panicked. In that panic, he did not look at   the face of the shooter. He got an idea of the size of the shooter, and the police department noted that. But Mr. Franz's identification of this man isn't worth anything.

(*Id.* at 14.)  Baran concluded:

> There are a lot of unanswered questions in this case.  And I told you when I did my opening comments to you that I can't explain all of that. And I can't tell you who did kill Elisha Franz. But I can tell you who didn't. And who didn't is this young man sitting right over here.

(*Id.* at 31.)

Respondents cite *Yarborough v. Gentry*, 540 U.S. 1 (2003), a case involving an attack on counsel's effectiveness in closing arguments. The Court held:

> When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect. See That presumption has particular force where a petitioner bases his ineffective-assistance claim solely on the trial record, creating a situation in which a court "may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive." Moreover, even if an omission is inadvertent, relief is not automatic. The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.

340

*Id.* at 8.   The Court went on to note that "calculated risk…lies at the heart of an advocate's discretion." *Id.* at 9. The Court concluded that failing to make an explicit argument on reasonable doubt was not deficient because "Counsel's entire presentation, however, made just that point," and it preserved counsel's  "strategy of appearing as the friend of jury autonomy." *Id.*

Similarly here, it is apparent from the closing argument, as well as the testimony presented at trial, that the defense chose to avoid committing to a single version of facts of how the murder occurred, other than to show that Petitioner was not the murderer. Given the evidence available to the defense, this was a reasonable trial strategy.  It left intact counsel's credibility with the jury, and did not put the jury in the position of an either/or decision, permitting an acquittal by both those who were convinced it was Isaacs and those who were not.  Petitioner proffers nothing to counter these conclusions, or to counter the presumption of effectiveness.

Accordingly,  the  undersigned  concludes  that  Petitioner  has  failed  to  show deficient performance with respect to his issue.

As a result, there is no prejudice to cumulate.

### (4).  Ground 9G (IAC re Sentencing)

In  his  Ground  9G,  Petitioner  argues  that  trial  counsel  was  "ineffective  at sentencing for not advocating for a sentence of less than life without parole and for not objecting to the court's consideration and use of the aggravating circumstances in ARS section 13-702 in sentencing me to natural life." (Petition, Doc. 1 at 9:5-A.)

In addition to relying on procedural default, Respondents argue that this claim has been rendered moot because Petitioner was eventually resentenced.  Respondents further argue that the trial court's reliance on section 13-702 was authorized by the controlling authority at the time of trial, counsel is not ineffective because he failed to anticipate a new rule of law.  (Answer, Doc. 14 at 221-224.)

Again, Petitioner replies only generically on Ground 9.  (Reply, Doc. 25 at 24-

25.)

Petitioner's first PCR petition attacked the ineffectiveness of trial counsel with respect to the aggravating factors. (Exhibit A-3, ROA, Item 297 at 3.) In his Supplemental Sentencing Memorandum, PCR counsel Goldberg argued on resentencing that Petitioner "should receive a sentence of life with the possibility of parole after 25 years." (Exhibit A-5, ROA, Item 324 at 5.)

In response to Petitioner's PCR petition, the trial court ruled:

> The defendant has demonstrated that in the sentencing hearing I considered aggravating circumstances listed in A.R.S. § 13-702, which was in conflict with the language of subsection F of that statute and with that of 13-703(B), and later expressly prohibited in *State v. Viramontes*, 204 Ariz. 360, 362, 64 P. 3d 188 (2003). His trial counsel did not object to that procedure or those findings, and so he is entitled to resentencing on his ineffective assistance claims against both trial counsel and appellate counsel and also on the basis of his sentencing error claims.

(Exhibit A-5, ROA at Item 325, Order 2/10/4 at 2.) The court then proceeded to resentence Petitioner without consideration of the offending factors.

Thus, any affect from trial counsel's deficiencies were erased when Petitioner was resentenced.

"If an action of the trial court cured a putative error, the petitioner is complaining only of an adverse event rather than actual error." *Derden*, 978 F.2d at 1458. Petitioner's eventual resentencing cured any error from the erroneous sentencing. Accordingly, there is no ineffectiveness or error to cumulate from counsel's failure to object to the aggravating circumstances.

### (5). Ground 9H (IAC re Appellate Counsel)

For his Ground 9H, Petitioner argues that Appellate Counsel was ineffective by failing to raise the improper aggravating circumstances issue, and failing to "federalize" other claims. (Petition, Doc. 1 at 9:5-A.)

Respondents note that Petitioner fails to identify the claims that should have been "federalized" but concede that his PCR petition raised the same claim and identified

342

certain claims.  (Answer, Doc. 14 at 224.)  Respondents argue that this claim is based on a false premise that Petitioner was required to present his claims to the Arizona Supreme Court to properly exhaust them.

In his first PCR petition, Petitioner argued that in the Petition for Review to the Arizona Supreme Court, appellate counsel failed to federalize his *Willits* instruction claim and the six claims explicitly excluded by counsel in his Petition for Review. (Exhibit A-3, ROA, Item 297, PCR Petition at 22-23.)  The omitted six claims included:

> 1. Whether the prosecutor committed misconduct by using the lost crime scene measurements against him at trial.
> 2. Whether the pre-trial identification procedures were unduly suggestive.
> 3. Whether the trial court erred by allowing the state to admit appellant's prior felony convictions pursuant to Rule 609 if he testified at trial.
> 4. Whether the verdict was based on insufficient evidence.
> 5. Whether the trial court erred in its evidentiary ruling which limited cross-examination of a detective.
> 6. Whether the trial court erred in imposing a natural life sentence based on various aggravating and mitigating circumstances.

(Exhibit HH, Pet. Rev. at 2.)  These claims correlate, respectively with Grounds 2 (Willits Instruction), 3 (Lost Measurements), 4 (Identifications), 5 (Impeachment with Priors), 6 (Insufficient Evidence), 7 (State's Investigation), and 10 (Sentence).  The undersigned has concluded hereinabove that any federal claims asserted by Petitioner with regards to such issues are without merit. (*See supra* Sections III(G) (Ground 2), III(H) (Ground 3), III(I) (Ground 4), III(Q)(5)(c)(1) (Ground 5), III(K) (Ground 6), III(L) (Ground 7), and III(O) (Ground 10).)  "The failure to raise a meritless legal argument does not constitute ineffective assistance of counsel."  *Baumann v. United States*, 692 F.2d 565, 572 (9th Cir. 1982).

Accordingly, there is no deficient performance of counsel or other error with regard to Ground 9H to cumulate.

**(6).  Ground 9I (IAC re Cumulative Prejudice)**

For his Ground 9I, Petitioner argues that "his defense was prejudiced as a result of

343

both counsel's individual and cumulative errors during trial, sentencing and on appeal."
(Petition, Doc. 1 at 9:5-B.)

As with his Supplemental Ground 3, Petitioner fails to enumerate those errors, and for that reason, this claim is conclusory and without merit. *James*, 24 F.3d at 26.

Even if the claim is construed to be directed at the other instances of ineffective assistance alleged in Petitioner's original Ground 9 and Supplemental Ground 2, Petitioner has failed to show any deficient performance by counsel with regard to those other claims. (*See supra* Sections III(N) (Ineffective Assistance Grounds 9A, B, C, D, and E), III(Q)(5)(c)(2) – (5) (Ineffective Assistance Grounds 9E, F, G, and H), and III(D)(6)(a)(4) (Ineffective Assistance Supplemental Ground 2).)

Accordingly, there is no deficient performance of counsel or other error with regard to Ground 9I to cumulate.


**6.  Conclusion on Cumulative Error**

Petitioner's Supplemental Ground 3 is conclusory and therefore without merit. To the extent that it could be construed to refer to the claims raised in his Petition and Supplemental Petition, Petitioner has failed to show any error to be cumulated, and thus has failed to show he was denied a fair trial resulting in a denial of due process.

Accordingly, if not dismissed as procedurally defaulted, Supplemental Ground 3 must be denied on the merits.

**R.  PROCEDURAL ACTUAL INNOCENCE**

**1.  Arguments**

As discussed herein above, the undersigned has determined that various claims by Petitioner are either barred under the statute of limitations, procedurally defaulted or procedurally barred under an independent and adequate state ground.   Petitioner contends that notwithstanding any such limitations bar, procedural default or procedural bar, his claims may be considered because he is "actually innocent."  (Reply, Doc. 25 at 16.) Such a claim is considered a *procedural* claim of innocence, in contrast to the *substantive* claims of innocence asserted in Petitioner Ground 11 and Supplemental Ground 1 addressed hereinafter in Section III(S).  *See Smith v. Baldwin*, 510 F.3d 1127, 1139 (9th Cir. 2007).   Petitioner contends that he has shown his actual innocence by the evidence of Isaacs' confession.  (Reply, Doc. 25 at 26.)

Respondents argue that Petitioner has failed to show his actual innocence.  To support this argument, Respondents point to the evidence of guilt presented at trial, and the evidence in the PCR proceedings that both showed Petitioner's guilt and undermined his trial defense.  (Answer, Doc. 14 at 85-90.)

In reply, Petitioner simply argues that he was denied the opportunity to develop the factual basis of his actual innocence because the state court refused to allow him to call Isaacs to testify.  (Reply, Doc. 25 at 4-5.)

**2.  Applicable Law**

**a.   Applicability of the *Schlup* Gateway**

The standard for "cause and prejudice" is one of discretion intended to be flexible and yielding to exceptional circumstances, to avoid a "miscarriage of justice."  *Hughes v. Idaho State Board of Corrections*, 800 F.2d 905, 909 (9th Cir. 1986).   Accordingly, failure to establish cause may be excused "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent."  *Murray v. Carrier*, 477 U.S. 478, 496 (1986) (emphasis added).  Although

345

not explicitly limited to actual innocence claims, the Supreme Court has not yet recognized a "miscarriage of justice" exception to exhaustion outside of actual innocence.  *See* Hertz & Lieberman, *Federal Habeas Corpus Pract. & Proc.* §26.4 at 1229, n. 6 (4th ed. 2002 Cumm. Supp.).  The Ninth Circuit has expressly limited it to claims of actual innocence.  *Johnson v. Knowles*, 541 F.3d 933, 937 (9th Cir. 2008).

The actual innocence exception was developed in  *Schlup v. Delo*, 513 U.S. 298, 327 (1995), and is commonly referred to as the "*Schlup* gateway."  *Gandarela v. Johnson*, 286 F.3d 1080, 1086 (9th Cir. 2002).

It has been extended to permit consideration of claims barred by the habeas statute of limitations. ."  *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1935 (2013).


### b.   New, Reliable Evidence Required

To pass through the *Schlup* gateway, a petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324.   "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Id.*

**Newness** - To be "new," the evidence need not have been "newly discovered" (*e.g.*  discovered post-trial), but must be "newly presented" (e.g. not presented at trial). *Griffin v. Johnson*, 350 F.3d 956, 963 (9th Cir. 2003) *cert. denied,* 541 U.S. 998 (2004). *But see* Jay Nelson, *Facing Up to Wrongful Convictions: Broadly Defining "New" Evidence at the Actual Innocence Gateway*, 59 Hastings L.J. 711, 719 (2008) (noting disagreement between circuits whether evidence must be newly discovered); and *In re Davis*, 557 U.S. 952 (2009) (remanding case asserting substantive claim of actual innocence to determine "whether evidence *that could not have been obtained at the time of trial* clearly establishes petitioner's innocence").

**Reliability** - "[T]he *Schlup* standard is demanding and permits review only in the

346

extraordinary case." *House*, 547 U.S. at 538 (quotations omitted). "[P]recedents holding that a habeas petitioner satisfied [*Schlup*'s] strictures have typically involved dramatic new evidence of innocence." *Larsen v. Soto*, 742 F.3d 1083, 1095-96 (9th Cir. 2013). For example, in *Schulp*, the Court found that a claim supported by sworn statements by new eyewitnesses that the defendant was elsewhere at the time of the crime, if deemed credible, could constitute such evidence.  513 U.S. at 331.  In *House*, the Court found new reliable evidence from: (1) new DNA evidence showing that semen on the victim came from her husband, not the defendant; (2) new forensic testimony that the blood stains on the defendant's clothes came from samples drawn during an autopsy, not during commission of the crime, corroborated by evidence showing a spill in handling; and (3) new testimony that around the time of the trial, the victim's husband confessed to two friends that he had killed his wife in a fight, corroborated by trial testimony indicating a history of a violent relationship and fight the night of the murder.   In evaluating the latter evidence, the Court observed: "The confession evidence here involves an alleged spontaneous statement recounted by two eyewitnesses with no evident motive to lie. For this reason it has more probative value than, for example, incriminating testimony from inmates, suspects, or friends or relations of the accused." *House*, 547 U.S. at 552.

### c.   All Evidence to be Considered

 "[A]lthough '[t]o be credible' a gateway claim requires 'new reliable evidence— whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial,' the habeas court's analysis is not limited to such evidence." *House v. Bell*, 547 U.S. 518, 537 (2006) (citations omitted). "[T]he District  Court must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial." *Schlup*, 513 U.S. at 331-332.

Indeed, "[t]he habeas court must make its determination concerning the petitioner's innocence '"in light of all the evidence, including that alleged to have been

illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.'" *Id.* at 328.

Moreover, the normal limitations on evidence do not apply. "In assessing the adequacy of petitioner's showing, therefore, the district court is not bound by the rules of admissibility that would govern at trial. Instead, the emphasis on 'actual innocence' allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial." *Schlup*, 513 U.S. at 327-328.

Although, "the *Schlup* inquiry, we repeat, requires a holistic judgment about all the evidence …[a]s a general rule, the inquiry does not turn on discrete findings regarding disputed points of fact." *House*, 547 U.S. at 539-40.

### d.   Standard of Proof

"Based on this total record, the court must make 'a probabilistic determination about what reasonable, properly instructed jurors would do.' The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *House v. Bell*, 547 U.S. 518, 538 (2006). "A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *Id.* A showing that a reasonable doubt exists in the light of the new evidence is not sufficient. Rather, the petitioner must show that no reasonable juror would have found the defendant guilty. *Schlup*, 513 U.S. at 329.

In making this analysis, the District Court must necessarily weigh the evidence. "[W]hen considering an actual-innocence claim in the context of a request for an evidentiary hearing, the District Court need not 'test the new evidence by a standard appropriate for deciding a motion for summary judgment,' but rather may 'consider how

1    the timing of the submission and the likely credibility of the affiants bear on the probable

2    reliability of that evidence.' " *House,* 547 at 537.   "[T]he court may consider how the

3    timing of the submission and the likely credibility of the affiants bear on the probable

4    reliability of that evidence." Schlup, 513 U.S. at 332.

5        In making these determinations, the district court cannot provide for a feckless

6    juror.   "It must be presumed that a reasonable juror would consider fairly all of the

7    evidence presented. It must also be presumed that such a juror would conscientiously

8    obey the instructions of the trial court requiring proof beyond a reasonable doubt."

9    *Schlup*, 513 U.S. at 329.

10

11       **e.   AEDPA Deference**

12       **State Court Factual Findings** - While Section 2254(d) (deference to state court

13   decision on merits) has no application in the context of a *Schlup* claim because it pertains

14   only to a "claim that was adjudicated" in state court, Section 2254(e)(1) does come into

15   play because it refers to the "determination of a factual issue"-that is, to a state court's

16   findings of fact, rather than its conclusions of federal law."  *Sharpe v. Bell*, 593 F.3d 372,

17   378 (4th Cir. 2010).  *See also Reed v. Stephens,* 739 F.3d 753, 773 n. 8 (5th Cir.) *cert.*

18   *denied*, 135 S. Ct. 435 (2014) (listing similar decisions from 3rd 6th, 8th, 9th, 10th, 11th,

19   albeit some unpublished).  Under § 2254(e)(1), "a determination of a factual issue made

20   by a State court shall be presumed to be correct. The applicant shall have the burden of

21   rebutting the presumption of correctness by clear and convincing evidence."

22       **Evidentiary Hearings** – Conversely, the limits on evidentiary hearings in 28

23   U.S.C. § 2254(e)(2) do not apply to Petitioner's assertions of   procedural actual

24   innocence.[58]

25                Its applicability is limited by the introductory language of
                 subsection (2), which states that "[i]f the applicant has *failed to*
26               *develop* the factual basis of a *claim* in State court proceedings, the
                 court shall not hold an evidentiary hearing on the claim unless [the
27               requirements of subsections (A) and (B) are met]." 28 U.S.C. §

28   _____
     [58] On the other hand, those limits do apply to his substantive claim of actual innocence.

                                    349

2254(e)(2) (emphases added). We reject the Commonwealth's argument that the plain meaning of this introductory language encompasses evidence that might establish cause and prejudice or a miscarriage of justice and that Cristin's failure to develop that evidence before the state courts now bars an evidentiary hearing on the subject.

*Cristin v. Brennan*, 281 F.3d 404, 413 (3d Cir. 2002).  *See also Teleguz v. Pearson*, 689 F.3d 322, 331 (4th Cir. 2012) ("Our sister circuits considering whether the limitation on evidentiary hearings in § 2254(e)(2) applies to *Schlup* claims have overwhelmingly found that it does not.");  . *Sibley v. Culliver*, 377 F.3d 1196, 1207 n.9 (11th Cir.2004); *Coleman v. Hardy*, 628 F.3d 314, 320 (7th Cir. 2010).  *See generally Griffin v. Johnson*, 350 F.3d 956, 966 (9th Cir.2003) (acknowledging but declining to address the issue of whether § 2254(e)(2) governs a request for a hearing on actual innocence); *Jaramillo v. Stewart*, 340 F.3d 877 (9th Cir. 2003) (same).  *But see Morris v. Dormire*, 217 F.3d 556, 560 (8th Cir.2000) (rejecting argument that district court abused its discretion in failing to hold an evidentiary hearing on claim of actual innocence where petitioner made no attempt to satisfy § 2254(e)(2)).

## 3.  Evidentiary Hearing

The only evidence relevant to actual innocence that Petitioner has proffered as being available at an evidentiary hearing has been testimony of co-defendant Isaacs, the testimony of inmates Ellis and Gaines, and (presumably his own) testimony regarding Isaacs motivations under prison life.  As discussed hereinabove, the undersigned has concluded that an evidentiary hearing is unauthorized and/or unnecessary in this case. (*See supra* Section III(A) (Motion for Evidentiary Hearing.)   In coming to that conclusion, however, the undersigned has made some assumptions which will be applied in resolving Petitioner's claim of procedural actual innocence.  Those are:

(1) that if called to testify, Isaacs would testify consistent with his confessions to inmates Allen, Roinuse, Ellis and Gaines, and that Isaacs' demeanor would reflect credibly on his testimony;

(2) that if called to testify, inmates Ellis and Gaines would testify credibly and

350

consistent with their declarations;

(3) that Petitioner would testify about prison life consistent with the allegations in his Motion for Evidentiary Hearing, and Petitioner's demeanor would reflect credibly on his testimony.

## 4. Evaluation of Evidence

For the reasons discussed hereinafter, the undersigned cannot find a reasonable probability that no reasonable juror would have convicted Petitioner in the light of all the evidence.  A reasonable juror could reject the exculpatory evidence offered by Petitioner as lacking credibility, and conclude that despite such evidence the evidence of Petitioner's guilt was credible and established Petitioner's guilt beyond a reasonable doubt.

### a.   New Evidence

In evaluating Petitioner 's claim of procedural actual innocence, the undersigned has taken into consideration all of the "new evidence" in this case.  The following is addressed to the most salient points.

#### (1).  Petitioner

**Summary of Petitioner's Testimony** - Petitioner testified at the first PCR hearing (Exhibit LLL, R.T. 5/30/08 at 83 *et seq.*) that he had a long list of convictions from Tennessee in two separate prosecutions, as well as a third in which he had plead guilty and was awaiting sentencing at the time he absconded from parole and his bond, and travelled to Laughlin, Nevada.  The charges in the various prosecutions included charges for arson, aggravated assault, aggravated burglary, and some eleven or twelve counts of burglary and theft.

Although Petitioner testified he was 5 feet 10 and 1/2 inches tall, Petitioner agreed that it was his picture in the photo lineups introduced at trial (Exhibit WD), and that it

shows he was between 72 and 73 inches tall.  In another picture, he was between 71 and 72 or with hair up to "sort of" 73 inches tall.  (Petitioner's Tennessee drivers license records listed him as 6'00".  (Exhibit CC, Trial Exhibits, Exhibit P-91, P-90 (Doc. 18-6 at 63-65).)

He testified that on Friday, July 10, 1998, he was at a party with the employees at the Crown Point Apartments.   That party involved a play fight with the Mexican landscaper.

Sometime after 10:00 in the evening he paged his marijuana dealer, Bobby Day to make a purchase.  Day lived with Bernie Hernandez at the Oasis Vista Apartments in Laughlin, Nevada.  He had met both Day and Hernandez at the theatre where he worked. Day called back and they arranged to meet at the theatre.    Petitioner drove there and picked up Day and Hernandez in Petitioner's car.  They left and eventually followed a truck to the Flamingo Casino, where they met Isaacs and another man, and then they all returned to Day's apartment, where Petitioner bought an ounce of marijuana for $60 and began to smoke it.  Petitioner does not believe he was with Hernandez and Isaacs until after 12:00, because he was with Kelly Erickson, whose wife was the apartment manager, and Erickson said she didn't get home until 12:00.

While at the apartment, Isaacs talked about someone snitching on him or his friends, and Petitioner "was under the impression that he…had killed somebody who had snitched."   Petitioner did not take Isaacs seriously because he seemed kind of crazy. Petitioner had never met Isaacs.  Isaacs had a Glock nine millimeter with him, and a shotgun was at the apartment too.

They all began smoking speed, including Petitioner, who then asked about buying some speed. Petitioner had snorted speed before, but had not smoked it.   The others agreed to sell him 10 quarters of speed for $200, but said they would need to go get it. By the time Petitioner had smoked his third lungful, he got sick, went into the bathroom and vomited.

Hernandez and Isaacs came to the bathroom and said they needed a ride to go get

352

the speed, and asked him to drive them.  He declined so Isaacs and Hernandez borrowed his car and left.  Bobby Day had stayed at the apartment with Petitioner.  When Isaacs and Hernandez returned one and half to two hours later, Petitioner paid them for the speed, they all did more speed, and then got in Petitioner's car and drove to Bullhead City.

In the car, they told Petitioner they needed to get rid of a shotgun.  They dropped off Bobby Day at a house, and then Petitioner, Isaacs and Hernandez drove to the home of Larry Witzig, who Petitioner did not know.   Petitioner admitted he was highly intoxicated at that time, and cannot tell what time he went to Larry Witzig's house.  It is hard for him to track time when he is intoxicated, and was not paying attention to the time.

Larry Witzig and his mother were at the house. Witzig told them they could leave the shotgun, so Petitioner gave the car keys to Isaacs, who went and retrieved the shotgun from the car.  Then, Witzig's mother appeared and told them they could not leave the shotgun there, so they left.  They then agreed to get rid of the shotgun.

Then they went to the Davis Dam, drove across to the Nevada side, parked, got out, and walked back across to the middle of the dam.  Hernandez wanted to jump off the dam with the gun, but they told him he couldn't.  They were all pretty high, but they talked about it while they walked half way across the dam where Isaacs dropped the gun in the water.

Then they went to a home in Bullhead City, a trailer with a basement, and did more speed.  Eventually they ended up at the Portofino Apartments in Laughlin, near Petitioner's apartment.  When the sun was coming up, he called his girlfriend, who was upset, so he drove home.

Later that day, Hernandez and Day came to Petitioner's apartment and said they should check his car because they had killed somebody.  Petitioner "was like, what? We just kind of blew it off."  After that day, Petitioner continued to see Hernandez when he would buy marijuana from his roommate, Day.  Hernandez had told him not to talk

about the murder because they had used his car, and Petitioner helped get rid of the gun.

A few weeks after the murder, Hernandez came to Petitioner's apartment saying the police were trying to talk to Hernandez, and asking for help to run.  Petitioner finished his work day at the apartment complex, and then took Hernandez to Calexico, across the border from Mexicali, Mexico.  He did not see Hernandez again until trial.

He left Arizona because a Las Vegas Metro policeman came to his door.

He was arrested by the FBI on November 13, and was interviewed by Agent Kerr. Kerr did not take notes during the interview.  He told Kerr "most of the truth" including where he went and doing drugs, but did not tell him about being anywhere in Bullhead City.    He did not tell Kerr about driving Hernandez and Isaacs around because he did not want to be implicated in the murder.

Since that time, Petitioner has had one conversation with Isaacs.  It was before Isaacs pled guilty, while they were in jail together.  Isaacs said "Why are you telling on me?"  Petitioner had not told on Isaacs beyond what he told the FBI.

Isaacs had shown other inmates the police reports from the case and has asserted that Petitioner told on him and was a confidential police informant in Tennessee, based on presentence reports.

Petitioner believed that Isaacs would testify at his trial and confess because that was what Isaacs had communicated to him through other inmates.  Isaacs wrote him one letter, which was intercepted by the prosecution, and Petitioner did not receive it until he got it from his lawyer.  The intercepted letter from Isaacs did not sound like someone who was mad at him, but was trying to help him.  Isaacs had already pled guilty and been sentenced at that time.  Petitioner explained the inconsistency by pointing to the fact that Isaacs had tried to manipulate PCR counsel by offering to come testify but wanting to be brought 30 days in advance of the hearing.

Petitioner has never had a face-to-face interaction with Isaacs at prison.  As testified by the other inmates, on entering a prison yard, the other inmates want to see your court records.  Isaacs has always shown his paperwork and told other inmates that

Petitioner told on him, and brags about committing the murder.  He has bragged to inmates other than Roinuse and Allen.  Isaacs' roommate told Petitioner that Isaacs has a tattoo of Isaacs killing the victim.

**Credibility** – Petitioner's credibility suffers from several defects.

First, as the petitioning prisoner, Petitioner has an obvious motivation to lie.

Second, Petitioner has a substantial criminal record.

Third, despite his protestations that he has always plead guilty and admitted his crimes, Petitioner has been demonstrated to have evaded responsibility for his crimes in other ways, including absconding, lying to law enforcement (*e.g.* the FBI), etc.

Fourth, Petitioner not only has admitted (and had corroborated by other witnesses) his substantial abuse of alcohol, marijuana, and methamphetamine on the night of the murder, but his own witnesses, Chester Flaxmayer and Dr. Blackwood provided convincing and uncontradicted evidence that Petitioner was likely to experience not only loss of memory from such abuse, but that he would unconsciously confabulate memories to replace such losses, and particularly to deal with the stress of guilt.  This suggests that although Petitioner may wholeheartedly believe in his own innocence, he may simply be mistaken.

Fifth, Petitioner's testimony is even less credible because he admits that he had never before smoked speed, and experienced new and unsettling effects.  A reasonable juror could conclude that this exacerbated what was his already diminished mental state.

**Corroboration of Prosecution's Case** – At the same time, Petitioner's testimony was corroborative of much of the prosecution's case, *e.g.* his involvement with Isaacs and Hernandez on the night of the murder, his alcohol and drug usage, the admissions of Isaacs and Hernandez to being involved in the murder, his participation in trying to dispose of the weapon at the Witzig home, and then ultimately doing so at the dam, his admission that his vehicle was used by he, Isaacs and Hernandez that night, and the motivation for the murder.  A reasonable juror could conclude that Petitioner was credible, but that the missing parts from the prosecution's case, e.g. Petitioner's

participation in the actual murder, could have been the result of a drug and alcohol induced loss of memory.

Moreover, the testimony that Petitioner's drug and alcohol abuse would render him impetuous, with impaired judgment and behavioral control, all would suggest that evidence showing his agreement to kill the victim as a matter of bravado or even to establish some nebulous drug supply arrangement, was credible.

**Indicia of Innocence** – Apart from the denial of any participation, and assertion that Isaacs admitted to having already executed the murder, the most exculpating portion of Petitioner's testimony was his assertions that he was at home with Daundivier and Erickson until after the murder occurred. But Petitioner's testimony on time is even more suspect, given the effects of his drug and alcohol abuse on the ability to perceive time and remember facts.  Indeed, Petitioner admitted he had no watch or clock to gauge by, or particular reason to keep track of time on that night.   Moreover, as discussed hereinafter, a reasonable juror could find Daundivier and Erickson to not be credible in their corroboration of that contention, and that Britton and Hernandez were more reliable witnesses on the point.

His credibility is even more suspect if a juror were to accept Britton's assertions that the subject party actually occurred the following night, with Petitioner again becoming intoxicated, providing a basis for a reasonable juror to conclude that Petitioner had also conflated his memories from the following Saturday night with his memories (or lack thereof) from the night of the murder.

### (2).  Co-Defendant Isaacs

The undersigned has presumed that (despite his consistent refusal to do so in the past) co-Defendant Isaacs would testify consistent with his confessions to Petitioner on the night of the murder (as described by Petitioner) and the other inmates that he was the one who killed the victim, not Petitioner.  The undersigned has further presumed that Isaacs' demeanor would indicate that his testimony was credible.

1   That does not mean, however, that the testimony itself would be deemed credible.

2   First, the PCR court has twice found that Isaacs' out of court confessions were not

3   credible.  (Exhibit MMM, M.E. 6/12/08; Supp. Record, Docs. 45/46, Appendix 4, Order

4   1/18/13 at 2.)  Those factual findings are entitled to a presumption of correctness, and

5   Petitioner fails to offer anything (apart from his own testimony on prison life which is

6   addressed hereinafter) to overcome that presumption, which is not clear and convincing

7   evidence.  Nor does Petitioner proffer anything to show that Isaacs' in-court confession

8   would not suffer from the same lack of credibility.

9   Second, Isaacs credibility would have been somewhat reduced because Isaacs had

10  previously been afforded opportunities to testify to Petitioner's innocence, including at

11  trial and in Petitioner's PCR evidentiary hearing.  In each instance, Isaacs refused.  On

12  the other hand, such refusal might be explained by a fear of prosecution. (*See* Exhibit

13  LLL, R.T.  at 163-164 (PCR counsel arguing that Isaacs still risked prosecution for first

14  degree murder).)

15  Third, as discussed hereinafter, the undersigned concludes that a reasonable juror

16  could reject Petitioner's testimony on the motivations of prison life, and conclude that

17  Isaacs stands to gain from confessing to the crime.

18  Fourth, a reasonable juror could conclude that Isaacs was acting consistently with

19  his statements to inmate Ellis that he would testify in return for a payment of $25,000

20  from Petitioner.  Even if the jury would not presume that Petitioner had agreed to such a

21  payment, they might conclude that Isaacs had a hope of gaining something from

22  Petitioner in exchange for his confession.

23  Fifth, the confessions of Isaacs are largely devoid of any specifics.  Petitioner

24  proffers nothing to show that Isaacs would offer details that would lend credibility to his

25  confessions.  The only things offered beyond a bald claim of "I did it" were assertions

26  that the victim was a confidential informant, ant that Hernandez had been there and

27  agreed with Isaacs to incriminate Petitioner.  (*See* Exhibit LLL, R.T. 5/30/08 at 40-41

28  (Roinuse testimony); *id.* at 71 (Allen testimony); Supp. Records, Docs. 45/46 at

Appendix 1, PCR Petition, Exhibit A, Ellis Declaration and Exhibit B, Gaines Declaration.)

Based upon the foregoing, a reasonable juror could dismiss any confession of Isaacs as simply not credible.


### (3).  Ellis and Gaines

The undersigned has also presumed for purposes of this Report & Recommendation that inmates Ellis and Gaines would testify credibly in accordance with their declarations.

Ellis declares that in 2011 Isaacs arranged to meet him in the prison library so Ellis could relay a message to Petitioner that in exchange for $25,000 Isaacs would confess in court and get his girlfriend and her sister to "tell the truth."  Isaacs then confessed to killing the victim, that his Hernandez testified against Petitioner, but Petitioner "wasn't even there."  He wanted the money because once he confessed, Hernandez would be in trouble for lying.  (Supp. Record, Docs. 45/46, Appendix 1, PCR Pet. Exhibit A, Ellis Declaration.)

Gaines declares that in 2011 he was talking to Isaacs and Isaacs confessed to killing the victim (a "rat") and that Petitioner was serving a life sentence for the murder even though he was innocent.  Isaacs asserted he didn't like Petitioner, and admitting the crime would get Hernandez in trouble, and Hernandez was with him at the time of the murder.  (*Id.* at Exhibit B, Gaines Declaration.)

Although the undersigned presumes that these inmates would testify credibly, that does not establish the credibility of Isaacs's statements.  For the reasons discussed hereinabove, and those discussed hereinafter with regard to prison life, the undersigned concludes that a reasonable juror could conclude that Isaacs's confessions were false.


### (4).  Prison Life Testimony

In his Motion for Evidentiary Hearing, Petitioner purports to provide testimony

358

about prison life.   The undersigned has presumed for purposes of this Report & Recommendation that such testimony would be offered with a credible demeanor. Petitioner contends:

> It is a fact that within the Arizona prison system the Aryan Brotherhood controls the "white" inmate population of which both Isaacs and Petitioner are "class" members in the eyes of the A.B.. Upon arrival in ADOC A.B. members demand all white inmates provide them with their legal files to allow A.B. members to "screen" inmates for the purpose of discovering snitches, sex offenders, and those who are not otherwise going to be allowed to hang around.  This is done to eliminate undesirables from the units because A.B. and other gang members blatantly commit crimes and conduct criminal enterprises in every unit in ADOC.  Isaacs simply could not "lie" and say he is the killer/shooter and actually gain respect from doing so.  He would have been killed for doing so. These violent A.B. inmates do not condone that type of behavior and would have immediately discovered he was lieing [sic].  But he was and is telling the truth when he says he is the killer and I am innocent….The reasons Clayton Ryionuse called Isaacs was because Isaacs failed being a skinhead and Ryionuse is a skinhead who was offended by Isaacs' fake skinhead affiliation.   This is classic prison culture clashing.   Isaacs faked being a skinhead because in ADOC there are few skinheads and they enjoy a special little corner of ADOC where, as long as they pass the background check by the A.B., they can then go off by themselves and basically be left alone as long as they do not break any A.B. created rules. The "real" skinheads pride themselves on that.  They also are only in small numbers on any given unit so they really stick together. For Isaacs to fake it was not too hard.  All he needed was one "real skinhead" to bring him in.  After that he was good.   The problem was, over the years, word got around that Petitioner is serving life for a crime he did not commit and for which Isaacs did commit and daily brags about committing.  I do not condone A.B. or skinhead philosophies however even these inmates can and often do have real understanding of right and wrong.  As spectators of Petitioner and Isaacs and this case inmates began to really look at everything and begin to realize it is wrong for the state to put me in prison and it is wrong for Isaacs to be respected when he knows I am innocent and thinks it is funny.  It is not funny.  Here again prison culture factors into the mix however because in prison it is also wrong to help authority.  So inmates are not readily willing to come forward and speak up for me in court because to do so labels them as snitches.  But a few have. Ryionuse, Allen, Ellis, and Gaines.

(Motion for Evidentiary Hearing, Doc. 82 at 19-20.)

In contrast, in rejecting Petitioner's PCR claim of actual Innocence, the PCR Court found:

> I also find both [inmates Roinuse and Allen] to be credible in their admissions that Isaacs reaps benefits within the prison inmate

culture, especially those in white supremacy gangs, by claiming to have killed an informant. Not only does Isaacs gain some measure of respect and authority over others by these statements, but he reduces the risk of being victimized himself by other inmates. As I mentioned at the close of the last hearing, Isaacs appears to be a person who needs all the protection he can muster.

(Exhibit MMM, Order 6/12/8 at 2.)

The critical issue with regard to Petitioner's newly proffered testimony is whether the rigors of prison life would provide motivation for Isaacs to lie about his guilt (as the PCR court found) or lie about his innocence (as Petitioner now argues). The essence of Petitioner's contention is that prison culture, particularly within the Aryan Brotherhood and Skinheads would sanction Isaacs if they found that he was lying about having killed a snitch. Petitioner argues that this makes Isaacs' confessions (whether to the other inmates or if called to testify) more credible.

Under Petitioner's contentions, when Isaacs walked into prison he faced a choice of which story to tell, knowing that if he were eventually found to have lied he would face consequences. He could tell a story consistent with his court file – that he was just an accomplice – or he could tell a story that would gain him social standing by claiming to be the killer. Petitioner contends that in light of the risk of retaliation the fact that Isaacs chose the latter demonstrates that the story he told must be true.

But this is based on an assumption that Isaacs believed the other inmates would eventually discern whether Isaacs' story was a lie. But Petitioner proffers nothing to suggest how they would accomplish such a feat. At most, he suggests that they would have reviewed Isaacs' court file. That file would have reflected his conviction as an accomplice. Moreover, the facts of this case (as argued by Petitioner) indicate that there were only two people with the personal knowledge of the real killer: Isaacs and Hernandez. Hernandez was not in prison. Petitioner would be expected to protest his innocence (and Isaacs' guilt), at least as long as his legal challenges continued. A reasonable juror could conclude that Isaacs would not find a real risk of having a false assertion of his own guilt being discovered.

Petitioner's contentions are also based on an assumption that Isaacs had taken the

safe route of telling the "truth" about his role in the murder.   But, Isaacs' character reflects a man with little regard for risk or societal constraints.  He functioned as a drug dealer and either killed or had killed someone he believed was a confidential informant. A reasonable juror could conclude that, faced with the choice of being a zero with no standing or a hero with a risk of being exposes a fraud, that Isaacs would chose the latter.

Moreover, the core problem with Petitioner's theory lies in the timing. The pertinent question is not whether Isaacs told the truth when he got to prison, but when he confessed to inmates Roinuse, Allen, Gaines, and Ellis, and whether his presumed testimony would be the truth.  Under Petitioner's theory, the last thing Isaacs would now do is admit that he had lied to the other prisoners and taken credit for something he didn't do under Petitioner's premise.  Not being a hero is one thing, but being a zero and a fraud is another.

If Petitioner's premise about Isaacs' initial choice is rejected, then Isaacs stands to gain doubly from claiming responsibility for the murder, both because it bolsters his claim to being a hero as a snitch killer, and because it perpetuates a story that if he were to backtrack on now would raise the ire of dangerous inmates.

Petitioner argues that "inmates began to really look at everything and begin to realize it is wrong for the state to put me in prison and it is wrong for Isaacs to be respected when he knows I am innocent."  (Motion for Evidentiary Hearing, Doc. 82 at 20.)  But this means that fellow inmates would be pressuring Isaacs to testify to his own guilt, giving one more motivation for Isaacs to lie.

In sum, Petitioner provides a weak alternative motivation for Isaacs to have been telling the truth when he confessed, but a doubly a strong motivation for him to perpetuate a lie now.  Under these circumstances, a reasonable juror could conclude that Isaacs chose to lie from the beginning to increase his standing, and has and will continued to do so in the future.

//

//

### (5).  Allen and Roinuse

In his second PCR hearing, Petitioner introduced testimony of inmate **Clayton Roinuse** (Exhibit LLL, R.T. 5/30/2008 at 19-62) that he was serving a life sentence for murder.  He had been told by other inmates that Isaacs deserved respect because he had killed a confidential informant, and even had a tattoo memorializing it.  (*Cf.* Exhibit CCC, Supp. PCR Pet. at Exhibit B, Letter from Roinuse to PCR counsel DeRienzo postmarked 2/22/07, at 2 (describing tattoo as depicting "a 'skin head' (him) holding a smoking shotgun).)  In February, 2008 (a year after writing to PCR counsel), Roinuse personal overheard Isaacs on two occasions telling other inmates that he had killed a confidential informant.  On the first occasion, he claimed another inmate was serving a life sentence for it.  Roinuse could not identify Isaacs because he had never seen him, just heard him in the recreation cells. Roinuse testified that Isaacs received benefits in prison culture from having killed an informant.  Roinuse had been threatened for agreeing to testify.  In prison culture, testifying against someone was the lowest form of life aside from being a sex offender.

Petitioner also introduced testimony of inmate **Jason Allen** (Exhibit LLL, R.T. 5/30/2008 at 63-81) that he was serving a 10.75 year sentence of kidnapping and aggravated assault.  He did not personally know Isaacs, but saw him when they were housed together.  At breakfast, he heard Isaacs call Petitioner "a rat" and saying "I don't know why Billy Duncan got life without parole, I'm the one that killed the bitch."  He agreed that inmates brag about crimes to get status in the prison.  In prison, being a snitch is at the bottom, killing snitch is closer to the top.

The PCR court found credible the testimony from Allen and Roinuse about Isaacs' prison admissions, Isaacs being a liar, and Isaacs would receive benefits from claiming to have killed an informant.[59] (Exhibit MMM, Order 6/12/8 at 2.).

---

[59] (However, in an interview with Petitioner's investigator, Allen admitted he would be willing to lie for Petitioner , but claimed he wasn't lying about Isaacs.  (Exhibit CCC at Exhibit D, Interview at 8, 10.).)    Applying the presumption of correctness under 28 U.S.C. § 2254(e)(1), the undersigned presumes in Petitioner's favor that Allen and Roinuse were credible as outlined by the PCR court.

But for the reasons discussed hereinabove, a reasonable juror could believe Allen and Roinuse, but not believe what Isaacs told them.

### (6).  Rusty Britton

At sentencing, Petitioner's girlfriend, Rusty Britton, testified (Exhibit U, R.T. 7/25/00 at 3-37) that Petitioner was with her from about 5:40 until 10:00 or 11:00 that night, during which time he drank 24 beers, then left in his white Nissan, and did not return until the next morning.  She denied any personal knowledge of whether Petitioner was involved in the shooting, but related Hernandez's statements that Petitioner's car had been used in the murder, that the murder was committed because the victim was a snitch, and Hernandez's request to go to Mexico.  She described finding a food receipt in the car from Bullhead City, dated the night of the murder.

If Britton's trial testimony is believed, it left Petitioner in a position to commit the murder, his car having been used to commit the murder, and helping an involved party leave the country and then shortly thereafter leaving the state.

The only potentially directly exculpatory testimony offered by Britton (apart from her own disbelief in his guilt) was Petitioner's statements that he had seen someone that matched the original description of the shooter (six foot one, stocky build) with a shotgun the night of the murder.

She also testified that the couple abandoned the white Nissan Sentra in Tennessee because of problems with obtaining the title.  This would diminish the suspicion that the car was abandoned because it had been used in the murder.

On the whole, however, Britton eviscerated Petitioner's alibi for the night of the murder, and conflicted with the testimony of all of the Petitioner's alibi witnesses.

### (7).  Chester Flaxmayer

At sentencing, criminologist Chester Flaxmayer testified (Exhibit V, R.T. 8/28/00 at 3-58) that the amount of alcohol that Rusty Britton testified Petitioner consumed on

the night of the murder, together with the reported marijuana us, would have significantly impaired his mental and physical abilities, and made him more prone to violence.

This testimony, combined with that of Britton and Daniel Blackwood, would on the one hand suggest that Petitioner might have been too impaired to have carried out the murder, or on the other hand suggest he might have been impaired enough to commit the murder when he might otherwise not have done so and not remember it thereafter.

### (8).  Robert Pelzer

Robert Pelzer, Petitioner's private investigator, testified at sentencing (Exhibit AA, R.T. 12/18/00 at 41-55) that Rusty Britton's statements to him were consistent with her testimony at sentencing.  Given the impact of Britton's statements on Petitioner's alibi defense, this would have been indicative of Petitioner's guilt.

### (9).  Daniel Blackwood

Neuropsychologist Daniel Blackwood testified at Petitioner's sentencing (Exhibit AA, R.T. 12/18/00 at 55-82) that Petitioner told him he had drunken so much that he did not remember anything from the night of the murder, and Blackwood believed that Petitioner's account of the night was a combination of memories and fiction, and should not be relied on as evidence.

On the other hand, Petitioner told Blackwood that he was not at the scene of the murder.

In sum, this evidence rendered largely unbelievable any testimony offered by Petitioner about the events on the night of murder.

### (10).  Bernie Hernandez

At trial, the defense attempted to introduce evidence that after leaving his employment at the theatre, Bernie Hernandez had supported himself by selling drugs.

364

Trial counsel represented to the trial court that Hernandez had told him that was his income source.   (Exhibit L, R.T. 4/26/00 at 90-99.)   The value of this evidence as circumstantial evidence regarding Petitioner's guilt is limited.   The evidence at trial fairly depicted Hernandez as steeped in the drug culture and, if not personally selling drugs, at least assisting a drug dealer (Isaacs) and arranging sales with him.   But that tends to corroborate Hernandez' story, and thus is not indicative of guilt or innocence.

The other use of this evidence would be to impeach Hernandez's credibility. Again, however, the evidence at trial amply depicted Hernandez's at least indirect involvement in selling drugs.

Moreover, even if the undersigned were inclined to treat counsel's statements as evidence (as opposed to an unfulfilled offer of evidence), for the reasons expressed by the trial judge in rejecting the evidence, the undersigned finds it unpersuasive impeachment of Hernandez.  (*See* Exhibit L, R.T. 4/26/00 at 100 (finding no automatic relationship between selling drugs and being untruthful, and no indication that Hernandez received preferential treatment in a prosecution for such selling.)

### (11).  Victim's Neighbors – Johnson, Ridley and Hill

At Petitioner's first PCR hearing, **Douglas Johnson** testified (Exhibit JJ, R.T. 11/10/03 at 10-28) that he saw no one around the Franz home at the time of the gunshots. The implication was that there was no white car parked out front, no Hernandez and Isaacs waiting outside, and no Petitioner inside the home, and thus Robert Franz must have been the murderer.

However, Johnson's testimony was not credible.  It was internally inconsistent. For example, he originally testified that he had laid back down after hearing the shots and then going back into the house.  When examined by the Court, he said he did not lay down, but stood by the side of his bed listening to his air conditioner.   Johnson claimed to have discerned that the noise he heard was not his air conditioner, because he saw the fan was still turning.  And yet he claimed to have told his wife to turn the air conditioner

back on.

Johnson testified that he heard what he concluded were gun shots, and saw a woman's body lying in the doorway of his neighbor's home, and yet did not call the police.

Johnson's testimony conflicted with all the testimony of Officer Ferris about the resting position of the victim's body, which was inside the home, in the hallway in front of the bathroom entrance, and not in the doorway. Similarly, State's Exhibit 8 showed the victim lying in the hallway, behind the front door, and not in the doorway to the home. (Exhibit CC-3, State's Exhibit 8.)

Nonetheless, a reasonable juror could believe Johnson's testimony and still conclude that Johnson saw no one at the home because, by the time he got into a position to observe, they had already left. Further, while one might imagine that if the assailants had arrived by car they must have raced away, squealing tires, but there was simply no evidence to conclude that this happened, and it is just as likely that they would attempt to escape by drawing as little attention to themselves as possible.

Petitioner also produced the police reports of interviews with neighbors Buck Ridley and Robert Hill. Neither of these witnesses has ever testified, and no affidavits or declarations have been presented, nor any suggestion made that they would provide additional information beyond their statements to police if called to testify.

The interview with **Buck Ridley** was reported as follows:

> On 7-11-98, at about 0730 hrs, I met with Mr. Buck Ridley, who lives on the east side of the victim's house (965 Sandy Beach) and identified myself and advised him we were conducting a homicide investigation. I asked for consent to do a more thorough search of his yard, and he consented. The search included both outside storage sheds. I searched for any evidence of the crime, or identity of the suspect(s) involved, which met with negative results.
> While there, I questioned Mr. Ridley, who said on 7-10-98, at about 11:40 PM, he heard the sound of something like someone slamming a car hood really loud twice. He got up and looked around, but saw and heard nothing. He said he exited his house on the west side porch, which faces the victim's house. He said the moon was full and everything was lit up very bright outside. It was very quiet, and he heard no one talking, no one running away, no dogs barking, no car engines racing, no tires squealing, etc. He said

1
2
3

> he heard nothing unusual. I asked him if he could hear anyone talking from the house behind him, referring to Mr. Franz, who was allegedly attempting to ask to use the phone to call 911 at the residence behind him; however he said he did not hear any voices coming from that area. He said afterwards he went back inside the house and back to bed.

4 (Exhibit A-4, ROA Item 298 Append. PCR Pet. Exhibit K, Suppl. Report.)  A reasonable

5 juror could infer from this evidence that by the time Ridley got out to look (at what he

6 thought was simply the slamming of a car hood), the assailants were already gone.

7      The interview with **Robert Hill** was reported as follows.

8
9
10

> I then spoke with Robert Hill who lives at 956 Sandy Beach, across the street and to the west. Hill said at approx 1200 midnight he heard a gunshot. He said approx 30 seconds later he heard two more shots. Hill said that he did not hear or see anything.

11 (*Id.*)  Hill is even less helpful than Ridley.  There is no indication that he investigated,

12 went outside or even got up to look out the window.  He simply confirms the three shots,

13 and denies seeing or hearing anything else.

14      Moreover, all of this information is only helpful if it is assumed that Franz was

15 the shooter and working alone, which the evidence does not support, particularly the lack

16 of a murder weapon.

17

18      **(12).  Gracie Cox**

19      Gracie Cox testified at Petitioner's first PCR hearing (Exhibit JJ, R.T. 11/10/03 at

20 29-67) that Petitioner was never at a party at her house (implying that Hernandez's story

21 of introducing Petitioner to Isaacs at the home was not believable).  However, as

22 observed by the PCR Court (Exhibit A-5, ROA at Item 319, Order 11/20/3 at 3), Cox

23 was not credible.  She admitted to having two to three parties a week at her house, with

24 friends and friends of friends, some 10 to 15 people at a time.  She also admitted to

25 drinking at the parties to the point of intoxication.  And despite her absolute clarity on

26 having never met Petitioner and to remembering everything despite her drinking, she

27 professed a complete inability to identify any particular date, and oddly referred to

28 Petitioner by his nickname, "Tennessee."

367

Cox also characterized Hernandez as a liar. However, her basis for that characterization was Hernandez's boasting about his romances and being a male model. She offered no testimony of Hernandez being dishonest on matters of significance. Moreover, Cox's credibility was limited by her romantic involvement with Isaacs.

### (13).  Adriana Chavira (Scroggins)

Similarly, Cox's sister, Adriana Chavira, aka Adriana Scroggins testified (Exhibit JJ, R.T. 11/10/03 at 68-83) that Petitioner had never been at her house.  However, she denied any recollection of essentially every other event or detail of the time.  She also admitted to having multiple parties per week, and drinking at the parties.  She also did not deny telling Detective Betts that Isaacs kept a gun at her house, and described a romantic tie between Isaacs and her sister.

### (14).  Lisa Sittel-Daily

Lisa Sittel-Dailey testified at the PCR proceeding (Exhibit JJ, R.T. 11/10/03 at 84-107)  that Robert Franz told a series of different stories about the events at the time of the murder that conflicted with each other on:  his movements, his vision of the murderer, and having seen a car.  To the extent that this testimony demonstrated the unreliability of Franz's identifications of Petitioner as the killer, this testimony was repetitive of the evidence at trial.  Of course, to the extent that Franz was wholly unreliable, his initial identification of the killer, which Petitioner contends could not have matched Petitioner, this testimony turns against Petitioner.

She also testified that Franz was jealous, had threatened her and the victim, and that the victim was afraid of him, and wanting to divorce him.  This would have tended to suggest that Franz had a reason to have killed his wife.  But, the fundamental problem with such evidence is the lack of a weapon found at the scene, or any other evidence beyond Petitioner's assertions of motive, to Franz killed his wife.  Accordingly, this

368

evidence is of little weight.

Finally, Dailey also testified that Franz had described the shooter as short, stocky and blonde, an arguably better description of Petitioner than the description he originally gave police of the shooter.  This would tend to show Petitioner's guilt.

### (15).  Petitioner's Convictions

The trial jury did not hear evidence of Petitioner's prior convictions, and that he had absconded from supervised early release to avoid sentencing on new felony charges to which he had pled guilty.  (*See* Exhibit AA, R.T. 12/18/00 at 84-92.)

A reasonable juror could take Petitioner's criminal history into account when evaluating his credibility, discounting his protestations of innocence.

There is no suggestion, however, that Petitioner's prior convictions were properly usable for any other purpose (e.g. to show motive, pattern, etc.), other than whatever inference could be made of violent tendencies from Petitioner having attacked his step father with a weight lifting bar.

### (16).  Letter from Isaacs to Petitioner

At trial the prosecution had available, but did not introduce, the jailhouse letter from Isaacs to Petitioner. (*See* Exhibit A-4/A-5, ROA at Item 302, PCR Response, Appendix.)  The contents of that letter are not particularly incriminating; they simply indicate the kinds of scheming one might expect of co-defendants, innocent or guilty. The true import of the letter is the familiarity between Isaacs and Petitioner shown in the letter.   Unless dismissed as a blatant, unilateral attempt by Isaacs to incriminate Petitioner (something not suggested by the innocuous contents), the letter tends to show that a cooperative relationship existed between Petitioner and Isaacs (whether developed before or after the murder).  This would be inconsistent with what one would expect between a murderer and an innocent man standing trial for that murder.

### (17).  Blair Abbott at Isaacs Hearing

As discussed hereinabove (*see supra* Section III(D)(6)(a)(4)), at the sentencing for Isaacs, Blair Abbott testified that when he had interviewed Hernandez, Hernandez had denied any drugs for murder deal.  Petitioner points out that this contradicted Hernandez's trial testimony that tended to show that Petitioner had agreed to commit the murder in exchange for being supplied with drugs.

The distinction between Hernandez's statements to Abbott and his testimony at trial is not as sharp as Petitioner would paint.  His story to Abbott was that Petitioner came to Isaacs wanting drugs, Isaacs was nervous and wanted the snitch dead, and Petitioner consented to kill the snitch. Hernandez told Abbott that it wasn't a deal, but just showing who was the "bad ass." Nonetheless, a reasonable juror could find implicit in that scenario an exchange of access to drugs for murder. That is essentially what Hernandez testified to.

Moreover, a reasonable juror could have discounted Hernandez's statements to Abbott as hedging in light of Abbott's status as an agent of the Isaacs defense, and the knowledge that casting Isaacs as not just an instigator of the murder, but its purchaser, would be bad for Isaacs.  Coupled with Hernandez's knowledge of the lengths to which Isaacs would go to deal with those he deemed a "snitch," Hernandez's desire to do anything he could to assist Isaacs, short of a wholesale changing of his story, is understandable.

Finally, but for this one exception, Hernandez's statements to Abbott tracked his consistent story about the events of the evening.

### (18).  Conclusions regarding New Evidence

Based on the foregoing, the undersigned concludes that Petitioner has failed to present any new reliable evidence of his actual innocence.  Petitioner's protestations of innocence are not reliable within the meaning of *Schlup,* and to a large extent provide corroboration of Hernandez's version of events.   Isaacs' confessions are not reliable

within the meaning of *Schlup*.   All the other new evidence is either indicative of Petitioner's guilt, or if tending to show his innocence it is on peripheral issues not directly indicative of innocence,  or controverted by other substantial evidence, and is not reliable within the meaning of *Schlup*.

### b.   Evidence of Guilt at Trial

There was substantial evidence presented at trial to establish Petitioner's guilt.

#### (1).  Eyewitnesses

Bernie Hernandez testified at length about the negotiation of, preparations for, completion of, and cover up of the killing, identifying Petitioner as the shooter. Robert Franz described the shooting, identified Petitioner as the shooter, identified the victim as an informant against Isaacs, and related Isaacs' threats against the victim.   Larry Witzig confirmed the attempts to hide the shotgun and the admissions by "Tennessee" of killing "a snitch" with her children nearby, and that he had identified "Tennessee" in a photo lineup.   Witzig's mother, Adrienne Stambaugh testified that Isaacs, Hernandez and Petitioner had come to her house that night and asked Larry to hide a shotgun under the house, but left with the shotgun.   Although he denied any knowledge in the courtroom, Travis Scroggins did not deny telling police in November, 1998 that Hernandez, Isaacs and a third man came to a party at his house, and left for a few hours together in a small white car.

#### (2).  Investigators

First responders, Officers Ferris and Hemingway, described a scene consistent with the testimony of Hernandez and Franz, including the still sleeping children.  Officer Kramer described recovering the shotgun in the water, in the location described by Hernandez.  Technician Walters calculated the height of the shooter at between 5'10" and 6'3", dependent upon the distance from the wall.  The medical examiner, Dr. Nelson, described a fatal shot fired from a few to 24 inches from the victim, entering the

victim at a height 57" from the ground, assuming the victim was standing straight. Detective Underwood described the trail followed from Witzig to Petitioner.  Detective Betts described Witzig's identification of Petitioner and Isaacs from photo lineups, and that Witzig referred to Petitioner as "Tennessee."  Betts described Stambaugh's naming of Hernandez as one of the men at her home with the shotgun, and Hernandez's involvement with the police and description of the murder, Petitioner's confession and the disposition of the gun.  Betts also described Franz's explanation for his adjustment of the height of the shooter, and his difficulty describing the hair color of the shooter. Morris identified the shotgun found in the water at the dam as a possible match with the one firing the shell casings found at the scene.

### (3).  Others

Officer Karinen detailed the victim's role as informant, and the disclosure in the booking report that Isaacs had been arrested based on information from an informant. He described Isaacs as very tall and thin, which would make him very different from Franz's descriptions of the shooter as stocky.

Agent Kerr, who arrested Petitioner in Florida obtained Petitioner's admissions that he was with Hernandez and "Bugsy" the night of the murder, and that they had taken his car.  However, accepting Petitioner's PCR testimony as truth, Petitioner lied about Isaacs and Hernandez taking his car to the store, and omitted any reference to his drug usage or purchases, having gone to Bullhead City, visiting Witzig, participating in the disposal of the weapon, seeing the shotgun, and ending up at the Portofino Apartments and calling his girlfriend.  Moreover, Petitioner told Kerr his escapade began at 10:00, not midnight.

### c.   Evidence of Innocence at Trial

On the other hand, there was evidence presented at trial which detracted from the prosecution's case.

372

**(1).  Alibi Witnesses:**

Under the prosecution's theory of the case, at about 11:30 p.m., on Friday, July 10, 1998, Petitioner was in Bullhead City, Arizona shooting the victim, and travelling with Bernie Hernandez and Michael Isaacs.  However, Petitioner presented evidence that he was at his apartment at that time.

Petitioner's supervisor, **Jerry Daundivier**, testified (Exhibit P, R.T. 5/2/00 at 64 - 84) that he was with Petitioner at his apartment complex in Laughlin, Nevada on July 10th at a barbecue where Petitioner got into a slap fight with Jesus the landscaper.  Daundivier arrived at about 9:00 p.m. The barbecue lasted until about 10:00.   Then, Daundivier, co-workers Kelly Erickson and Jesus Viera, and Petitioner left the apartment together.   Daundivier stayed with Petitioner until midnight, until Erickson's wife (who thought they spent too much time together) was due home.  He saw Petitioner the next morning, Saturday, at 9:00 a.m., still intoxicated and too sick to work his overtime shift. He was certain the party was July 10th because it was a payday, the night of the fight, and they had to work overtime the next day.

But a reasonable juror could discount Daundivier's story, at a minimum by concluding he was mistaken about his days or times.  On cross-examination, Daundivier admitted that his first statement about the case was to Petitioner's uncle, Tom Vandenberg, who filled out a written statement and asked Daundivier to sign it.  (*See* Petition, Exhibits, Statement of J. Daundivier 1/10/99.)  Moreover, Britton testified that when Petitioner left between 10:00 and 11:00 she saw him drive away, that Petitioner did not return home from his night out until 10:00 or 11:00 the next morning, and that she and Petitioner had a party at their house on Saturday night.

Moreover Daundivier's testimony contradicted that of Jesus Viera about the nature of the "fight" between him and Petitioner.

Daundivier's supervisor, **Arnold Burdett**, testified (Exhibit P, R.T. 5/2/00 at 86 - 100) and corroborated Daundivier's testimony with regard to the dates of the scheduled overtime on July 11th, the report of the fight between Petitioner and the landscaper, and

1   Petitioner being too sick to work overtime. He testified that he received the report about

2   Petitioner not working the overtime and the slap fight on the same day.  But he admitted

3   knowing nothing about Petitioner's whereabouts the evening of July 10th.

4          But a reasonable juror could conclude that Burdett was not credible.  He testified

5   that he had a father-figure relationship with Petitioner and discussed Petitioner's

6   relationship problems with him, that he had initiated contacts with the police and

7   prosecutor to have them investigate the stories of Daundivier and Erickson, and that his

8   written statement had been filled out by Petitioner's uncle, Tom Vandenberg.  (*See*

9   Petition, Exhibits, Statement of A. Burnett 1/10/99.)

10   **Kelly Erickson** testified (Exhibit P, R.T. 5/2/00 at 102 -123) to being at the same

11   party, the slap fight between Petitioner and Jesus Viera, that he, Petitioner and

12   Daundivier ended up outside on the grass, to being with Petitioner from about 7:00 p.m.

13   until about 12:30 a.m., and Daundivier being with them until 12:00 midnight when he

14   left to avoid Erickson's wife, who was due to be home around midnight.

15          But a reasonable juror could conclude that Erickson was not credible.  He testified

16   that he and Petitioner were friends, co-workers, and neighbors.  He drank together with

17   Petitioner a few times, and did not remember the date of the slap-fight party, but asserted

18   it was a Friday night because it was a payday.  He didn't know if it was the Friday before

19   the Saturday when Petitioner was supposed to work overtime, and didn't know if it was

20   before or after the 4th of July.  He admitted telling the prosecutor that it was no more than

21   a month before Petitioner quit working, but he was not positive.

22          He testified that he had been with Petitioner since before 7:00 that night until after

23   midnight.   But that conflicted with Rusty Britton's testimony not only about when

24   Petitioner left, but about Petitioner leaving at about 8:30 to go buy more beer.

25          Moreover, he could not provide any relevant dates or timeframes beyond his

26   insistence that the party was on a Friday.  He was uncertain about his memories of who

27   was at the party, couldn't remember what month he had been interviewed by Petitioner's

28   investigator, and admitted that Petitioner's uncle, Tom Vandenberg had given him a

prepared written statement to sign.   (*See* Petition, Exhibits, Statement of K. Erickson 1/10/99.)

Further, he admitted that Daundivier would sometimes leave him before midnight, but insisted remembering that on that occasion Daundivier looked at his watch and said "Well, I got to go," and when Erickson asked why  Daundivier responded, "It's 12:00 o'clock."   (*Id.* at 122.)   A reasonable juror, hearing of Erickson's wife's consistent schedule and that the friction with Erickson's wife was an on-going concern, could conclude that the story of this exchange was contrived.

Moreover, his testimony contradicted that of Jesus Viera about the fight between Viera and Petitioner.

**Jesus Viera** testified (Exhibit Q, R.T. 5/3/00 at 4 -16) to being at the same party, which he remembered being on a Friday. He testified that he and Petitioner started drinking together after work, then Viera went home to shower before going to Petitioner's apartment.   His version of the events between him and Petitioner was far different from the escalating "slap fight" others had testified about, asserting that they were playing around and Petitioner threw a boiled potato at his face.   He denied that they got into a slap fight, pushed each other, or that he was angry.   He testified that he was with Petitioner from 7:00 until 10:30 p.m. that evening, and that he and Petitioner both had about 16 or 17 beers, and that Petitioner did not seem drunk. He did not remember the date of the party.   He knew Petitioner for about two months and did not see him again after that night, but Viera worked outside.

A reasonable juror could fully believe Viera and still conclude that Petitioner was guilty.   Viera offered nothing to show Petitioner's location at the time of the murder. While he corroborated some of the testimony from Daundivier and Erickson, he contradicted other parts, including the nature of the fight, and who was drinking.   At best, however, he could only place the party on a Friday night.   His testimony that he never saw Petitioner again provided some implication that the party was closer to when Petitioner quit work and left for Florida – although Viera worked outside, they did both

1   work and live at the same apartment complex.

2       The records keeper for the apartment complex, **Kerri Martin**, testified (Exhibit

3   Q, R.T. 5/3/00 at 17 -27) that Petitioner began working on June 26, 1998, his first

4   payday was July 10, 1998, he was scheduled to work July 11, 1998 but called in sick.

5   The sick leave record was faxed on Monday, July 13, 1998. He also called in sick two

6   weeks later, on Monday, July 27.  The only other time he took off was a leave of absence

7   beginning September 21, 1998.  His last day worked was September 17, 1998.

8       This corroborated the date of Petitioner calling in sick from the Saturday

9   overtime, and the paydays.  It did not, of course, provide any indication of the events of

10   July 10th.

11      In sum, Petitioner's alibi for the murder would hinge on the jury believing: (1)

12   that the party occurred on Friday, July 10th; and (2) that Daundivier and Erickson stayed

13   with Petitioner after that party until the murder had already occurred (at around 11:30).

14      With regard to the former, Daundivier and Petitioner were the only witnesses

15   providing direct testimony placing the party on July 10th.  For the reasons discussed

16   hereinabove, the credibility of both could reasonably be rejected.  Burdett testified that

17   he learned of the party with the fight on Saturday, July 11th when he also learned of

18   Petitioner missing his overtime shift. But a reasonable juror could conclude that Burdett

19   was confused about the timing of learning that information, and thus the date of the

20   party, given Martin's testimony that the records of the missed shift were not forwarded

21   until Monday, July 13.   The record itself was undated.  (Exhibit CC, Trial Exhibits at

22   Exhibit S-WD (Doc. 18-6 at 7).)

23       Erickson and Viera could only place the party on a Friday that was a payday, but

24   their credibility on dates was suspect.  Moreover, a reasonable juror could conclude that

25   the evidence tying the party to a payday was overstated, and that a party on the next day

26   would have been just as likely to be a celebration of the payday, particularly given

27   Petitioner's obligation to work the following Saturday.  Moreover, Britton specifically

28   testified that the party was on Saturday night.  And Daundivier, Arnold and Erickson

376

could have been influenced by Petitioner's uncle.

Thus, a reasonable juror could conclude that the party was actually on Saturday night.

With regard to the time Petitioner departed, the stories of Petitioner, Daundivier and Erickson all say that they were together on July 10, 1998 until after the murder. Their testimony on that issue hinged upon the issue of the friction between Daundivier and Erickson's wife, and the time that she returned from work that night, which they uniformly insisted was after midnight.  However, for the reasons discussed hereinabove, the credibility of Daundivier and Erickson could be questioned given their relationship with Petitioner, and the influence of Petitioner's uncle.

Moreover, their testimony conflicts with Petitioner's story to Agent Kerr that he was with Bobby Day and at Hernandez's apartment from 10:00 p.m. until daybreak the next morning, Britton's testimony that she and Petitioner had been drinking together only until 10:00 or 11:00 when Petitioner left in his car, and that the party occurred the next night, which was when Petitioner became ill, and Hernandez's testimony that he and Petitioner went to a party together around 9:00 p.m.

### (2).  Credibility of Hernandez

Hernandez made inconsistent statements about whether he and Petitioner worked together the day of the murder.  He testified he was uncertain, had told defense counsel Petitioner was working, and told Detective Betts Petitioner wasn't working.

### (3).  Identification of Petitioner

Franz provided a series of conflicting descriptions of the height of the shooter, and identified an innocent man at the motor vehicle office as the shooter.   Detective Underwood related that Franz had described the shooter as a large man, in contrast to Petitioner's medium height and build.   Detective Betts related that Franz had first described the shooter as 6' to 6'5" and 200 pounds, and later described the killer as

having blond hair, and then later a darker shade, that he was a short man, about 40 years old, and then that he was just under six feet tall.  Betts related that Franz told the 911 operator "he's got red and white" and that red and white sometimes referred to members of the California Hell's Angels.  (Although, the manner in which Franz made the reference could have simply been a hurried description of some article of clothing.)  Betts also related that Franz identified Greenwood as the shooter, but Greenwood didn't match Franz's descriptions, and had a verified alibi, and Franz later admitted to being wrong about Greenwood.  Officer Poor testified that at the scene, Franz described the shooter as 6'5", stocky, with an unaccented voice.

Witzig couldn't identify Petitioner in the courtroom as the shooter, even though he had identified him in a photo lineup, and sought confirmation from the police that he had selected the "right" person. (Although Witzig's courtroom denial was clouded by his fear of reprisal at being a snitch, coupled with testimony that he was the fount of information ultimately leading to Hernandez and Petitioner.  Indeed, a juror submitted a question about Witzig's potential for being returned to prison.  (Exhibit N, R.T. 4/27/00 at 59.)) Witzig's mother, Stambaugh, had described the two men with Mugsy as "Hispanic."  (Petitioner is Caucasian.)

Technician Walters had originally estimated the height of the shooter at 6'3", taller than Petitioner, albeit based on a series of questionable assumptions about the location of the shooter and the victim, firing position, position of the victim, and subject to discrepancies in his testimony as to whether the shooter moved between shots, as shown by the trajectories of the shots and the resting positions of the shell casings.  (Nonetheless, the range of possible heights as reflected by Walters' testimony and the coroner's testimony, included Petitioner's height.)

In contrast to Franz's description of the shooter as having no accent, Petitioner's supervisor, Jerry Daundivier, testified that Petitioner had a "little bit of a southern accent."  (Exhibit P, R.T. 5/2/00 at 66.)   Kelly Erickson agreed Petitioner had a noticeable southern accent.

### (4).  Credibility of Franz

Detective Betts related that Franz said he had run to the neighbors because his phone was out of order, but Betts found a phone in the Franz's bedroom that was operational.  Officer Poor testified that Franz told him there were phones in the house, including near the bedroom, but he forgot because he was so upset.  A reasonable juror could dismiss this discrepancy as Franz attempting to explain his having fled the home without acting to protect the children.

Technician Walters testified that Franz's footprints indicated he was walking, not running, from the house, as Franz testified, and suggesting Franz was not in a panic, running for his life. However, there was testimony by Franz that he had recently had neck surgery, had not been wearing his neck brace, and had to move gingerly to avoid re-injury, suggesting that perhaps a walking was all he was willing to risk on his flight to safety.

Detective Underwood described the noise of the shotgun blast as loud perhaps suggesting the children would not have been still sleeping, but this would not explain the neighbors' identification of the time of shots, or the discovery of the still sleeping children by police.

### (5).  Credibility of the Investigation

Technician Walters and Detective Underwood admitted that the measurements of the scene were lost.  However, Petitioner fails to show what beneficial information these measurements would have yielded.  At most, Petitioner suggests this information would have been relevant to establishing the height of the shooter.  However, as discussed hereinafter, the undersigned concludes that the variables on the position of the victim and the shooter make it doubtful that such information would have yielded anything to demonstrate Petitioner's innocence.

Detective Betts testified that potentially exculpatory witnesses were not interviewed.  Betts admitted that he had not asked any of the people at the apartments

where Petitioner lived and worked if they knew where Petitioner was at the time of the shooting.  But, as discussed elsewhere herein, the undersigned concludes that these witnesses were either not helpful, or not persuasive.

### (6).  Petitioner's Story

Agent Kerr testified that upon being arrested Petitioner told about being sick in Laughlin, and having his car taken by Isaacs and Hernandez the night of the murder, and Hernandez telling him the next day about the murder and that the murder weapon, a pistol (curious given Petitioner's awareness at least through the newspaper accounts that a shotgun was used), was thrown off the dam.  He also said Hernandez told him that they did not use his car for the murder.  Petitioner also described to Kerr another unidentified Mexican male at the apartment. (This potentially corresponded with Stambaugh's original statement that her home was visited by Isaacs and two Hispanic males, but Petitioner's later testimony admitted he was there with Isaacs and Hernandez.) However, Petitioner related the time they left with his car as 2:30 or 3:00 a.m., long after the murder.

Moreover, as discussed hereinabove, much of this statement was controverted by Petitioner himself in his testimony at the PCR hearing.  (*See supra* Section III(R)(4)(a)(1) (New Evidence from Petitioenr.)

### d.   Topical Analysis

Petitioner raises a series of topics in his arguments on his claim of actual innocence.

### (1).  Height of the Shooter

Petitioner has raised a litany of arguments about the height of the shooter. Petitioner has claimed to be five feet, ten and a half inches, or less.  But the credible evidence (Petitioner's mugshots, drivers license, and at least some of his medical

records) show that Petitioner was six feet or more in height.  (*See* (Exhibit CC, Trial Exhibits, State's Exhibit 99-WD (medical records); (Exhibit CC, Trial Exhibits, State's Exhibit 100-WD, at Doc. 18-3, physical page 16, 17, 18, 19, 21, 49 (mugshots).)

There is little doubt that Franz offered a variety of stories about the shooter's height, some of which would match Petitioner's height and some that wouldn't.  But he did ultimately identify Petitioner as the shooter.

The prosecution's forensic evidence placed the height of the shooter at a range which could have included Petitioner's height.  Technician Walters calculated the height of the shooter at between 5'10" and 6'3", dependent upon the distance from the wall. Petitioner's expert, Sweedo, calculated a height range from 6'2" to over 6'7".  However, that evidence was based on assumptions about the position of the victim (e.g. standing straight, crouching, etc.), the distance between the victim and the wall and the victim and the shooter, whether there was deflection off the broken jawbone, the absence of any carpet or padding, the height of the shooter's shoes, and the manner in which the gun was held.  In short, none of the forensic evidence was particularly convincing one way or the other.  Most troubling is the lack of evidence as to the posture of the victim and the manner in which the gun was held.

In sum, Petitioner's height, whether 5'10" or 6'2", provides little to show Petitioner's innocence.

### (2).  Franz Credibility

**Marital Relationship** - Throughout the course of the case, from trial on, Petitioner has pointed to Robert Franz as a potential culprit, asserting that he and the victim had a troubled and dissolving marriage, complicated by his drug addiction and her being a confidential informant, and that an impending divorce and a life insurance policy created a motive for Franz to kill his wife, or at least want her dead.  In the course of trial, without benefit of Petitioner's testimony, this argument had some merit.  But with the benefit of Petitioner's testimony, to the extent that it may be clothed with the

credibility of being incriminating, painting Franz as the shooter is simply not a persuasive approach. While there is no way to ascertain whether Franz had any involvement in the murder, there is no credible evidence that he was the murderer.[60] Even Petitioner now asserts that on the evening of the murder, Isaacs confessed to him about killing the victim. Moreover, Franz had no opportunity to dispose of the shotgun, and the evidence is functionally undisputed that Petitioner, Isaacs and Hernandez attempted to hide a shotgun with Witzig and then disposed of it off the dam on the night of the murder.

Indeed, one could conclude that Franz was complicit in the murder, and still believe that Petitioner was the shooter.

**Identifications** – Petitioner points to persuasive evidence that Franz was not a reliable eyewitness. Given Franz's history as a drug abuser, and his apparent panic at the time of the crime, it is not surprising that he would not make a good witness. Had Franz ultimately identified Petitioner in a one-on-one identification, it would likely bear no weight. But, Franz identified Petitioner from a photo lineup. As discussed hereinabove (*see supra* Section III(I) (Ground 4-Identifications)), that photo lineup was not suggestive. There is no evidence to show why Franz would have a motive to falsely identify Petitioner as opposed to some other third party, and it is unlikely he would have done so randomly. Moreover, to the extent that Franz's description of the events around the shooting (the statements of the shooter, etc.) were corroborative of Hernandez's statements to police, they tend to show Petitioner's guilt, despite Franz's general unreliability.

### (3). Scroggins Party

Hernandez testified that he introduced Petitioner to Isaacs at the Travis Scroggins

---

[60] The PCR court observed: "I find no credible evidence pointing to Mr. Franz as the killer or a conspirator with the actual killer. Without that theory, there is no known theory by which Mr. Franz would identify the wrong person other than mistake." (Exhibit A-5, ROA Item 319, Order 11/20/3 at 5.)

party.  In contrast, Petitioner testified that the introduction occurred at the Flamingo Casino.  Travis Scroggins, Griselda (Gracie) Cox, and Adriana (Scroggins) Chavira all offered testimony suggesting that Petitioner was not at the party.  For the reasons discussed hereinabove, however, Petitioner is generally not credible, Griselda Cox is generally not credible, and Adriana Chavira is generally not credible.

On the other hand, Travis Scroggins testified that Isaacs was at the party.  Of course to the extent that one assumed this occurred early in the evening or while Petitioner was left at Bobby Day's apartment, it would not contradict with Petitioner's version of events. However, Scroggins also admitted that he had told investigators in November 1998 that Isaacs had left his house the night of the murder with someone in a small white car and didn't return for several hours, although he didn't know anyone who drove such a car.

Moreover, beyond the extent to which it tends to impeach Hernandez, the location at which Petitioner met Isaacs is not indicative of Petitioner's guilt or innocence.

### (4).  Witzig/Stambaugh Inability to Identify Petitioner

Petitioner complains that Larry Witzig and his mother, Adriane Stambaugh, were unable to identify him at trial.  However, Petitioner has admitted that he was present at their home with Isaacs and Hernandez.  Moreover, they identified the third person as "Tennessee."  Further, given the lapse of time (compared to when Witzig first told his story to police), his having seen Petitioner only the one time for a relatively short time period, and petitioner's weight loss, the inability to identify Petitioner at trial was not surprising.

### (5).  Trial Court's Evaluation

Petitioner points to the fact that the trial court observed that the case was a close one and that it found Hernandez not entirely credible. (Supp. Petition, Doc. 78 at 5-6.3.)

Indeed in deciding the motion for new trial, the trial court observed:

383

On the weight of the evidence argument, you know, I wouldn't have bet my own money on the likelihood of a conviction in this case, because it did seem to hinge directly on the jury absolutely believing Hernandez. Because I thought there was plenty of other evidence, you know, that would suggest that somebody about the height of Michael Isaacs could have been the shooter.

But I did not find a lack of evidence from which a jury could not reasonably convict. And I cannot say that they were wrong to believe Hernandez's testimony. And therefore I think that the weight of the evidence does support the conviction. And it just depends on which 12 people you get as to whether they subjectively were going to rely on that or not.

(Exhibit T, R.T. 7/14/00 at 7.)[61]   But those are not findings of fact, but at most conclusions of law reached in resolving the motion.

Moreover, this Court's analysis of actual innocence is not limited to the evidence admitted at trial, as was the trial court's in resolving the motion for new trial.  This Court's analysis now includes such things as Petitioner's criminal history, the subsequent incriminating testimony of Rusty Britton at sentencing, the subsequent testimony at the PCR hearing from Petitioner corroborating at least portions of Hernandez's testimony, the letter from Isaacs, the subsequent testimony at sentencing of Chester Flaxmayer and Dr. Blackwood about Petitioner's potential for lapses of memory, etc.

Additionally, Petitioner observes that at sentencing, when considering pecuniary gain as an aggravating factor, the trial court commented:

Next the State alleges that the defendant committed the offense in the expectation of receipt of something of pecuniary gain under (F)(5).  The only evidence of this motive is the testimony of Mr. Hernandez. However, Mr. Hernandez also testified that it was the defendant, and not Mr. Isaacs, who bought the drugs later that same evening. This is inconsistent with the premise that he committed murder so that Isaacs would then be his supplier of drugs, which would be the pecuniary gain theory.

I find some other aspects of the Hernandez testimony to be less than credible also, and therefore I find the State has not proved the (F)(5) aggravating circumstance.

---

[61] Petitioner also references a comment by the trial court at sentencing about a situation that "was not a slam dunk case of his guilt."  (Supp. Petition, Doc. 78 at 5-6.3 (referencing Exhibit Z, R.T. 12/14/00 at 23).) However, that comment was not a finding of fact or even a comment on the evidence in this trial.  Rather, the trial court was analyzing Petitioner's request to proceed without counsel and compared between such requests in the face of a guilty plea, and such requests where the defendant denied guilt and the case not a "slam dunk."

(Exhibit BB, R.T. 1/24/01 at 7.)  This comment is not particularly helpful.  Aside from the bare findings of fact about what testimony was given, the trial court's conclusion that Hernandez was not entirely credible leaves this Court to construe which parts were credible, and which weren't. To the extent that the trial court may have made conclusory findings about the motivation for the murder, it did so without the evidence developed at the PCR hearings.[62]  This Court must, however, consider *all* of the evidence.

### e.   Conclusions

As discussed hereinabove, the undersigned has found that Petitioner has failed to provide reliable new evidence of his actual innocence.  For this reason alone, Petitioner's assertions of actual innocence must be rejected.

Even if Petitioner's new evidence could be deemed reliable, after taking into account all of the evidence, including the evidence at trial tending to show Petitioner's innocence, the undersigned concludes that a reasonable juror, properly instructed and following those instructions, could find Petitioner not guilty beyond a reasonable doubt. At best, to overcome the evidence that Petitioner was the shooter, and confessed to shooting the victim while participating in disposing of the weapon. Petitioner provides insignificant discrepancies in testimony, questionable and controverted alibi testimony, purported confessions by a prisoner motivated to lie, and Petitioner's own testimony.

Petitioner argues that his conviction rested on the jury absolutely believing Hernandez. To the extent that is true, a reasonable juror could reject the credibility of the contrary testimony, dismiss the discrepancies in Hernandez's previous statements, and conclude that Hernandez was telling the truth when he testified that Petitioner killed the victim.

Accordingly, Petitioner has not provided evidence of his actual innocence

---

[62] Moreover, the undersigned finds nothing inconsistent between Petitioner paying for drugs and developing a purchaser/supplier relationship.  The evidence tends to show that Petitioner was in essence acquiring the opportunity to be a buyer of illegal drugs from a nervous supplier by killing the supplier's snitch.

sufficient to pass through the *Schlup* gateway.

## S.  SUBSTANTIVE ACTUAL INNOCENCE

### 1.  Arguments

For his Ground 11, Petitioner argues that he is being held in violation of his Constitutional rights because he is actually innocent.  (Petition, Doc. 1 at 9:7-A, *et seq.*)

Respondents argue that this argument is either: (a) a non-cognizable state law claim that the state court violated Ariz.R.Crim.Proc. 32.1(h) in rejecting this claim;  or (b) is not cognizable because Arizona permits review of such claims; or (c)  is without merit because the Supreme Court has not yet recognized a free-standing actual innocence claim, and Petitioner has failed to meet the extraordinarily high threshold required to establish actual innocence.  (Answer, Doc. 14 at 249-256.)

Petitioner replies, asserting his innocence and citing *In re Davis*, 557 U.S. 952 (2009) as "almost an exact replica."

For his Supplemental Ground 1, Petitioner again argues that he is being held in violation of his Constitutional rights because he is actually innocent, this time adding arguments based upon the assertions of inmates Ellis and Gaines regarding Isaacs' confessions.  (Supp. Petition, Doc. 78 at  6-6.1 *et seq.*)

Respondents repeat their arguments from Ground 11.  (Supp. Response, Doc. 80 at 17, *et seq.*.)  Respondents add that the PCR judge in the most recent proceeding properly concluded that Isaacs had no credibility, and argue that determination is entitled to a presumption of correctness and deference under 28 U.S.C. § 2254(d)(2) (unreasonable determination) and (e)(1) (clear and convincing evidence), even though no evidentiary hearing was conducted.  (*Id.* at 20-23.)

Petitioner replies, asserting that he is not entitled to any form of early release, no presumptions of correctness should apply given the lack of a hearing, and Respondents get the facts wrong.  (Supp. Reply, Doc. 84 at 7-10.)

**2.  State Court Ruling**

The last reasoned decision on the claim of actual innocence based on the evidence in Ground 11 was the PCR court's June 12, 2008 denial of Petitioner's second PCR petition.  The court ruled:

> Addressing the merits of the petition, Rule 32.1(h) places the burden of proof by clear and convincing evidence on a defendant raising an "actual innocence" claim. The credibility of the defense witnesses is not really critical to the determination, because they are essentially messengers from the prison yard(s). In other words, whether I find any of these individual witnesses to be trustworthy or not is not as important as whether I find that a reasonable juror or other fact-finder would attribute weight and credibility to Isaacs' statements in the prison yard.
>
> I do find the testimony of Roinuse and Allen to be credible to the extent that they testified that Isaacs has made admissions in prison yards that he killed the victim in this case. I also find Roinuse to be credible in his testimony that he finds Isaacs to be a liar, and that he does not believe anything Isaacs says. I also find both to be credible in their admissions that Isaacs reaps benefits within the prison inmate culture, especially those in white supremacy gangs, by claiming to have killed an informant. Not only does Isaacs gain some measure of respect and authority over others by these statements, but he reduces the risk of being victimized himself by other inmates. As I mentioned at the close of the last hearing, Isaacs appears to be a person who needs all the protection he can muster.
>
> I do not find the defendant's testimony on the events of the night of the murder to be entitled to any weight. Aside from his numerous felony convictions, the self-reported substance abuse that night would have rendered him unable to clearly perceive, remember or recite the activities of that time period with the detail he provides.
>
> For all these reasons, I find that the defendant has not met the clear and convincing evidence standard of Rule 32.1(h).

(Exhibit MMM, M.E. 6/12/08 at 1-2.)

The last reasoned decision on actual innocence based on the additional evidence in Supplemental Ground 1 was the PCR court's January 18, 2013 denial of Petitioner's third (and most recent) PCR petition.  The court ruled:

> The defendant presents sworn statements of inmates Jason Ellis and Shawn Gaines. Inmate Ellis would testify that co-defendant Michael Isaacs told him that "Duncan is doing time for something I did, not him." Further, Isaacs offered to testify to this fact in exchange for payment of $25,000.00. Inmate Gaines would testify that Isaacs told him that Duncan was" serving life for the same crime even though he was innocent."
>
> A defendant is entitled to relief if he can demonstrate by

clear and convincing evidence that the proffered evidence is such that no reasonable fact finder would have found him guilty beyond a reasonable doubt. See, Rule 32.1(h), A.R.Crim.P.

This is not the first time the defendant has proffered "jail house testimony" on this issue. Much like Judge Moon indicated in his June 12, 2008 Order, the Court finds this proffered evidence unpersuasive. Assuming arguendo that Ellis and Gaines are believable, anything that comes out of Isaacs mouth at this point is not. As determined previously by Judge Moon, Isaacs obtains benefits within the prison inmate culture by claiming that he killed an informant. It reduces his risk of being victimized by other inmates. Further, the fact that Isaacs is demanding payment of $25,000.00 in exchange for this testimony makes him even less credible, were that even possible.

The Court finds that the reasons given why the claim was not raised in a prior petition in a timely manner are not meritorious. The Court finds that the defendant fails to present any material issue of fact or law that would entitle him to relief and therefore his actual innocence claim is summarily dismissed. *See,* Rule 32.2(b).

(Supplement to Record, Docs. 45, 46 at Appendix 4, Order 1/18/13 at 2.)

### 3.  Application of Law

#### a.   No Remedy for Violation of 32.(h)

To the extent that Petitioner intends to assert that the PCR court misapplied Arizona's rule on actual innocence claims, Ariz.R.Crim.Proc. 32.1(h), Petitioner's claim is a non-cognizable state law claim.  "We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).   A state prisoner is entitled to habeas relief under 28 U.S.C. § 2254 only if he is held in custody in violation of the Constitution, laws or treaties of the United States.  Federal habeas relief is not available for alleged errors in the interpretation or application of state law.  *Estelle v. McGuire*, 502 U.S. 62 (1991).

Accordingly, to the extent that Ground 11 or Supplemental Ground 1 rest upon a violation of Rule 32.1(h), they are not cognizable in this proceeding.

#### b.   No Free Standing Actual Innocence Claim

As noted by Respondents, the Supreme Court has never found a constitutional

prohibition on conviction of one who is actually innocent.

> Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding...This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution-not to correct errors of fact.

*Herrera v. Collins*, 506 U.S. 390, 400-401 (1993).  At best, a majority of the Court in *Herrera* "assumed, without deciding, that execution of an innocent person would violate the Constitution."  *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997).   As recently as 2013, the Supreme Court has observed: "We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence." *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013).

Here, Petitioner was not sentenced to death.  Accordingly, even if the *Herrera* assumption could be found to create a habeas ground for relief, it would not apply to Petitioner.

In the context of a non-capital defendant, the Ninth Circuit is almost as non-committal.   "We have not resolved whether a freestanding actual innocence claim is cognizable in a federal habeas corpus proceeding in the non-capital context, although we have assumed that such a claim is viable."  *Jones v. Taylor*, 763 F.3d 1242, 1246 (9th Cir. 2014).

Respondents contend that the lack of clear authority, particularly from the Supreme Court, resolves the matter, under 28 U.S.C. § 2254(d)(1).   However, it is unresolved whether this provision would apply to a claim of actual innocence.  At least Justices Stevens, Ginsburg and Breyer have questioned this point.  *In re Davis*, 557 U.S. 952 (2009) (Stevens, J. concurring).[63]

Moreover, for that section to apply, the state court must have reached the merits

---

[63]   Justice Stevens went on to question further whether § 2254(d)(1) could be constitutionally applied in a capital case.  "Even if the court finds that § 2254(d)(1) applies in full, it is arguably unconstitutional to the extent it bars relief for a death row inmate who has established his innocence."  *Davis*, 557 U.S. 952.

of the Petitioner's federal claim.   As discussed hereinabove, the undersigned has concluded that no federal claim of actual innocence was presented to the state courts. (*See supra* Section III(A)(4)(a)(1) (Isaacs Testimony – Deference to State Courts).)

Ordinarily, that would leave this court to resolve whether such a claim exists. However, precedent suggests an alternative: "Also, even where an actual innocence claim has been filed, *Herrera, House, Carriger*, and *Jackson* all support the practice of first resolving whether a petitioner has made an adequate evidentiary showing of actual innocence before reaching the constitutional question of whether freestanding innocence claims are cognizable in habeas."   *Osborne v. Dist. Attorney's Office for Third Judicial Dist.*, 521 F.3d 1118, 1131 (9th Cir. 2008) *rev'd and remanded on other grounds,* 557 U.S. 52  (2009).

Accordingly, for purposes of this Report and Recommendation, the undersigned will presume for purposes of this Report & Recommendation that Petitioner's free-standing, substantive claim of actual innocence is a recognizable claim.

### c.   Standard for Free-Standing Actual Innocence

The *Carriger* court found no established standard for a claim of actual innocence, and adopted the following from Justice Blackmun's dissent in *Herrera*:   "a habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent."   132 F.3d at 476.   The court observed that this was a greater standard than the "actual innocence" showing required under the "*Schlup* gateway" for consideration of a procedurally defaulted claims.  *Id.* at 477-478.

In rejecting the claim of actual innocence, the *Carriger* court observed:

> Carriger has not met this burden. Although the postconviction evidence he presents casts a vast shadow of doubt over the reliability of his conviction, nearly all of it serves only to undercut the evidence presented at trial, not affirmatively to prove Carriger's innocence. Carriger has presented no evidence, for example, demonstrating he was elsewhere at the time of the murder, nor is there any new and reliable physical evidence, such as DNA, that

391

would preclude any possibility of Carriger's guilt. Although Dunbar's confession exonerating Carriger does constitute some evidence tending affirmatively to show Carriger's innocence, we cannot completely ignore the contradictions in Dunbar's stories and his history of lying. Accordingly, the confession by itself falls short of affirmatively proving that Carriger more likely than not is innocent. Carriger's freestanding claim of actual innocence must fail.

*Carriger v. Stewart*, 132 F.3d 463, 477 (9th Cir. 1997)

### d.   Actual Innocence Not Shown

Similarly here, Petitioner proffers no reliable evidence affirmatively showing his innocence.  The only evidence which might be deemed to affirmatively show his innocence (as opposed to only attacks on the prosecution's evidence) is: (1)  his own testimony, which is not credible for the reasons discussed hereinabove; (2) the out-of-court or presumed confessions of Isaacs, which are not credible for the reasons discussed hereinabove; and (3) the alibi evidence which was controverted by not only Petitioner's own statements, but that of his girlfriend, Rusty Britton and the various prosecution witnesses

Moreover, for purposes of this claim of substantive actual innocence, the factual findings, including credibility determinations of the state courts are entitled to a presumption of correctness.  The state court has already concluded that Petitioner and Isaacs lack credibility. (*See* Exhibit MMM, Order 6/12/08 at 2.)

There is no "new and reliable physical evidence, such as DNA, that would preclude any possibility of [Petitioner's] guilt." *Carriger*, 132 F.3d at 477. *See e.g. House*, 547 U.S. at 554-555 (DNA testing of semen); *Jackson v. Calderon*, 211 F.3d 1148 (9th Cir. 2000) (expert medical testimony that petitioner lacked requisite mental capacity due to intoxication with PCP). Nor is there any new testimony from multiple disinterested witnesses, supported by independent evidence, implicating a different suspect. *See House*, 547 U.S. at 548-553.

To be sure, Petitioner identifies a laundry list of evidence that he asserts demonstrates defects in the prosecution's evidence. But that is not sufficient. "Evidence

that merely undercuts trial testimony or casts doubt on the petitioner's guilt, but does not affirmatively prove innocence, is insufficient to merit relief on a freestanding claim of actual innocence." *Jones*, 763 F.3d at 1251.

As discussed hereinafter, the undersigned finds that Petitioner has failed to meet the lesser standard of the *Schlup* gateway, and thus must necessarily find that Petitioner would fail to meet the higher standard for a free standing claim of actual innocence.

Accordingly, original Ground 11 and Supplemental Ground 1 must be denied.

## T.  SUMMARY

Based on the foregoing, the undersigned has concluded:

(1) Petitioner's Supplemental Grounds 2A, 2B, 2C, 2D, 2E, 2G, 2H, 2I, 2J, 2K, 2L and 3 are barred by the habeas statute of limitations;

(2) Petitioner has procedurally defaulted his state remedies on the following claims:  original Grounds 2, 7, 8, 9E (as to Kristina Cox), 9F, 9G, 9H, 9I, 12, Supplemental Grounds 2 and 3;

(3) Petitioner's Ground 12 is repetitive of individual claims in Ground 9;

(4) Petitioner's claim in Ground 5 was barred on independent and adequate state grounds,

(5) Petitioner has not shown cause and prejudice or actual innocence to excuse his procedural defaults or procedural bar;

(6) (in the course of rejecting Petitioner's assertions of cause and prejudice) Petitioner's Supplemental Ground 2 is without merit;

(7) Petitioner's original Grounds 1, 2, 3, 4, 5, 6, 7, 8, 9A, 9B, 9C, 9D, 9E (except as to Kristina Cox), and 10, and his Supplemental Grounds 2 and 3 are without merit.

(8) (in the course of rejecting Petitioner's Supplemental Ground 3) Petitioner's claims in Grounds 5, 9E (as to Kristina Cox), 9F, 9G, 9H, 9I are without merit.

(9) Petitioner has not shown procedural actual innocence to avoid the effect of his limitations bar, procedural defaults or procedural bar;

(10) Petitioner's claims of free-standing substantive actual innocence in original Ground 11 and Supplemental Ground 1 are without merit.

# IV.  CERTIFICATE OF APPEALABILITY

**Ruling Required** - Rule 11(a), Rules Governing Section 2254 Cases, requires that in habeas cases the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Such certificates are required in cases concerning detention arising "out of process issued by a State court", or in a proceeding under 28 U.S.C. § 2255 attacking a federal criminal judgment or sentence. 28 U.S.C. § 2253(c)(1).

Here, the Petition is brought pursuant to 28 U.S.C. § 2254, and challenges detention pursuant to a State court judgment.  The recommendations if accepted will result in Petitioner's Petition being resolved adversely to Petitioner.  Accordingly, a decision on a certificate of appealability is required.

**Applicable Standards** - The standard for issuing a certificate of appealability ("COA") is whether the applicant has "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

"When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id.*

To grant a certificate of appealability on a procedural decision, the Court must also find that Petitioner states a valid claim.  The *valid claim* determination for procedural rulings does not require the Court to make a "definitive" determination of the merits of the claims, but rather only a "preliminary" one.  *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003).  It requires only "a general assessment of their merits," *id.* at 336, and

395

not a "certainty of ultimate relief," *id.* at 337.  The Ninth Circuit has taken a particularly broad view of this standard, at least in comparison to some other circuits.  *See* David Goodwin, *An Appealing Choice: An Analysis of and A Proposal for Certificates of Appealability in "Procedural" Habeas Appeals*, 68 N.Y.U. Ann. Surv. Am. L. 791, 821 (2013) (comparing circuits).  The Ninth Circuit has concluded: "we will simply take a 'quick look' at the face of the complaint to determine whether the petitioner has 'facially allege[d] the denial of a constitutional right.' " *Lambright v. Stewart*, 220 F.3d 1022, 1026 (9th Cir. 2000) (quoting *Jefferson v. Welborn*, 222 F.3d 286, 289 (7th Cir. 2000)).  Thus, in resolving the instant issue, the Court need not evaluate whether Petitioner's claims are ultimately substantiated by the record, but simply whether the Petition has made out a constitutional claim.  Moreover, circuit court precedent is not determinative in deciding whether a claim is substantial.  "Even if a question is well settled in our circuit, a constitutional claim is debatable if another circuit has issued a conflicting ruling." *Allen v. Ornoski*, 435 F.3d 946, 951 (9th Cir. 2006).  Neither is the court bound by the deference normally required for review of claims of state prisoners under the AEDPA.  *See Camargo v. Ryan*, CV-13-02488-PHX-NVW, 2015 WL 2142711, at *4 (D. Ariz. May 4, 2015).

**Standard Met** - Assuming the recommendations herein are followed in the district court's judgment, that decision will be in part on procedural grounds, and in part on the merits.

Procedural Grounds - To the extent that Petitioner's claims are rejected on procedural grounds, under the reasoning set forth herein, the undersigned finds that "jurists of reason" would not "find it debatable whether the district court was correct in its procedural ruling," except as to the following issues or grounds:

(1)  The effect on exhaustion of a PCR court ruling that a claim has been previously presented, when the record reflects it was not, but the claim is not thereafter fairly presented to the Arizona Court of Appeals and that court issues a summary denial. (*See supra* Section III(D)(5)(c) (Exhaustion of Supplemental Ground 2).)

396

(2) Whether, despite the holdings of *Dickens v. Ryan* , 740 F.3d 1302 (9th Cir. 2014), 28 U.S.C. § 2254(e)(2) continues to preclude the use of evidence newly developed in the evaluation of a claim ineffective assistance of PCR counsel as cause under *Martinez v. Ryan*, when thereafter considering the merits of the underlying claim of ineffectiveness of trial counsel. (*See supra* Section III(D)(6)(a)(3)(c)(4) (*Martinez* Claims - AEDPA Limitations).)

Further, under the "quick look" standard, Petitioner's related claims of ineffective assistance of counsel in Supplemental Grounds 2A, 2B, 2D, 2F, 2G and 2I (although ultimately determined by the undersigned to be without merit), are at least of "some merit" sufficient to make out constitutional claims.

<u>On the Merits</u> - To the extent that Petitioner's claims are rejected on the merits, under the reasoning set forth herein, the constitutional claims are plainly without merit.

Accordingly, to the extent that the Court adopts this Report & Recommendation as to the Petition, a certificate of appealability should be denied.

## V. ORDERS

**IT IS THEREFORE ORDERED** that Petitioner's Motion for Evidentiary Hearing, filed April 1, 2015 (Doc. 82) and any requests for evidentiary hearings in his briefs herein, including any requests for discovery therein, are **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner's Motion for the Appointment of Counsel, filed April 1, 2015 (Doc. 83) is **DENIED**.

## VI. RECOMMENDATIONS

**IT IS THEREFORE RECOMMENDED** that Grounds  2A, 2B, 2C, 2D, 2E, 2G, 2H, 2I, 2J, 2K, 2L and 3 of Petitioner's Supplemental Petition for Writ of Habeas Corpus, filed February 4, 2015 (Doc. 78) be **DISMISSED** as barred by the statute of limitations.

**IT IS FURTHER RECOMMENDED** that Grounds 2, 7, 8, 9E (as to Kristina

Cox), 9F, 9G, 9H, 9I, and 12 of Petitioner's Petition for Writ of Habeas Corpus, filed April 29, 2011 (Doc. 1) and  Supplemental Grounds 2 and 3 of Petitioner's Supplemental Petition for Writ of Habeas Corpus, filed February 4, 2015 (Doc. 78) be **DISMISSED** as procedurally defaulted.

**IT IS FURTHER RECOMMENDED** that to the extent the District Court rejects the foregoing, that Grounds 2, 7, 8, 9E (as to Kristina Cox), 9F, 9G, 9H, 9I, and 12 of Petitioner's Petition for Writ of Habeas Corpus, filed April 29, 2011 (Doc. 1) and Supplemental Grounds 2 and 3 of Petitioner's Supplemental Petition for Writ of Habeas Corpus, filed February 4, 2015 (Doc. 78) be **DENIED** as without merit.

**IT IS FURTHER RECOMMENDED** that Grounds 1, 2, 3, 4, 5, 6, 7, 8, 9A, 9B, 9C, 9D, 9E (except as to Kristina Cox), 10 and 11 of Petitioner's Petition for Writ of Habeas Corpus, filed April 29, 2011 (Doc. 1) and Supplemental Ground 1 of Petitioner's Supplemental Petition for Writ of Habeas Corpus, filed February 4, 2015 (Doc. 78) be **DENIED** as without merit.

**IT IS FURTHER RECOMMENDED** that, to the extent the reasoning of this Report & Recommendation are adopted by the District Court in its judgment, a Certificate of Appealability be **ISSUED** as to the following issues or grounds:

(1) The effect on exhaustion of a PCR court ruling that a claim has been previously presented, when the record reflects it was not, but the claim is not thereafter fairly presented to the Arizona Court of Appeals and that court issues a summary denial. (*See supra* Section III(D)(5)(c) (Exhaustion of Supplemental Ground 2).)

(2) Whether, despite the holdings of *Dickens v. Ryan* , 740 F.3d 1302 (9th Cir. 2014), 28 U.S.C. § 2254(e)(2) continues to preclude the use of evidence newly developed in the evaluation of a claim ineffective assistance of PCR counsel as cause under *Martinez v. Ryan*, when thereafter considering the merits of the underlying claim of ineffectiveness of trial counsel. (*See supra* Section III(D)(6)(a)(3)(c)(4) (*Martinez* Claims - AEDPA Limitations).)

## VII.  EFFECT OF RECOMMENDATION

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to *Rule 4(a)(1), Federal Rules of Appellate Procedure*, should not be filed until entry of the district court's judgment.

However, pursuant to *Rule 72(b), Federal Rules of Civil Procedure,* the parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the Court.  *See also* Rule 8(b), Rules Governing Section 2254 Proceedings. Thereafter, the parties have fourteen (14) days within which to file a response to the objections.  Failure to timely file objections to any findings or recommendations of the Magistrate Judge will be considered a waiver of a party's right to *de novo* consideration of the issues,  *see United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003)(*en banc*),  and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the recommendation of the Magistrate Judge, *Robbins v. Carey*, 481 F.3d 1143, 1146-47 (9th Cir. 2007).

Dated: August 6, 2015

11-8067r RR 12 05 11 on HC.docx

James F. Metcalf
United States Magistrate Judge